UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT A. SLOVAK,<br><br>　　　　　Plaintiff,<br>　v.<br><br>GOLF COURSE VILLAS<br>HOMEOWNERS ASSOCIATION, *et al*.,<br><br>　　　　　Defendants. | 3:13-cv-00569-RCJ-VPC<br><br>**REPORT AND RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE** |

　　　　This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. Before the court is a motion (#107) by defendant Wells Fargo Bank, N.A. ("Wells Fargo") to enforce the terms of a binding settlement agreement reached by the parties before this court on June 3, 2014 (#96). Plaintiff Robert Slovak ("Slovak") responded (#115), and Wells Fargo replied (#123).

## I.   BACKGROUND

　　　　The current dispute arises from the parties' differing interpretations of their settlement agreement. On June 3, 2014, the parties participated in lengthy discussions and reached an oral agreement to settle this litigation, which involves various claims in contract and tort against Wells Fargo related to a home equity line of credit on plaintiff's real property in Incline Village, Nevada. Slovak also brought claims against the Golf Course Villas Homeowners Association, but he and the Association agreed to a stipulated dismissal of the claims without prejudice; the Court ordered dismissal on June 19, 2014 pursuant to that stipulation (#85). Following the discussions, the court convened and placed the material terms of the settlement onto the record (#96). Present at the

hearing were Slovak, Robert Ferguson ("Ferguson") on behalf of Wells Fargo, plaintiff's counsel, Joseph Scalia ("Scalia"), and defense counsel, Catherine O'Mara ("O'Mara").

**1.      The June 3, 2014 Settlement Hearing**

The essence of the June 3 agreement was that Slovak would repay to Wells Fargo a portion of the balance due under the terms of the promissory note for the home equity loan, and that Wells Fargo would take the appropriate steps to remove the lien from his property, such that the title will be clear of any encumbrances related thereto.  Accordingly, and first, Slovak is to pay a sum of $280,000 to Wells Fargo, which "represents a payoff of the note secured by deed of trust on Mr. Slovak's property . . . ."  (#96 at 7:22-25, 8:13-15.)  Scalia, Slovak, O'Mara, and Ferguson each agreed to this term (*id*. at 8:3, 8:6, 8:9, 8:12), and there is no controversy about it.

Second, upon Slovak's payment, Wells Fargo will take necessary steps to lift the lien from Sloavk's property.  The dispute centers, in part, on the meaning of words spoken at the hearing related to this term.  Initially, the court stated that "the second term of the agreement is that the canceled note will be returned and deed of trust will be returned to Mr. Slovak through counsel or directly to Mr. Slovak, whichever the parties work out."  (*Id*. at 8:16-19.)  As the court verbally verified the parties' acceptance of this term, uncertainty arose regarding the procedures by which Wells Fargo reconveys the title to real property.  The court clarified to Ferguson that "the note needs to be returned to Mr. Slovak indicating that it's cancelled."  (*Id*. at 9:9-10.)  Ferguson responded: "I'll have to check on that.  I know that we would reconvey the lien once the note is paid, the deed of trust, following reconveyance with the county showing that it's paid."  (*Id*. at 9:11-14.)  Scalia questioned "why [Wells Fargo] can't just write canceled on the deed and the note . . . ."  (*Id*. at 9:16-17.)  Slovak then alleged that Wells Fargo, or its counsel, had already indicated that "they would return the note and deed under no uncertain terms . . . . they said, yes, of course, you will get the note

-2-

and the deed." (*Id*. at 9:22-10:2.) Ferguson again intimated his uncertainty with the exact steps, and said: "I know for sure we file a reconveyance releasing . . . the lien from the property." (*Id*. at 10:4-8.)

Therefore, the court summarized its impression of the agreement. ". . . I think that the understanding that we have here today is that the canceled note and deed of trust will be returned to Mr. Slovak and that there will be a reconveyance, . . . ." (*Id*. at 10:14-17.) O'Mara guaranteed that her client will "make every effort to return the deed of trust and the note to Mr. Slovak . . . ." (*Id*. at 11:1-3.) Scalia stated that he and Slovak "will do the settlement agreement, we will tender the check, we will wait for these documents to come in. Once they're all in, the reconveyance, the cancellation, then we'll file the stipulation to dismiss." (*Id*. at 11:9-12.) The court verified that Slovak understood and agreed, and he responded that he did, although he also stated that he "continue[d] to believe that Wells Fargo does not have [his] original note . . . ." (*Id*. at 11:19-22.)

The court reiterated the terms and verified the parties' assent thereto one final time. ". . . Mr. Slovak, will prepare a check for $280,000 to pay off this home equity line of credit; . . . Wells Fargo intends as we speak here today to return a canceled deed of trust and promissory note to [Slovak] and also file a deed of reconveyance . . ., and . . .the submission of the stipulation and order ending this case will not be filed until those issues are resolved to the satisfaction of the parties." (*Id*. at 12:5-13.) Slovak responded: "I understand and I accept." (*Id*. at 12:14.) Scalia, O'Mara, and Ferguson also verified their agreement. (*Id*. at 12:18, 12:21, 12:24.) The parties further agreed that the settlement would remain confidential and is not an admission of liability by Wells Fargo, and also that the court will retain jurisdiction to adjudicate any issues that arise in the consummation and finalization of the written agreement and stipulation for dismissal. (*Id*. at 12:25-15:3.) The court set a deadline of August 3, 2014 for the filing of the stipulated dismissal—and, by implication, the

completion and signing of the written settlement agreement.  (*Id*. at 16:20-25.)  Following the conference, O'Mara agreed to draft the written agreement at Scalia's request and deliver it to him for Slovak's review.  (#107-1 at 2:26-27.)

**2.     Completion of the Written Agreement**

Over the next several months, disputes arose about the settlement terms.  The principal focus of the discord centered on Slovak's desire for forensic examination of the original note.  (*See id*. at 3:8-4:20.)  Scalia and O'Mara initially worked together to consummate the agreement, but plaintiff terminated Scalia's representation on or around July 15, 2014.  (*Id*. at 3:7-10, 7.)

On July 24, Slovak emailed O'Mara.  In addition to expressing his concern about the length of time in which he could review the forthcoming settlement agreement, he indicated that he had engaged "the services of a forensic note examiner to authenticate the note and the deed of trust.  They will be making a number of tests.  They need lead time to coordinate their schedule to attend the presentation of the note and deed of trust."  (#107-1 at 10.)  Later that day, O'Mara responded with a proposal to stipulate to an extension of the deadline for completing and signing the written settlement agreement, to allow for its finalization and review by the parties.  (*Id*. at 12.)  She also expressed confusion about the forensic examination, for that was neither discussed nor made part of the settlement terms on June 3, 2014.  (*Id*.)

A full week later, on August 1, and despite his professed concern with the looming deadline, Slovak responded.  He conditioned his agreement to a stipulation on Wells Fargo's agreement to allow "inspection of the note by a qualified person."  (*Id*. at 15.)  That afternoon, Slovak again emailed O'Mara and stated that "Wells Fargo was supposed to have had the settlement agreement done and arranged to have the deed of trust and promissory note brought into court for inspection by a party who authenticates such things.  They failed to do so."  (*Id*. at 19.)  Claiming that Wells Fargo

was, therefore, in default of the agreement, Slovak again demanded that Wells Fargo acquiesce "to an expert to authenticate the deed of trust and promissory note." (*Id*.)  One hour later, O'Mara responded.  She informed Slovak that Wells Fargo would agree to extending the deadline, but it would not stipulate to inserting a new term into the agreement that conditioned his performance on forensic examination. (*See id*. at 21.)  She further informed Slovak that she would ask the court for a status hearing if he was unable to agree to Wells Fargo's proposed stipulation. (*Id*.)  Slovak answered the following Monday, again reiterating in his email his position that his agreement to pay Wells Fargo was conditioned on Wells Fargo's production of the trust deed and original note, "subject to the norms of a person who authenticates said instruments to inspect and assure that the instruments are in fact originals . . . ." (*Id*. at 24.)

A second issue, albeit minor, related to the manner in which the deed of trust would be reconveyed.  In late June, as O'Mara continued to secure the original note to provide to Slovak, as contemplated by the settlement agreement, she and Scalia spoke by phone. (*Id*. at 3:1-2.)  Scalia suggested that Wells Fargo simply record a deed of reconveyance, since such an act is "typically" how creditors lift real property liens in Nevada. (*Id*. at 3:3-5.)  As this was the understanding that Ferguson held and communicated—however unclearly—at the June hearing, and as Slovak's counsel also shared that understanding, O'Mara agreed. (*Id*. at 3:5-6.)

**3.     The September 22, 2014 Status Hearing**

On September 22, 2014, the court held a status hearing (#104).  In attendance were Slovak, acting *pro se*, O'Mara, and Richard Gordon ("Gordon"), also an attorney for Wells Fargo. (#104 at 2:7-9.)  At some length, Gordon recounted the events that had transpired between the June and September hearings.  Specifically, he focused on the issue of forensic examination. (*Id*. at 4:20-5:17.)  In explaining his understanding of the terms, he stated that "Wells Fargo has the original note

and is willing to provide that marked as paid upon the payment of $280,000 by plaintiff." (*Id*. at 6:1-3.) He also explained that, as "is always done in reconveying," Wells Fargo would ensure that a deed of reconveyance would be properly filed and recorded with the Washoe County recorder, as Scalia had suggested to O'Mara, to extinguish the lien upon the clearance of Slovak's payment. (*See id*. at 6:4-8.) Gordon also expressed his frustration with Slovak's conduct, and remarked that if the settlement could not be soon resolved, Wells Fargo would prefer to proceed to dispositive motion practice—including consideration of its fully-briefed motion to dismiss by the District Court. (*Id*. at 6:19-24.)

Slovak spoke next. First, he explained that, after the hearing, he "realized that none of the issues would be discussed in detail, and [he] was in an extremely frightened state, and we [i.e. the parties], in fact, only covered mostly the homeowners association's actions." (*Id*. at 7:23-8:1.) Second, he stated that he "*assumed* . . . that there would be a situation in which the note and the deed of trust, the originals, were brought to court, and [he] would bring a check in full, the $280,000, and that would be the beginning of the resolution of this action." (*Id*. at 8:3-7) (emphasis added). Further, he contested that he had ever permitted Scalia to agree to simply allowing a deed of reconveyance, because "for someone to demonstrate that they have standing to receive your payment, they have to demonstrate they're the holder in due course, and that means you have to prove . . . in the State of Nevada, that you are in possession of the note and the deed." (*Id*. at 8:8-9:22).

In the midst of the latter remarks, the court clarified that "what a lender does is record the deed of reconveyance which tells the world and you that this [i.e. the lien] has been resolved, . . . Wells Fargo no longer has an interest in this particular parcel of property . . . ." (*Id*. at 9:4-8.) After Slovak communicated his interpretation of Nevada law, the court asked about Gordon's statements

about the original note.  Slovak confirmed that he did, in fact, want forensic examination.  (*Id*. at 10:1-10.)

Following exchanges by the parties about other non-germane issues (*see id*. at 10:11-14:21), the court articulated its view.

> I've read the settlement agreement. The settlement agreement is very straightforward, the settlement that we put on the record.  It requires very few steps.  The one issue that seemed to be at contention was whether—Mr. Ferguson said he wasn't sure what the process was for releasing the lien and so forth, and we now have established what it is, it is that they will give you the promissory note, the original note, marked paid in full, and they will file a deed of reconveyance, record it with the county recorder's office which ends the case.

(*Id*. at 14:22-15:7.)  The court, following this clarification, inquired of Slovak:

> My question is, sir, are you going to sign the settlement agreement which outlines the terms of the settlement that were set out at the settlement conference and put on the record, which includes you give them—I think it's $280,000, they give you the note, the paid—note paid in full, they record a deed of reconveyance, and you file—submit—everybody signs a stipulation to dismiss this case, and there are some other minor points that are included in every settlement agreement, but that seems to me to be the deal.

(*Id*. at 15:14-23).

Slovak rearticulated his view that Wells Fargo had breached the agreement by failing to prepare and execute the written document by August 3, 2014.  (*Id*. at 15:24-16:13.)  Gordon responded and explained that it took time to clarify the procedure under which the lien would be extinguished, and that Wells Fargo and O'Mara had worked to stipulate for more time to accommodate Slovak's concern with the brevity of the review period.  (*Id*. at 17:24-18:9.)  Slovak, as Gordon observed, ultimately refused to assent to more time.  (*Id*. at 18:14-18.)

Thereafter, the court recessed to allow the parties to directly converse about these issues.  (*Id*. at 19:8-10.)  However, the court noted that it would not set aside the agreement simply because it had not been completed by August 3.  (*Id*. at 19:13-20.)  Prior to recessing, Slovak said: "I said all I

wanted to do was receive the original note and deed, just like I have, to prove that Wells Fargo Bank has standing in collecting the money for this loan, which I believe they do not under any circumstances, and they cannot prove it, and they know it, and I feel like I'm being railroaded . . . ." (*Id*. at 21:23-22:2.)  Following further exchanges about the settlement to which Slovak had agreed and his interpretation of the terms—namely, that Wells Fargo would produce the trust deed to prove its standing to collect payment—the court recessed.  (*Id*. at 22:4-23:19.)  Following the recess, Gordon indicated that his client would file a motion to enforce.  (*Id*. at 24:9-15.)  Slovak confirmed that he would "stick[] to the original terms as [he] understood them . . . ."  (*Id*. at 24:18-19).

## II.   LEGAL STANDARD

Federal courts "'have no inherent power to enforce settlement agreements entered into by parties litigating before them.'"  *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 967 (9th Cir. 2014) (quoting *Arata v. Nu Skin Int'l, Inc.*, 96 F.3d 1265, 1268 (9th Cir. 1996)).  Courts may, however, retain jurisdiction to enforce a settlement where the order dismissing the case or a term of the settlement expressly so provides.  *Id*.  When reviewing a motion to enforce a settlement agreement, federal courts must apply state law.  *Wilcox v. Arpaio,* 753 F.3d 872, 876 (9th Cir. 2014). In Nevada, a settlement agreement is a contract, and it is thus governed by principles of state contract law.  *May v. Anderson,* 121 Nev. 668, 672 (2005).  For a contract to be enforceable, basic and familiar contract principles apply: there must be an offer and acceptance that demonstrate a "meeting of the minds," and also consideration.  *Id.*  A contract forms when the parties agree to the material terms, even if the exact language does not become final until a later date.  *Id.*

## III.   DISCUSSION

Before turning to the positions of the parties and clarifying the terms of the agreement, it is helpful to examine applicable areas of Nevada law that motivate their respective positions.

### A. Security Interests in Real Property under Nevada Law

In Nevada, "promissory notes on real estate loans are typically secured by deeds of trust on the property." *Edelstein v. Bank of New York Mellon*, 286 P.3d 249, 254 (2012). The note is a promise to repay a debt, and, therefore, the right to repayment of it. *Id*. A deed of trust "secures[s] the performance of an obligation or the payment of any debt." NRS 107.020. It is "[c]onsidered a form of mortgage" and is "merely a lien on the property as security for the debt . . . ." *Edelstein*, 286 P.3d at 254. As an interest in real property, the deed must be recorded pursuant to provisions of the Nevada Revised Statutes in order to give priority to the security interest over subsequent liens. *See* NRS 111.310, NRS 107.026; *Edelstein*, 286 P.3d at 254. The grantor (i.e. the debtor) signs the deed, and it is then held by a third-party trustee on behalf of the beneficiary (i.e. the creditor) pursuant to the requirements of NRS 107.028.

To utilize the nonjudicial foreclosure process permitted by Nevada law for debts secured by deeds of trust, the note and the deed must be simultaneously held. *Edelstein*, 286 P.3d at 260. That the deed and note have been separated, however, "'does not render either instrument void.'" *Id*. at 259 (quoting *Morgan v. Ocwen Loan Servicing, LLC*, 795 F. Supp. 2d 1370, 1375 (N.D. Ga. 2011)). Although *foreclosure* may not occur until such time that the documents are reunited, the holder of the note may demand payment. *See id*. at 261; *see also* NRS 104.3301(1) (providing that the "person entitled to enforce" a promissory note includes "the holder of the instrument").[1] In other words, the note independently entitles a person in lawful possession thereof, as a holder or holder-in-due-course, to demand repayment under the note's terms.[2]

---

[1] In addition, under the approach adopted by the Nevada Supreme Court in *Edelstein*, a proper negotiation of the note pursuant to the applicable statutes automatically transfers the deed of trust, and thereby allows the note holder to initiate foreclosure proceedings. *Edelstein*, 286 P.3d at 258-59; *see also Einhorn v. BAC Home Loans Servicing, LP,* 290 P.3d 249, 253 n.6 (Nev. 2012); *Hower v. Countrywide Home Loans, Inc.*, No. 3:12-cv-00047-RCJ-WGC, 2013 WL 839917, at *2 & n.2 (discussing various cases and exceptional circumstances).

[2] This is only a brief description of the complex requirements of negotiable instruments, codified in chapter 104 of the

When the grantor has performed his obligation or satisfied his debt, the encumbrance remains on the property until the trustee acts, as required by law, to clear the title. The deed of trust

> *may* be discharged by an entry on the margin of the record thereof [i.e. the deed of trust itself], signed by the trustee . . . in the presence of the recorder or the recorder's deputy, acknowledging the satisfaction of or value received for the deed of trust and the debt secured thereby. The recorder or the recorder's deputy shall subscribe the entry as witness. *The entry has the same effect as a reconveyance of the deed of trust acknowledged and recorded as provided by law*. The recorder shall properly index each marginal discharge.

NRS 107.073(1) (emphasis added). Yet "if the deed of trust has been recorded by a microfilm or other photographic process, a marginal release may not be used and an acknowledged reconveyance of the deed of trust *must* be recorded." NRS 107.073(2) (emphasis added).

The following requirements apply to the beneficiary and trustee upon the satisfactory repayment of the note. First, "[w]ithin 45 calendar days after a debt secured by a deed of trust . . . is paid or otherwise satisfied or discharged, and a properly executed request to reconvey is received by the trustee, the trustee shall cause to be recorded a reconveyance of the deed of trust." NRS 107.077(2). Second,

> [w]ithin 21 calendar days after receiving written notice that a debt secured by a deed of trust . . . has been paid or otherwise satisfied or discharged, the beneficiary shall deliver to the trustee or the trustor the original note and deed of trust, *if the beneficiary is in possession of those documents*, and a properly executed request to reconvey the estate in real property conveyed to the trustee by the grantor. If the beneficiary delivers the original note and deed of trust to the trustee or the trustee has those documents in his or her possession, the trustee shall deliver those documents to the grantor.

NRS 107.077(1) (emphasis added). These provisions "provide[] a mortgagor with a cause of action for damages if a beneficiary *who is in possession of an original note and deed of trust*, as well as a request to reconvey the property, does not deliver the former documents to the trustee or trustor

---

Nevada Revised Statutes. Because the nuances are inapplicable to the issue before the court, this brief summation suffices. For a clear statement of Nevada law on this matter, see *Leyva v. National Default Servicing Corp*., 255 P.3d 1275, 1280-81 (Nev. 2011).

(mortgagor) within twenty-one days of receiving written notice of satisfaction of debt secured by a deed of trust" and "applies to deeds of trust *only after the underlying debt has been repaid.*" *DaSilva v. Wells Fargo Bank, N.A.*, No. 3:10-CV-00381-RCJ-VPC, 2011 WL 221718, at *5 (D. Nev. Jan. 19, 2011); *Florio v. Vista Pac. Holdings*, No. 2:11-cv-01191-MMD-RJJ, 2012 WL 3023265, at *4 n.2 (D. Nev. July 24, 2012).

**B.     Analysis**

The court has reviewed the written settlement agreement, the hearing transcripts, and the briefs on the motion to enforce. For good cause appearing, the court hereby recommends that defendant's motion be granted. Plaintiff should be ordered to sign the agreement and comply with the provisions therein. Plaintiff's dispute with the agreement rests on three issues: (1) he interprets the language to obligate Wells Fargo to return his original deed of trust; (2) he contends that the terms require Wells Fargo to return the original note, rather than making its "best efforts" to do so; and (3) he argues that he should not be required to stipulate to the dismissal of his claims prior to "confirm[ing] strict performance on the part of Wells Fargo." (#115 at 10-11.) The court discusses each in turn.

**1.     The Meaning of "Return the Deed of Trust"**

References to returning the deed of trust during the settlement conference meant that Wells Fargo would reconvey the title to Slovak, and nothing more. On this point, the written agreement is consistent with the material terms placed on the record, and plaintiff should not be permitted to avoid the performances to which he agreed. This interpretation of the transcript's language is consistent with the spirit of the agreement reached by the parties—that Slovak would fulfill his obligation to repay the amount owing on the promissory note, and that Wells Fargo would honor his payment by releasing the lien on his property. Throughout the lengthy discussions on June 3, 2014,

it was apparent that the performance contemplated for Wells Fargo in return for Slovak's payment was reconveying the title.

Moreover, this construction of the language is consistent with the legally effective actions contemplated by Nevada law. As underscored by the statutes and the Nevada Supreme Court, a deed of trust and its deed of reconveyance are closely related, *see Utley v. Airoso*, 86 Nev. 116, 122 (discussing "a promissory note secured by a preexisting deed of trust" and "*its* deed of reconveyance") (emphasis added), and it is entirely common for the trustee to fulfill its statutory obligation to unencumber the title by recording a deed of reconveyance, *see Giorgi v. Pioneer Title Ins. Co.*, 85 Nev. 319, 320-21 (1969) (explaining that the deed of reconveyance extinguished the security interested provided by the deed of trust); *Estrada v. Goldman Sachs*, No. 2:13-CV-00477-APG, 2013 WL 5969817, at *1 (D. Nev. Nov. 7, 2013) (same); *Ades v. Citi Mortgage, Inc.*, No. 2:10-CV-02104-GMN, 2012 WL 6720612, at *3 (D. Nev. Dec. 26, 2012) (same); *United States v. Real Prop. Located at Incline Vill.*, 976 F. Supp. 1327, 1345-46 (D. Nev. 1997) (same).

When the trustee is required to reconvey title pursuant to Nevada law, the statutes make clear that the trustee has a choice between notating the deed of trust or recording a deed of reconveyance. *See* NRS 107.073(1) (providing that a deed of trust "may" be notated and recorded). The latter option is often preferable to the more burdensome notation method; assuming that a deed of reconveyance is not made mandatory by NRS 107.073(2), to lift the lien via notation, the trustee must personally visit the recorder's office and make the margin notations before witnesses. *See* NRS 107.073(1). Moreover, returning the trust deed to the grantor has no legal effect, for only the trustee may take the legally effective action with deed of trust to clear the title of the grantor's property. In other words, returning to Slovak the actual deed would be a legally meaningless action. *See Mead v. Pinyard*, 154 U.S. 620, 620 (1876) (explaining that title to property cannot be divested simply by

"[h]anding back the deed"). What mattered was that Wells Fargo agreed to take the steps required by Nevada law to render his title free and clear of the lien. This is why, when legal actors refer to "returning a deed of trust," it is understood that the required action is reconveyance of the title by law, not physical return to the grantor of the trust deed. *See, e.g.*, *Bertelsen v. Harris*, 537 F.3d 1047, 1052-53 & n.7 (9th Cir. 2008) (characterizing, in its own words, the phrase "execute the deeds of reconveyance" as the requirement to "reconvey the deeds of trust"); *Bird v. Recontrust Co., N.A.*, No. 3:10-cv-00649-RCJ-VPC (D. Nev. July 23, 2014) (describing the Court's order to "reconvey the deed of trust").

Despite the understanding held by the court, Ferguson, and Slovak's own lawyer (*see* #107-1 at 3:1-6), Slovak mistakenly presumed he would repossess the original trust deed; his response to defendant's motion is premised on this notion (#115 at 11:7-19), and he did make references to the matter at the September hearing (*see, e.g.*, #104 at 9:14-22.). Nevertheless, the settlement as written is binding upon him. As described, the court placed the material terms of the agreement onto the record and the parties agreed to such terms, thereby creating a binding agreement. *May,* 121 Nev. at 672. No basis exists for excusing plaintiff's performance. Assuming for argument that plaintiff would contend that rescission of the contract is warranted on the basis of a unilateral mistake, the court concludes that rescission is inappropriate as a matter of law. A party may avoid a contract on the grounds of unilateral mistake only where, among other requirements, his mistake has a materially adverse effect upon him. *Home Savers, Inc. v. United Sec. Co.*, 103 Nev. 357, 358-59 (1987); *In re Irrevocable Trust Agreement of 1979*, 331 P.3d 881, 885 (Nev. 2014) (citing *Home Savers* with approval).

Here, plaintiff's mistake is not adverse. First, as the court has explained at great length, the ultimate relevance of the trust deed, in context of the agreement, is that it will be extinguished by the

proper recording of a title reconveyance.  Wells Fargo cannot clear the title by placing the deed in his possession.  Whatever plaintiff's interpretation of Nevada law, the short of the matter is that the only adverse action would be defendant's failure to extinguish the lien on his property.

Second, the anticipated argument (*see* #104 at 14-22) that without the trust deed, Wells Fargo lacks "standing" to demand payment—and, therefore, that plaintiff would not have entered into the agreement but for his belief that he would receive the actual document—is one without merit. Plaintiff's belief about the deed is simply an incorrect statement of law.  Nothing more than Wells Fargo's possession of the note is required for it to demand payment thereon. *See Edelstein*, 286 P.3d at 260-61.  That is, Wells Fargo did not need to prove its possession of the deed—which does not, alone, evidence a debt—to collect on a promissory note in its possession.  Thus, plaintiff's June 3 agreement to satisfy his debt, even if based on a mistake about the trust deed term, is not adverse to him: wherever the deed, plaintiff would owe the unpaid amount to Wells Fargo or any lawful holder of the promissory note.

Relatedly, even if the court credits for the purpose of argument his view of the law on this point, his agreement to tender payment nevertheless supplants that ordering of events.  That is, even if Wells Fargo had to produce the trust deed to collect on the note, plaintiff's indisputable agreement on June 3, 2014 to tender payment was the *first* performance under the agreement.  The term necessarily moots the issue.  Because plaintiff must pay Wells Fargo before it must produce the note and (again, assuming *arguendo*) the deed, standing would be irrelevant since payment would have prior tendered.  Quite plainly, his belief that his performance is conditional to their *ex ante* production and examination of the note and the deed is disproved by the hearing transcript.

Finally, NRS 107.077 provides no basis for concluding that the mistake is adverse.  Damages arise under that section only "if" the beneficiary—i.e. Wells Fargo—possesses the original note and

trust deed and fails to return them upon the grantor's full or satisfactory payment or discharge. *See* NRS 107.077(1). In other words, if Wells Fargo lacks possession of the deed of trust, no liability arises. Further, Wells Fargo may opt to deliver the trust deed to its third-party trustee, who then becomes responsible for returning it. *See id.* In this instance, it is the trustee, and not Wells Fargo, who may be liable for statutory damages. NRS 107.077(3). Accordingly, the mistake is not adverse to plaintiff, and it is not a basis for setting aside the settlement agreement. Any damages pursuant to NRS 107.077 are merely speculative against Wells Fargo; it cannot be said, therefore, that plaintiff has been adversely impacted by agreeing to a settlement that would extinguish (by its operation) his ability to bring a claim under the statute.

At bottom, the settlement agreement requires only that Wells Fargo, following plaintiff's payment of $280,000, return to him the promissory note and record a deed of reconveyance that clears the title to his property. Plaintiff's contention that Wells Fargo must also deliver the trust deed lacks support and provides no basis for vacating the agreement.

**2.      The Original Note**

Next, plaintiff raises issue with the agreement's provision that Wells Fargo will make its best efforts to return the original note. He would have it say that Wells Fargo shall return the original note. The court appreciates plaintiff's position, but believes this is a non-issue. As a preliminary matter, plaintiff is correct that the agreement requires return of the note, rather than Wells Fargo's best efforts. (*See, e.g.*, #96 at 8:16-19, 10:14-17, 12:5-13.) Yet Gordon affirmed at the September hearing that Wells Fargo does, in fact, possess the original note, and will return it to plaintiff when his payment clears. (#104 at 6:1-3) ("Wells Fargo has the original note and is willing to provide that marked as paid upon payment of $280,000 by plaintiff."). Accordingly, even if the agreement says

Wells Fargo will make only its "best effort" to return the note, Gordon's representation effectively necessitates its actual return.  In short, any disagreement on this term is merely semantics.

Accordingly, the court again concludes that this issue is an insufficient basis for setting aside the settlement.  The Court may wish to order minor modification of the written agreement on this point, but the circumstances of the case likely render it unnecessary.  Were any issues to arise regarding return of Slovak's original note, they would constitute issues of performance, to be dealt with as such—as the court explains below.

**3.    Stipulation to Dismissal**

In his final challenge to the agreement, plaintiff declares that it is "unconscionable" to compel him to sign the settlement agreement "without an opportunity to confirm strict performance on the part of Wells Fargo."  It is an argument in search of a problem.  Parties who settle their claims in federal court routinely stipulate to dismissal of claims prior to "verifying" strict performance of the other party, particularly in instances where, as here, the performances of one party are to follow those of the other.

By delaying the stipulation, the court believes that plaintiff is subtly attempting to effect forensic examination of the original note prior to tendering payment—a desire that he shared with the court during the September hearing (*see* #104 at 4:25-5:5, 10:1-10)—or otherwise plotting to keep open this case as a vehicle for litigating any issues between him and Wells Fargo until he is satisfied.  As the court explained to plaintiff in September, "there will be no forensic discovery in this case."  (#104 at 19:11-12.)  The terms of the agreement do not mention—let alone condition his performance—on prior examination of the note that Wells Fargo must produce.  To settle any lingering doubts: there shall be *no forensic examination prior to plaintiff's payment*.

Nor does agreement placed on the record condition plaintiff's release of claims on his verification of Wells Fargo's performance. At the hearing, plaintiff was made aware that the settlement of this case would lead to dismissal of his claims with prejudice. (*See* #96 at 15:15-17.) The release of claims is a standard provision of any settlement agreement; it is anything but "unconscionable." As the parties are aware, this court has retained jurisdiction to adjudicate issues arising with the consummation and finalization of the written settlement agreement. *Torlakson*, 762 F.3d at 967. Here, the court's supervisory authority is limited; in the court's own words, it has "retain[ed] jurisdiction in the event issues arise with respect to consummating and finalizing the settlement agreement." (#96 at 14:14-16.) The court does not sit today to examine and ajudicate minutiae; instead, the court retains jurisdiction only to verify that the parties draft the written agreement, sign it, and lodge a stipulation of dismissal with the District Court.

This limited process does not, however, deny plaintiff the ability to seek remedy for problems that may later arise. If subsequent issues create disagreement, the parties may obviously work together to resolve them, and if necessary, the parties may file a new lawsuit for breach of contract or other applicable claims. As the Ninth Circuit has explained, "[i]n the usual course upon repudiation of a settlement agreement, the frustrated party may sue anew for breach of contract . . . ." *Keeling v. Sheet Metal Workers Intern. Ass'n, Local Union 162*, 937 F.2d 408, 410 (9th Cir. 1991). Therefore, plaintiff may not utilize this court's limited power to enforce the agreement as subterfuge for litigating contractual performance issues, such as the authenticity of the original note. Stated differently, plaintiff cannot refuse to sign the agreement and decline to release his claims until Wells Fargo has carried out its performance to his liking. If plaintiff wanted to verify the authenticity of the note or Wells Fargo's standing to collect payment or any other issue, he should have included that as a material term on June 3, 2014. He did not. Hence, if he believes that Wells Fargo has not

complied with the terms of the agreement, *following* his payment to Wells Fargo, and *following* Wells Fargo's performance of its terms, his remedy is to bring suit under applicable liability theories in an appropriate judicial forum.

### IV.  CONCLUSION

For the foregoing reasons, the court concludes that defendant's motion to enforce should be granted. The record demonstrates that plaintiff and defendant have entered into a binding settlement agreement, and the written agreement prepared by Wells Fargo, attached to its motion as Exhibit 9, embodies the material terms to which the parties agreed. The various issues plaintiff raises in his response lack merit. First, the spirit and meaning of the language on the record require only that defendant take the necessary steps to clear the title to plaintiff's property after he tenders payment. To the extent that plaintiff would argue that he was mistaken about the return of the trust deed, the argument will ultimately fail as a matter of law because plaintiff cannot demonstrate that he is adversely impacted by the settlement agreement on this point. Second, defendant has indicated that it will produce the original note, and plaintiff's argument on this point is, therefore, moot. Finally, the release term of the agreement is not unconscionable; rather, it is a standard term of settlement agreements, and will not prevent plaintiff from properly litigating, *ex post*, issues that arise with defendant's performance.

The parties are advised:

1.   Pursuant to 28 U.S.C. § 636(b)(1)(c) and Local Rule IB 3-2, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.  This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's order.

### IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the District Court enter an order as follows:

1.  **GRANTING** defendant's motion to enforce (#107), and **ORDERING** the settlement agreement, attached to defendant's motion as Exhibit 9, be ratified as the binding agreement between plaintiff and defendant;

2.  **ORDERING** that plaintiff perform under the terms of the agreement as outlined in Exhibit 9;

3.  **DISMISSING** this case **WITH PREJUDICE** with the parties to bear their own costs and attorney fees.

**DATED:** March 2, 2015.

_____
**UNITED STATES MAGISTRATE JUDGE**