1          UNITED STATES DISTRICT COURT
              DISTRICT OF NEVADA
2   BEFORE THE HONORABLE CARLA BALDWIN CARRY, MAGISTRATE JUDGE
                 ---o0o---
3

4   Robert A. Slovak,           :  No. 3:13-cv-569-MMD-CBC
                                 :
5            Plaintiff,          :
                                 :  November 28, 2018
6        -vs-                    :
                                 :
7   Golf Course Villas          :  United States District Court
    Homeowners Association,      :  400 S. Virginia Street
8                                :  Reno, Nevada  89501
             Defendant.          :
9   _____:

10

11                        **TRANSCRIPT OF**
12                    **EVIDENTIARY HEARING**

13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:       Tory Pankopf
15                           Scott Johannessen
                             Attorneys at Law
16

17  FOR THE DEFENDANT:       Jeffrey Willis
                             Kelly Dove
18                           Attorneys at Law

19

20  Proceedings recorded by mechanical stenography produced by
    computer-aided transcript
21

22

23  Reported by:                 KATHRYN M. FRENCH, RPR, CCR
                                  NEVADA LICENSE NO. 392
24                                CALIFORNIA LICENSE NO. 8536

25

| | | |
|---|---|---|
| 08:37:49 | 1 | Reno, Nevada, Wednesday, November 28, 2018, 9:00 a.m. |
| 08:37:49 | 2 | ---OoO--- |
| 08:37:49 | 3 | |
| 09:03:32 | 4 | THE CLERK:  This is the date and time set for an |
| 09:03:32 | 5 | evidentiary hearing in case number 3:13-civil-569-MMD-CBC, |
| 09:03:39 | 6 | Robert Slovak versus Golf Course Villas Homeowners |
| 09:04:45 | 7 | Association. |
| 09:04:45 | 8 | Present on behalf of plaintiff, Tory Pankopf and |
| 09:04:52 | 9 | Scott Johannessen. |
| 09:04:54 | 10 | Present behalf of defendant, Kelly Dove and Jeffrey |
| 09:04:58 | 11 | Willis. |
| 09:04:59 | 12 | THE COURT:  Thank you. |
| 09:04:59 | 13 | Good morning everybody.  Thank you for being here |
| 09:04:59 | 14 | today. |
| 09:05:01 | 15 | We're here for an evidentiary hearing that I have |
| 09:05:10 | 16 | set related to the Plaintiff's Motion For Sanctions.  Before |
| 09:05:10 | 17 | we get started, I'm going to go through some housekeeping |
| 09:05:11 | 18 | issues as to, first off, what all I've reviewed in preparation |
| 09:05:14 | 19 | for this but then, secondly, how we are going to proceed today |
| 09:05:18 | 20 | and what the expectations will be. |
| 09:05:18 | 21 | In preparation for the hearing today, I should |
| 09:05:19 | 22 | let everyone know I think I've read virtually every document |
| 09:05:23 | 23 | that's been filed in this case; however, last night, I |
| 09:05:27 | 24 | re-reviewed, in preparation of today's hearing, document |
| 09:05:30 | 25 | number 218 and the exhibits attached thereto, which is the |

09:05:33  1   Motions For Sanctions.

09:05:34  2            I also reviewed Document 222 and the exhibits

09:05:38  3   thereto, which is the Wells Fargo response to the motion.

09:05:40  4            And finally, I reviewed docket number 225 and the

09:05:44  5   exhibits attached to that, which are the plaintiff's reply

09:05:47  6   brief.

09:05:47  7            I would note for the record that that particular

09:05:50  8   document violates Local Rule 7-3b.  That rule prohibits any

09:05:54  9   reply brief being in extension of 12 pages long, unless it's a

09:05:58  10  reply brief with respect to a motion for summary judgment.

09:06:01  11  That document was 18 pages long.  There has been no objection,

09:06:05  12  however, by the defendant; therefore, the Court reviewed that

09:06:08  13  and will continue to -- you know, it will not be stricken from

09:06:11  14  the record and no other sanction will be imposed.  However,

09:06:14  15  I do want to make a note for the record that that was a

09:06:17  16  violation of the Local Rule.

09:06:20  17            With respect to this hearing, I have set this for

09:06:23  18  an evidentiary hearing and what I anticipate to do is simply

09:06:26  19  to take evidence.  I do not want to spend time with argument.

09:06:30  20  I've read the briefs.  I am very familiar with the brief.

09:06:32  21  I've done extensive research on my own relative to the various

09:06:36  22  issues, as well as reviewed the cases that have been cited

09:06:39  23  by the parties.  Therefore, what we will be doing today is

09:06:41  24  simply taking evidence on behalf of both the plaintiff and the

09:06:45  25  defendant.

09:06:45  1          I felt that given the record in this case and the

09:06:48  2     history of the litigation, creating a good and extensive

09:06:53  3     record was important in this particular matter.

09:06:56  4          So with that, what we will do is we will start with

09:06:59  5     the plaintiff.  Plaintiff will call his witnesses that he has

09:07:02  6     and then we'll move to the defense.  If we have time at the

09:07:05  7     end, then I will have some opportunity for the parties to

09:07:09  8     argue their positions but, primarily, I have a lot of

09:07:12  9     questions that if we have time to get to, I would like the

09:07:16  10    parties to be able to respond to in order to assist me in

09:07:20  11    ruling on this particular motion.

09:07:22  12         We do have a court reporter here today and so,

09:07:25  13    because of that, I would ask the parties to go ahead and

09:07:28  14    come to the podium in order to do their exams and do their

09:07:32  15    arguments.  Normally, I usually have people sit at counsel

09:07:37  16    table because we're doing it by recording.  I'm not as

09:07:40  17    concerned with that today.  I would want to make sure that

09:07:42  18    everybody knows not to interrupt each other, not to speak

09:07:45  19    over each other.  With the court reporter, it's very difficult

09:07:48  20    to pick that up.  And most importantly, if I am speaking I

09:07:52  21    would ask that no one else speak for a number of different

09:07:56  22    reasons.  Obviously, if I'm saying something, it's probably

09:07:59  23    because I have a question or I need something clarified.  But

09:08:01  24    secondly, again, we can't pick that up on the recording or on

09:08:06  25    the transcript when we're speaking over one another.

09:08:07  1        For purposes of the hearing today, we will start,

09:08:11  2   as soon as I'm finished giving this overview, and we will go

09:08:14  3   until 10:30.  We will take a brief recess for, probably, 10

09:08:18  4   minutes.  We will come back and we will go until noon.  I

09:08:21  5   anticipate if we need to go into the afternoon, we will start

09:08:25  6   at 1:30, but we will break at 2:45 because I have criminal

09:08:29  7   calendar at 3:00 p.m., and we will resume as soon as I am

09:08:32  8   finished with criminal calendar, but we will conclude this

09:08:35  9   hearing today at 5:00.  It will not go into any other days.

09:08:39  10  There will not be any continuances.

09:08:41  11        So I'm not going to put time limitations on the

09:08:44  12  parties, but I want everybody to be cognizant of that.  If I

09:08:47  13  think that the plaintiff is taking too long with his witnesses

09:08:50  14  and the defense is not going to be able to call theirs,

09:08:52  15  then I will stop and we will move on to the defense's

09:08:55  16  witnesses.  So, I would hope that everybody uses their time

09:08:58  17  wisely.

09:08:59  18        With that, I think I've covered everything to sort

09:09:05  19  of setout the ground rules of what I would like to do today.

09:09:09  20  And so with that, I will simply turn it over to the

09:09:11  21  plaintiff's counsel.

09:09:12  22             Who will be leading the testimony today?

09:09:15  23             MR. JOHANNESSEN:  Your Honor, Mr. Pankopf will.

09:09:19  24  I have a quick question, Your Honor?

09:09:20  25             THE COURT:  Okay.

09:09:20  1          MR. JOHANNESSEN:  There's a Rule 615 motion

09:09:23  2  pending on sequestration and I would ask the Court any

09:09:27  3  potential nonparty witnesses be excused from the courtroom

09:09:30  4  while we're providing our testimony.

09:09:32  5          THE COURT:  That would be granted.

09:09:33  6          MR. WILLIS:  Your Honor, may I be heard?

09:09:35  7          THE COURT:  Okay.

09:09:35  8          MR. WILLIS:  The only nonparty witness in this

09:09:37  9  courtroom is our expert and Rule 615 routinely does not apply

09:09:42  10  to experts because the whole point of having an expert in a

09:09:44  11  rebuttal capacity is to rebut what the presenting party's

09:09:48  12  expert says.

09:09:49  13          THE COURT:  Okay.  Have you presented -- is

09:09:52  14  there an expert report that's been drafted?

09:09:54  15          MR. WILLIS:  There is not, Your Honor.

09:09:55  16          THE COURT:  Okay.  And I would agree with that,

09:09:57  17  that normally we do allow experts to hear the testimony of

09:10:00  18  expert witnesses of the opposing party.  So in light of that,

09:10:03  19  if there is no other witness her to testify -- that's present

09:10:07  20  in the courtroom that's not an expert, they should be removed

09:10:11  21  from the courtroom and not here for the hearing.  But if

09:10:15  22  there's any experts, they can remain, both on the plaintiff's

09:10:18  23  and the defense side.  I was unaware that the defendant had

09:10:21  24  hired an expert, so this is news to me and I'm assuming news

09:10:25  25  to plaintiff's counsel as well.  I wish I would have had some

09:10:30  1    notice of that.

09:10:30  2            But with that in mind, is there anything else -- and

09:10:33  3    I'm sorry, again, sir, what was your name?

09:10:36  4            MR. JOHANNESSEN:  My name is Scott Johannessen.

09:10:38  5            THE COURT:  Okay.  Nice to meet you, sir.

09:10:41  6            MR. JOHANNESSEN:  Nice to meet you.

09:10:42  7            THE COURT:  And so will you be doing the hearing

09:10:43  8    or is that Mr. Pankopf that will be doing that?

09:10:45  9            And I'm sorry, sir.  I hope I'm pronouncing your

09:10:48  10   name correctly.

09:10:49  11           MR. PANKOPF:  You are.

09:10:50  12           THE COURT:  Okay.  Thank you.

09:10:51  13           MR. PANKOPF:  And I'm going to do the voir dire

09:10:53  14   of Dr. James Kelley.

09:10:55  15           THE COURT:  Okay.

09:10:55  16           MR. PANKOPF:  And Mr. Johannessen will be

09:10:58  17   handling the other witnesses.

09:11:00  18           THE COURT:  Okay.  And how many witnesses did

09:11:01  19   you intend to call today, sir?

09:11:03  20           MR. PANKOPF:  Uh, at most, two.

09:11:05  21           THE COURT:  Okay.  And then is that Mr. --

09:11:08  22   Dr. Kelly?

09:11:09  23           And who was your second witness?

09:11:11  24           MR. JOHANNESSEN:  It will be what is,

09:11:14  25   apparently, the custodian of records for Wells Fargo.  I'm

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

09:11:17  1    not sure yet.

09:11:18  2                    THE COURT:  Okay.

09:11:18  3                    MR. JOHANNESSEN:  But, we were not provided much

09:11:20  4    information.  I'm not sure what her role is.  I know her title

09:11:23  5    and her name.  That's it.

09:11:24  6                    THE COURT:  Were they provided a subpoena to be

09:11:26  7    here today?

09:11:27  8                    MR. JOHANNESSEN:  No.  They are producing her

09:11:28  9    today.

09:11:29  10                    THE COURT:  Okay.

09:11:29  11          And on behalf of the defense -- and I'm sorry.  Are

09:11:32  12    you Mr. Gordon, is that correct?

09:11:33  13                    MR. WILLIS:  Yeah.  I'm sorry.  It's Jeff

09:11:34  14    Willis.

09:11:34  15                    THE COURT:  Okay.  Jeff Willis.  Okay.

09:11:37  16          And please feel free to correct me if I say

09:11:40  17    anybody's name wrong or I pronounce it incorrectly.  I'm not

09:11:43  18    trying to be rude.

09:11:43  19                    MR. JOHANNESSEN:  I've been living with the last

09:11:45  20    name since high school, so --

09:11:47  21                    THE COURT:  Okay.

09:11:47  22                    MR. WILLIS:  Your Honor, we have a client

09:11:48  23    representative in the courtroom who we may or may not call.

09:11:51  24    We were not advised by plaintiff that they intended to call a

09:11:54  25    Wells Fargo witness adversely.

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
| 09:11:56 | 1 | THE COURT:  Okay. |
| 09:11:57 | 2 | MR. WILLIS:  And there was no subpoena. |
| 09:11:59 | 3 | THE COURT:  Okay. |
| 09:11:59 | 4 | MR. JOHANNESSEN:  And I believe, Your Honor, on |
| 09:12:01 | 5 | November 6th, in our court -- our telephonic hearing, that's |
| 09:12:04 | 6 | when -- the name had not been identified yet, but the Court |
| 09:12:07 | 7 | allowed us to examine the witness at the -- whoever that might |
| 09:12:11 | 8 | end up being -- at the hearing today. |
| 09:12:12 | 9 | THE COURT:  That's correct. |
| 09:12:13 | 10 | MR. JOHANNESSEN:  And also, Your Honor, if I |
| 09:12:15 | 11 | may, there's also a motion to exclude the expert testimony, |
| 09:12:19 | 12 | which goes to your second point that you raised earlier.  I |
| 09:12:23 | 13 | believe it's Jan Kelly.  There are a lot of Kellys in the room |
| 09:12:29 | 14 | right now. |
| 09:12:29 | 15 | But Jan Kelly, I'm not sure she's been designated as |
| 09:12:32 | 16 | an expert.  The only thing that I've received from Wells Fargo |
| 09:12:35 | 17 | is a CV, curriculum vitae, and also the name, but nothing |
| 09:12:41 | 18 | else.  So on -- last night I was waiting for more from Wells |
| 09:12:44 | 19 | Fargo, did not receive it.  I kept asking for it.  But I |
| 09:12:47 | 20 | did file, on behalf of Mr. Slovak, a motion to exclude the |
| 09:12:51 | 21 | testimony. |
| 09:12:52 | 22 | And, Your Honor, I was just as surprised as the |
| 09:12:54 | 23 | Court is to have this late designation, whatever that might |
| 09:13:00 | 24 | be.  The only thing I know is Ms. Kelly was supposed to be at |
| 09:13:03 | 25 | -- with them, quote, with them at the hearing.  And also I |

09:13:07  1   might add, Your Honor, this is -- and it's more thoroughly

09:13:10  2   explained in the motion to exclude --

09:13:12  3              THE COURT:  Okay.  So I'm going to stop you

09:13:14  4   right there, sir.  I'm fairly confident at the hearing that I

09:13:18  5   indicated I did not want any more filings made with respect to

09:13:22  6   this motion.  But with that being said, let me turn to the

09:13:26  7   defense counsel at this point with respect to this expert.

09:13:29  8        Has this person reviewed these documents and will

09:13:31  9   they be opining as to the authenticity of them beyond just

09:13:38  10  simply the custodian of records now?

09:13:42  11             MR. WILLIS:  Miss Kelly is a forensic document

09:13:45  12  examiner who has examined the documents and is prepared

09:13:48  13  to testify that the documents she reviewed are original

09:13:52  14  documents.  She is also prepared to testify regarding the

09:13:55  15  anticipated testimony of Dr. Kelley, that these documents

09:14:01  16  were signed using an inkjet printer.  So, yes, we do have

09:14:06  17  her available in the courtroom.

09:14:08  18        Now, Your Honor, we were --

09:14:09  19             THE COURT:  So, but there, there has been no

09:14:11  20  expert report that's been created by your expert and produced

09:14:15  21  to the plaintiff at this point with respect to that expert?

09:14:18  22             MR. WILLIS:  That is correct.  That is correct,

09:14:20  23  Your Honor.

09:14:20  24             THE COURT:  Has she created any expert report

09:14:24  25  that's been provided to you, sir?

09:14:26  1          MR. WILLIS:  She has not created a report that

09:14:28  2   has been provided to me or anybody else.  We do have some

09:14:31  3   PowerPoint slides, which I will mark as an exhibit and provide

09:14:35  4   to counsel for plaintiff.

09:14:37  5          THE COURT:  But those have not been provided in

09:14:40  6   advance of today's hearing?

09:14:41  7          MR. WILLIS:  No, Your Honor.  In fact, they were

09:14:43  8   created last night.

09:14:52  9          THE COURT:  Okay.  Here's the thing.  If we're

09:14:58  10  going to have a competing expert by the defense, I believe

09:15:02  11  that the plaintiff has a right to see what those findings

09:15:06  12  and those basis of her expert opinions would be prior to the

09:15:10  13  hearing in order for them to be properly prepared.  I was not

09:15:15  14  under the impression that there was going to be an expert.

09:15:18  15  And in fact, as I recall from our last hearing, Ms. Dove

09:15:21  16  indicated that you had not intended to hire an expert witness.

09:15:26  17         MR. WILLIS:  I don't -- I don't believe that we

09:15:29  18  made that representation, Your Honor.

09:15:31  19         THE COURT:  My understanding was that you had

09:15:33  20  considered retaining an expert, but had not done so.

09:15:37  21         MR. WILLIS:  That, I believe, was the statement

09:15:38  22  that was made because at the time of the hearing we had not

09:15:41  23  retained Ms. Kelly.

09:15:42  24         And frankly, Your Honor, we were viewing this

09:15:45  25  hearing as in the nature of a Daubert hearing, where the issue

09:15:48  1   before the Court is the qualifications of Dr. Kelley to opine

09:15:51  2   as an expert in the area of forensic document examination.

09:15:55  3   We were actually hopeful that Ms. Kelly, Jan Kelly, would not

09:15:59  4   be needed to testify because, after Dr. Kelley's testimony,

09:16:02  5   we believe the Court should rightfully exclude any testimony

09:16:06  6   offered as an expert of opinion by him under 702 and under

09:16:11  7   Daubert.

09:16:12  8            THE COURT:  And that is correct, that is one

09:16:14  9   of the primary basis of this hearing today is to go through

09:16:17  10  the Daubert analysis and to make a determination as to

09:16:22  11  Mr. Kelley's -- or Dr. Kelley's qualifications because I do

09:16:23  12  believe that this entire motion turns on the question of

09:16:27  13  whether or not that expert opinion is something that is even

09:16:30  14  admissible or should be considered by the Court.  So, I don't

09:16:33  15  disagree with that.

09:16:35  16            We're going to proceed today either way.  And we'll

09:16:37  17  take the testimony.  And your objections can be made on the

09:16:40  18  record.  But, I'm not going to continue this or make anybody

09:16:45  19  go home at this point with everybody that's come.  And I

09:16:47  20  believe, Mr. Johannessen, you've come from quite a distance to

09:16:50  21  be here.  I'm sure Dr. Kelley has as well.  So, we'll go ahead

09:16:54  22  and proceed.

09:16:54  23            But with that in mind, we'll move forward and we'll

09:16:59  24  see where we're at, and then we'll just revisit what needs to

09:17:02  25  happen as the hearing proceeds.  So with that, I'm going to go

09:17:07  1  ahead and turnover to plaintiff's counsel and let's just get

09:17:09  2  started at this point.

09:17:10  3              MR. WILLIS:  Thank you, Your Honor.

09:17:12  4              MR. PANKOPF:  Your Honor, we would like to call

09:17:14  5  Dr. James Kelley.

09:17:32  6              THE COURT:  Please, sir.

09:17:32  7              MR. WILLIS:  Point of clarification, Your Honor.

09:17:34  8  I'm not sure I heard counsel.  Are they intending to use two

09:17:38  9  lawyers on one witness?

09:17:40 10              THE COURT:  That won't be permitted.

09:17:42 11              MR. JOHANNESSEN:  No, Your Honor.

09:17:43 12              THE COURT:  Okay.

09:17:44 13              MR. WILLIS:  Thanks.  I'm sorry.  Then I just

09:17:44 14  misunderstood.  I'm sorry.

09:17:45 15              THE COURT:  Okay.  Thank you, sir.

09:17:45 16              MR. JOHANNESSEN:  One of clarification for my

09:17:47 17  benefit.  Would the motion to exclude the testimony of

09:17:51 18  Ms. Kelly -- or pardon me, the expert that is designated by

09:17:56 19  Wells Fargo, you are correct, that in May 10th, the Court

09:18:00 20  ordered the parties to disclose their experts.  Wells Fargo

09:18:05 21  opted not to.  That was over 200 days ago.

09:18:10 22              THE COURT:  Okay.  I'm going to stop.

09:18:12 23              MR. JOHANNESSEN:  Yes, Your Honor.

09:18:12 24              THE COURT:  When I say I'm a done, I'm done.

09:18:14 25              MR. JOHANNESSEN:  Thank you, Your Honor.

09:18:14    1           THE COURT:  I don't want to have anymore

09:18:16    2   argument.  Any reconsideration arguments that happen right

09:18:18    3   after I make a ruling will not be considered.  We don't have

09:18:20    4   enough time for that today.  And quite frankly, I don't want

09:18:23    5   to get into that at this point.

09:18:25    6           As I indicated at the proceedings on the 11-13, I

09:18:31    7   thought I was quite clear I did not want to have anymore

09:18:34    8   filings made.  I was not aware of these two motions that

09:18:37    9   were filed yesterday with respect to these particular

09:18:40   10   witnesses.

09:18:41   11           I will note, for the record, that when this all

09:18:43   12   started, this expert was not provided to the plaintiff.  When

09:18:48   13   this -- or the defendant, when this initially all occurred and

09:18:52   14   sort of came as somewhat of a surprise at the May 10th hearing

09:18:56   15   in and of itself.  So, I think we can all agree that the way

09:19:00   16   that this has proceeded has not exactly been the way that

09:19:03   17   would be ideal for all parties involved.

09:19:05   18           So we're going to proceed at this point.  I will

09:19:08   19   hear the witnesses that everyone has brought here to testify

09:19:11   20   and then I will rule on this subsequent to this hearing.  So

09:19:14   21   with that in mind, let's get started so that we can make sure

09:19:17   22   that we get all the testimony in at this point.

09:19:19   23           MR. JOHANNESSEN:  Thank you, Your Honor.

           24   \\\

           25   \\\

**DR. JAMES KELLEY,**
called as a witness on behalf of the Government,
was sworn and testified as follows:

09:19:22  3

09:19:33  4            THE CLERK:  Please state your full name for the

09:19:33  5  record, spelling your last name.

09:19:33  6            THE WITNESS:  My full name is Dr. James M.

09:19:36  7  Kelley, Madison Kelley, K-e-l-l-e-y.

09:19:41  8            THE CLERK:  Thank you.

09:19:44  9                    **DIRECT EXAMINATION**

09:19:44  10  BY MR. PANKOPF:

09:19:44  11   Q   Dr. Kelley, what is your occupation?

09:19:46  12   A   Uh, I'm a scientist and an engineer.  Okay.

09:19:52  13   Q   Are you employed?

09:19:57  14   A   I've been self-employed for years, so.

09:20:07  15            THE COURT:  If I can interrupt you, sir.

09:20:09  16        I see that I have an exhibit binder here.  Was that

09:20:12  17  provided to the plaintiff's counsel?

09:20:14  18            MR. PANKOPF:  Yes, Your Honor.

09:20:15  19            THE COURT:  And has defense got a binder that's

09:20:19  20  similar to this?

09:20:19  21            MR. WILLIS:  Your Honor, we don't, but we

09:20:21  22  can create one.  We didn't want to have duplication, so

09:20:24  23  we've actually culled down our potential exhibits to, looks to

09:20:29  24  be about five or six maximum.

09:20:31  25            THE COURT:  Okay.

09:20:31  1                 MR. WILLIS:  We would, perhaps at the break,

09:20:33  2   arrange to have those numbered.  And I can put those in a

09:20:36  3   binder if that would be more convenient for the Court.

09:20:38  4                 THE COURT:  No.  Actually, I had not anticipated

09:20:40  5   this because everyone had attached exhibits to their various

09:20:43  6   motions and I assumed that these are duplications of various

09:20:46  7   exhibits that have already been attached to the different

09:20:51  8   motions.  In my preparation, I was using the exhibits as they

09:20:51  9   were attached to the motions to be prepared.  So if, when you

09:20:53  10  go through these witness -- or these exhibits, if you could

09:20:56  11  point to the exhibit that it matches, and in respect to the

09:20:59  12  motions and the replies and the oppositions, that would be

09:21:03  13  very helpful to me as we go through this.

09:21:05  14                And I'm sorry to interrupt, sir, but please

09:21:08  15  continue.

09:21:08  16                MR. PANKOPF:  Thank you, Your Honor.

09:21:09  17  BY MR. PANKOPF:

09:21:12  18  Q   Dr. Kelley, can you describe, briefly, the subject matter

09:21:15  19  of your specialty, your expertise.

09:21:17  20  A   Uh, yes, I have, educationally, I have a mast -- a B.A.

09:21:25  21  in mathematics, with a minor in chemistry and philosophy.  I

09:21:29  22  have a Master's Degree in Electrical Engineering from U.C.

09:21:35  23  Santa Barbara.  And I have a Ph.D degree in Electrical and

09:21:39  24  Computer Engineering from the University of California,

09:21:41  25  Santa Barbara.

09:21:42  1          From a work experience, uh, I was involved in

09:21:47  2     reactor -- nuclear reactor corporate design unit for five at

09:21:52  3     General Electric.  I was involved with a Raytheon Missile

09:22:00  4     Systems division in the creation of the B-1 Bomber, repel

09:22:06  5     stop or attack radar.  And, um, also with the anti ballistic

09:22:15  6     missile system.

09:22:16  7          I was mathematician at Stanford Research Institute

09:22:20  8     in Menlo Park, California.

09:22:21  9          And let's see, what else?

09:22:23  10          I started, I ran my own company for 10 years,

09:22:26  11     building, uh, in-circuit emulators for highly specialized

09:22:40  12     computers.

09:22:40  13                COURT REPORTER:  Building what?

09:22:40  14                THE WITNESS:  In -- i-n-c-i-r-c-u-i-t,

09:22:41  15     emulators, E-m-u-l-a-t-o-r-s, which are specialized tools for

09:22:42  16     engineers and scientists, which were also used to program the

09:22:46  17     Space Shuttle payload computer.

09:22:48  18          Oh, and I also worked in infrared guidance system

09:22:58  19     for a missile system for shor -- it's a shoulder launched

09:23:07  20     anti missile system to shoot down shoulder launched missiles

09:23:11  21     within two seconds.  So, they only had two seconds to do it.

09:23:15  22          And I had patents in, uh -- I have three U.S.

09:23:20  23     patents in computer technology.

09:23:27  24     BY MR. PANKOPF:

09:23:27  25      Q   Do you have any specializations within the fields that

09:23:31   1   you've identified?

09:23:32   2   A    Uh, yes.  Part of the PAT program, we had specialization

09:23:39   3   fields.  And one of them here is the single processing and it

09:23:44   4   has to do with image processing and speech processing.  And

09:23:51   5   in connection with that, I did create a digital radio for

09:23:55   6   Litton Industries for F-16 fire aircraft.

09:24:00   7   Q    Does your specialty involve forensic document

09:24:18   8   examination?

09:24:19   9   A    Well, forensic document examination, uh -- the procedures

09:24:25   10   of forensic document examination involve the use of scan, you

09:24:29   11   know, photoscanners, microscopes, you know, and inspection,

09:24:34   12   according to the SWG doc and AST standards, and the procedures

09:24:41   13   are specified in there.

09:24:43   14   Q    So are you familiar with the printing processes of the

09:24:49   15   printers?

09:24:50   16   A    Yes.  Yeah, you have to be nowadays because there are

09:24:53   17   different kinds of printers.  And inkjet printers, in

09:25:00   18   particular, have advanced greatly over the years, and they're

09:25:04   19   responsible for the creation of about 6 percent of the

09:25:08   20   counterfeit money in the United States according to the FBI.

09:25:12   21   So, they're that good.  They can make a $100 bill and that can

09:25:16   22   pass.

09:25:18   23            And there's some interesting cases of this in the --

09:25:21   24   which you can find online, where people have gotten caught

09:25:25   25   using Hewlett Packard inkjet printers and making $100 bills.

09:25:31  1    And so making a $100 bill is a lot harder than putting a

09:25:36  2    signature on a loan document.

09:25:38  3    Q    Did I hear you correctly?  Did you say you attended --

09:25:41  4    did you tell me what university you attended?

09:25:43  5    A    I graduated from University of California, Santa Barbara,

09:25:47  6    with a Master's Degree in Electrical Engineering.  And I

09:25:51  7    graduated with a Ph.D degree from the University of

09:25:55  8    California, Santa Barbara, in electrical and computer

09:25:58  9    engineering as to design of computers.

09:26:02  10   Q    And your undergraduate degree was earned where?

09:26:05  11   A    San Jose State University.

09:26:07  12   Q    And did you say that was mathematics?

09:26:10  13   A    Yeah, in mathematics.  But, I worked my way through

09:26:14  14   college.  I was working at General Electric in their nuclear

09:26:17  15   reactor physics group, which consisted of about five people

09:26:21  16   from MIT, MIT and Stanford nuclear engineering.  They had

09:26:30  17   nuclear engineering degrees, so.

09:26:33  18   Q    Did you have any minors at your undergrad?

09:26:36  19   A    Yes.  I, I was -- when I came to college, I was an

09:26:41  20   honors chemistry student and a honors humanities and advanced

09:26:46  21   placement mathematics.  So I took a chemistry minor to --

09:26:50  22   because I was getting plenty of physics at General Electric.

09:26:56  23   Q    Did you have any specialized degrees or training?

09:26:59  24   A    Well, uh, I'm a licensed private pilot with a tail

09:27:06  25   guarder certification and I have Scuba.

09:27:10   1              Uh, as far as -- what other areas you mean, like

09:27:15   2    specialized training?

09:27:17   3    Q    Right.  Did you, did you attend classes at Lowell

09:27:23   4    Technical Institute?

09:27:24   5    A    I did.  Yeah, that was when I was working for

09:27:27   6    Raytheon Missile Systems, they wanted me to take a course in

09:27:31   7    nuclear reactor physics at Lowell Technical Institute.  I was

09:27:31   8    just kind of interested in it.  I wasn't doing it any longer.

09:27:35   9    I just thought I'd take a course unit there.

09:27:38   10             And I also took training in information theory at

09:27:43   11   Stanford.  And also Raytheon sent me to conferences with

09:27:49   12   the -- they're basically they're the leading world experts in

09:27:52   13   information theory.

09:27:54   14   Q    Can you give --

09:27:56   15   A    In the East Coast.

09:27:56   16   Q    Can you give us a synopsis from, you know, when you

09:27:59   17   graduated from your undergrad to the present time of what

09:28:02   18   positions you held at the various companies --

09:28:05   19   A    Okay.

09:28:06   20   Q    -- in your company?

09:28:07   21   A    Okay.  Well, I worked first for General Electric for

09:28:13   22   about five years.  And when I graduated, I had some choices

09:28:21   23   to make because I was offered two jobs with hydrogen bomb

09:28:25   24   designing works at Lawrence Livermore Labs, and also a nuclear

09:28:29   25   rocket that they had under development there at the time.

09:28:32   1          I ended up taking a job at Stanford Research

09:28:36   2   Institute as a mathematician because I wanted to continue my

09:28:39   3   education, and it was near Stanford University.  And I was

09:28:43   4   assigned there to reviewing tactical electronic battle field

09:28:49   5   environments, to creating a (unintelligible) program for

09:28:55   6   sub-optimum deployment of missile systems in the United

09:28:59   7   States, you know, in different states of the United States.

09:29:02   8          And I also had a job of looking at nuclear blast

09:29:10   9   damage in cities in the United States, which I did not like.

09:29:24  10   Q   Is there anything else that -- I know you've talked about

09:29:27  11   it briefly before --

09:29:28  12   A   Yeah, well --

09:29:34  13   Q   (Unintelligible.)

09:29:34  14          COURT REPORTER:  Don't talk at the same time.

09:29:34  15   BY MR. PANKOPF:

09:29:34  16   Q   Go ahead.

09:29:35  17   A   Okay.  Well, yeah, and then I left there to go, uh, to a

09:29:41  18   con -- a software consulting firm in Houston, Texas, that was

09:29:44  19   doing work for NASA.  And, uh, and I ended up -- that was

09:29:50  20   about a year because that company ended up going out of

09:29:53  21   business.  So during the course of that year, I went to

09:29:55  22   Washington, D.C., where I was working on a program, some

09:29:59  23   neighborhood youth core database for -- you know, managing

09:30:03  24   that.

09:30:03  25          And then I moved to Raytheon Missile Systems as a

09:30:08  1   consultant first.  And when the company went out of business
09:30:11  2   and Raytheon hired me as a senior engineer.  And I worked
09:30:21  3   there -- on the anti ballistic missile system at first,
09:30:26  4   developed some new mathematical algorithms that were used in
09:30:33  5   the testing.  And then they moved me to the, I think it's a 7,
09:30:39  6   task 7, which was a prototype of the B-1 Bomber radar system.
09:30:48  7        And then I was appointed manager of that group,
09:30:53  8   overseeing the high repel stopper, meaning repel stopper, or
09:31:01  9   repel stopper, which was a radar that was tested at Holloman
09:31:05  10  Air Force Base in New Mexico, and Wright-Patterson in Ohio,
09:31:10  11  and worked -- then I went back to Raytheon, and the chief
09:31:18  12  scientist of, of -- in Santa Barbara wanted me to come to
09:31:25  13  work or stay in Bedford until the electronic countermeasures
09:31:32  14  portions became active of their contract.  But, I wanted to
09:31:35  15  move to the West Coast because my family is on the West Coast.
09:31:39  16  Q    Right.
09:31:39  17  A    And so I left Raytheon and went to work for Ross Boroughs
09:31:43  18  Company out of San Francisco.  I got a call one day from
09:31:47  19  Raytheon and they wanted me to come down there to commit to
09:31:52  20  working on the development of the B-1 Bomber electronic
09:31:57  21  countermeasures system.  So I was working for the chief
09:32:01  22  scientist of Raytheon in Santa Barbara, Goleta, you know,
09:32:07  23  Goleta area of Santa Barbara.  And I stayed there for about a
09:32:10  24  year.  And they gave me a list of problems when I came in
09:32:14  25  and I solved every problem.  And I also designed, ended up

09:32:18  1  designing the prototype electronic countermeasure processor to

09:32:23  2  meet the air force specifications because they had -- they

09:32:26  3  were extreme, extreme requirements.  And we didn't, when we

09:32:30  4  started out, we didn't know how to do it.

09:32:35  5  Q   Do you have any memberships to any professional societies

09:32:39  6  or associations or organizations?

09:32:41  7  A   Yes.  I'm a member of the Association of Computer

09:32:44  8  Machinery, and the Institute of Electrical and Electronic

09:32:50  9  Engineers.  And these are the largest associations in the

09:32:53  10  world of their kind.  They're worldwide organizations.

09:32:58  11  Q   What is the Computational Intelligence for ACM?

09:33:03  12  A   It's basically artificial intelligence.

09:33:06  13  Q   Is it -- what do you have to do with that?

09:33:08  14  A   Well, I'm monitoring that because some of the computer

09:33:12  15  patents I have relate to artificial intelligence.  They're

09:33:17  16  associative memories.

09:33:19  17  Q   Is that another professional organization you're a member

09:33:22  18  of?

09:33:22  19  A   I triple E, yeah.  Uh-huh.  Well, the computational

09:33:27  20  science is a sub -- a special interest group within the I

09:33:32  21  triple E.

09:33:37  22  Q   Are there any honors or acknowledgments or awards you've

09:33:41  23  received in your field?

09:33:42  24  A   Well, yeah, I was -- I worked, you know -- when I, later

09:33:47  25  on, when I worked for Chipson Technologies (phonetic), I was

09:33:51  1   elected Fellow, Engineering Fellow there, which is an honorary

09:33:55  2   position within the company.  It was later acquired by

09:33:58  3   Intel Corporation.

09:33:59  4   Q   Did a lot of these companies that you worked for work for

09:34:02  5   the government?

09:34:03  6   A   Chips didn't, but Raytheon certainly did and Litton

09:34:10  7   did and Stanford Research Institute did.  General Electric

09:34:16  8   sometimes did.  We worked with Oak Ridge National Laboratory

09:34:20  9   and I put the Oak Ridge National Laboratory library up on the

09:34:25  10  General Electric computers.  That was one of my tasks.

09:34:29  11        And I also had to learn to run all the codes, the

09:34:33  12  nuclear codes.  That's why they wanted to hire me on the

09:34:37  13  hydrogen bomb project.  I run all the nuclear codes.

09:34:41  14        And I was training people at General Electric that

09:34:44  15  just graduated, like, with their master's degrees in nuclear

09:34:46  16  engineering, so I would train them in how to use those codes.

09:34:50  17  Q   Did you get ever get any ratings from the government?

09:34:55  18  A   Yeah.  When I was going to Santa Barbara for my

09:35:00  19  master's degree program, one of the professors there was

09:35:03  20  (unintelligible) for summer employment, so the U.S. Navy rated

09:35:06  21  me as a GS-18.

09:35:08  22  Q   What does that mean?

09:35:09  23  A   I don't know.  I thought -- I didn't know what it meant

09:35:12  24  at the time, but I later found out.  I think that's the

09:35:15  25  highest rating that they had in -- so and they said would you

09:35:20   1    take a lower one.  And I said, well, no, that's okay.  Thanks

09:35:26   2    a lot.  And I went and I got a job up in the, you know, in the

09:35:28   3    San Jose area with a assess control company for the summer

09:35:31   4    until I had a fellowship from the -- you know, the school had

09:35:36   5    arranged for me to complete my Ph.D by providing me with a,

09:35:41   6    you know, basically money to do that.  So, yeah.

09:35:44   7       Q    It was the highest rating they had for what?

09:35:47   8       A    I think it was the highest rating they had for engineers

09:35:50   9    at that -- in that the navy missile place down there, so.

09:35:57   10      Q    Did it relate to your pay grade or something of that

09:36:00   11   nature?

09:36:00   12      A    Yes.  A pay grade.  Yeah, it's basically a pay grade.

09:36:03   13   It's a rank, pay rank.

09:36:08   14      Q    So after this career in electrical engineering, computer

09:36:13   15   software designing and what have you, how did you segue into

09:36:17   16   your present field of document examination?

09:36:26   17      A    Well, that came later.  I was asked in 2012 by a private

09:36:31   18   detective in Montana to look at his note because it had ink

09:36:35   19   that went from blue to black in it, and it was delivered to

09:36:38   20   him electronically.  So he sent it down to me and I put it

09:36:42   21   in Adobe Illustrator, and I could see that the signature,

09:36:47   22   which went from blue to black ink, was constructed in Adobe

09:36:53   23   Illustrator.  And it took about 5 or -- 5 minutes to do that,

09:36:57   24   5 or 10 minutes after I loaded it in.  And I could turn the

09:37:01   25   signature on and off, and different parts of it would

09:37:04  1    appear -- there are little switches in Adobe.  So -- and the

09:37:08  2    reason is is the signature was in layers and you just turn the

09:37:10  3    layers on and that signature appears in the right place.

09:37:13  4              THE COURT:  Sir, can you make sure that you

09:37:15  5    speak directly into the microphone so that we can hear you.

09:37:18  6              THE WITNESS:  Yes.

09:37:22  7    BY MR. PANKOPF:

09:37:23  8    Q    Do you have some type of expertise in Adobe photoshop?

09:37:28  9    A    Well, I was using Adobe Illustrator.

09:37:31  10   Q    I'm sorry.  Adobe Illustrator.

09:37:34  11   A    Yeah.  I was using both of them.  But for this one, the

09:37:38  12   Adobe Illustrator was able to demonstrate that.

09:37:41  13             And also there's no pen that -- where the ink goes

09:37:43  14   from blue to black to blue, so it was pretty obvious that this

09:37:48  15   was not an authentic document, or even a copy of an authentic

09:37:53  16   document.

09:37:53  17   Q    Are there certain standards that you follow as a forensic

09:37:57  18   document examiner as to laser or inkjet printers?

09:38:02  19   A    Yeah.  The standards are in two places.  One is the

09:38:07  20   association for testing materials, which is forensic document

09:38:14  21   standards.  And the second place they are, which are

09:38:18  22   essentially identical, is the SWG doc, which stands for

09:38:24  23   south -- Scientific Working Group and documents.  And the

09:38:29  24   FBI belongs to that group.  The FBI lab belongs to the SWG

09:38:34  25   doc and they worked with the AST for awhile until some

09:38:39   1   controversy developed, which I'm not familiar with.  I'm not

09:38:43   2   familiar with what caused this split off from the two groups,

09:38:46   3   but both groups still provide standards.  And, beyond that, I

09:38:54   4   don't know what the nature of that controversy was.

09:38:57   5   Q    Do you have that exhibit book sitting in front of you,

09:39:02   6   Dr. Kelley?

09:39:02   7   A    I do not.

09:39:14   8   Q    Would you please look at Exhibit 8.

09:39:23   9   A    I have it.

09:39:24  10   Q    Okay.  Review the document, please.

09:39:26  11   A    Yeah, it's the standard guide --

09:39:29  12   Q    I mean review it to yourself.

09:39:30  13   A    Oh, I see.

09:39:33  14         (Witness reviews document.)

09:39:44  15   Q    Have you had a chance to review it?

09:39:46  16   A    Yes.

09:39:46  17   Q    Can you tell us what Exhibit 8 is?

09:39:48  18   A    Yeah, it's a four-page document and it's a guide -- it's

09:39:54  19   a standard guide for the examination of documents produced

09:39:58  20   with a liquid inkjet technology.

09:40:03  21   Q    Are these the standards you follow when you examine a

09:40:06  22   document?

09:40:06  23   A    Yes.  Yes.  There's nothing -- I don't do anything that's

09:40:10  24   not in these standards.

09:40:13  25   Q    Is there anything esoteric about these standards?

09:40:18  1   A    No.   They define what they think is important, and this

09:40:23  2   guide was agreed to by all those members of these groups of

09:40:27  3   the SWG doc group, which is part of the ASTM at the time this

09:40:33  4   was done.  And so this was the opinion of the industry at the

09:40:40  5   time, so this is the their opinion of what the standard should

09:40:44  6   be and what the procedures should be.

09:40:48  7   Q    Does the standard describe the methodology you should use

09:40:53  8   when examining a document?

09:40:54  9   A    Yes.

09:40:54  10  Q    And do you -- and you follow it?

09:40:57  11  A    Yes.

09:40:58  12  Q    Is it -- is this standard grounded in the generally

09:41:08  13  accepted body of knowledge and experience in the field of

09:41:11  14  forensic document examiners?

09:41:14  15  A    They all agree to what's in the standard; so, yes.

09:41:17  16  Q    Does this particular ASTM standard state that itself --

09:41:24  17            MR. WILLIS:  Objection, Your Honor.  The

09:41:25  18  document speaks for itself.

09:41:30  19            THE COURT:  I agree.  That's sustained.

09:41:35  20            And Mr. Pankopf, I would actually like the witness

09:41:39  21  to go back.  If you can go over -- was there evidence of him

09:41:47  22  being trained as a forensic document examiner on using these

09:41:54  23  standards?  I have not heard any and I have not seen any in

09:41:57  24  the record.  And that would be really important for us to

09:41:59  25  establish here today.

09:42:01  1   BY MR. PANKOPF:

09:42:01  2   Q   What type of training do you have in forensic document

09:42:05  3   examination?

09:42:07  4   A   I don't have any specific formal training in it, but I

09:42:10  5   can -- this document is only four pages long and it involves

09:42:12  6   everything I already know how to do; so microscopes, scanners,

09:42:17  7   light use of illumination, the equipment.  And so -- and I

09:42:22  8   already know how to use it.  In fact, I know how to design a

09:42:25  9   lot of it, so.

09:42:26  10   Q   And would you characterize yourself as a scientist?

09:42:29  11   A   Yeah.  I'm both a scientist and an engineer.  Yeah.

09:42:33  12   Q   Do you know how to examine problems?

09:42:39  13   A   Oh, you mean --

09:42:40  14   Q   Excuse me.  Let me finish my question.

09:42:42  15   A   Okay.

09:42:42  16   Q   Do you know how to examine problems?

09:42:44  17   A   Yes.

09:42:45  18   Q   And do you know how to read, you know, this ASTM and

09:42:50  19   apply the methodology?

09:42:52  20   A   Yes.  It's straightforward.  They define their terms.

09:42:55  21   They define what's important to them in terms of features

09:42:59  22   produced by the inkjet.  I look for the features that they've

09:43:03  23   identified and I take pictures.  They want you to record the

09:43:09  24   results, so I take hundreds of pictures of these documents.

09:43:13  25          Typically, I have 11 to 14 gigabytes of photographs

09:43:18   1    that are both microscope photographs and photoscanner

09:43:23   2    photographs because the scanner, IRS photoscanner can be

09:43:29   3    used as a microscope as well.

09:43:32   4    Q    How does examining the authenticity of a document as to

09:43:45   5    whether it was created by a laser or inkjet printer compare to

09:43:52   6    the numerous, if not countless, problems that you've solved

09:44:00   7    over your career as a scientist or an nuclear engineer or

09:44:05   8    electrical engineer?

09:44:07   9              MR. WILLIS:  Objection, Your Honor.  Vague,

09:44:09   10   argumentative, and compound.

09:44:10   11             THE COURT:  I agree.  It is a compound question,

09:44:12   12   sir.  If you could break that up, that would make it easier

09:44:15   13   for the witness to answer.

09:44:17   14   BY MR. PANKOPF:

09:44:18   15   Q    How does examining a document as a -- having been created

09:44:25   16   by a laser, an inkjet printer, compare to the problems that

09:44:31   17   you solved as a nuclear engineer?

09:44:34   18             MR. WILLIS:  Objection.  Vague.  And relevance.

09:44:36   19             THE COURT:  I'm going to allow it.  Thank you,

09:44:38   20   sir.

09:44:39   21             THE WITNESS:  Should -- can I answer or --

09:44:42   22             MR. PANKOPF:  Yeah.

09:44:43   23             THE COURT:  Yes, please.

09:44:44   24             THE WITNESS:  Um, well, you know, nuclear

09:44:47   25   physics is a lot harder than this, so it doesn't -- you

| 09:44:50 | 1 | know, this doesn't require a master's degree, you know, this |
| 09:44:55 | 2 | work.  In fact, most of the people working in the document |
| 09:44:57 | 3 | examination field are not even technically trained, like, you |
| 09:45:01 | 4 | know, they don't have technical degrees.  They have degrees in |
| 09:45:04 | 5 | various -- |
| 09:45:04 | 6 | MR. WILLIS:  Objection, Your Honor.  I move to |
| 09:45:06 | 7 | strike.  That was non-responsive to the question.  It was |
| 09:45:08 | 8 | speculation on the part of the witness. |
| 09:45:09 | 9 | THE COURT:  And I agree, so that is sustained. |
| 09:45:21 | 10 | THE WITNESS:  Uh-huh. |
| 09:45:21 | 11 | BY MR. PANKOPF: |
| 09:45:21 | 12 | Q   How does the examination of the document having been |
| 09:45:23 | 13 | created by an inkjet printer compare to the problems you |
| 09:45:27 | 14 | solved as an electrical engineer? |
| 09:45:30 | 15 | A   They're is -- they're, really, totally different |
| 09:45:33 | 16 | problems, you know.  I mean, radar and -- radars do involve |
| 09:45:38 | 17 | image processing though. |
| 09:45:47 | 18 | Q   Does the methodology in this particular ASTM tell you |
| 09:45:53 | 19 | what type of equipment to use? |
| 09:45:55 | 20 | A   Yeah. |
| 09:45:56 | 21 | MR. WILLIS:  Your Honor, again, the document |
| 09:45:58 | 22 | speaks for itself. |
| 09:46:03 | 23 | THE WITNESS:  Section 6 -- |
| 09:46:04 | 24 | THE COURT:  Sir, I have not ruled on the |
| 09:46:06 | 25 | objection. |

09:46:06   1          THE WITNESS:  Oh.  I'm sorry.

09:46:08   2          THE COURT:  The document does speak for itself

09:46:15   3   with respect to that; however, I'm going to allow some leeway

09:46:20   4   because I want to get as much evidence on the record as we

09:46:23   5   can.

09:46:23   6          So I'm going to allow it, but I would ask

09:46:26   7   Mr. Pankopf to move on to something else after that question.

09:46:35   8          Please answer the question, sir.

09:46:37   9          MR. PANKOPF:  So you can answer it now.

09:46:38  10          THE WITNESS:  I can answer now?

09:46:39  11          Okay.  Well, 6.2 talks about specific magnification,

09:46:44  12   so that would imply the use of microscopes and high risk

09:46:49  13   scanners.

09:46:50  14          Uh, rulers, they want you to measure things.  The,

09:46:53  15   um, photoscanner can measure things up to one ten-thousandths

09:47:01  16   of an inch.

09:47:02  17          Other apparatus would be, uh, magnets.  I sometimes

09:47:06  18   use magnets to determine if the ink is ferromagnetic.  And

09:47:10  19   that can be important because they don't make ferromagnetic

09:47:14  20   pens.  They make bar codes.  Inkjets, uh, frequently have

09:47:20  21   ferromagnetic ink in them, so I'm looking for that.

09:47:24  22          Imaging equipment includes the microscopes again,

09:47:28  23   and the scanners primarily.  And they would include things

09:47:36  24   like infrared, ultraviolet, and also the regular visual

09:47:42  25   spectrum that were used too.

09:47:47   1         Reference materials could be other things that we

09:47:50   2   know to be good, you know, good things to compare to.

09:47:54   3         And then the other requirements, sufficient time to

09:47:58   4   do all this -- and we're always time bound in these reports,

09:48:02   5   so we can only -- I can't report on absolutely everything.  I

09:48:07   6   have to report on the things that are probative, when I have

09:48:11   7   probative things, and things which are indicative, to the

09:48:15   8   extent that I have time to do that and, you know, to evaluate

09:48:21   9   it.

09:48:24  10         MR. PANKOPF:  Your Honor, I would like to have

09:48:26  11   marked Plaintiff's Exhibit 8 as an exhibit.  Again, I didn't

09:48:29  12   know whether we want to mark it as we have it in our book

09:48:33  13   or -- yes.  Okay.

09:48:34  14         So I'd mark it as Exhibit 8 and move it into the

09:48:37  15   record.

09:48:37  16         THE COURT:  Is there any objection?

09:48:38  17         MR. WILLIS:  We have no objection, Your Honor.

09:48:39  18         THE COURT:  So admitted.

09:48:41  19         (Whereupon, Exhibit 8 -- a document, ws received in

09:48:42  20   evidence. 8 received.)

09:48:42  21   BY MR. PANKOPF:

09:48:43  22    Q   And Dr. Kelley, can you look at Exhibit 9, please.

09:48:50  23         MR. PANKOPF:  And Your Honor, this is the --

09:48:52  24   this is document 225-4 attached to the reply brief, in support

09:48:59  25   of the reply brief.

| 09:49:00 | 1 | THE COURT:  Okay.  And is -- |
| 09:49:07 | 2 | MR. PANKOPF:  I mean -- |
| 09:49:08 | 3 | THE COURT:  -- is this the same document? |
| 09:49:09 | 4 | MR. PANKOPF:  It is, Your Honor.  It has the |
| 09:49:11 | 5 | Court's stamp on top, the filing stamp. |
| 09:49:14 | 6 | THE COURT:  So the document that's at 8 and |
| 09:49:17 | 7 | document that's at 9, are these the same? |
| 09:49:20 | 8 | MR. PANKOPF:  No, Your Honor.  The, uh, document |
| 09:49:25 | 9 | Exhibit 8 is the ASTM standard. |
| 09:49:28 | 10 | THE COURT:  Okay. |
| 09:49:28 | 11 | MR. PANKOPF:  And just for your information, |
| 09:49:31 | 12 | it's identical to the SWG doc.  I was going to ask him about |
| 09:49:37 | 13 | that and then move it into evidence. |
| 09:49:39 | 14 | THE COURT:  Is there any objection to the |
| 09:49:40 | 15 | admission of Exhibit 9, sir? |
| 09:49:41 | 16 | MR. WILLIS:  No, Your Honor. |
| 09:49:42 | 17 | THE COURT:  Okay.  It will be admitted. |
| 09:49:46 | 18 | (Whereupon Exhibit 9 -- a document, was received in |
| 09:49:46 | 19 | evidence.) |
| 09:49:46 | 20 | BY MR. PANKOPF: |
| 09:49:47 | 21 | Q   Are you familiar with these standards? |
| 09:49:48 | 22 | A   Yes. |
| 09:49:49 | 23 | Q   And how do they compare to the ASTM standards? |
| 09:49:53 | 24 | A   They're, word for word, identical. |
| 09:50:01 | 25 | Q   So Dr. Kelley, if I understand your testimony, your |

09:50:04  1    previous testimony, the first time you examined a document

09:50:07  2    was back in the year 2012, is that correct?

09:50:10  3     A   Yes.

09:50:12  4     Q   And have you, have you continued examining documents

09:50:17  5    since then?

09:50:18  6     A   Yes.  The private detective, you know, was kind of

09:50:23  7    excited and he started sending other people with -- you know,

09:50:27  8    one of their staff looked at, and I -- so I was just doing it

09:50:31  9    for free for a while.  And it started taking up more time, so

09:50:35  10   uh, it, uh -- that's how that happened.

09:50:43  11    Q   Okay.  Dr. Kelley, would you take a look at Exhibit 6 in

09:50:47  12   your book, please.

09:50:51  13             THE COURT:  If I could just interject a question

09:50:53  14   because I want to be clear on this.

09:50:55  15             So as I understand it, sir, you did not receive any

09:50:59  16   formal training in forensic document examinations, is that

09:51:02  17   correct?

09:51:02  18             THE WITNESS:  That's correct.

09:51:03  19             THE COURT:  So your experience and expertise

09:51:06  20   comes simply from having received a document that you

09:51:09  21   examined, and then moving forward with those examinations.

09:51:12  22             Is that accurate.

09:51:13  23             THE WITNESS:  That's right.

09:51:14  24             THE COURT:  Okay.  Thank you, sir.

09:51:15  25             Please go back to -- was it Exhibit 6?

09:51:19  1                    MR. PANKOPF:  Yes, Your Honor.

09:51:20  2                    THE COURT:  Thank you.

09:51:24  3                    MR. PANKOPF:  And again, for your clarification,

09:51:27  4       Your Honor, this is document 218-6, which was attached --

09:51:31  5                    THE COURT:  Okay.

09:51:31  6                    MR. PANKOPF:  It's separated from Dr. Kelley's

09:51:34  7       report, that was attached in support of the motion itself.

09:51:39  8       And you have the file stamp on top.

09:51:42  9                    THE COURT:  I see that, sir.  Thank you.

09:51:43  10                   Is there any objection to that exhibit number 6,

09:51:46  11      sir?

09:51:46  12                   MR. WILLIS:  Your Honor, we do not object to

09:51:49  13      the portions of Exhibit 6 that detail the alleged experience.

09:51:55  14      We do object to the first two pages, which is, I think at

09:52:01  15      best, a very biased statement of the industry that he believes

09:52:07  16      exists, and there is nothing to support those allegations.

09:52:12  17                   MR. PANKOPF:  It's opinion testimony.

09:52:17  18                   MR. WILLIS:  Only, for example, I -- he states

09:52:19  19      in this document "it's easy to fabricate a mortgage document."

09:52:23  20                   THE COURT:  And I've read this document several

09:52:26  21      times and I'm very familiar with it.

09:52:28  22                   MR. WILLIS:  Oh.  Well, in that case --

09:52:30  23                   THE COURT:  I'm going to go ahead and allow it

09:52:32  24      to be admitted, with the caveat that I understand the position

09:52:39  25      of the defense that this really is more statements being made

09:52:42   1   by the defendant's -- or by plaintiff's expert that are more

09:52:45   2   in the realm of his opinions of the industry in general, but

09:52:50   3   not specific to this case.  So with that caveat, the exhibit

09:52:56   4   will be admitted.

09:52:57   5            (Whereupon, Exhibit 6 -- a document, was received in

09:53:03   6   evidence.)

09:53:03   7   BY MR. PANKOPF:

09:53:05   8   Q    How many -- Dr. Kelley, how many times have you given

09:53:08   9   testimony in court as an expert witness?

09:53:14  10   A    Including what?  Summary judgments?  Uh --

09:53:17  11   Q    No.

09:53:18  12   A    Evidentiary hearings?  Everything?  Or --

09:53:22  13   Q    Well, I would exclude motions for summary judgment, you

09:53:25  14   know, in support or against.  You know, just limit the

09:53:29  15   question to where you actually were up in the stand there

09:53:33  16   giving testimony.

09:53:34  17   A    It's got to be at least 20 or 30 times.  Yeah.

09:53:40  18   Q    And in regards to either supporting a motion for summary

09:53:45  19   judgment or opposing a motion for summary judgment, how many

09:53:50  20   times have you offered your expert opinion report in support

09:53:53  21   of either?

09:53:54  22   A    Actually, it depends on, you know, on -- a complete

09:54:01  23   answer would depend on where you are.  Like, in Hawaii, they

09:54:04  24   usually don't -- they go by the reports, you know.  And so in

09:54:08  25   Hawaii, a lot of the summary judgment motions you just --

09:54:11  1   decided by looking at two reports, one from expert A and the

09:54:18  2   other one expert B.  So they didn't, they didn't bother to

09:54:22  3   take -- you know, call the people in for testimony.  Uh, other

09:54:27  4   places, they do.

09:54:28  5         And so I haven't really counted them all, but, uh,

09:54:34  6   a lot of times I'm giving depositions, so a lot of times I'll

09:54:41  7   be deposed by an opposition and --

09:54:43  8   Q    Okay.  Depositions don't really count.

09:54:45  9   A    Okay.

09:54:46  10   Q    It's kind of a different animal.

09:54:47  11   A    Okay.

09:54:47  12   Q    So we don't really need to know about that.

09:54:49  13         THE COURT:  Well, I think that now requires

09:54:51  14   clarification.

09:54:52  15         Sir, you've responded that you've testified 20 to

09:54:54  16   30 times.  Are you including in that your depositions or are

09:54:58  17   you only specifically relating to hearings or trials?

09:55:01  18         THE WITNESS:  I think I'm probably including the

09:55:04  19   depositions.

09:55:05  20         THE COURT:  Okay.

09:55:06  21         THE WITNESS:  Yeah.

09:55:06  22         THE COURT:  Then can you re-ask the question,

09:55:08  23   sir.

09:55:08  24         MR. PANKOPF:  Yes, Your Honor.

          25         ///

—39—

09:55:11   1   BY MR. PANKOPF:

09:55:11   2   Q    Okay.  With that in mind -- you're excluding your

09:55:14   3   deposition testimony -- how many times have you actually

09:55:17   4   testified in court as an expert witness, when you're actually

09:55:21   5   sitting next to the judge in the witness chair?

09:55:25   6   A    Okay.  One -- maybe, maybe 10 times, you know, where

09:55:41   7   there's actually, you know, court, you know, type hearing,

09:55:50   8   right.

09:55:50   9            THE COURT:  And I'm sorry to interrupt again,

09:55:52   10   but I think a follow-up question is necessary.

09:55:55   11            When you say 10 times, are those all specific to

09:55:59   12   issues related to document examination?

09:56:02   13            THE WITNESS:  Yes.

09:56:03   14            THE COURT:  Okay.

09:56:14   15   BY MR. PANKOPF:

09:56:20   16   Q    Now in this particular case, did you conduct an

09:56:24   17   examination or a personal examination or testing of the

09:56:28   18   subject documents, the note and the deed of trust, and the

09:56:32   19   rider that was attached to the deed of trust?

09:56:36   20   A    Yes.  On June 8th, in Las Vegas.

09:56:38   21   Q    That was going to be my next question, when you did

09:56:41   22   examine it.

09:56:43   23            June 8 of this year?

09:56:44   24   A    Yeah.

09:56:44   25   Q    And again, that was in Las Vegas.

09:56:49  1              How did you examine the document?

09:56:52  2    A    Well, I --

09:56:53  3    Q    Documents.

09:56:54  4    A    -- I began with a visual examination of the documents to

09:56:57  5    see if there's any obvious thing to be looked at because that

09:57:01  6    helps guide what I look at.  And I'll use a oblique lighting

09:57:10  7    at the visual level.  And also I use tactile things to

09:57:13  8    determine if there are any indentations that can be felt,

09:57:17  9    say, in the initials or signature.  And that's at the

09:57:22  10   visual -- you know, at the human level, without, you know --

09:57:25  11   just using lights basically.

09:57:27  12   Q    Okay.  So what are you looking for, specifically, when

09:57:31  13   you're visually examining --

09:57:33  14   A    The features --

09:57:34  15   Q    -- the documents?

09:57:34  16   A    The features of the document.  Like, if it was made with

09:57:37  17   a ballpoint pen, there may be indentations that I can detect.

09:57:44  18   With the lighting, I can, to some extent -- I mean, if there's

09:57:49  19   obvious pixelation in the signature, of course that would be

09:57:54  20   -- indicate it's fake immediately, without looking to a, you

09:57:58  21   know, a photoscanner or a microscope picture.

09:58:03  22   Q    Do the standards that we -- or that you told us about,

09:58:09  23   tell you to conduct a visual examinations beforehand?

09:58:14  24   A    Yeah.  Yeah, they're part of the procedure, including the

09:58:19  25   oblique lighting.

09:58:20 1   Q   So after you've visually examined them, what is the

09:58:24 2   process?

09:58:25 3   A   Well, then I'll scan the -- each page of the document at

09:58:33 4   twelve hundred pixels per inch.  And this is the capture of

09:58:37 5   the whole image with a high quality scan.  Right?

09:58:40 6   Q   (Nodding head affirmatively.)

09:58:41 7   A   So if it's -- after that, I'll take the scanner and I'll

09:58:48 8   zero in using the marquee function, and I'll extract the

09:58:52 9   signature at up to nine thousand six hundred pixels per inch.

09:58:56 10  Q   Excuse me.  Are you doing that when you go back to your

09:58:59 11  office?

09:59:00 12  A   No, no --

09:59:01 13  Q   Or are you doing it --

09:59:02 14  A   No, I do it --

09:59:02 15  Q   -- at the examination?

09:59:03 16  A   No, I do it during the examination.  That's why the

09:59:06 17  examination takes so long.

09:59:07 18  Q   Right.

09:59:07 19  A   Because --

09:59:08 20  Q   How long did the examination take?

09:59:10 21  A   Well, to scan at twelve hundred pixels per inch, takes

09:59:13 22  approximately three minutes with the scanner that I put on the

09:59:15 23  table down there.  That's a V-550550 Epson.  And it has an

09:59:20 24  optical density of 3.4 out of 4, which means it's really good

09:59:24 25  with color.  Okay?

42

09:59:26   1          And it takes three minutes.  So when I take so many

09:59:30   2   pictures, it takes three hours to complete the examination,

09:59:33   3   which is a lot.

09:59:36   4   Q   Is that how long it took you to complete this

09:59:39   5   examination?

09:59:39   6   A   Yeah.  It typically takes three hours.  Sometimes it

09:59:42   7   could take more if there were more documents than we had.

09:59:45   8   Q   And how many total pages did you examine?

09:59:48   9   A   Well --

09:59:49   10  Q   With -- considering the deed of trust and the note all

09:59:52   11  together.  Roughly.

09:59:53   12  A   Well, I don't remember the exact page count, but I

09:59:57   13  examined the deed of trust, the condominium rider, and the

10:00:01   14  note, promissory note.  And they weren't the long form, so --

10:00:06   15  but I extracted all of the initials from every document at

10:00:10   16  high resolution so that I could do color comparisons.  And I

10:00:15   17  extracted the signatures at high resolution.

10:00:19   18          In some cases, I can get it up to twelve thousand

10:00:22   19  six hundred pixels per inch.  And I -- and then I examined,

10:00:29   20  you know, I examined this for features that they identify

10:00:33   21  within the inkjet standard or otherwise.  Sometimes a laser

10:00:38   22  jet standard.  So if a document was created, the form was

10:00:41   23  created with a laser printer, it's going to be made in toner,

10:00:46   24  not -- if it's created, uh -- and then the signature would be

10:00:51   25  in ink over a toner document.

10:00:54    1           So, I make the distinction between how the document
10:00:58    2  was made.  And that's why it's a document examination.  I'm
10:01:03    3  not just looking at the signature.  I'm looking at the whole
10:01:06    4  document and everything on it.  Everything I can find on it.
10:01:09    5           And then what I do is I'll take the -- a microscope.
10:01:14    6  And the one I have right down there is a specially designed
10:01:19    7  stand for examining documents and it can take, uh -- reliably
10:01:25    8  take pictures at 50 -- magnification is about 50 and also 200.
10:01:37    9  And at 200, I'm able to see fine detail, which is required by
10:01:43   10  the standard.  The standard says you must be able to detect
10:01:47   11  the fine detail within the document that you're looking at.
10:01:51   12  And the fine detail includes the paper fibers and all of the
10:01:55   13  little artifacts that go into the creation of the signature
10:01:59   14  or the initial.
10:02:00   15           And you'll see in the actual report, you can
10:02:03   16  actually see the results of that fine detail at 200
10:02:07   17  magnification.  The scanner won't go there.  It doesn't go
10:02:11   18  up that high.
10:02:12   19           So, it's a little bit like we're looking at things
10:02:17   20  here, and then we get closer and closer, and higher and higher
10:02:21   21  power magnification, and finally we see how it's made.  And
10:02:25   22  we can even see the structures within the signature itself.
10:02:30   23  And then in this particular case, it's actually showing
10:02:34   24  magenta structures within the blue ink signature, so.
10:02:41   25           And also the standard requires that you check for

10:02:48  1   inkjet satellites.  It's right there in the standard.  And,

10:02:53  2   uh, those satellites can vary in size from one micron up to

10:02:59  3   60 microns.  And if you don't have sufficient magnification,

10:03:03  4   you're not going to see the small ones.  And the reason

10:03:07  5   they're so tiny is the satellite droplets break off from the

10:03:13  6   main droplet and they always have less volume of ink in them.

10:03:16  7          And between the generations of inkjet printers, the

10:03:20  8   printer companies have now -- are now able to produce droplets

10:03:25  9   that have one-half picoliter.  That's where we're at right

10:03:30  10  now.  Eight years ago that might have been 5 picoliters

10:03:34  11  because -- you know, the equipment is improving.

10:03:37  12         So I have to be able to see things that are almost,

10:03:40  13  uh -- otherwise would be invisible, and may be invisible to a

10:03:44  14  scanner depending on what age, what the age of the inkjet was,

10:03:48  15  so -- what generation it came from.  So --

10:03:53  16                THE COURT:  I need to ask a question --

10:03:54  17                THE WITNESS:  Yes.

10:03:55  18                THE COURT:  -- so I understand your process,

10:03:58  19  sir.

10:03:58  20         My understanding is you visually review the

10:04:01  21  document.  You scan it.  And it's the scanned copy that

10:04:05  22  you use to do your examination that you're describing, is

10:04:08  23  that correct?

10:04:09  24                THE WITNESS:  Yes.  And I scan it at different

10:04:12  25  levels of power.

45

```
10:04:13   1              THE COURT:  But it's not the original document
10:04:15   2   that you're using with your magnifier or your --
10:04:19   3              THE WITNESS:  I'm scanning the original
10:04:20   4   document.
10:04:20   5              THE COURT:  -- your microscope?
10:04:21   6         No.  But you're examining the scanned copy when
10:04:24   7   you're using your microscope and these techniques, is that
10:04:28   8   correct?
10:04:28   9              THE WITNESS:  Uh-huh.  Yeah.  It's the same way
10:04:30  10   you would do if you were examining bacteria.  You aren't going
10:04:34  11   to actually put your eye up to the bacteria.
10:04:34  12   BY MR. PANKOPF:
10:04:38  13    Q   I don't think -- I don't think I understand that
10:04:40  14   correctly.  My understanding was that he was -- he actually
10:04:42  15   uses the microscope during the examination, the physical
10:04:45  16   examination of the documents to extract --
10:04:48  17    A   Pictures.
10:04:49  18    Q   -- pictures?
10:04:50  19    A   Uh-huh.
10:04:51  20              MR. PANKOPF:  So he's not -- so to clarify your
10:04:54  21   question, I don't believe he was using the scans and using the
10:04:57  22   microscope to magnify it even more.  He actually magnified it
10:05:01  23   from the documents that were presented at the examination.
10:05:07  24         Am I correct?
10:05:08  25              THE WITNESS:  Yeah, I don't alter the images
```

46

| | | |
|---|---|---|
| 10:05:10 | 1 | that I take.  These are photographs. |
| 10:05:11 | 2 | THE COURT:  Okay.  But, backup. |
| 10:05:11 | 3 | THE WITNESS:  Yes. |
| 10:05:12 | 4 | THE COURT:  So you review the documents and then |
| 10:05:14 | 5 | you scan them, correct? |
| 10:05:16 | 6 | THE WITNESS:  Uh-huh.  Yeah. |
| 10:05:17 | 7 | THE COURT:  And the scanned copy is what he then |
| 10:05:20 | 8 | uses to conduct the analysis that he does, correct? |
| 10:05:25 | 9 | MR. PANKOPF:  Well, that's correct, but there's |
| 10:05:27 | 10 | another part to it. |
| 10:05:28 | 11 | THE COURT:  Okay.  Well, maybe if you could ask |
| 10:05:29 | 12 | him that and clarify it, that would be very helpful. |
| 10:05:32 | 13 | Thank you. |
| 10:05:33 | 14 | MR. PANKOPF:  Thank you, Your Honor. |
| 10:05:33 | 15 | BY MR. PANKOPF: |
| 10:05:37 | 16 | Q   Is it not true that you used the microscope during the |
| 10:05:41 | 17 | physical examination of the document? |
| 10:05:42 | 18 | A   That's true. |
| 10:05:43 | 19 | Q   Right.  So when you scanned -- you scan the entire image |
| 10:05:47 | 20 | of each of the pages of the documents, correct? |
| 10:05:50 | 21 | A   Well, the microscope doesn't scan. |
| 10:05:52 | 22 | Q   No, I understand.  I'm asking about scanning.  You scan |
| 10:05:55 | 23 | the document, right? |
| 10:05:56 | 24 | A   Yeah, but -- |
| 10:05:57 | 25 | Q   Each page? |

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

47

10:05:58 1    A   -- the scanner scans the document.  Yes.

10:05:59 2    Q   Right.  And in addition to that, you took digital images

10:06:03 3    of specific parts of the documents, correct?

10:06:05 4    A   Yes.

10:06:06 5    Q   During the examination itself.

10:06:08 6    A   Yes.  That's a separate act.

10:06:10 7    Q   Right.  You didn't scan the image and then print it out

10:06:14 8    and then magnify that picture up from that?

10:06:17 9    A   No.  That's correct.  Every, every photograph is a direct

10:06:20 10   photograph of the original document.

10:06:22 11   Q   Which you obtained at the time of your examination of the

10:06:26 12   documents, correct?

10:06:27 13   A   Yeah.  They handed it to me and I -- you know, I am

10:06:32 14   examining it, what they gave me.

10:06:34 15   Q   Okay.

10:06:35 16            THE COURT:  So the pictures that he takes are

10:06:37 17   from the original documents?

10:06:38 18            MR. PANKOPF:  That's my understanding, Your

10:06:40 19   Honor.

10:06:40 20        Is that correct?

10:06:41 21            THE WITNESS:  That's absolutely correct.

10:06:43 22   They're direct picture from the original document.  They're

10:06:46 23   not derivatives.

10:06:52 24   BY MR. PANKOPF:

10:06:52 25   Q   Okay.  So I think we understand that at the examination,

10:06:55   1   you took the time to scan each individual document, and then

10:06:59   2   you, in some particular instances, you took microscopic

10:07:06   3   pictures of certain parts of particular parts of the

10:07:09   4   document's, correct?

10:07:10   5   A   I always do both.  I always take microscope pictures and

10:07:14   6   scanner pictures because I never know where the features are

10:07:17   7   going to appear.  It's, you know --

10:07:19   8   Q   Was there any other process or methodology that you used

10:07:23   9   during the actual physical examination of those documents?

10:07:26   10  A   Well, yeah, I'll use other methods when I think it's

10:07:30   11  called for.  For example, I had a case recently in Hawaii

10:07:34   12  where I found out that the signature was made with magnetic

10:07:38   13  ink, you know, and I -- there's no pen with magnetic ink, You

10:07:43   14  know, so.

10:07:44   15  Q   Well, how did you make a determination that it was

10:07:47   16  magnetic ink?

10:07:48   17  A   I had a little magnet and I took the paper and I hung it

10:07:51   18  like this, and put it up next to the signature, and the paper

10:07:55   19  stuck to it.  It's ferromagnetic.  Very simple test.

10:07:59   20  Q   So what I was trying to get at with my previous question

10:08:02   21  was did you implement any other methodologies or procedures

10:08:07   22  that day, back in June, on June 8th?

10:08:09   23  A   No.  I didn't use that test that day because I didn't

10:08:12   24  need to.

10:08:13   25  Q   I know.

10:08:13    1    A    Yeah.

10:08:14    2    Q    I understand that.  But what I'm asking you is was there

10:08:17    3    anything else that you've already -- other than what you've

10:08:19    4    already told us, that you implemented that day when you were

10:08:23    5    examining the documents?

10:08:25    6    A    Yes.  I do have some infrared microscope photos of the

10:08:31    7    ink, you know, the signatures and other, other artifacts on

10:08:35    8    the documents.

10:08:36    9    Q    On this particular -- these documents that we're talking

10:08:41   10    about right now?

10:08:41   11    A    Yeah.  Yeah, I had like --

10:08:43   12    Q    Okay.

10:08:43   13    A    -- five or 600 photographs, and they're all directly made

10:08:46   14    from the document itself.  And they're time stamped, date

10:08:51   15    stamped, and they can't be -- you know, they can't be altered

10:08:51   16    so.

10:08:57   17    Q    So what's the next step in the process after you gathered

10:09:00   18    the digital data from the documents that you scanned?

10:09:02   19    A    Well, I have to go home because I got 600 pictures to

10:09:06   20    look at.  And so I go down the pictures and I'm looking for

10:09:09   21    the features that they talk about in the ASTM standard.

10:09:14   22              THE COURT:  Okay.  So now we're moving back to

10:09:16   23    my question again.

10:09:17   24              So when he goes back -- and I'll direct this at

10:09:21   25    you, sir.  When you go back, when you're actually doing the

10:09:23  1  analysis, you're using the photographs that you took from the

10:09:26  2  microscope.

10:09:27  3              THE WITNESS:  Yeah, the direct photographs.

10:09:29  4              THE COURT:  But it's the images that you're

10:09:31  5  using at that point to come to your conclusions, is this

10:09:35  6  correct?

10:09:35  7              THE WITNESS:  Yeah.  Because the human eye can't

10:09:38  8  see, cannot see, uh, at the microscopic level.  I mean, we're

10:09:44  9  just not good at that sort of thing.  So I have to take -- do

10:09:48  10  what other scientists do and take photographs.

10:09:51  11         And that is exactly what is happening on Mars now

10:09:54  12  is --

10:09:54  13              THE COURT:  Okay.  And appreciate that, sir, but

10:09:56  14  we don't have a lot of time to get into the Mars rover.

10:09:59  15         So if you can just continue, sir.

10:10:02  16  BY MR. PANKOPF:

10:10:03  17   Q   Dr. Kelley, would you turn your attention to Exhibit 5 in

10:10:06  18  the witness book in front of you.

10:10:13  19         And Your Honor, this is document 218-8 that was

10:10:19  20  attached to the Motion For Sanctions in support.  And it's --

10:10:25  21  you know, he can, Dr. Kelley can authenticate it, but it's

10:10:29  22  his report, his expert opinion report.

10:10:32  23              THE COURT:  Is there any objection?

10:10:33  24              MR. WILLIS:  Yes, Your Honor.  For the record,

10:10:36  25  we object under 403 grounds.  It's cumulative because the

10:10:40  1   good doctor is sitting on the stand.  However, I anticipate

10:10:43  2   the Court, having already reviewed it, will allow it in.

10:10:46  3           THE COURT:  Okay.  Thank you, sir.

10:10:48  4           And it will be admitted with the objections noted

10:10:52  5   at this point.

10:10:53  6           (Whereupon, Exhibit 5 -- a document, was received in

10:10:56  7   evidence.)

10:10:56  8   BY MR. PANKOPF:

10:10:57  9   Q    Dr. Kelley, can you -- you're familiar with the -- your

10:11:02  10  report, correct?

10:11:03  11  A    Yes.

10:11:03  12  Q    Can you walk us through, uh, the documents and the

10:11:09  13  photographs and the conclusions that you have reached?

10:11:15  14  A    Yes.  Where do you want me to start?  Uh --

10:11:20  15  Q    Well --

10:11:20  16  A    -- we've already discussed the examination.

10:11:23  17  Q    I mean, the note --

10:11:27  18  A    Of the examined documents?

10:11:29  19  Q    Identifying the note, deed of trust --

10:11:29  20  A    Okay.

10:11:32  21  Q    -- and then the photographs of the exhibits that are

10:11:34  22  attached in support of your conclusions.

10:11:37  23  A    Uh-huh.

10:11:44  24           Oh.  Okay.  So on page 3, I'm looking at an image

10:11:47  25  size anomalies where I measure the size of the images on the

-52-

10:11:51   1   paper and the paper itself.

10:11:53   2   Q   I don't think we're with you on that.

10:11:55   3          If you look at the bottom of the page, it says

10:11:58   4   Exhibit 5, and then it's got what we call a bates stamp

10:12:01   5   number.  You know, it's 1 through 32, I think, or 39 -- 1

10:12:05   6   through 39.  So when you're referencing a specific page

10:12:09   7   number, let's reference those numbers so that we can all be

10:12:13   8   on the same page.  And --

10:12:19   9   A   I'm sorry.  I'm not quite getting you.

10:12:21   10          MR. PANKOPF:  May I approach the witness?

10:12:22   11          THE COURT:  Please, sir.  Thank you.

10:12:24   12          MR. PANKOPF:  Thank you.

10:12:24   13          When you look at the -- then on here --

10:12:24   14          THE WITNESS:  Oh, that part.  Okay.  Use that

10:12:24   15   as a reference.

10:12:43   16          Got it.  Okay.  Understood.

10:12:43   17   BY MR. PANKOPF:

10:12:44   18   Q   All right.  So you can tell us what page you're on.

10:12:46   19   A   5-003.  Exhibit 5-003.

10:12:53   20          Okay.  And so, here, we're looking at Exhibit A.

10:12:57   21   And the first one is a promissory note.  And these were actual

10:13:04   22   measurements of the image size on the note.  And I just do

10:13:09   23   this as -- I usually do this to every, in every document exam

10:13:15   24   to see if there's a, you know, if there are any anomalies in

10:13:21   25   this.  I don't consider this necessarily probative.  But, it

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

10:13:24   1   is part of the indicative evidence.  It's not probative, but

10:13:27   2   it's, hey, what's going on here?  Right?

10:13:30   3   Q   Okay.  So what is it?

10:13:31   4   A   Well, it's just showing that there's an error in the

10:13:34   5   length and the width of pages 1, 2, and 3, and that they

10:13:41   6   aren't all the same size.  You know, if you just look down at

10:13:46   7   -- it's like error in width is .09 on page 1.  Error in width

10:13:52   8   on page 2 is .1, which is pretty close.  I'd say that that's

10:13:57   9   pretty close.  On page 3, it's .07.  And that is different.

10:14:02   10  And then on page 4, there's no difference.  It's exactly the

10:14:06   11  right size.

10:14:08   12        So, it's showing that there's a variation in the

10:14:11   13  width of the image on the paper, indicating that these -- this

10:14:15   14  shouldn't -- it shouldn't be there, you know.  It's indicating

10:14:19   15  there's something -- it's an anomaly.

10:14:22   16  Q   What do you mean?  What is the anomaly?

10:14:24   17  A   The anomaly is they're not all the same size image.

10:14:27   18  Q   Well, what should the image size be?

10:14:30   19  A   It should --

10:14:31   20  Q   What should --

10:14:32   21  A   They should be all zero zero.  Okay?  So there should be

10:14:37   22  no error --

10:14:38   23  Q   Okay.

10:14:39   24  A   -- in the width and the length.

10:14:40   25  Q   What I'm seeing here, you got right next to note, it says

10:14:43  1    "ideal size eight-and-a-half by 14," right?

10:14:46  2    A    Uh-huh.

10:14:46  3    Q    Then it says "actual size 8.37 by 13.84."

10:14:51  4    A    That's correct.  Yeah.

10:14:52  5    Q    And so if, like you said, it's probative, but this is

10:14:58  6    indicative.  It should be the ideal size rather than the

10:15:02  7    actual size.

10:15:03  8    A    Yeah.  Yeah.

10:15:04  9    Q    Right?

10:15:04  10   A    But I wouldn't simply base my opinion on that one result.

10:15:08  11   And that's what I mean by indicative.

10:15:10  12   Q    And you did not, did you?

10:15:12  13   A    I did not, no.  I did -- I'm making an observation of

10:15:17  14   an anomaly.  And there's also errors in the length of the

10:15:21  15   document.

10:15:22  16   Q    Okay.  So you were kind of walking us through this, so we

10:15:33  17   go to the next page, Exhibit 5, 4.

10:15:36  18   A    5-004?

10:15:37  19   Q    Yes.

10:15:38  20   A    Okay.  This is the deed of trust.  And I made similar

10:15:41  21   measurements here.  And here, there -- none of them are zero.

10:15:46  22   You know, they all have a -- you know, the error width in

10:15:53  23   page 1 is .09; on page 2 it's .03, which is pretty close to

10:15:57  24   zero.  And on page 3 it's .11, which is the greatest

10:16:02  25   difference.  And then page 4 is .10.

10:16:07   1          So, so most of them are clustering around .1 in

10:16:13   2   error.  Okay?  And the width.  But, one is almost zero.

10:16:20   3   Again, kind of similar to the other things.  And these are

10:16:23   4   being made with the scanner grid, which is accurate to one

10:16:30   5   part in twelve hundred.  Okay?

10:16:33   6   Q    Yeah.

10:16:33   7   A    Of twelve hundredth of an inch.

10:16:37   8          So then we have a similar phenomena with the

10:16:41   9   length, error in length -- oh, except we had a really

10:16:46   10  extraordinary -- okay.  In the one -- on page 3 is the maximum

10:16:50   11  deviation in both width and length.

10:16:54   12  Q    What do you mean on page 3?  The maximum --

10:16:57   13  A    Well, page 3 of this little chart.

10:16:59   14  Q    Oh.  I'm sorry.  I was going back to page 3.

10:17:01   15  A    Yeah.  The error in the width is .11, which is the

10:17:04   16  maximum error for the whole set of pages.  And the --

10:17:07   17          THE COURT:  In the interest of time, can we move

10:17:09   18  to the next --

10:17:11   19          MR. PANKOPF:  Yes.

10:17:12   20          THE WITNESS:  Yeah.

10:17:13   21          Yeah.  So these are indications that these are

10:17:17   22  anomalies within the actual sizes of the --

10:17:17   23  BY MR. PANKOPF:

10:17:19   24  Q    And did you find the same anomalies with the rider that

10:17:22   25  was attached to the deed of trust, or similar anomalies?

10:17:27   1    A    Yeah.   There are anomalies here to, but they're

10:17:31   2    compatible with each other.   It's just two pages and they

10:17:33   3    have about the same error.

10:17:35   4    Q    All right.   So let's move this along.   We'll go to your

10:17:39   5    first -- well, it's actually probably third Exhibit A-3, which

10:17:47   6    is -- it's on page 521.   You have it marked as the condominium

10:17:58   7    rider.

10:17:59   8              I'm sorry, Your Honor.   We'll move forward from

10:18:02   9    that.   We'll actually go to exhibit -- or page number 5-04,

10:18:07  10    which is Exhibit B-1.

10:18:07  11              COURT REPORTER:   B or D?

10:18:16  12              MR. PANKOPF:   B, as in boy.

10:18:16  13              THE COURT:   I'm sorry, sir.   Could you repeat

10:18:18  14    that?   I'm --

10:18:19  15              MR. PANKOPF:   It's exhibit B, as in boy, 1.   And

10:18:23  16    it's page -- or Exhibit 5, page 24.

10:18:27  17              THE COURT:   Okay.   Thank you, sir.

10:18:27  18    BY MR. PANKOPF:

10:18:37  19    Q    Dr. Kelley, is this one of the images that you took?

10:18:40  20    A    Referring to Exhibit 5-022?

10:18:43  21    Q    024.

10:18:44  22    A    Oh.   Two four.   Okay.

10:18:47  23              Yes.

10:18:48  24    Q    What is it an image of?

10:18:51  25    A    Okay.   Uh, here we extracted the, using the high

10:18:57   1   resolution scanner, an image of Robert A. Slovak's signature

10:19:05   2   from the promissory note.

10:19:09   3   Q    Okay.  And what else can you tell us about it?

10:19:15   4   A    Then we took -- I decided to take the numbers because

10:19:19   5   they fit, they actually fit well within the focal area of

10:19:23   6   the microscope.  And, uh, which will -- we looked at.  And

10:19:30   7   then I blew this up.  You can see it's about 4X, 4 or 5X,

10:19:36   8   five times, in Adobe Photoshop.  You know, I scale, I scaled

10:19:42   9   the image, and then put it back here so I can look at,

10:19:46  10   within the stroke, and see if there are any, in this case,

10:19:50  11   discolorations within -- or other artifacts within the blue

10:19:55  12   ink date.

10:19:58  13   Q    Is this looking for discolorization, something that is in

10:20:05  14   the standards that you follow?

10:20:07  15   A    Sure.  You're supposed -- you know, you're to record all

10:20:10  16   of these observations.  These are observations and they're

10:20:14  17   being recorded.

10:20:15  18   Q    And so is this indicative or probative of discoloration?

10:20:20  19   A    Well, at this level, we're not done yet.  What this is

10:20:23  20   saying is you better look at this with a microscope and see

10:20:27  21   what's really going on here.  Where are these discolorations

10:20:31  22   coming from?

10:20:31  23              And you can't see it with this level of a scan, so

10:20:37  24   I have to -- then I go to the microscope to see what it looks

10:20:42  25   like.

10:20:43   1    Q    Okay.  And did you do that in this case?

10:20:47   2    A    Yes.

10:20:51   3    Q    So --

10:20:52   4    A    So it's the next page.

10:20:53   5    Q    -- do you have -- the next page?

10:20:54   6    A    Yeah, the next page is 5-025.  And here, I put a bounding

10:21:01   7    box around the, you know, the scan file, which was magnified

10:21:08   8    five times, and then I take that and I further -- I can zero

10:21:15   9    in on it with -- well, let's see, this one is -- yeah, I can

10:21:21  10    zero in on it to reveal that there are magenta dome structures

10:21:28  11    within signature.  Okay?

10:21:30  12         So we're seeing blue ink and magenta within the

10:21:34  13    signature.  Magenta is red.  Red, basically.  And cyan is blue

10:21:40  14    basically.  It's a form of blue ink, so.

10:21:46  15    Q    And that's, that's what you're seeing when you -- what

10:21:50  16    part of the -- I guess the zero and zero two, you blew up the

10:21:54  17    top half of it, is that correct?

10:21:56  18    A    Yeah.  These are actually scan files.  This is not a,

10:21:58  19    this is not a high res scan file in the bottom part of the

10:22:04  20    zero two five.  And that's showing the magenta ink.

10:22:12  21    Q    So what does this tell you when you find, you know, what

10:22:17  22    you're indicating here is 61 percent cyan, uh, and then, you

10:22:23  23    know, 95 percent cyan, and 82 percent magenta --

10:22:27  24    A    Uh-huh.

10:22:27  25    Q    -- and then the cyan is the 50 percent and magenta is

10:22:32  1   79 percent within the body of this, uh, this zero, this

10:22:39  2   number?

10:22:39  3    A    Okay.  Let me explain.

10:22:43  4          Inkjets and cyan ink can have a maximum, at each

10:22:48  5   channel, the typical basic processing inks are cyan, magenta,

10:22:54  6   yellow, and black.  Each one can't be at 100 percent.  That

10:22:57  7   would be the maximum amount of ink the nozzle can emit.  Okay?

10:23:02  8          And in inkjets, these nozzles are almost always,

10:23:05  9   almost always separate nozzles.  So there's a cyan cartridge,

10:23:10 10   and that's hooked up to a cyan nozzle.  There's a magenta

10:23:15 11   cartridge hooked up to magenta print head, basically.  And,

10:23:22 12   there's a yellow hooked up to a yellow print head.  And the

10:23:26 13   ink isn't mixed at the print head.  There's some exceptions to

10:23:31 14   that, but this is usually true, especially in high quality

10:23:35 15   printers.  And then the black comes out of a different print

10:23:39 16   head.

10:23:39 17          So we have -- and then the ink usually comes out in

10:23:43 18   the order CYMK.  So they spray down the cyan first.  And then

10:23:48 19   they spray down the magenta.  And then they spray down the

10:23:52 20   yellow.  And then black, if there is any.  Okay?

10:23:55 21          So, so when I'm looking at this -- so when you see

10:24:00 22   61 up here, that's 61 percent.  That's just 61 percent of the

10:24:03 23   maximum amount of ink.

10:24:06 24          And this image didn't come out very well on this

10:24:09 25   picture.  It's correct on the, I think on the other stuff,

10:24:16  1  but, you know, this is Adobe, Adobe thing.  You can fix that

10:24:20  2  easily.  But the -- uh, so I'm looking at the volume levels

10:24:25  3  of ink.  And what this says is that if I take -- if I have,

10:24:31  4  like, 50 percent cyan and 50 percent magenta, relatively, it

10:24:36  5  gives you a nice blue ink  Okay?  If it's properly mixed.

10:24:41  6  And if it doesn't mix, which is frequently the case with

10:24:47  7  inkjets, then on the paper, then you're going to get distinct

10:24:52  8  color clusters.

10:24:53  9       So when these things exist, it indicates a

10:25:01  10  four-process color being used.  And, typically, pens do not

10:25:05  11  have four process colors in them.  They use premixed ink at

10:25:10  12  the factory.  So --

10:25:16  13  Q   So --

10:25:16  14  A   So there -- and when I see pure cyan ink within the

10:25:20  15  thing --

10:25:20  16           THE COURT:  I'm going to stop the witness.  I

10:25:22  17  think that we're going -- I would ask that you ask a question

10:25:24  18  and then that you answer the question, as opposed to going on

10:25:27  19  to long explanations because I think we're all getting a

10:25:30  20  little lost.

10:25:31  21       So I'll ask you to ask the question again, which is

10:25:34  22  what does this mean?  And if we could get a more direct answer

10:25:38  23  to that question because I still haven't heard that answer

10:25:41  24  yet.

10:25:43  25           MR. PANKOPF:  I think he was getting to it right

10:25:45  1    there.

10:25:45  2                    THE COURT:  Okay.

10:25:45  3    BY MR. PANKOPF:

10:25:45  4    Q    So what does it mean when you make these observations?

10:25:49  5    A    It's indicative of an inkjet printer.  Inkjet printers

10:25:55  6    use cyan, magenta, yellow and black ink, and times more, but

10:26:02  7    to produce the -- whatever thing they're trying to print.  All

10:26:05  8    right?  And if it's a signature, it's going to be mostly -- a

10:26:09  9    blue ink signature is going to be mostly cyan and magenta.  If

10:26:16  10   I -- if I add, you know, if I add yellow to that, it'll make

10:26:19  11   the signature darker.

10:26:22  12   Q    What expertise do you have with inkjet printers?

10:26:26  13   A    I've got 12 of them and I actually test these things.

10:26:30  14   Q    How do you -- I mean, do have a working knowledge of how

10:26:36  15   inkjet printers work?

10:26:37  16   A    Yeah, I perform experiments to make sure that what I'm

10:26:41  17   saying is correct.  And so I have printers, inkjet printers

10:26:45  18   with up to 10 different colors in them.

10:26:47  19   Q    Are inkjet printers similar to computers in the sense

10:26:50  20   that --

10:26:51  21   A    Well, computers don't print anything, but they, uh, you

10:26:54  22   know, they -- you know, the printers do what the computer

10:26:57  23   tells them.  Right?  So I --

10:26:58  24   Q    I'm -- I guess what I'm getting at is, you know, you

10:27:01  25   design computer softwares and computers throughout your

10:27:05    1   career.

10:27:05    2   A    Sure.

10:27:06    3   Q    So did that experience give you experience with the

10:27:12    4   machinations of an inkjet printer?

10:27:15    5   A    Yeah.  Yeah, I can go read their patents.  I also do

10:27:18    6   my own patents, so I can read all of their patents.  And

10:27:21    7   there's, like, hundreds of patents on inkjet printers, and

10:27:25    8   they identify all the problems with the inkjet printers.

10:27:29    9   That's a good place to go if you want to know what's wrong

10:27:31   10   with them.

10:27:32   11   Q    So when you were at the law office in Vegas, when you

10:27:36   12   were visually examining the signature on the note, did you

10:27:44   13   notice any of the anomalies you were looking for in terms of

10:27:50   14   indentation or evidence of a ballpoint pen?

10:27:53   15   A    Well, when I did check for indentations, I didn't find

10:27:56   16   any that I could feel, you know, so -- or see.

10:28:06   17   Q    And so what's your conclusion, or what was your

10:28:08   18   conclusion on the note based on this evidence that you

10:28:11   19   reviewed?

10:28:14   20   A    Well, this strongly indicates inkjet, but I'm looking

10:28:18   21   for something probative.  Okay?  And probative is satellites,

10:28:23   22   inkjet satellites.  When there's inkjet satellites, that's

10:28:27   23   probative because ink -- you know, pens do not spray inkjet

10:28:32   24   satellites all over paper.  You know, they just come out of

10:28:36   25   the ball.  Right?  And so when the satellites are present,

10:28:38   1   that's probative.

10:28:40   2   Q    Okay.  So let's look at the next page -- Exhibit 5,

10:28:47   3   page 26.

10:28:47   4   A    Uh-huh.

10:28:49   5   Q    And what is that?

10:28:51   6   A    Well, these are three different signatures of Robert

10:29:00   7   Slovak, parts of the signatures.  And you see, in some cases,

10:29:04   8   they're getting bigger.

10:29:05   9        And I actually put this in here to show what happens

10:29:09   10  when you begin to magnify these things.  You see more and

10:29:12   11  more and more of how the thing is constructed, which is, uh,

10:29:19   12  interesting.  Okay?

10:29:20   13       So, that's really why this is one is here.  It's

10:29:23   14  just showing the process of, you know, getting to the truth

10:29:26   15  here, so.

10:29:27   16  Q    So let's look at the next page, 5-27.

10:29:31   17  A    Okay.  So 5-27 is -- there's a bounding box around the E

10:29:40   18  in Robert, and another bounding box around the little R in

10:29:48   19  Robert.

10:29:49   20       And I'm expanding -- what I'm doing is I'm taking

10:29:52   21  the microscope and I'm going in there and putting it over that

10:29:55   22  and taking a picture.  And the picture is pointed to by the

10:29:59   23  arrow.  Unfortunately, when this document was created, it

10:30:03   24  dislocated the arrows a little bit.  So the original document

10:30:06   25  has the arrows in the right place, but the bottom line is

10:30:10  1    the picture on the bottom, on the right, is a very detailed

10:30:14  2    picture made by that microscope on the table there, showing

10:30:22  3    the fine detail of how the E in Robert is structured.

10:30:29  4           So, you see the texture and the colors and that.

10:30:32  5    And moreover, you're beginning to see something else.  You're

10:30:36  6    seeing satellites, satellite ink droplets are inside this

10:30:40  7    thing, and that's what those little arrows point to.

10:30:43  8           So this is the beginning -- so this is probative

10:30:46  9    evidence and we can make it even more probative by further

10:30:51  10   magnifying that so you can see those little droplets more

10:30:55  11   clearly.

10:30:55  12   Q    Where, where, is -- is there magenta in the E in Robert,

10:31:01  13   within the body of --

10:31:03  14   A    Yeah, well --

10:31:04  15   Q    -- (unintelligible.)

10:31:04  16   A    Yeah, the second bounding box on --

10:31:06  17   Q    Yeah.

10:31:06  18   A    -- the left side --

10:31:07  19   Q    Yes.

10:31:08  20   A    -- it points -- the arrow is supposed to point to the

10:31:11  21   picture on the right, and that's the microscope picture.  And

10:31:15  22   in there you're seeing, again, the process colors that the

10:31:18  23   scanner revealed.  So the scanner is showing the processed

10:31:22  24   colors, but this is showing them in more detail.  And it's

10:31:26  25   also showing the paper fibers, you know, how the ink has gone

65

10:31:30  1   into the paper fibers.

10:31:32  2           And it's revealing also, around this portion of the

10:31:36  3   picture -- again, if you look very closely, you'll begin to

10:31:39  4   see the tiny little satellite ink droplets.  And those could

10:31:44  5   not have been put there by a pen.  It's just not possible,

10:31:50  6   so -- and that's why they have satellite ink droplets in the

10:31:57  7   standard.  They want you to look for them.

10:32:00  8   Q   So based on this piece of evidence in the satellite

10:32:15  9   droplets that you observed, were you able to come to a

10:32:18  10  conclusion as to whether this is an actual ballpoint pen

10:32:23  11  signature or was it created by an inkjet printer?

10:32:28  12  A   The deed of trust signature is created by an inkjet

10:32:33  13  printer, clearly.

10:32:34  14  Q   Go and turn to page, the next page 5-28.

10:32:43  15  A   Okay.

10:32:44  16  Q   What are we looking at here?

10:32:46  17  A   Okay.  So this is the signature -- on the left side is

10:32:49  18  the signature of Robert Slovak -- A. Slovak --

10:32:53  19  Q   Are you on the same page I am?

10:32:54  20  A   I'm on 5-029.

10:32:57  21  Q   Go to 5-08, please.

10:32:59  22  A   Oh.  Excuse me.  Sorry.

10:33:01  23          I thought you were moving.

10:33:03  24          Okay.  Got it.

10:33:04  25  Q   What is this?

10:33:05   1   A   Uh, these are the initials on the deed of trust, page 1,

10:33:12   2   at the top; page 2 down below that; and page 3 down below

10:33:18   3   page 2; and the final initial down there, I guess, page 4.

10:33:24   4   Right?

10:33:26   5   Q   Okay.  So what's the significance of this information on

10:33:29   6   this exhibit?

10:33:30   7   A   Oh.  I'm measuring the color of the ink.  So this is a

10:33:34   8   different type of measurement.  So it turns out the scanner

10:33:38   9   has 48-bit color.  It has greater color capacity than the

10:33:44   10   microscope.  So each channel, 16 bits of color, it's red,

10:33:50   11   green, and blue.  That's what it measures.

10:33:53   12        Here, I put it into the lab color mode.  And the

10:33:57   13   reason we do that is that when we're making comparisons, all

10:34:02   14   of the colors in the A and B channels.  Right?  And the system

10:34:06   15   is setup so that a deviation of 1 is detectable by a human

10:34:11   16   being eye, the human eye.  Okay?  And the L stands for

10:34:14   17   illuminosity.  That's the brightness of the light.

10:34:18   18        So if I turn the illuminosity up and down, as long

10:34:22   19   as I don't turn it out, off, it won't affect the color

10:34:26   20   measurement.

10:34:27   21        So when I'm making color measurements, I compare

10:34:31   22   the A channels, A and B channels of one initial, to the A and

10:34:37   23   B channels of another, and there's a simple formula.  It's

10:34:42   24   like the way you calculate the hypotenuse of a triangle.  And

10:34:47   25   if that -- if the thing coming out of the square root of A,

10:34:52  1   A-1 minus A-2, plus a square plus B-1, minus B-2 all squared,

10:35:01  2   is less than 2.5, then it's considered color match.  If it's

10:35:12  3   greater than that, then it's considered a mismatch.  And the

10:35:15  4   bigger that number, the worse the mismatch.

10:35:18  5           So what we're looking at here is an A channel value

10:35:23  6   of 24 on page 1, with an A channel value of 33 on page 2.  So,

10:35:30  7   the colors don't match.  I mean, right away, they're not going

10:35:34  8   to match, even if you don't look at, you know, the B channel.

10:35:38  9   Right?

10:35:39  10          And then I go to page 3, and I look at that and I

10:35:42  11  say, well, okay, so, on page 3, we see that page 3 is starting

10:35:46  12  to, you know, it's more closely matching page 1, but it

10:35:51  13  doesn't match page 2.  That's an anomaly.  I mean, if these

10:35:55  14  things were all made with the same pen, the ink color should

10:35:59  15  match.

10:36:00  16          And then finally we get to this final one, and it

10:36:04  17  says 24 here, and 75, and this is a little odd because this

10:36:12  18  is also a mismatch.  It doesn't match anything.  Because

10:36:16  19  when you look at both the A and B channels, the difference is

10:36:20  20  going to be a lot greater than 3, right?  And it's not hugely

10:36:26  21  greater than three, but it's greater than that.

10:36:28  22          So these things, essentially, don't match each

10:36:32  23  other the way they should match.  So -- and the measurement

10:36:39  24  standards here is done by the color standards group, CIE.  So

10:36:44  25  I didn't make this stuff up, they did.  You know, and this

10:36:48  1   is what they agreed on how you measure color.  And this same

10:36:53  2   standard is used when you go down to Orchard -- one of the

10:36:57  3   hardware stores and try to match paint.  So if you're trying

10:37:00  4   to match paint colors, so when you go to paint your wall, you

10:37:03  5   may get the same color.  So they use this same formula of the

10:37:07  6   L-A-B color mode.

10:37:07  7              THE COURT:  Okay.  I'm going to interject again.

10:37:10  8   If we can get to the actual answer to the question at this

10:37:12  9   point, and then we're going to take a break.

10:37:16  10             MR. PANKOPF:  Okay.

10:37:17  11  BY MR. PANKOPF:

10:37:18  12  Q   So what's the significance in terms of the probative or

10:37:22  13  indicative value of the fact that the initials have -- are not

10:37:27  14  matching?

10:37:27  15  A   Well, I consider this a strong indication.  I consider

10:37:32  16  the inkjets probative.  So what it means is that all the

10:37:37  17  indications are pointing to it not being an original document.

10:37:43  18  And the ink -- and the satellites are saying it's not original

10:37:47  19  at all.  Forget about it.

10:37:49  20  Q   Okay.

10:37:49  21  A   Okay?

10:37:50  22             And so everything is pointing in a same direction.

10:37:52  23  I don't have indicators saying, oh, yeah, it could be

10:37:58  24  original.  They're all saying it's not.  So everything --

10:38:02  25  every one of these sets of measurements is all pointing in

10:38:05   1    the same direction.  If I didn't have the satellites, I would

10:38:08   2    have a bunch of indicators, and that would justify an opinion

10:38:12   3    that it's more likely than not a -- not the original document.

10:38:17   4    It's a copy.

10:38:19   5              MR. PANKOPF:  Thank you, Dr. Kelley.

10:38:21   6              THE COURT:  Okay.  At this point, we're going

10:38:23   7    to take a 10-minute break.  Let's come back at ten to 11:00.

10:38:27   8    I assume that you will go through the next few pages a bit

10:38:32   9    quicker so that we can get to the cross-examination by defense

10:38:35   10   counsel.  I want to make sure that we have enough time.  And

10:38:39   11   we will go from there.

10:38:40   12             At this point, we'll be in recess.

10:38:43   13             Thank you.

10:38:43   14             (Recess taken.)

10:54:14   15             THE CLERK:  In the matter of Robert A. Slovak

10:54:17   16   versus Golf Course Villas, and others, court is again in

10:54:22   17   session.

10:54:23   18             THE COURT:  Thank you.  Please be seated.

10:54:24   19             Before we get started, I want to go through a couple

10:54:27   20   housekeeping matters.  While we were on the break I have

10:54:30   21   reviewed documents 241, 242, and 243.  Starting with document

10:54:35   22   241, which is the Motion to Exclude the Expert Testimony of

10:54:39   23   the Defendant's Expert, I am going to overrule that motion --

10:54:42   24   are deny that motion.  Based upon what is listed in the

10:54:45   25   information on this document, there was notice provided to

10:54:48  1  the plaintiff, I believe on November 21st, that this expert

10:54:54  2  would be a rebuttal expert, and that Wells Fargo would be

10:54:56  3  offering that rebuttal expert.

10:55:00  4          In all fairness to the parties, I think part of it

10:55:02  5  is my own fault because I didn't set a schedule for when

10:55:06  6  notification should have been made for particular witnesses,

10:55:09  7  but by no means based on the transcript of our November 6th

10:55:12  8  hearing, was there any preclusion of Wells Fargo from

10:55:15  9  obtaining an expert or providing an expert, in particular a

10:55:18  10  rebuttal expert, which is the way I see -- or at least I am

10:55:23  11  interpreting the expert that Wells Fargo is going to be

10:55:25  12  providing.

10:55:26  13          More importantly, as this is an evidentiary hearing

10:55:28  14  for my purposes, to help me understand all of the issues and

10:55:31  15  rule on this motion -- which I will say, and I'm not sure it's

10:55:35  16  really been made clear.  This is a very serious motion that's

10:55:39  17  been made.  This is a motion for sanctions not just against

10:55:42  18  Wells Fargo, but against the law firm of Snell & Wilmer, and

10:55:46  19  individual attorneys.  And I take that very, very seriously,

10:55:49  20  which is partly why I wanted to have an evidentiary hearing.

10:55:53  21  And so I'm denying the motion on 241.

10:55:57  22          As we go to document number 242, I believe I ruled

10:56:01  23  on that in open court, but I did want to make a record on

10:56:04  24  that, specific to the document number.

10:56:06  25          And as we go to document number 243, which is

| | | |
|---|---|---|
| 10:56:09 | 1 | objections to specific declarations that were provided as |
| 10:56:12 | 2 | part of the response to Wells Fargo, from Wells Fargo to |
| 10:56:15 | 3 | the motion for sanctions, I'm going to overrule those |
| 10:56:19 | 4 | objections as well. |
| 10:56:19 | 5 | At this time I'll going ahead and turn it over to |
| 10:56:23 | 6 | Mr. Pankopf, if you would like to continue, sir. |
| 10:56:25 | 7 | MR. PANKOPF:  Thank you, Your Honor. |
| 10:56:25 | 8 | MR. WILLIS:  Your Honor, if I might just one |
| 10:56:27 | 9 | point of clarification. |
| 10:56:28 | 10 | THE COURT:  Please, sir. |
| 10:56:29 | 11 | MR. WILLIS:  We progressed into the substance of |
| 10:56:32 | 12 | Dr. Kelley's testimony. |
| 10:56:33 | 13 | THE COURT:  Right. |
| 10:56:34 | 14 | MR. WILLIS:  Moved beyond, basically, voir dire |
| 10:56:37 | 15 | of qualifications.  I just wanted to make sure that the Court |
| 10:56:41 | 16 | was aware that we do not -- we do not believe we have waived |
| 10:56:44 | 17 | our objection to his qualifications. |
| 10:56:46 | 18 | THE COURT:  No.  And I thank you for bringing |
| 10:56:48 | 19 | that up and I should have made that clear at the beginning of |
| 10:56:50 | 20 | the hearing.  My intent was to allow the witnesses to testify |
| 10:56:53 | 21 | entirely, without waiving any objection to their actual |
| 10:56:57 | 22 | qualifications under Daubert or Rule 702.  But, in order to |
| 10:57:03 | 23 | get all of the testimony in, I wanted to go through |
| 10:57:05 | 24 | everything. |
| 10:57:05 | 25 | And thank you, sir, for bringing that up. |

10:57:08  1   Absolutely.  You have every -- I mean, that is not waived, so

10:57:12  2   we'll just go ahead and continue from here.

10:57:14  3           MR. WILLIS:  Thank you, Your Honor.

10:57:16  4               **DIRECT EXAMINATION (resumed)**

10:57:18  5   BY MR. PANKOPF:

10:57:19  6   Q   Dr. Kelley, can you please turn to Exhibit 5, page 29.

10:57:30  7   A   Okay.

10:57:31  8   Q   What's the purpose of this exhibit?

10:57:38  9   A   Oh, yeah.  The purpose of this exhibit is to indicate

10:57:43  10  that there is overspray that can be seen near the signature.

10:57:49  11  And that's stuff that is not on the stroke itself.  And

10:57:56  12  overspray is one of the features that is identified in the

10:58:00  13  inkjets standard and it's caused by ink collecting on the

10:58:07  14  print head and then falling off onto the paper later on.

10:58:11  15  Right?  Because the heads are very close to the paper.  They

10:58:14  16  don't make contact with it, but, you know, the air currents

10:58:18  17  that blow them off and you get a spray effect.  So, that's

10:58:22  18  defined within the standards.

10:58:24  19           So, I'm looking for that here.  And I found it.

10:58:29  20  Yeah.

10:58:29  21  Q   Okay.  Turn to the next page, please, Exhibit 5, page 30.

10:58:40  22  A   Okay.

10:58:41  23  Q   What are we looking at here?

10:58:43  24  A   Uh, okay.  So here we have a much -- 200 magnification

10:58:51  25  level, picture of, I think the bounding box that was on the

| | | |
|---|---|---|
| 10:58:57 | 1 | previous page.  And I'm looking now for the satellites.  Okay? |
| 10:59:03 | 2 | And I'm finding them. |
| 10:59:05 | 3 | So the small arrows are pointing to these little |
| 10:59:08 | 4 | tiny satellite ink droplets.  And they're -- typically they |
| 10:59:13 | 5 | fall separately, you know, they don't do the -- exactly the |
| 10:59:16 | 6 | same thing as a spray.  You know, what I mean? |
| 10:59:19 | 7 | So you can see them there.  And they're various |
| 10:59:23 | 8 | sizes, which is, uh -- you can see on the thing.  But |
| 10:59:26 | 9 | they're quite small because the stroke itself is only about |
| 10:59:30 | 10 | 400 microns.  And these little dots are like down in the -- |
| 10:59:34 | 11 | you know, they're down around 6 to 10 or 20 microns.  Some |
| 10:59:42 | 12 | of them are 6 to 20 microns.  I'm just estimating from the -- |
| 10:59:47 | 13 | relatively to the size of the pen -- yeah, the stroke there. |
| 10:59:56 | 14 | Q   Can you look at the bottom of the page to give us more of |
| 11:00:01 | 15 | a specific answer as to what we're looking at, please. |
| 11:00:04 | 16 | A   Uh, 5 -- on page 5-30? |
| 11:00:09 | 17 | Q   Yes. |
| 11:00:10 | 18 | A   Okay. |
| 11:00:11 | 19 | What was the question? |
| 11:00:13 | 20 | Q   Well, you said I think I'm looking at, you know, a |
| 11:00:16 | 21 | signature, but where is the signature from? |
| 11:00:18 | 22 | A   Oh.  The signature is from the previous page, Robert |
| 11:00:22 | 23 | Slovak. |
| 11:00:23 | 24 | Q   What document is this signature from? |
| 11:00:25 | 25 | A   Uh, I believe this is the, uh, the -- |

74—

| | | |
|---|---|---|
| 11:00:29 | 1 | Q   Take your time and read what you wrote. |
| 11:00:31 | 2 | A   Yeah.  Just a second.  Let me check because this -- my |
| 11:00:35 | 3 | document is not completely correct. |
| 11:00:51 | 4 |     (Witness reviews document.) |
| 11:00:52 | 5 |     This is the deed of trust.  So, we're looking at a |
| 11:00:56 | 6 | very tiny portion of a signature -- |
| 11:00:59 | 7 | Q   Well, wait just -- I don't mean to interrupt you. |
| 11:01:01 | 8 |     Are you on the page -- exhibit 5, page 30? |
| 11:01:03 | 9 | A   Yeah. |
| 11:01:04 | 10 | Q   And do you see at the bottom where it says exhibit B-7? |
| 11:01:07 | 11 | A   Oh.  I'm sorry.  Okay. |
| 11:01:09 | 12 |     Yeah.  My copy is really messed up. |
| 11:01:12 | 13 | Q   Is it -- |
| 11:01:12 | 14 | A   It doesn't look like that on the screen. |
| 11:01:14 | 15 | Q   Okay. |
| 11:01:15 | 16 | A   So, you have to excuse me. |
| 11:01:19 | 17 |     Okay.  So B-7, the picture is okay thought, but the |
| 11:01:21 | 18 | writing on the picture is not.  Okay? |
| 11:01:26 | 19 |     So B-7 is the rider.  Okay?  And so what it's |
| 11:01:31 | 20 | showing is two things.  One is the satellites, and also the |
| 11:01:35 | 21 | presence of these magenta nodules within the stroke itself, |
| 11:01:42 | 22 | which is similar to the deed of trust. |
| 11:01:46 | 23 |     So, we have magenta and cyan dominated things.  And |
| 11:01:51 | 24 | if you notice, all the satellites are cyan.  We don't have |
| 11:01:54 | 25 | any magenta satellites, which is very -- you know, it's kind |

11:01:58  1    of interesting.  And they're actually, uh, if I measure the

11:02:02  2    ink color of the actual satellite, they're cyan, just like

11:02:07  3    they came out of the cyan cartridge.

11:02:10  4    Q    Right.

11:02:11  5    A    So, it's just a peculiarity of this particular inkjet.

11:02:16  6    Q    So from this particular piece of evidence that you

11:02:19  7    obtained, what conclusion can you draw from this regarding

11:02:23  8    the signature on the rider?

11:02:26  9    A    The satellites are probative.  The existence of these

11:02:30  10   little nodules within the things are strongly indicative.

11:02:34  11   Okay?  In other words, more likely than not.  And then -- but

11:02:38  12   the satellites are -- you just don't get satellites from pens.

11:02:43  13   They -- you know, I've done the experiment with lots of pens,

11:02:43  14   so.

11:02:47  15   Q    So what -- can you be more explicit in what your

11:02:51  16   conclusion is?

11:02:51  17   A    Yeah.  My conclusion is that the rider is not the

11:02:54  18   original document.  It's a copy.

11:02:59  19   Q    That -- was it that the signature was created by an

11:03:01  20   inkjet printer?

11:03:03  21   A    Yeah.  Yeah, we have two -- two -- uh, one very strong

11:03:07  22   indicator.  And the other is just probative evidence that it

11:03:10  23   was, uh --

11:03:11  24   Q    Okay.  Please look at the next page --

11:03:13  25   A    -- a copy.

76

11:03:14  1    Q    -- which is page 31, Exhibit 5.

11:03:17  2    A    Okay.

11:03:21  3    Q    Take your time and read everything on the document.

11:03:23  4    A    Okay.  Yeah.  Just give me a second because, again, the

11:03:27  5    writing on the picture is, uh, not been made clear.

11:03:44  6              So this is B-8.  So B is, again, the rider.  It's an

11:03:48  7    initial on the rider, according to my notes.  And it's uh --

11:03:52  8    and I'm blowing it up.  I -- from the bounding box on the

11:03:55  9    initials.  So the other one was the signature.  Now this is

11:03:59  10   the initials, okay, that's on that document, the rider.

11:04:05  11   And we're seeing that this also shows the same evidence.

11:04:11  12   We're seeing satellite ink droplets and we're seeing, again,

11:04:16  13   repeated initials, the magenta ink, within the stroke itself,

11:04:23  14   the blue stroke.

11:04:28  15   Q    So this is a magnification of the, the R initial?

11:04:33  16   A    Yeah.  There's a little red box around the R in -- on the

11:04:40  17   left side.

11:04:40  18              Do you see the little red -- that's the bounding

11:04:43  19   box.

11:04:43  20   Q    Right?

11:04:43  21   A    So the microscope took a picture of what's inside that

11:04:47  22   box.

11:04:48  23   Q    So you're seeing the cyan satellite droplets?

11:04:54  24   A    Right.

11:04:54  25   Q    And then the magenta?

—77—

11:04:56  1    A    Uh, yeah.

11:04:58  2    Q    Droplets within this, the initial itself?

11:05:02  3    A    Yeah.

11:05:02  4              THE COURT:  So I have a question, so let me

11:05:04  5    just be clear for the record.

11:05:06  6              So the initials that are here that are listed on

11:05:11  7    V-55, file number 340, that is the image that was taken by

11:05:16  8    the microscope, is that correct?

11:05:18  9              THE WITNESS:  The picture on the right side were

11:05:20  10   taken by the microscope.

11:05:22  11             THE COURT:  And then in your lab, you blew

11:05:26  12   that up in that section, in that small square, and that's the

11:05:29  13   pictures that we see on the right side, is that correct?

11:05:33  14             THE WITNESS:   No.  That's not correct.  You

11:05:35  15   got it out of order. The picture was taken during the

11:05:42  16   examination.

11:05:42  17             THE COURT:  Okay.  Let me ask again.

11:05:44  18             THE WITNESS:  It wasn't take afterwards at my

11:05:46  19   house, so.

11:05:47  20             THE COURT:  Okay.  But my question is are the

11:05:49  21   initials that are listed here, is that the photograph that was

11:05:53  22   taken by the microscope of the original documents?

11:05:57  23             THE WITNESS:  The one on the left side is a

11:06:00  24   scanner.

11:06:00  25             THE COURT:  Okay.

11:06:00   1          THE WITNESS:  And the one on the right side is

11:06:02   2   the microscopes, okay, two microscope photos.  Two separate

11:06:08   3   ones were taken of -- and you see me blowing up the bounding

11:06:14   4   region within the right.  There's another bounding box on the

11:06:19   5   right side and I don't --

11:06:19   6          THE COURT:  Sir, I'm going to interrupt you.

11:06:21   7   I'm going to ask you just to stop right there.  But, I

11:06:24   8   understand what you're saying.  I'm trying to clarify.

11:06:27   9          These photos on the right are different, in that

11:06:31   10   they are separate images that wee created by the microscope

11:06:36   11   on, was it June 8th of 2018?

11:06:38   12          Am I following that correctly?

11:06:40   13          THE WITNESS:  Yes.

11:06:40   14          THE COURT:  Okay.  Please continue, Mr. Pankopf.

11:06:44   15   BY MR. PANKOPF:

11:06:46   16   Q   So these observations that you've made with these

11:06:50   17   photographs, have been magnified.  What conclusions does it

11:06:53   18   lead you to come to?

11:06:55   19   A   The, uh, the rider is a copy.  It's not the original

11:07:01   20   rider.

11:07:08   21   Q   So are there any other conclusions that you've reached

11:07:13   22   regarding the deed of trust, the note, and the rider?

11:07:17   23   A   I didn't reach any others.  So I'm allowed, by the

11:07:21   24   standards, to stop when I achieve -- you know, I've reached

11:07:25   25   this level of evidence.  I don't have to keep looking for

11:07:30  1    more things is all.

11:07:33  2    Q    So just to recap, so you've come to the conclusion that

11:07:37  3    the signature on the note is -- was created by an inkjet

11:07:43  4    printer, is that correct?

11:07:45  5    A    Yes.

11:07:45  6    Q    And is that true as to the deed of trust?

11:07:48  7    A    Yes.

11:07:49  8    Q    And the rider that was attached to it?

11:07:51  9    A    Yes.

11:07:55  10              MR. PANKOPF:  Your Honor, I have no further

11:07:57  11   questions at this time.

11:07:57  12              THE COURT:  Thank you very much, sir.

11:07:59  13         At this time we'll allow the defense to

11:08:01  14   cross-examine the witness.

11:08:03  15              MR. WILLIS:  Thank you, Your Honor.

11:08:04  16              MR. PANKOPF:  Excuse me just one second.  I just

11:08:32  17   wanted to double check.  We moved that into evidence when we

11:08:35  18   were -- the report and what not, right?

11:08:38  19              THE CLERK:  Exhibit number 5.

11:08:39  20              MR. PANKOPF:  Yes.

11:08:40  21              THE COURT:  Yes.

11:08:41  22              THE CLERK:  Yes.

11:08:42  23              MR. PANKOPF:  Okay.  Thank you.

11:08:42  24   \\\

11:08:43  25   \\\

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:08:43 | 1  | **CROSS-EXAMINATION**                                        |
| 11:08:45 | 2  | BY MR. WILLIS:                                               |
| 11:08:45 | 3  | Q   Good morning, doctor, how are you?                      |
| 11:08:46 | 4  | A   Good morning.  I'm fine.                                 |
| 11:08:48 | 5  | Q   Great.                                                   |
| 11:08:49 | 6  | May the witness be handed defense exhibits 1 and 2,         |
| 11:08:55 | 7  | please.                                                      |
| 11:08:55 | 8  | THE CLERK:  Yes.                                            |
| 11:08:58 | 9  | THE WITNESS:  Are we done with this one?                    |
| 11:09:00 | 10 | BY MR. WILLIS:                                               |
| 11:09:00 | 11 | Q   No.  I would like you to turn to Exhibit 9.             |
| 11:09:04 | 12 | THE WITNESS:  Oh.  Okay.                                    |
| 11:09:04 | 13 | THE COURT:  Just so I'm clear, these are                    |
| 11:09:06 | 14 | duplicates of what have been admitted already as plaintiff's |
| 11:09:11 | 15 | Exhibit 8 and 9, is that correct?                            |
| 11:09:12 | 16 | MR. WILLIS:  I do not believe so, Your Honor.              |
| 11:09:14 | 17 | But, let me check.                                           |
| 11:09:17 | 18 | THE COURT:  Oh.  I'm sorry.  You're right.  I               |
| 11:09:19 | 19 | apologize.                                                   |
| 11:09:19 | 20 | Go ahead.  I just saw the top of the documents.            |
| 11:09:23 | 21 | You're correct.  They're not the same.                      |
| 11:09:24 | 22 | BY MR. WILLIS:                                               |
| 11:09:25 | 23 | Q   Before we get to 1 and 2, I would like you to turn to   |
| 11:09:28 | 24 | Exhibit 9, which I believe you've described as the SWG doc, if |
| 11:09:33 | 25 | I could use the enunciated acronym.  The SWG doc standard for |

| | | |
|---|---|---|
| 11:09:39 | 1 | examination of documents produced with liquid inkjet |
| 11:09:41 | 2 | technology. |
| 11:09:42 | 3 | Do you see that? |
| 11:09:43 | 4 | A   Yes. |
| 11:09:44 | 5 | Q   And if I understood your testimony correctly, you're |
| 11:09:46 | 6 | contending that what you do is in conformity with this SWG |
| 11:09:50 | 7 | doc, this standard, is that right? |
| 11:09:52 | 8 | A   Yes. |
| 11:09:53 | 9 | Q   So, doctor, uh, turn to paragraph 4.1 of Exhibit 9.  And |
| 11:10:05 | 10 | tell me if I read this correctly: |
| 11:10:07 | 11 | "The procedures outlined here are grounded in the |
| 11:10:10 | 12 | generally accepted body of knowledge and experience in the |
| 11:10:13 | 13 | field of forensic document examination.  By following these |
| 11:10:18 | 14 | procedures, a forensic document examiner can reliably reach |
| 11:10:22 | 15 | an opinion concerning whether two or more documents produced |
| 11:10:26 | 16 | with inkjet technology are from the same device, whether a |
| 11:10:30 | 17 | particular device created the document, or the determination |
| 11:10:34 | 18 | of the make or model of a device." |
| 11:10:36 | 19 | Did I read that correctly? |
| 11:10:38 | 20 | A   Yes. |
| 11:10:39 | 21 | Q   Now you're not doing any of those things, are you? |
| 11:10:41 | 22 | A   Well, uh, I'm -- |
| 11:10:43 | 23 | Q   That's a yes or a no question, doctor? |
| 11:10:46 | 24 | A   I'm not trying to identify -- |
| 11:10:47 | 25 | Q   Doctor, it's yes or no question. |

82

| | | |
|---|---|---|
| 11:10:48 | 1 | A   Well -- |
| 11:10:49 | 2 | Q   You're not doing any of those things, are you? |
| 11:10:51 | 3 | A   No.  No, I'm not doing that. |
| 11:10:52 | 4 | Q   Okay. |
| 11:10:52 | 5 | A   Okay. |
| 11:10:53 | 6 | Q   Thank you. |
| 11:10:53 | 7 |     Would you turn to exhibits 1 and 2, please. |
| 11:11:06 | 8 |     That would be defense 1 and 2.  They're -- I'm |
| 11:11:10 | 9 | sorry.  They're not -- they're what's on the counter in front |
| 11:11:13 | 10 | of you, on the bar in front of you. |
| 11:11:15 | 11 | A   Oh.  Okay.  All right. |
| 11:11:18 | 12 | Q   Do you recognize Exhibit 1 as the SWG doc standard for |
| 11:11:23 | 13 | minimum training requirements for forensic document examiners? |
| 11:11:28 | 14 | A   Yes. |
| 11:11:29 | 15 |     MR. WILLIS:  Your Honor, we offer Exhibit 1, |
| 11:11:31 | 16 | defense 1. |
| 11:11:33 | 17 |     THE COURT:  Any objection? |
| 11:11:41 | 18 |     Any objection? |
| 11:11:43 | 19 |     MR. PANKOPF:  No objection. |
| 11:11:44 | 20 |     THE COURT:  Thank you. |
| 11:11:45 | 21 |     It will be admitted. |
| 11:11:46 | 22 |     (Whereupon, Exhibit 1 -- a document, was received in |
| 11:11:47 | 23 | evidence.) |
| 11:11:47 | 24 |     MR. WILLIS:  Thank you. |
| | 25 |     /// |

| | | |
|---|---|---|
| 11:11:47 | 1 | BY MR. WILLIS: |
| 11:11:48 | 2 | Q   Exhibit 1, doctor. |
| 11:11:49 | 3 |     Would you agree that the SWG doc standard for |
| 11:11:52 | 4 | minimum training requirements requires the trainee to have |
| 11:11:56 | 5 | 24 months of supervised instruction? |
| 11:12:02 | 6 | A   Well, yes, but -- |
| 11:12:03 | 7 | Q   Thank you. |
| 11:12:04 | 8 |     You have not had 24 months of supervised |
| 11:12:07 | 9 | instruction, have you? |
| 11:12:07 | 10 | A   No. |
| 11:12:08 | 11 | Q   Okay. |
| 11:12:09 | 12 |     Would you look at Exhibit 2. |
| 11:12:15 | 13 | A   Yes. |
| 11:12:16 | 14 | Q   Do you recognize this as the ASTM standard guide for |
| 11:12:20 | 15 | minimum training requirements for forensic document examiners? |
| 11:12:23 | 16 | A   Uh-huh. |
| 11:12:24 | 17 | Q   Do you recognize it? |
| 11:12:25 | 18 | A   I recognize it as the standard guide. |
| 11:12:28 | 19 | Q   Thank you. |
| 11:12:29 | 20 |         MR. WILLIS:  We offer Exhibit 2. |
| 11:12:31 | 21 |         MR. PANKOPF:  No objection. |
| 11:12:32 | 22 |         THE COURT:  Thank you. |
| 11:12:32 | 23 |     That will be admitted, sir. |
| 11:12:34 | 24 |     (Exhibit 2 received.) |
| | 25 |     /// |

84

| | | |
|---|---|---|
| 11:12:35 | 1 | BY MR. WILLIS: |
| 11:12:35 | 2 | Q   Would you agree with me, doctor, the standard guide, |
| 11:12:37 | 3 | the ASTM is identical in its requirements for 24 months of |
| 11:12:43 | 4 | continued -- or, excuse me, of continuous supervision for |
| 11:12:47 | 5 | trainees? |
| 11:12:47 | 6 | A   It is.  But, it's only a guide.  It's not actually a |
| 11:12:50 | 7 | standard. |
| 11:12:51 | 8 | Q   Well, I stand corrected there.  But, the 24 months |
| 11:12:55 | 9 | remains the same. |
| 11:12:56 | 10 | A   Yes. |
| 11:12:56 | 11 | Q   And you didn't have a guide or a standard that you |
| 11:13:01 | 12 | followed because you didn't do 24 months of training, |
| 11:13:03 | 13 | correct? |
| 11:13:03 | 14 | A   Right. |
| 11:13:04 | 15 | Q   Thank you. |
| 11:13:04 | 16 | A   Uh-huh. |
| 11:13:09 | 17 | Q   Would you turn to -- now this is back in the notebook. |
| 11:13:15 | 18 | And I would like you to turn to Exhibit 7, which I believe |
| 11:13:32 | 19 | was offered and received into evidence. |
| 11:13:34 | 20 | Do you have that in front of you, doctor? |
| 11:13:36 | 21 | THE COURT:  I don't believe that's been |
| 11:13:37 | 22 | admitted, sir. |
| 11:13:37 | 23 | MR. WILLIS:  Oh. |
| 11:13:38 | 24 | THE COURT:  But, I did overrule the objections |
| 11:13:40 | 25 | that were filed at document number 243. |

11:13:43    1          And as this was offered by plaintiffs counsel, does

11:13:46    2   plaintiff have any objection to the admission -- oh.  I'm

11:13:49    3   sorry.  This is a separate declaration.  I don't believe

11:13:52    4   this was actually admitted.  This is Mr. -- Dr. Kelley's

11:13:55    5   declaration.

11:13:56    6          Is there any objection to the admission of that?

11:13:58    7          MR. PANKOPF:  No, Your Honor.

11:13:58    8          THE COURT:  Thank you.

11:13:59    9          So that will be admitted, sir.  I apologize.

11:13:59   10          (Whereupon, Exhibit 7 -- a document, was received in

11:14:01   11   evidence.)

11:14:01   12          MR. WILLIS:  Thank you.

11:14:01   13          If you would give me a moment, Your Honor.

11:14:07   14   BY MR. WILLIS:

11:14:08   15   Q   Now, doctor, do you recognize Exhibit 7 as a document

11:14:11   16   that you prepared on or about September 10th that was to be

11:14:16   17   filed in this litigation?

11:14:17   18   A   Yes.

11:14:18   19   Q   And you understood that it was to be filed in this

11:14:21   20   litigation in connection with this particular hearing?

11:14:26   21   A   Well, they just asked me to prepare the declaration.  I

11:14:29   22   didn't get any more information.

11:14:31   23   Q   Right.  And you understood when you prepared this

11:14:33   24   declaration, that your qualifications as a forensic document

11:14:36   25   examiner were at issue.

11:14:38   1          You understood that, didn't you?

11:14:40   2    A   I just responded.  I just did what they wanted.  I wasn't

11:14:44   3    trying to analyze the case, okay, you know, okay, the

11:14:46   4    litigation.

11:14:47   5    Q   So is it your testimony that you don't believe your

11:14:49   6    qualifications are at issue?

11:14:51   7    A   No.  I'm, I'm not saying that.  I mean, uh, you know,

11:14:55   8    I'm responding to -- I'm replying to things that, you know,

11:15:00   9    the opposition was saying, right?  So I mean --

11:15:03  10    Q   Okay.  You know your qualifications are at issue, yes or

11:15:07  11    no?

11:15:07  12    A   Yeah.  Sure.

11:15:08  13    Q   Thank you.

11:15:09  14    A   Uh-huh.

11:15:09  15    Q   And you realize that in connection with your questioned

11:15:13  16    qualifications, your experience as an expert witness in other

11:15:16  17    litigation would be relevant?

11:15:20  18    A   Yeah.  Sure.

11:15:21  19    Q   Sure.  Right?

11:15:22  20    A   Right.

11:15:23  21    Q   Would you look at paragraph 3.

11:15:30  22          Paragraph 3 of Exhibit 7 states -- tell me if I read

11:15:34  23    it right --

11:15:34  24    A   Uh-huh.

11:15:34  25    Q   -- "only two of the many case" -- I assume cases -- "I

11:15:38  1   have provided my expert opinion have proceeded to trial where

11:15:42  2   I testified as an expert witness.  These were Penbroke versus

11:15:45  3   U.S. Bank in Colorado, and Bank of New York versus Didrick

11:15:51  4   (phonetic), in Collier County, Florida."

11:15:54  5         Do you see that?

11:15:55  6   A   I wrote that.

11:15:56  7   Q   Did ya?

11:15:57  8   A   Yes.

11:15:57  9   Q   It's not true, is it, doctor?

11:16:00  10  A   It is true.  You're wrong.  I testified in the Penbroke

11:16:06  11  trial.  I was voir dired.  And I testified at that trial.

11:16:09  12  Q   And you were excluded?

11:16:10  13  A   In Colorado.

11:16:11  14  Q   And you were excluded as an expert, weren't you?

11:16:15  15  A   Look, I testified at the trial.  I don't know what

11:16:18  16  happened after the trial or anything else.  I have no

11:16:21  17  information on that.

11:16:21  18  Q   So you're unaware an order filed in the District Court,

11:16:25  19  County of Jefferson, Golden, Colorado, on March 9, 2015,

11:16:30  20  granting motion in limine to exclude opinion testimony of

11:16:34  21  James Kelley, you're unaware of that?

11:16:36  22  A   I'm totally unaware of it because I testified at the

11:16:40  23  trial.  I was there.  I did it.  I mean, there's no question

11:16:43  24  about it.

11:16:44  25  Q   Well, would you agree with me, sir, if the court granted

11:16:47  1  a motion in limine to exclude your opinion testimony, that

11:16:51  2  whether you testified or not, your testimony wasn't accepted

11:16:54  3  as that of an expert?

11:16:56  4  A   The Court -- the judge didn't tell me my motion

11:16:58  5  was excluded or anything else.  He asked questions.  He

11:17:02  6  participated in the -- I mean, come on.  I mean, you weren't

11:17:05  7  there.  I was.  I testified in the Penbroke trial.  So what

11:17:10  8  you're saying is not true, in some respect, and I don't know

11:17:13  9  why.

11:17:13  10  Q   Well, sir, let me ask you this.  Wouldn't you agree that

11:17:16  11  what you're saying in paragraph 3 is disingenuous if you were

11:17:20  12  excluded, by the granting of a motion in limine?

11:17:23  13  A   I'm not going to do a legal opinion of something I don't

11:17:26  14  know anything about.  I'm completely unaware of any motion to

11:17:30  15  exclude me.  That would be -- the attorney managing the case

11:17:33  16  would know about that.  I wouldn't.  I was on the stand.  I

11:17:35  17  was put on the stand.  I was voir dired first, just like here

11:17:40  18  today, and then I proceeded to testimony.  They presented me

11:17:42  19  with my report on a tablet.  I went through the thing, uh, in

11:17:47  20  court, and everyone was watching it, just like we're doing

11:17:51  21  here today, and we completed the proceedings.

11:17:54  22          Now if something else happened, I don't know about

11:17:57  23  it.  Okay?

11:17:57  24  Q   All right.

11:17:58  25  A   I left Denver, went back to do my other work.  Right?  So

11:18:04  1   I'm completely unaware of what you're talking about.

11:18:06  2   Q   Well, if you had been aware of that, you wouldn't have

11:18:09  3   written paragraph 3 the way you wrote it, right?

11:18:11  4   A   I testified at the trial.

11:18:13  5   Q   All right.  Fine.

11:18:14  6           Now you also, apparently, are unaware that your

11:18:19  7   testimony was -- or a motion in limine to bar your testimony

11:18:24  8   was granted in Naples, Collier County, Florida, on June 16,

11:18:30  9   2014?

11:18:30  10  A   I don't know what the judges are doing, but I was put on

11:18:33  11  the stand by the judge.  They had two expert witnesses there.

11:18:36  12  One was the private detective and the other was myself, and

11:18:40  13  they chose me and I testified as a proffer of testimony for --

11:18:44  14  on appeal, okay?

11:18:46  15  Q   Okay.  So you were just unaware that your testimony was

11:18:50  16  stricken?

11:18:50  17  A   I don't, I don't write motions and I don't participate in

11:18:54  18  motions to exclude ordinarily.  I mean, I just don't know what

11:18:57  19  they're doing.  I just do what I'm asked to do.

11:19:00  20  Q   Now you would agree that you have been excluded as an

11:19:03  21  expert witness for lack of qualifications under Rule 702 on

11:19:08  22  many occasions?

11:19:11  23          MR. PANKOPF:  Objection --

11:19:12  24          THE WITNESS:  You would have to be more

11:19:14  25  specific.

11:19:14  1              MR. PANKOPF:  Vague.  Vague ambiguous as to

11:19:16  2    "many objections."

11:19:17  3              THE COURT:  Okay.  First, when there's an

11:19:19  4    objection pending, sir, I would ask that you not answer the

11:19:22  5    question.

11:19:23  6          Secondly, I don't quite understand the objection on

11:19:29  7    many basis.  I don't know that that's a valid objection.

11:19:32  8          So, I'm going to ask that the question be reread so

11:19:35  9    I can hear it again because everyone was talking over each

11:19:38  10   other at that point.

11:19:38  11         Miss Clerk can you --

11:19:40  12             MR. WILLIS:  I can rephrase.

11:19:42  13             THE COURT:  Okay.  Thank you, sir.

11:19:43  14   BY MR. WILLIS:

11:19:44  15   Q   You are aware, are you not, doctor, that you have been

11:19:47  16   rejected as an expert witness in more than one case?

11:19:51  17   A   Yes.

11:19:52  18   Q   In fact, you've been rejected as a witness in several

11:19:55  19   cases?

11:19:57  20   A   Yes.

11:19:58  21   Q   And the two cases that you've avow to the Court you

11:20:02  22   testified at trial, we have just learned your testimony was

11:20:06  23   excluded, correct?

11:20:09  24             MR. PANKOPF:  Objection.  Calls for speculation.

11:20:11  25             THE WITNESS:  I can't agree with something I

| | | |
|---|---|---|
| 11:20:12 | 1 | don't even know about.  Okay? |
| 11:20:14 | 2 | THE COURT:  Again, sir, when there's an |
| 11:20:16 | 3 | objection pending, I would ask that you not answer the |
| 11:20:18 | 4 | question -- |
| 11:20:19 | 5 | THE WITNESS:  Okay. |
| 11:20:19 | 6 | THE COURT:  -- and talk over the attorney for |
| 11:20:21 | 7 | the plaintiff or the defendant. |
| 11:20:22 | 8 | THE WITNESS:  Sorry. |
| 11:20:24 | 9 | THE COURT:  I'm sorry.  Can you restate the |
| 11:20:26 | 10 | question? |
| 11:20:27 | 11 | MR. WILLIS:  I think my point is made, Your |
| 11:20:27 | 12 | Honor. |
| 11:20:29 | 13 | THE COURT:  Okay.  Thank you, sir. |
| 11:20:33 | 14 | BY MR. WILLIS: |
| 11:20:37 | 15 | Q   You, on your -- in your declaration, your September 11th |
| 11:20:41 | 16 | declaration, 9-11 declaration, you list a number of cases in |
| 11:20:45 | 17 | paragraph 4 where you say the cases were resulted in a |
| 11:20:51 | 18 | resolution through either summary judgment and/or settlements. |
| 11:20:54 | 19 | Correct? |
| 11:20:55 | 20 | A   Yes. |
| 11:20:56 | 21 | Q   Now, in those cases, you never -- you did not testify in |
| 11:20:59 | 22 | court, correct? |
| 11:21:00 | 23 | A   No. |
| 11:21:00 | 24 | Q   And as far as you know, your qualifications weren't |
| 11:21:04 | 25 | challenged in these cases? |

11:21:05  1   A   I don't know.  Uh, they do things differently in Hawaii.

11:21:10  2   A lot of these cases are Hawaiian cases.

11:21:14  3   Q   But they were resolved without any necessity to call you

11:21:17  4   to testify in court?

11:21:18  5   A   Uh --

11:21:19  6   Q   Correct?

11:21:19  7   A   Yes.  According to the lawyer, Gary Duben, he told me all

11:21:26  8   these cases were -- uh, the report was accepted.  Okay?  So I

11:21:31  9   got in information from the lawyer, so.

11:21:32  10  Q   Now I want to change subjects just for a moment.

11:21:35  11  A   Uh-huh.

11:21:35  12  Q   I want you to tell me, in your own words, how would you

11:21:38  13  describe your methodology?

11:21:40  14  A   I follow the -- it depends on what I'm looking at, of

11:21:49  15  course.  But in this particular case, the inkjet methodology

11:21:54  16  was being applied.  Okay?  I didn't need to use laser jet

11:21:58  17  because the document wasn't made by a laser jet.  Okay?

11:22:02  18  Q   What -- I'm sorry.  I guess my question wasn't clear.

11:22:05  19          What would you call your methodology?

11:22:07  20  A   My methodology is a methodology of SWG docs and the ASTM,

11:22:16  21  where they identify the things they're supposed to be looking

11:22:19  22  at.  The features --

11:22:20  23  Q   Do you -- excuse me.

11:22:21  24          Do you regard yourself as a forensic document

11:22:24  25  examiner?

11:22:25   1    A    Yes.  I examine the whole document.  I'm not a

11:22:28   2    handwriting analyst, per se, which is a different -- you know,

11:22:32   3    it's a different type of thing.

11:22:34   4    Q    Have you ever written anything, any articles, any paper,

11:22:39   5    any treatise that relates to forensic document examination?

11:22:44   6    A    Yeah.  I'm actually writing an E book on --

11:22:47   7    Q    I don't care what you're writing.

11:22:47   8    A    Yeah.  Okay.

11:22:49   9    Q    Have you written anything?

11:22:51   10   A    Well, I've written it.  I haven't put it out there yet.

11:22:54   11   Okay?

11:22:54   12   Q    You know, you're right.

11:22:56   13        Have you published anything?

11:22:57   14   A    Not yet.  Okay.

11:22:58   15   Q    Have you had any -- have you had that writing reviewed by

11:23:03   16   a peer?

11:23:04   17        Do you understand what that means?

11:23:05   18   A    My report has been peer reviewed.

11:23:08   19   Q    By whom?

11:23:09   20   A    Uh, in the MacDonald case in Washington State, my

11:23:15   21   forensic report was reviewed by another forensic document

11:23:21   22   examiner who agreed with my findings.

11:23:24   23   Q    Who was that?

11:23:24   24   A    I don't remember his name offhand, but we can certainly

11:23:28   25   get that to you.

11:23:29    1    Q    That wasn't your buddy, Mr. Michaels?

11:23:31    2    A    No.  He's not my buddy, incidentally.

11:23:35    3    Q    So you had one report reviewed by another examiner.  Have

11:23:39    4    you had any writings at all reviewed by professional bodies

11:23:43    5    that relate to document examination?

11:23:45    6    A    Point of clarification.  I'm not the one that had my

11:23:48    7    report reviewed.  That was done by the client's attorney in

11:23:53    8    the MacDonald case.

11:23:54    9    Q    Okay.  Fine.

11:23:55   10    A    Okay?  And it was independently reviewed.

11:23:57   11    Q    Have you had any scientific body review any report or

11:24:06   12    treatise or paper that you prepared as part of a peer review

11:24:12   13    process?

11:24:13   14    A    Other than the one we just talked about, no.  Okay.

11:24:18   15    Q    Are you familiar with the term "error rate"?

11:24:21   16    A    I am.

11:24:22   17    Q    What's the error rate in your methodology?

11:24:26   18    A    Well, that's like asking what is the error rate in the

11:24:31   19    ASTM inkjet standard.

11:24:33   20    Q    Right.  The ASTM inkjet standard that is used to

11:24:38   21    determine whether a document was prepared -- or whether two

11:24:40   22    documents were prepared on the same machine.  That standard

11:24:43   23    we're talking about?

11:24:45   24    A    Well, I want to make a point here, if I --

11:24:47   25    Q    No.  Answer my question.

| | | |
|---|---|---|
| 11:24:48 | 1 | A    Well -- |
| 11:24:48 | 2 | Q    Is that the standard we're talking about? |
| 11:24:50 | 3 | A    That's not what I'm talking about.  That's what you're |
| 11:24:53 | 4 | talking about.  Okay.  So maybe we're clear -- |
| 11:24:56 | 5 | Q    So you're not talking about the ATSM standard that we |
| 11:25:00 | 6 | have introduced into evidence in this case. |
| 11:25:02 | 7 | A    I'm talking -- |
| 11:25:03 | 8 | Q    We're talking about something else? |
| 11:25:04 | 9 | A    I'm talking about the features identified in the ASTM |
| 11:25:10 | 10 | inkjet standard. |
| 11:25:11 | 11 | Q    On page 6 of your -- |
| 11:25:15 | 12 |           THE COURT:  Can I ask a question?  I still don't |
| 11:25:17 | 13 | have an answer to the question of what is the error rate for |
| 11:25:20 | 14 | your methodology, sir. |
| 11:25:23 | 15 |           THE WITNESS:  Well, uh, there's every -- there's |
| 11:25:28 | 16 | no way of doing an error rate, in general, for that.  Every |
| 11:25:37 | 17 | document, you know, every document could be unique.  But, you |
| 11:25:42 | 18 | could create a standardized test and that hasn't been done. |
| 11:25:47 | 19 | Okay? |
| 11:25:47 | 20 |           THE COURT:  And one other question, if I may. |
| 11:25:49 | 21 |      You were asked about peer review as it related to |
| 11:25:55 | 22 | specific reports or specific documents.  The methodology that |
| 11:26:00 | 23 | you're using appears to be somewhat different than what the |
| 11:26:05 | 24 | standard says.  And I think that was already pointed out, |
| 11:26:08 | 25 | that the standard is determining what machine created a |

11:26:12    1    document, or if two documents were created by the same

11:26:16    2    machine.

11:26:16    3           So, has your methodology that you're using to work

11:26:21    4    backwards ever been peer reviewed?  To take a document and

11:26:25    5    determine if it was created by an inkjet printer, has that

11:26:30    6    methodology, used in that way, ever been peer reviewed?

11:26:34    7           THE WITNESS:  I'm not aware of any report put

11:26:40    8    out by that.  However, there is university documents, like at

11:26:46    9    Purdue forensic labs -- that's Department of Electrical

11:26:52   10    Engineering at Purdue, that's a forensic document lab -- and

11:26:54   11    they have, you know, identified these inkjet things.  So, they

11:26:57   12    have a 60-page report on it, so.  But they don't -- aren't

11:27:01   13    talking about error rates there.  They're talking about the

11:27:04   14    process of how the ink is created, how the satellites are

11:27:09   15    created.

11:27:10   16           THE COURT:  Okay.  Thank you, sir.  I'm just

11:27:11   17    trying to just to clarify.

11:27:12   18           Please continue, Mr. Willis.

11:27:15   19           THE WITNESS:  Yeah.

11:27:15   20           MR. WILLIS:  Thank you.

11:27:16   21    BY MR. WILLIS:

11:27:17   22    Q   Let's stay with Exhibit 7 for a bit.

11:27:19   23           Would you turn to page 7, colon, 03.  So, the third

11:27:23   24    page of your declaration.

11:27:24   25    A   Okay.

11:27:24  1    Q    You have --

11:27:26  2    A    Uh-huh.

11:27:26  3    Q    -- from lines 14 through 25, your, quote, research, end

11:27:31  4    quote, regarding document examination.

11:27:33  5    A    Uh-huh.

11:27:34  6    Q    Now was any of this reduced to writing?

11:27:38  7    A    Yeah, I have writing.  And I haven't published everything

11:27:41  8    yet, but it's going into the book.

11:27:43  9    Q    Into the book that you're currently working on?

11:27:45  10   A    Yeah.  It's going to be an E book because -- you know, to

11:27:48  11   avoid degradation due to printing.

11:27:51  12   Q    So none of this research, though, you are not able to

11:27:54  13   provide any of this research to us because you're still in the

11:27:57  14   process of reducing it to writing, is that correct?

11:28:00  15   A    Well, I've given the, uh, plaintiff's, I think, some of

11:28:07  16   it for blue ink pens.  These are actually pens.  Real pens.

11:28:13  17   So -- in other words, they become a reference standard.

11:28:17  18   Right?  And that research shows from the pens that there are

11:28:21  19   no satellites created by pens.

11:28:26  20   Q    While we're on that topic --

11:28:27  21   A    Uh-huh.

11:28:28  22   Q    -- are --

11:28:29  23   A    Well, they have it.  I gave it to them.  I don't know

11:28:32  24   what they're going to do with it, so.

11:28:34  25   Q    Now the topic of ink and pens --

11:28:36   1   A   Uh-huh.

11:28:37   2   Q   -- it's true that cyan, which is blue, correct?

11:28:40   3   A   Well, it's a form of blue.  Yes.

11:28:42   4   Q   Form of blue.  And blue ink, sometimes has its hue

11:28:48   5   intensified, or enhanced by adding a little cyan, correct?

11:28:53   6   A   Well, I, I don't understand your question.  You're asking

11:28:56   7   me if you add cyan to cyan that you get a hue change?

11:29:01   8   Q   I'm sorry.  By adding magenta.

11:29:04   9          My error.  I apologize?

11:29:04   10  A   Well, if you put cyan and magenta together in, roughly,

11:29:08   11  equal portions, it's just going to look like kind of a dark

11:29:13   12  blue.  Not a real dark blue, but a light dark blue.

11:29:15   13  Q   Yeah.  But if you put minimal amounts of magenta in the

11:29:18   14  cyan, it's going to enhance the cyan color, correct, the hue?

11:29:21   15  A   It will shift it a little bit more blue.

11:29:23   16  Q   Okay.

11:29:24   17  A   You know, a stronger blue.

11:29:25   18  Q   Okay.

11:29:25   19  A   A stronger blue.

11:29:26   20  Q   And that occurs, does it not?

11:29:27   21  A   It can.  It can.

11:29:28   22  Q   And while we're also on the topic of ink products, or

11:29:32   23  ink-like products, you talked briefly about laser printing.

11:29:37   24  A   Uh-huh.

11:29:37   25  Q   Laser printing uses toner, correct?

11:29:40   1    A    Yes.

11:29:41   2    Q    And toner can either be black or it can be in color,

11:29:44   3    correct?

11:29:45   4    A    Yes.

11:29:45   5    Q    Thank you.

11:29:47   6          Let's turn back to your report.

11:29:51   7          I'm looking at your training on page 7.  There are

11:29:55   8    10 or so things mentioned.  None of them have to do with

11:29:58   9    document examination, do they?

11:30:00   10   A    I -- I'm sorry.  I don't know what page you're looking

11:30:04   11   at.

11:30:04   12   Q    Page 4, Arabic 7.  It's on line 1 of that page.

11:30:10   13   A    Page -- go back.  Could you give it to me by the bottom

11:30:15   14   exhibit number?

11:30:16   15   Q    Exhibit 7, page 004.

11:30:18   16   A    Okay.  I'm there.

11:30:20   17         Okay.  Now what do you want me to look at?

11:30:23   18   Q    Top of the page, lines 1 through 7.

11:30:25   19   A    Uh-huh.

11:30:26   20   Q    None of the training that you list in your report, or

11:30:29   21   your declaration, relates to document, forensic document

11:30:34   22   examination, right?

11:30:35   23   A    That's not correct.

11:30:36   24   Q    Okay.  Which ones?

11:30:40   25   A    Those are all relevant.

11:30:43   1          Uh, the use of photoscanners is image processing.

11:30:48   2   The use of microscopes is imaging processing.  Uh, a light --

11:30:53   3   Q   Excuse me, doctor.  I'm talking about forensic document

11:30:58   4   examination.

11:30:58   5   A   Well, forensic document examination uses image processing

11:31:03   6   to -- in order to capture the pictures of the documents.

11:31:07   7   Q   And I --

11:31:08   8   A   So you can see the fine detail.

11:31:10   9   Q   All right.  And I'm sure you'll tell me that the digital

11:31:15   10  phased array radar and electronic countermeasures also relates

11:31:20   11  to document examination?

11:31:21   12  A   It created an image that was processed and displayed on

11:31:25   13  the computer of all the targets in the sky.

11:31:29   14  Q   I'm not denigrating the significance of this.  I mean,

11:31:33   15  certainly, that has some significance.  It just has, really,

11:31:37   16  nothing to do with whether or not a signature is valid,

11:31:39   17  correct?

11:31:40   18          MR. PANKOPF:  Objection.  Argumentative.

11:31:43   19          THE COURT:  I'm going to allow it.

11:31:44   20       But Mr. Willis, if you can --

11:31:46   21          MR. WILLIS:  I'll move on, Your Honor.  But, I

11:31:47   22  would like an answer to the question.

11:31:50   23          THE WITNESS:  Could you rephrase it?  I'm --

11:31:52   24          MR. WILLIS:  No.  I'm not even going to do that,

11:31:54   25  doctor.

11:31:54   1                    THE WITNESS:  Okay.

11:31:55   2   BY MR. WILLIS:

11:32:02   3    Q   So, let's talk about what you did here.  You came to my

11:32:11   4   office and you spent, roughly, three hours looking at a HELOC,

11:32:22   5   Home Equity Line of Credit Agreement, right?

11:32:25   6    A   That was one of the documents.

11:32:27   7    Q   A deed of trust?

11:32:28   8    A   Yes.

11:32:28   9    Q   And a rider?

11:32:30  10    A   Yes.

11:32:30  11    Q   And you were -- you described, I think, what you did with

11:32:37  12   your microscope and your scanner at that time, correct?

11:32:40  13    A   Yes.  I took direct photographs of the original,

11:32:47  14   purported original documents.  Right.

11:32:48  15    Q   And then you returned to your office, if you will, and

11:32:51  16   then you did additional inquiry and determined that the

11:32:58  17   initials and the signatures on those documents were placed

11:33:03  18   there using an inkjet printer, is that correct?

11:33:07  19    A   Yes.

11:33:08  20    Q   Okay.  Now, did you assume that the person, allegedly,

11:33:15  21   doing this, had access to the original wet ink signature

11:33:20  22   documents?

11:33:22  23    A   I made no assumptions.  I'm just looking at observations.

11:33:28  24   All my conclusions are based on the data that I collected, not

11:33:31  25   on any speculation about, you know, uh, who or what or, you

| | | |
|---|---|---|
| 11:33:37 | 1 | know, did anything.  This is just science.  Observation, |
| 11:33:41 | 2 | recording, you know, explanation.  That's it. |
| 11:33:45 | 3 | Q   Okay.  Well, let's walk through what had to happen. |
| 11:33:51 | 4 | Let's assume you're right, that those signatures on these |
| 11:33:55 | 5 | documents, the rider, the deed of trust, and the -- I'll call |
| 11:33:59 | 6 | it the note, because I think you call it the note.  The |
| 11:34:02 | 7 | signature on those three documents were created post facto |
| 11:34:07 | 8 | using an inkjet printer.  Okay?  That's basically what you're |
| 11:34:12 | 9 | telling us here today. |
| 11:34:13 | 10 | Right?  That's what you're telling us? |
| 11:34:17 | 11 | A   Yeah.  I'm saying they're copies. |
| 11:34:19 | 12 | Q   Right.  But did I get the rest right?  They're copies |
| 11:34:25 | 13 | made -- the signatures and the initials were placed on the |
| 11:34:29 | 14 | paper of the copy by an inkjet printer? |
| 11:34:36 | 15 | A   Not necessarily one inkjet printer, but an inkjet |
| 11:34:42 | 16 | printer.  Yes. |
| 11:34:44 | 17 | Q   And the forms themselves, the forms of the HELOC and the |
| 11:34:47 | 18 | deed of trust and the rider were created using laser printing, |
| 11:34:53 | 19 | correct? |
| 11:34:53 | 20 | A   False. |
| 11:34:55 | 21 | Q   What? |
| 11:34:55 | 22 | A   These documents are ink-based.  In fact, the signature |
| 11:34:59 | 23 | lines are made out of ink.  They have, uh -- you can tell very |
| 11:35:03 | 24 | easily by looking at the wick inks1. |
| 11:35:09 | 25 | COURT REPORTER: Looking at the what? |

11:35:10   1        THE WITNESS:  Oh.  Feathering of ink, which it

11:35:12   2   kind of climbs out and it looks like hair on the signature.

11:35:16   3        So if you blow that up, you can see the hair.

11:35:19   4   BY MR. WILLIS:

11:35:19   5   Q   So are you testifying here today that the templates of

11:35:24   6   these documents were not created using a laser printer?

11:35:27   7   A   Well, I like to be very specific --

11:35:28   8   Q   Me too.

11:35:29   9   A   Okay.  So the -- I was looking at this last night, in

11:35:33  10   fact, again.  The --

11:35:34  11   Q   Well, answer my question, doctor.

11:35:36  12        Were the documents, the templates, were they created

11:35:39  13   using a laser printer?  Yes or no.

11:35:40  14   A   The HELOC --

11:35:42  15        MR. PANKOPF:  Objection.  That's asked and

11:35:44  16   answered.  He already said no.

11:35:45  17        THE COURT:  I don't think he has answered that,

11:35:48  18   at least I haven't heard an answer yet.

11:35:50  19        THE WITNESS:  The HELOC was not created with a

11:35:53  20   laser printer.

11:35:54  21   BY MR. WILLIS:

11:35:54  22   Q   And the others?

11:35:55  23   A   The form was not created with a laser printer.

11:35:59  24   Q   Okay.  Well, I have to tell you maybe I didn't read your

11:36:01  25   report carefully enough.  I thought you said all the documents

11:36:03   1   were created with a laser printer.

11:36:05   2            Did I read that wrong?

11:36:06   3   A   If that's in there, I don't recall that.  But if it was

11:36:09   4   in there, it's not.  The, the HELOC was -- I'm speaking now

11:36:14   5   specifically HELOC because I looked at it last night, and it

11:36:18   6   was -- the signature line is ink.  Okay?  It's made with ink.

11:36:25   7   It's not made by toner.

11:36:27   8   Q   All right.  How about the rest --

11:36:29   9   A   Toner doesn't wick, feather.

11:36:32  10   Q   And is the rest of the HELOC, in your opinion, created by

11:36:35  11   a laser printer?

11:36:36  12   A   Uh, I would have to check.  But, basically, I checked the

11:36:50  13   HELOC credit agreement last night when I was looking at the

11:36:55  14   stuff.

11:36:55  15            I could actually pull it up on the screen if I

11:36:58  16   needed to.

11:36:59  17   Q   Sure.  Simple question.  Was the rest of the HELOC, the

11:37:04  18   agreement, created by a laser printer?

11:37:07  19   A   I was just looking at the signature line.

11:37:09  20   Q   Okay.  So if you said in your report, a month ago, that

11:37:12  21   it was, then you probably would stand by that position,

11:37:15  22   correct?

11:37:16  23   A   Well, if the signature line was created by ink, it's more

11:37:21  24   likely than not that the rest of the document was, okay?

11:37:23  25   Yeah.

11:37:23  1   Q   All right.  We'll get back to that.

11:37:25  2          I want to though -- let's get back to what you say

11:37:30  3   happened.  And you are saying that somebody willfully created

11:37:35  4   the document, a clever forgery, putting the signatures of

11:37:41  5   Mr. Slovak and his initials on the documents using an inkjet

11:37:47  6   printer?

11:37:47  7              MR. PANKOPF:  Objection.  Misstates his

11:37:49  8   testimony.

11:37:49  9              THE COURT:  I don't believe it does misstate the

11:37:51  10  testimony.  I think that's exactly why we're here.

11:37:54  11         So, please answer the question, sir.

11:37:56  12             THE WITNESS:  Yeah, I'm saying that the, uh,

11:37:58  13  signature and initials of Slovak were placed on those

11:38:01  14  documents, yes, by an inkjet printer.

11:38:01  15  BY MR. WILLIS:

11:38:04  16   Q   By an inkjet printer?

11:38:05  17   A   Yes.  More -- it could be more than one inkjet, but it's

11:38:09  18  definitely an inkjet printer.

11:38:10  19   Q   Okay.  And you're also saying that the forms of the

11:38:13  20  documents -- let's leave the HELOC aside for a moment -- the

11:38:18  21  forms of the document, the templates, were created by using a

11:38:21  22  laser printer, correct?

11:38:23  23   A   I thought I already answered that.  The signature line on

11:38:26  24  the HELOC is not toner.  It's ink.  It's very easy to show

11:38:33  25  that.

11:38:34  1    Q    Doctor --

11:38:34  2    A    I'm being very specific because I'm looking at specific

11:38:38  3    features within a document.  I'm not trying to

11:38:41  4    over-generalize, you know.

11:38:42  5    Q    Terrific.  Terrific.

11:38:45  6              Here's, here's my question --

11:38:46  7    A    Uh-huh.

11:38:47  8    Q    -- set aside the HELOC.  The deed of trust and the rider

11:38:50  9    were created by using a laser printer?

11:38:53  10   A    You're saying that?

11:38:55  11   Q    I'm asking you to confirm it.

11:38:56  12             Is that true or not?

11:38:58  13   A    Look, my memory is not that good, so I would have to look

11:39:02  14   at the pictures again.  But, I could answer the question by

11:39:05  15   reference to the pictures themselves.

11:39:07  16   Q    All right.

11:39:08  17   A    They're very easy to tell the difference between a toner

11:39:11  18   and ink.  It's very easy.  It's not a confusing subject.

11:39:16  19   Q    Okay.  So whether it's a laser printer or anything other

11:39:19  20   than an inkjet printer, the template and the signatures were

11:39:24  21   created by different methods.

11:39:26  22             Will you at least agree with that?

11:39:28  23   A    I'm not sure what you're saying.  I mean, what are you

11:39:35  24   asking?  Are you asking me -- what are you asking me to say

11:39:38  25   here?  I don't get.

| | | |
|---|---|---|
| 11:39:40 | 1 | Q   Okay.  Signatures created by inkjet printer, correct? |
| 11:39:44 | 2 | A   Yeah. |
| 11:39:45 | 3 | Q   Template created by -- |
| 11:39:45 | 4 | A   That's enough.  I don't -- |
| 11:39:46 | 5 | Q   -- something -- |
| 11:39:47 | 6 | THE COURT:  Sir -- |
| 11:39:47 | 7 | MR. WILLIS:  -- template created by something |
| 11:39:49 | 8 | else, correct? |
| 11:39:49 | 9 | THE COURT:  Stop. |
| 11:39:50 | 10 | Again, you need to let him finish his question |
| 11:39:52 | 11 | before you answer.  So if you can maybe cut that down and be |
| 11:39:58 | 12 | more specific. |
| 11:39:59 | 13 | And then answer his question directly, please, sir. |
| 11:40:02 | 14 | THE WITNESS:  I'll try. |
| 11:40:03 | 15 | MR. WILLIS:  Okay. |
| 11:40:04 | 16 | BY MR. WILLIS: |
| 11:40:05 | 17 | Q   Is it your belief, doctor, that the inkjet signatures and |
| 11:40:09 | 18 | initials were placed on the three documents after all of the |
| 11:40:16 | 19 | other language was on those documents? |
| 11:40:21 | 20 | A   I didn't -- I didn't have to analyze it in that fashion. |
| 11:40:26 | 21 | All I had to do was determine if the signatures were placed on |
| 11:40:30 | 22 | the document by an inkjet printer.  So, I didn't have to ask |
| 11:40:33 | 23 | the question that you're asking. |
| 11:40:35 | 24 | Q   Okay. |
| 11:40:35 | 25 | A   So -- |

11:40:36   1   Q   My understanding is that you were provided with

11:40:39   2   certain -- you were provided, by Mr. Slovak, with copies

11:40:43   3   of these documents that he received at the closing of the

11:40:46   4   loan in 2002?

11:40:49   5   A   I, I have copies of the reference documents.

11:40:53   6   Q   Yes.

11:40:53   7   A   Yeah, I do.

11:40:54   8   Q   And those copies show --

11:40:56   9               MR. PANKOPF:  Objection.  The question is beyond

11:40:57  10   the scope of the direct examination.

11:41:00  11               THE COURT:  I'm going to allow it.

11:41:02  12               Please.

11:41:03  13   BY MR. WILLIS:

11:41:03  14   Q   And those copies -- it's interesting, Your Honor, because

11:41:06  15   they're contained in their exhibit book by the way.

11:41:08  16               Those copies, those copies show that Mr. Slovak

11:41:12  17   signed the deed of trust, the rider, and the HELOC, correct?

11:41:20  18   A   I, I didn't really use the reference documents, so.

11:41:26  19   Q   Did you look at them?

11:41:27  20   A   And I believe you're correct.

11:41:29  21   Q   Okay.  I'm correct?

11:41:30  22   A   But I can't say for sure because I didn't really use

11:41:33  23   them.

11:41:33  24   Q   Do you have any reason to believe that Mr. Slovak didn't

11:41:36  25   sign the documents?

| | | |
|---|---|---|
| 11:41:39 | 1 | A   No.   That's not my job. |
| 11:41:41 | 2 | Q   Do you have any reason to believe that Mr. Slovak didn't |
| 11:41:44 | 3 | get the $275,000 from Wells Fargo? |
| 11:41:46 | 4 | MR. PANKOPF:  Objection.  Relevance. |
| 11:41:48 | 5 | THE WITNESS:  I didn't -- I wasn't looking -- |
| 11:41:50 | 6 | MR. PANKOPF:  Objection. |
| 11:41:51 | 7 | THE WITNESS:  -- at money issues.  I was only |
| 11:41:53 | 8 | looking at the document. |
| 11:41:54 | 9 | THE COURT:  Sir, stop. |
| 11:41:55 | 10 | Again, I am not going to say this again.  When there |
| 11:41:58 | 11 | is an objection, please don't speak. |
| 11:42:01 | 12 | THE WITNESS:  Okay.  I'll try. |
| 11:42:01 | 13 | THE COURT:  And that goes for everybody.  I'm |
| 11:42:04 | 14 | going to sustain the objection because I don't think it really |
| 11:42:07 | 15 | gets to where we're at here today. |
| 11:42:09 | 16 | So, please continue, sir. |
| 11:42:12 | 17 | MR. WILLIS:  Thank you. |
| 11:42:12 | 18 | BY MR. WILLIS: |
| 11:42:13 | 19 | Q   Do you have any reason to doubt that at one point in |
| 11:42:16 | 20 | time, the original; that is, the wet ink signature documents, |
| 11:42:21 | 21 | the rider, the HELOC, and the deed of trust, that those |
| 11:42:25 | 22 | existed? |
| 11:42:26 | 23 | MR. PANKOPF:  Objection.  Speculation and |
| 11:42:28 | 24 | relevance. |
| 11:42:30 | 25 | THE COURT:  I don't think that there's anything |

—110—

11:42:32  1    wrong with that question.

11:42:33  2            Please answer the question.

11:42:34  3            THE WITNESS:  Well, uh, I assume that there was

11:42:41  4    an original document at some point in time.  Right.  So --

11:42:44  5    BY MR. WILLIS:

11:42:44  6    Q   Okay.  And then you've also assumed that at some point

11:42:46  7    after the execution of the original document, somebody,

11:42:49  8    somewhere, decided that they needed to create this forgery,

11:42:55  9    correct?

11:42:55  10   A   Yes.

11:42:56  11   Q   Okay.  And so to create the forgery, would they have

11:43:00  12   needed, in your opinion, the original documents?

11:43:04  13   A   No.  They could have a digital image of it.

11:43:07  14   Q   Okay.  A digital image.  So, they had to have, at least,

11:43:12  15   a digital image --

11:43:14  16   A   Yes.

11:43:14  17   Q   -- of these documents.

11:43:15  18           And then, physically, how would this happen?

11:43:18  19   Would -- is it your opinion that the forms were then created

11:43:22  20   using a laser printer or some other form of printing?

11:43:26  21           MR. PANKOPF:  Objection.  Speculation.  And,

11:43:28  22   foundation.

11:43:30  23           THE COURT:  I'm going to overrule any objection.

11:43:32  24   I thought that in his report he stated that the templates were

11:43:35  25   created by a laser jet printer.

11:43:38  1              THE WITNESS:  That's an, actually could be an

11:43:40  2    error in my report because I looked at it last night and I

11:43:43  3    noticed hair, what they call --

11:43:45  4              THE COURT:  Okay.  Sir --

11:43:45  5              THE WITNESS:  Sorry.

11:43:46  6              THE COURT:  -- there was a question pending, so

11:43:48  7    I'm going to ask you to answer the question.

11:43:50  8          And Miss Court Reporter, can you repeat the question

11:43:52  9    back.

11:44:08  10             (Record read.)

11:44:12  11             THE WITNESS:  Well, yes, you would have to

11:44:14  12   either have some off-the-shelf forms, or you would have to

11:44:19  13   print them.  Right?  And then you would have to put the

11:44:22  14   signature on them.

11:44:23  15   BY MR. WILLIS:

11:44:24  16   Q    Yeah.  Okay.

11:44:24  17   A    Right.

11:44:25  18   Q    So the first thing that this very clever forgerer would

11:44:29  19   have to do would be to find the off-the-shelf forms, right?

11:44:32  20   A    Yes.

11:44:32  21   Q    And either create them or take them off a shelf, correct?

11:44:35  22   A    Yes.

11:44:36  23   Q    And then this person would have to find an inkjet printer

11:44:40  24   and place those preprinted forms in the inkjet printer,

11:44:44  25   setting up the paper in such a way that the blue ink only

11:44:48  1   comes out where the initials and the signature appear,

11:44:54  2   correct?

11:44:55  3    A   You mean placing the initials and signature in the right

11:44:59  4   place in the document?

11:44:59  5    Q   Right.

11:44:59  6    A   Yeah.  And that can be done.  Yeah.

11:45:01  7    Q   Okay.  But, that's what they would have to do.  They

11:45:03  8   would have to first find the forms, and then they would have

11:45:06  9   to go put the signatures on using the inkjet printer, right?

11:45:10  10   A   Yes.

11:45:11  11   Q   Okay.

11:45:11  12             MR. PANKOPF:  Objection.  It calls for -- I'm

11:45:14  13   sorry.  He already answered.

11:45:19  14             THE COURT:  Thank you, sir.

11:45:22  15   BY MR. WILLIS:

11:45:23  16   Q   Would you turn to your report, which I believe is

11:45:30  17   Exhibit 5?

11:45:31  18             MR. PANKOPF:  Five.

11:45:32  19             MR. WILLIS:  Thank you.

11:45:34  20   BY MR. WILLIS:

11:45:40  21   Q   Now, if I could direct your attention on to page 4 of

11:45:44  22   Exhibit 5, at the top of the page.

11:45:50  23        Do you see that?

11:45:50  24   A   Oh.  Oh, I'm sorry.  Excuse me.  I was looking at the

11:45:54  25   wrong one.

| | | |
|---|---|---|
| 11:45:55 | 1 | Q   Actually, the bottom line on page 3.   Forgive me. |
| 11:45:59 | 2 | Bu you say, and I quote:  "The note table above |
| 11:46:03 | 3 | shows that pages 1 through 3 are all about 1 percent smaller |
| 11:46:07 | 4 | than they should be." |
| 11:46:08 | 5 | A   Uh-huh. |
| 11:46:09 | 6 | Q   "This indicates they are copies and not the original |
| 11:46:12 | 7 | printed form." |
| 11:46:14 | 8 | Do you see that? |
| 11:46:17 | 9 | A   Okay.  I'm on page 3.  Bottom? |
| 11:46:19 | 10 | Q   Yes.  Bottom of the page. |
| 11:46:22 | 11 | A   Okay.  Got it. |
| 11:46:23 | 12 | Q   "The table shows that they're about 1 percent smaller |
| 11:46:26 | 13 | than they should be.  This indicates they are copies and not |
| 11:46:29 | 14 | the original printed form." |
| 11:46:30 | 15 | Okay? |
| 11:46:31 | 16 | A   Uh-huh. |
| 11:46:31 | 17 | Q   "The signature page of note -- of page 2 -- the signature |
| 11:46:35 | 18 | page of the note is page 2 and is therefore a copy.  The last |
| 11:46:39 | 19 | page, page 4, is, apparently, an original page from the |
| 11:46:44 | 20 | promissory note form." |
| 11:46:46 | 21 | So you've concluded that this clever forgerer found |
| 11:46:51 | 22 | one page of the form, but created the other three, correct? |
| 11:46:55 | 23 | A   Not really.  I'm just making observations about the |
| 11:46:59 | 24 | size of the pages.  I'm not trying to speculate on how this |
| 11:47:04 | 25 | happened, which could have happened in many different ways.  I |

11:47:07  1    mean, there are many possible explanations for this.  But,

11:47:12  2    what's the anomaly is the fact that they don't agree in size.

11:47:16  3     Q   Yes.

11:47:17  4          Now let's go back to the table again on the other

11:47:21  5    page -- this is page 3 -- where you're talking about the page

11:47:25  6    sizes.

11:47:26  7          Was this part of your report that you looked at last

11:47:29  8    night?

11:47:31  9     A   Yeah.  I looked at it briefly.

11:47:33  10    Q   You were concerned, weren't you, because you indicate in

11:47:36  11   your report that there is a discrepancy between the sizes of

11:47:40  12   the pages, that some are not eight-and-a-half by fourteen.

11:47:44  13   They are eight-and-a-half by 13.8, et cetera, et cetera.

11:47:47  14    A   Uh-huh.

11:47:48  15    Q   You thought that was significant?

11:47:49  16    A   It can be significant.  Yeah.

11:47:51  17    Q   And you're talking about the size of the paper, correct?

11:47:54  18    A   Right.

11:47:54  19    Q   Eight-and-a-half by fourteen inch paper, legal size paper

11:47:59  20   we used to call it.

11:48:00  21          Do you remember that?

11:48:02  22    A   Yeah, I know --

11:48:03  23    Q   Okay.  So what you're saying is that page 3 shrunk to

11:48:11  24   8.43 times 13.8 versus the 8.5 times 14?

11:48:17  25                MR. PANKOPF:  Objection.  That misstates his

-115-

11:48:19    1    testimony.  That's not what he said.

11:48:20    2                    MR. WILLIS:  Well, that's what the page says.

11:48:22    3                    THE WITNESS:  I just made a measure --

11:48:25    4                    THE COURT:  Whoa.  Everybody stop.

11:48:28    5            Okay.  What he's doing is simply reading from the

11:48:31    6    table that's in your, in your witness' report and there is

11:48:35    7    nothing impermissible about that, having already done that

11:48:38    8    on direct.

11:48:39    9                    So, please answer the question.

11:48:40    10                    MR. PANKOPF:  May I expound a little bit, Your

11:48:42    11    Honor, please?

11:48:43    12                    THE COURT:  No.

11:48:44    13                    Please answer the question, sir.

11:48:45    14                    THE WITNESS:  Okay.  Could you repeat the

11:48:47    15    question, please.

11:48:47    16                    MR. WILLIS:  Madam Court Reporter?  Sorry to

11:49:13    17    bother you.

11:49:13    18                    (Record reread.)

11:49:16    19    BY MR. WILLIS:

11:49:16    20    Q    That's what you're saying, correct?

11:49:18    21    A    This is page 4, right?

11:49:25    22    Q    No, it's page 3.  Bottom of page 3.

11:49:29    23    A    Okay.  That's the problem I'm having.  I'm on the wrong

11:49:32    24    -- page 3.  So page -- sir, try again.

11:49:36    25    Q    Okay.  I'm going to try again.

| | | |
|---|---|---|
| 11:49:38 | 1 | What you're saying on this table is that page 3 of |
| 11:49:40 | 2 | the HELOC shrank from eight-and-a-half times fourteen, to 8.43 |
| 11:49:46 | 3 | times 13.8, correct? |
| 11:49:47 | 4 | A   Yeah. |
| 11:49:48 | 5 | Q   But, page 4 remained at eight-and-a-half by fourteen? |
| 11:49:53 | 6 | A   Yes.  That's what -- those are the measurements. |
| 11:49:56 | 7 | Q   And then on the next page, you conclude page 4 is, |
| 11:49:59 | 8 | apparently, an original page from the promissory note form |
| 11:50:02 | 9 | because it hadn't shrunk, correct? |
| 11:50:05 | 10 | A   Yeah.  So I, I make that statement there. |
| 11:50:12 | 11 | Q   Yeah.  That's what you're opining.  You're putting your |
| 11:50:16 | 12 | alleged expertise behind that statement, correct? |
| 11:50:20 | 13 | A   Well, I'm -- well -- |
| 11:50:22 | 14 | Q   Do you want to change it? |
| 11:50:27 | 15 | A   Well, it actually should be rephrased.  Could be an |
| 11:50:31 | 16 | original page. |
| 11:50:32 | 17 | Q   Okay.  Could be? |
| 11:50:33 | 18 | A   It could be something else too, right. |
| 11:50:35 | 19 | Q   Okay.  And as opposed to the other three pages, which |
| 11:50:38 | 20 | because of the shrinkage, you opined couldn't be part of the |
| 11:50:41 | 21 | original page -- or original document, correct? |
| 11:50:44 | 22 | A   Yeah.  Unless -- |
| 11:50:48 | 23 | Q   Okay. |
| 11:50:48 | 24 | A   -- the original document itself was shrunk, you know, |
| 11:50:51 | 25 | you know what I mean?  So I'm just making measurements -- and |

11:50:55  1  I don't want to go too far with this stuff.  That's why it's

11:50:59  2  an indicator.  It's not probative.

11:51:01  3    Q   Okay.

11:51:02  4                MR. WILLIS:  Madam Clerk, could the witness

11:51:04  5  please be provided with Exhibits 3, 4 and 5.

11:51:09  6                THE COURT:  And that's defense exhibits?

11:51:11  7                MR. WILLIS:  Defense Exhibits 3, 4 and 5.  And

11:51:14  8  at the same time, if possible, 3-A, 4-A and 5-A.

11:51:17  9                THE CLERK:  I'll just give them all.

11:51:26  10            Some of the numbers are still on the back.

11:51:29  11                MR. WILLIS:  Okay.

11:51:29  12                THE WITNESS:  Do you still need the binder?

11:51:31  13                MR. WILLIS:  Yeah.  We're going to need it

11:51:32  14  later, but you can put it down for a while.

11:51:35  15                MR. PANKOPF:  I'm not sure we have 3, 4 and 5.

11:51:37  16                MR. WILLIS:  You don't have 3, 4 and 5.

11:51:40  17  BY MR. WILLIS:

11:51:40  18    Q   3, 4 and 5 are the original note, deed of trust and

11:51:44  19  rider.  3-A, 4-A, 5-A are copies of those documents that I

11:51:48  20  personally made yesterday using a color scanner.

11:51:52  21                MR. PANKOPF:  Objection.  Assumes facts not

11:51:54  22  in evidence.

11:51:55  23                MR. WILLIS:  Well, I'm about to get -- sorry,

11:51:57  24  Your Honor.

          25                ///

11:52:05    1    BY MR. WILLIS:

11:52:05    2    Q   So, doctor, do you recognize what you have in your

11:52:07    3    hand --

11:52:07    4                  THE COURT:  I'm not -- wait.  There's an

11:52:08    5    objection pending.

11:52:10    6                  So, you're objecting to him reviewing the documents

11:52:12    7    because they have not been offered yet into evidence?

11:52:17    8                  MR. PANKOPF:  No.

11:52:18    9                  THE COURT:  Okay.  So is that a withdrawn

11:52:20   10    objection at this point then?

11:52:21   11                  MR. PANKOPF:  Yeah, it will be withdrawn.

11:52:22   12                  THE COURT:  Okay.

11:52:23   13                  Please continue, sir.

11:52:24   14    BY MR. WILLIS:

11:52:24   15    Q   Do you recognize -- which document do you have in your

11:52:27   16    hand, doctor?

11:52:29   17    A   This is the credit agreement.

11:52:30   18    Q   Okay.  You recognize that as the credit agreement you

11:52:33   19    reviewed in my office on June 8th?

11:52:36   20    A   It looks like it.  I don't know if it's exactly the same

11:52:39   21    one or not.

11:52:40   22                  THE COURT:  Sir, for my edification, what is

11:52:43   23    that number because I don't have a copy of that in front of

11:52:46   24    me.  What is the exhibit number?

11:52:48   25                  MR. WILLIS:  I think --

11:52:49  1                    THE CLERK:  -- on the back?

11:52:50  2                    MR. WILLIS:  Is it 3-A or 3, Exhibit 3?

11:52:53  3                    THE WITNESS:  Exhibit 3 it's marked on here.

11:52:56  4     Defendant's Exhibit 3.

11:52:57  5                    THE COURT:  Thank you, sir.  Appreciate that.

11:52:58  6     BY MR. WILLIS:

11:52:59  7      Q   Would you confirm that Exhibit 3-A is a true and exact

11:53:02  8     copy of Exhibit 3?

11:53:07  9                    MR. PANKOPF:  Can we have a copy of what he's

11:53:09  10    looking at?

11:53:09  11                   THE COURT:  He's looking at what is purported to

11:53:12  12    be the original and a copy that Mr. Willis made yesterday.

11:53:15  13                   MR. PANKOPF:  They don't have copies for us to

11:53:18  14    look at.

11:53:18  15                   MR. WILLIS:  I gave them to you at break.

11:53:20  16                   MR. PANKOPF:  No you didn't.

11:53:21  17                   MR. WILLIS:  Sorry.

11:53:22  18                   MR. JOHANNESSEN:  No you didn't.

11:53:24  19                   MR. WILLIS:  Oh.  Well, then I apologize.

11:53:27  20                   MR. JOHANNESSEN:  I have 3-A, 3-B, 3-C.  You

11:53:31  21    mentioned 4 and 5-A.

11:53:32  22                   MR. WILLIS:  My error.

11:53:34  23                   THE COURT:  Let's just stick with 3-A and -B

11:53:36  24    and what we have right now, and we'll get to that maybe at the

11:53:39  25    break.  We can make copies at that point.

11:53:41   1                     MR. WILLIS:  Yeah.  I should have copies.  I

11:53:43   2   apologize.

11:53:43   3                     THE COURT:  Okay.

11:53:43   4   BY MR. WILLIS:

11:53:44   5   Q   What do you have in your hand, doctor?

11:53:46   6   A   I've got two things -- I mean I've got Exhibit 3 and 3-A

11:53:51   7   is lying in front of me.

11:53:52   8   Q   Okay.  Are they one -- are they copies?  Are they the

11:53:56   9   identical document?

11:53:57   10   A   I don't know.  I would have to examine them in detail,

11:54:00   11   but they're copies.  Yeah.  I don't know if they're identical.

11:54:06   12                     MR. WILLIS:  Your Honor, may I approach for a

11:54:07   13   moment just to sort out the exhibits.

11:54:09   14                     THE COURT:  Please, sir.

11:54:17   15                     MR. WILLIS:  Pardon me, doctor.

11:54:19   16        Do you have 3-A?

11:54:20   17                     THE WITNESS:  Yeah.  This is 3-A.

11:54:51   18                     MR. WILLIS:  All right.

11:54:59   19   BY MR. WILLIS:

11:55:00   20   Q   Now, you have in front of you exhibits -- you have copies

11:55:03   21   of the HELOC, correct, Home Equity Line of Credit?

11:55:08   22   A   Yeah, this is the HELOC.

11:55:10   23   Q   One is marked Exhibit 3?

11:55:12   24   A   Yes.

11:55:12   25   Q   And one is marked Exhibit 3-A?

11:55:14  1   A   Yes.

11:55:14  2   Q   Okay.  I asked you whether you recognized Exhibit 3 as

11:55:17  3   the document you examined in my office and you said it looked

11:55:21  4   like it.

11:55:21  5   A   It looks like it, but I can't make sure it is the --

11:55:24  6   exactly the same document without examining it.

11:55:26  7   Q   But that is the document, that is a copy of the document

11:55:29  8   that you examined and measured and created table 3 of your

11:55:37  9   report around, correct?

11:55:38  10              MR. PANKOPF:  Objection.  Calls for speculation.

11:55:40  11  He doesn't know if it's a copy of the original or a copy of a

11:55:44  12  copy.  I mean, it hasn't been established that this, this is

11:55:48  13  the actual copy of the original that was examined.

11:55:50  14              THE COURT:  Thank you, sir.  I hear your

11:55:52  15  objection.  However, he asked him if this appears to be a

11:55:55  16  copy of the document that he examined in his office, and

11:55:58  17  that's a fair question.

11:55:59  18              MR. PANKOPF:  He said a copy of the original.

11:56:03  19              THE COURT:  A copy of the document that he

11:56:04  20  reviewed at his office, which they purport to be original and

11:56:08  21  you claim is not.

11:56:09  22          So, yes, please answer the question, sir.

11:56:11  23              THE WITNESS:  Uh, okay.

11:56:15  24          So, uh, this appears to be, uh, either the original

11:56:23  25  or a copy of the original I examined in the office.  That's

```
11:56:26   1   all I can say at this point.
11:56:27   2   BY MR. WILLIS:
11:56:27   3    Q    All right.  That's fine.
11:56:27   4    A    Okay?
11:56:28   5    Q    And what was the exhibit number for the record?
11:56:30   6    A    This is 3, yeah, that we -- I was referring to.
11:56:35   7    Q    Okay.  Thank you.
11:56:37   8         Would you hand Exhibit 3 to Her Honor, please.
11:56:40   9             THE COURT:  Thank you, sir.
11:56:41  10   BY MR. WILLIS:
11:56:41  11    Q    I would like you to look at the copy, Exhibit 3-A.
11:56:44  12         Do you have it there?
11:56:45  13    A    Uh-huh.  Yes.
11:56:46  14    Q    Do you recognize that as copy of the Home Equity Line of
11:56:49  15   Credit that you, as part of your assignment in this case,
11:56:52  16   reviewed?
11:56:53  17             MR. PANKOPF:  Objection.  Your Honor, he's
11:56:54  18   here to be voir dired, not to authenticate documents for
11:56:59  19   defendants.
11:57:01  20             THE COURT:  The witness is here to testify about
11:57:02  21   the expert opinions that he's provided, including voir dire
11:57:06  22   as to his qualifications.  His expert opinion is based upon
11:57:10  23   the review of documents in Mr. Willis' office that they
11:57:14  24   purport to have been provided here today.  He can absolutely
11:57:18  25   answer questions related to those documents and those expert
```

11:57:21   1    opinions.

11:57:22   2              I find it very curious, however, that there was a

11:57:25   3    document filed before this hearing -- let me pull it up --

11:57:31   4    document number 237, which was a request for clarification,

11:57:41   5    wherein the plaintiff's counsel indicated that documents

11:57:45   6    needed to be provided at the hearing for their expert to be

11:57:48   7    able to testify.  And, these purport to be the very documents

11:57:52   8    that were at issue.  So, the objection is overruled.  And any

11:57:57   9    line of questioning -- anymore objections to these particular

11:58:01   10   documents and whether or not this witness can testify to

11:58:03   11   those documents are overruled.

11:58:05   12             We are now almost at noon.  How much longer do you

11:58:08   13   have, sir?

11:58:08   14             MR. WILLIS:  I can wrap this up before noon,

11:58:11   15   Your Honor, this last point.

11:58:12   16             THE COURT:  Okay.  Okay.

11:58:12   17   BY MR. WILLIS:

11:58:13   18   Q   Okay.  Still with me, doctor, on the HELOC?

11:58:15   19   A   Okay.

11:58:16   20   Q   The HELOC, we agree, is the document where you said

11:58:19   21   page 3 had shrunk, page 4 had stayed at eight-and-a-half by

11:58:23   22   14, correct?

11:58:24   23   A   Yeah.  That's what my measurements show.

11:58:26   24   Q   Okay.  Doctor, having that document in your hand, as

11:58:30   25   you sit here today, would you agree that that is absolutely

11:58:33  1  impossible because it's a double-sided document on the same

11:58:36  2  piece of paper?  Page 3 and page 4 are on the same piece of

11:58:40  3  paper.

11:58:47  4   A   That would be correct.

11:58:49  5             MR. WILLIS:   Nothing further.  Thank you -- or

11:58:50  6  I have, actually, further, Your Honor, but this is a good

11:58:53  7  point to take a break.

11:58:55  8             THE COURT:  Okay.

11:58:55  9        In light of how long this is taking, I'm going to go

11:58:57 10  ahead and break, but we're going to come back at 1:00.  I want

11:59:02 11  to make sure we can get through all of this.

11:59:04 12        At this time, though, I would ask Mr. Willis -- and

11:59:08 13  I'm sorry.  Is it Ms. Dove?

11:59:10 14             MS. DOVE:  It is.  Thank you, Your Honor.

11:59:11 15             THE COURT:  If you can make sure that

11:59:13 16  plaintiff's counsel has copies of any additional documents

11:59:15 17  that you plan to give.  If you need copies made, please let

11:59:19 18  me know and we can make those in chambers to ensure that

11:59:22 19  everybody has copies of what you're looking at.

11:59:24 20        I am going to now hand back -- or do you have any

11:59:28 21  other questions about what's been marked as document number 3,

11:59:31 22  sir?

11:59:31 23             MR. WILLIS:  I will, Your Honor.  Yes.

11:59:32 24             THE COURT:  I'm still going to hand that back to

11:59:34 25  the clerk so I don't lose it.

11:59:35   1            So, Miss Clerk, here is document number 3.  And when

11:59:37   2    we get back to that, I'll request it back.

11:59:40   3            Like I said, we'll be back here at one o'clock to

11:59:42   4    resume questioning.  And at this time, we will be in recess.

11:59:46   5            (Noon recess taken.)

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

| | | |
|---|---|---|
| 12:59:53 | 1 | Reno, Nevada, Wednesday, November 28, 2018, 1:00 p.m. |
| 01:00:01 | 2 | ---OoO--- |
| 01:02:18 | 3 | |
| 01:07:13 | 4 | THE CLERK:  In the matter Robert A. Slovak |
| 01:07:15 | 5 | versus Golf Course Villas Homeowners Association, court is |
| 01:07:17 | 6 | again in session. |
| 01:07:19 | 7 | THE COURT:  Good afternoon.  Please be seated. |
| 01:07:21 | 8 | MR. JOHANNESSEN:  Good afternoon. |
| 01:07:22 | 9 | THE COURT:  Before we get started, I want to |
| 01:07:24 | 10 | make a record because I am going to, not necessarily reverse |
| 01:07:28 | 11 | a decision that I made earlier, but I want to make a |
| 01:07:31 | 12 | clarification to a ruling that I made earlier. |
| 01:07:33 | 13 | Defense has offered as exhibits, Exhibit 3, |
| 01:07:37 | 14 | Exhibit 3-A; Exhibit 4, Exhibit 4-A; and Exhibit 5 and |
| 01:07:42 | 15 | Exhibit 5-A.  Exhibits 3, 4, and 5 purport to be the documents |
| 01:07:48 | 16 | that Mr. -- or Dr. Kelley -- I apologize -- reviewed when he |
| 01:07:52 | 17 | was at the Snell & Wilmer offices in June of 2018.  And, 3-A, |
| 01:07:58 | 18 | 4-A and 5-A purport to be copies made of those documents in |
| 01:08:03 | 19 | anticipation of this hearing today.  At this point, however, |
| 01:08:06 | 20 | there has been no evidence, necessarily, to show that these |
| 01:08:09 | 21 | are, in fact, the documents that Dr. Kelley reviewed; rather, |
| 01:08:14 | 22 | he had indicated that they appear to be. |
| 01:08:17 | 23 | So, under Rule 104, under the Federal Rules of |
| 01:08:21 | 24 | Evidence, I am making the ruling that, preliminarily, we will |
| 01:08:24 | 25 | allow these to be testified to, and that they will be allowed |

01:08:27  1   to be examined and gone over; however, I am not going to admit

01:08:31  2   these documents into evidence until there is testimony to show

01:08:35  3   the chain of custody that these are, in fact, those documents,

01:08:38  4   if that is the purpose that they're being offered for.

01:08:41  5   However, I think it's fair to allow him to testify that

01:08:44  6   they appear to be the same document, however the weight

01:08:47  7   and credibility as to the testimony related to those will be

01:08:50  8   specific to whether or not that can be tied up.  So I'm not

01:08:54  9   sure how defense intends to do that, but there does need to be

01:08:57  10  some showing that these are, in fact, the same documents that

01:09:00  11  he reviewed.

01:09:01  12       I would also point out for the record that I

01:09:03  13  understand it's Wells Fargo's position that these are the

01:09:05  14  original documents.  And, of course, it's plaintiff's position

01:09:08  15  that these are forgeries.  So to the extent that we say

01:09:11  16  these are originals, we say that with that clarification,

01:09:13  17  that I understand that there is a dispute between the parties

01:09:16  18  as to their original nature.  So if I use that term, or

01:09:19  19  that terminology gets used by anybody in the courtroom, I

01:09:22  20  understand what is being said by that.  But, we're not

01:09:25  21  necessarily making an assumption that these are, in fact,

01:09:27  22  the originals because that is exactly why we're here today.

01:09:31  23       So with that clarification, and with that

01:09:33  24  information, we'll go ahead and get started.

01:09:36  25       One thing I also wanted to point out of the record,

01:09:40  1   I do not have a criminal hearings today.  As it turns out,

01:09:42  2   there are no arrests.  So, we can go forward and use as much

01:09:45  3   time as we need to today.  I will say this, my initial intent

01:09:49  4   was to only allow one day of testimony and one day of this

01:09:52  5   hearing.  However, I will reserve judgment on whether or not

01:09:54  6   I'm going to stand by that as we get closer to the end of the

01:09:56  7   day.

01:09:57  8          I want to make clear on the record how serious I

01:10:00  9   find this motion.  I think that it has incredible impact on,

01:10:03  10  especially, the individual attorneys of the law firm that have

01:10:05  11  been alleged to have committed materially false information

01:10:09  12  that has been presented to the Court and, because of that, I

01:10:11  13  want to make sure that we're doing everything that we can to

01:10:13  14  make a very good and very thorough record on these allegations

01:10:18  15  because I think that is incredibly important to do, given the

01:10:21  16  seriousness of the allegations that have been made.

01:10:23  17         So with that, Mr. Willis, we'll go ahead and

01:10:26  18  continue with your cross-examination, sir.

01:10:27  19             MR. WILLIS:  Thank you.

01:10:33  20             THE COURT:  And I should state for the record,

01:10:34  21  to the extent that Mr. Pankopf and Mr. Johannessen have

01:10:37  22  continuing objections to Exhibits 3, 4 and 5 and 3-A, 4-A

01:10:42  23  and 4-A sic.), those are noted for the record and will be

01:10:45  24  considered without having to renew those objections on a

01:10:48  25  regular basis.

| | | |
|---|---|---|
| 01:10:49 | 1 | MR. JOHANNESSEN:  Thank you, Your Honor. |
| 01:10:50 | 2 | MR. PANKOPF:  Thank you. |
| 01:10:51 | 3 | **CROSS-EXAMINATION (resumed)** |
| 01:10:56 | 4 | BY MR. WILLIS: |
| 01:10:56 | 5 | Q   Good afternoon, doctor. |
| 01:10:57 | 6 | A   Good afternoon. |
| 01:10:59 | 7 | Q   Do you have before you exhibits 3, 4 and 5?  If you |
| 01:11:04 | 8 | don't, may we get them to you. |
| 01:11:06 | 9 | A   I do not have 3.  I have 3-A. |
| 01:11:09 | 10 | THE CLERK:  Judge has 3. |
| 01:11:10 | 11 | THE COURT:  I have 3.  Do you need him to have |
| 01:11:12 | 12 | that back? |
| 01:11:12 | 13 | MR. WILLIS:  If you wouldn't mind, Your Honor. |
| 01:11:14 | 14 | 3, 4 and 5 I would like in front of the witness. |
| 01:11:19 | 15 | THE WITNESS:  I believe I have -- this doesn't |
| 01:11:22 | 16 | have a -- oh.  There it is.  4, okay. |
| 01:11:25 | 17 | So, I've got 4, 4-A, and 5-A.  And -- I don't know |
| 01:11:33 | 18 | if I have 5. |
| 01:11:34 | 19 | Yeah, I got 5.  Okay. |
| 01:11:36 | 20 | MR. WILLIS:  Okay.  Excellent.  And 5 is the one |
| 01:11:38 | 21 | I'd like to talk to you about, so if you would grab that, I'd |
| 01:11:41 | 22 | appreciate it. |
| 01:11:53 | 23 | THE WITNESS:  It is the condominium rider. |
| 01:11:56 | 24 | MR. WILLIS:  That's correct, the condominium |
| 01:11:58 | 25 | rider. |

01:11:58  1    BY MR. WILLIS:

01:12:00  2    Q    Now, Dr. Kelley, if I understood you correctly this

01:12:03  3    morning, when you began to discharge your assignment, you

01:12:09  4    physically inspected the three documents that were provided

01:12:14  5    to you at our office, correct?

01:12:16  6    A    Yes.

01:12:17  7    Q    And you physically inspected them, if I understood you,

01:12:21  8    again, for the purpose of determining whether there were any

01:12:25  9    indentations or furrows that were related to the signatures?

01:12:30  10   A    That's one of the tests that I look at.  Yeah.

01:12:32  11   Q    Okay.  And I believe you testified that you didn't find

01:12:36  12   any?

01:12:37  13   A    No.

01:12:38  14   Q    Is that correct, you did not find any?

01:12:40  15   A    At the time.

01:12:42  16   Q    Now looking at page -- or looking at Exhibit 5, which is

01:12:46  17   the condominium rider --

01:12:48  18   A    Uh-huh.

01:12:49  19   Q    -- at the top of the first page, there is a bar code?

01:12:52  20   A    Yes.

01:12:53  21   Q    Would you rub your finger across that and tell me whether

01:12:57  22   or not you believe that is a bar code that was affixed to the

01:13:00  23   document in your hand, as opposed to part of a copy?

01:13:08  24   A    I -- I'm not sure what you're asking me here.  I'm a

01:13:12  25   little bit baffled.

01:13:13  1    Q    See the bar code?

01:13:14  2    A    Yes.  I see the bar code.

01:13:16  3    Q    Rub your finger over it to see if there's a ridge.

01:13:20  4    A    Uh, what are you asking me to feel?  The bar code?

01:13:23  5    Q    Yes.

01:13:23  6    A    You can't feel it because it's ink, you know.  Do you

01:13:29  7    want me to feel the edge of it?

01:13:30  8    Q    Yes.

01:13:31  9    A    Okay.  There's two-bar codes there.

01:13:33  10   Q    Thank you.

01:13:34  11            Right.  I was asking about the one on the top of

01:13:36  12   page 1.

01:13:37  13   A    Okay.

01:13:38  14   Q    Is there a bar code that appears to be affixed to this

01:13:43  15   document?

01:13:43  16   A    Yes.

01:13:44  17   Q    And turning to page 2.  Is there a bar code that appears

01:13:49  18   to be affixed to the document?

01:13:50  19   A    No.

01:13:53  20   Q    Bottom of page 3, at the bomb bottom, there's a different

01:13:57  21   one, different kind?

01:13:58  22   A    Yeah.

01:13:58  23   Q    Would you do the same procedure with that bar code to

01:14:01  24   determine if there's a ridge.

01:14:03  25   A    Well, I, I -- that's not my procedure.  I don't feel bar

01:14:07   1    codes.  I look at them.  Right?

01:14:11   2              Okay.  Does that help?

01:14:12   3    Q    Let me ask it this way.  Doctor, you agree bar codes on

01:14:18   4    Exhibit 5 are not part of the original document?

01:14:20   5    A    The bar codes here were put onto this document.

01:14:24   6    That's --

01:14:24   7    Q    Thank you.  Thank you.

01:14:26   8              Now in your investigation, and in your scientific

01:14:31   9    research, did you reach any conclusions as to how the clever

01:14:35   10   forger could put the bar codes on Exhibit 5?

01:14:38   11   A    The same way you would put a bar code on any document.

01:14:45   12   Q    Okay.  So as part of the process -- using your

01:14:48   13   hypothesis -- our forgerer not only created the document

01:14:53   14   using laser printing, placed the signatures on the document

01:14:59   15   with an inkjet printer, and then also managed to find bar

01:15:04   16   codes to affix to the document that would be the equivalent

01:15:08   17   of the bar codes that were on the original, is that right?

01:15:11   18   A    Well, that's a really compound -- it's got a lot of terms

01:15:15   19   in there.  First of all, I don't know if what you're saying is

01:15:19   20   correct about this, the one I examined being laser printed or

01:15:25   21   not.  And I haven't had an opportunity to examine this.  So,

01:15:28   22   I'm going to kind of move that one aside because I don't have

01:15:32   23   any opinion that I -- I don't have any facts upon which I can

01:15:35   24   base an opinion.

01:15:36   25   Q    Well, you concluded that the document was a forgery,

01:15:40  1    correct?

01:15:40  2    A    I concluded -- I conclude that the copy is a copy.  I

01:15:45  3    don't -- courts conclude that copies are forgeries.  I don't

01:15:49  4    do that.  I don't make conclusions of the law.  Okay?

01:15:52  5    Q    You lost me there.

01:15:56  6          Are you here saying you don't have an opinion as to

01:15:58  7    whether or not the signature was a forgery?

01:16:00  8    A    I am saying it's a copy.  I'm very clear about that in

01:16:05  9    all of my reports.  It's a copy.

01:16:07  10   Q    And that doesn't --

01:16:08  11   A    It becomes an forgery when presented as an original

01:16:12  12   document in a legal proceeding or for payment.

01:16:14  13   Q    Okay.

01:16:14  14   A    So.

01:16:15  15   Q    It transforms from a copy to a forgery?

01:16:18  16   A    Yes.

01:16:19  17   Q    Oh?

01:16:20  18   A    All forgeries are copies.  All copies are not forgeries.

01:16:24  19   It's that simple.

01:16:30  20   Q    Okay.

01:16:30  21          So, it's fair to say then that at no time in

01:16:33  22   your scientific analysis of these documents did you make any

01:16:37  23   inquiry into how and why these bar codes were placed on the

01:16:41  24   document.

01:16:41  25          Is that fair?

01:16:42  1    A    Oh, I examined the bar codes.

01:16:44  2    Q    Okay.

01:16:45  3    A    And I examined -- I read the bar codes underneath, to the

01:16:48  4    extent that I could, using, uh, certain techniques I have of

01:16:54  5    looking through the document.

01:16:55  6    Q    But wouldn't you agree that if someone was out to copy

01:16:59  7    this original document, they would not only have to copy the

01:17:02  8    template and the signatures, they would also have to find bar

01:17:07  9    codes that were the equivalent of the originals?

01:17:11  10   A    Well, all bar codes are manufactured, so they would have

01:17:15  11   to either have some bar codes available, or manufacturer some

01:17:20  12   bar codes.

01:17:21  13   Q    Okay.

01:17:22  14   A    Uh-huh.

01:17:23  15   Q    Would you look at the deed of trust, please.  This is

01:17:30  16   Exhibit 4.

01:17:38  17        Do you have that?

01:17:40  18   A    I do.  I just have to get to it.

01:17:43  19   Q    The number will appear on the back page of the exhibit.

01:17:46  20   It's 4.

01:17:47  21   A    Okay.  We're good.

01:17:48  22   Q    You got it?

01:17:49  23        Okay.  Same question again.  Does this appear to be

01:17:52  24   the deed of trust that you examined in my office on June 8th?

01:17:56  25   A    I can't guarantee that this is it because I haven't

01:17:59    1    examined this document and compared it to my records.

01:18:02    2    Q    Would it be possible for you to do that?

01:18:04    3    A    It would take time.  Yeah.

01:18:05    4    Q    Would it take more than half-an-hour?

01:18:07    5    A    I -- it takes me three hours to examine each batch of

01:18:12    6    documents.  That's, that's pretty much a standard.

01:18:14    7    Q    So, you're telling us that in three hours you could tell

01:18:17    8    us definitively whether or not that document was the one you

01:18:20    9    examined in my office on June 8th?

01:18:22    10   A    I may be able to, but that's -- I -- when we begin an

01:18:27    11   examination, I don't know where it's going to take me.  Okay?

01:18:29    12   So -- so, yeah.  So in order to form a solid opinion, I would

01:18:34    13   need to examine the documents.

01:18:35    14   Q    Okay.  And that, you say, takes around three hours?

01:18:38    15   A    In almost every case it takes three hours because of

01:18:41    16   the number of photographs and scans and so on.

01:18:45    17   Q    And you would need to do all of that just to confirm that

01:18:48    18   that was the same document that you looked at on June 8th?

01:18:51    19   A    To be thorough.

01:18:52    20   Q    How about to be prudent, but not thorough, as your

01:18:56    21   definition?

01:18:56    22   A    I don't do that.

01:18:57    23   Q    Okay.  But you --

01:18:58    24   A    That's why I take three hours to, you know, make --

01:19:01    25   Q    All right.

01:19:01  1   A   -- copies, make the record of the documents that I'm

01:19:05  2   examining.

01:19:06  3   Q   We'll get back to that.

01:19:08  4        Would you turn, please, to page 4 of 4 in the deed

01:19:11  5   of trust.

01:19:17  6        And do you see at the bottom left, there's what's

01:19:19  7   called a notary jurat?

01:19:28  8   A   Yes.

01:19:28  9   Q   Do you see that?

01:19:29  10       And you see that the jurat is of Cindy Reyes,

01:19:34  11  correct?

01:19:34  12  A   It says so.

01:19:35  13  Q   Okay.  All right.

01:19:36  14       And there's a signature in what appears to be

01:19:39  15  black ink?

01:19:40  16  A   It appears to be.  Yes.

01:19:41  17  Q   So would you turn that page over and rub your finger

01:19:45  18  underneath, or where the notary stamp and signature are?

01:19:52  19  A   (Witness complies.)

01:19:54  20       Yeah.

01:19:54  21  Q   Feel anything?

01:19:55  22  A   Yes, I do.

01:19:56  23  Q   So we can assume then that the document you have before

01:20:01  24  you was, in fact, the paper that the notary jurat was placed

01:20:07  25  on in 2002, right?

01:20:09  1    A    No.  You can't assume anything.

01:20:11  2    Q    Why not?

01:20:12  3    A    I would have to compare this with the, with my record of

01:20:16  4    the original document.  This, this can be made.

01:20:20  5    Q    What can be made?

01:20:21  6    A    The notary stamp.

01:20:22  7    Q    Ah.  Good.

01:20:22  8    A    Yeah.

01:20:24  9    Q    So now our clever forgerer would not only have to have a

01:20:28  10   bar code machine, but figure out how to get Cindy Reyes'

01:20:32  11   notary stamp, correct?

01:20:33  12   A    It's not hard to do.  You can have them made.

01:20:34  13   Q    Are you an expert in notary stamps?

01:20:36  14   A    Yeah.  You can have them made for a few dollars, so.

01:20:39  15   Q    Have you ever done that?

01:20:41  16   A    Yes.

01:20:41  17   Q    You've had a notary stamp made for a few dollars?

01:20:44  18   A    It wasn't a notary stamp.  It was an endorsement stamp

01:20:48  19   and I did it to see how it behaved on the paper.  But, it was

01:20:52  20   an actual copy of the real stamp.

01:20:55  21   Q    But you're not saying that you actually went out and

01:20:57  22   tried to purchase a notary public stamp, are you?

01:21:00  23   A    I had it made.

01:21:01  24   Q    It wasn't a notary public stamp?

01:21:04  25   A    No.  Not a notary stamp.  I had an endorsement stamp

01:21:08  1   made, a product endorsement stamp, endorsement.  And blank

01:21:12  2   with the signature on it.

01:21:13  3   Q   So looking at Exhibit 4, the deed of trust, how

01:21:19  4   many printing processes appear on these papers, on these

01:21:24  5   pages of the deed of trust?  How many different printing

01:21:27  6   processes appear?

01:21:30  7   A   What do you mean by "printing processes"?  Different

01:21:33  8   types of printers?

01:21:34  9   Q   You really don't understand what "printing processes"

01:21:38  10  means?

01:21:38  11  A   Well, I just want to know what you --

01:21:40  12  Q   You're a document examiner.

01:21:42  13  A   (Sigh.)

01:21:46  14  Q   I'll give you a clue.  A pen would be a printing process.

01:21:51  15  An inkjet would be a printing process.  A laser printer would

01:21:53  16  be a printing process.  A typewriter would be a printing

01:21:56  17  process.

01:21:58  18          Do you understand what I'm asking now?

01:21:59  19  A   I, I mean I'm understanding what you're saying.

01:22:00  20  Q   So how many different printing processes appear on the

01:22:03  21  deed of trust?

01:22:04  22  A   Well, I would have to count them by your standard -- not

01:22:10  23  that I necessarily agree with some of your terms.

01:22:12  24          Okay.  So I've got one, two, three -- uh, I got what

01:22:17  25  appears to be some typewriting, four.  And I've got some,

01:22:25   1   uh -- what appear to be APN numbers on the front.  And of

01:22:32   2   course, you have the bar codes.  Right?

01:22:35   3   Q    So if I understood you correctly, on the bar codes,

01:22:38   4   that -- those did not figure into your investigation

01:22:41   5   whatsoever, correct?

01:22:42   6   A    That's not actually true.

01:22:43   7   Q    Well, how did they figure into your investigation?

01:22:46   8   A    I already told you that I looked through them to see if

01:22:49   9   the bar code underneath is the same as the bar code at the

01:22:53  10   top because it's a real question why are there two-bar codes

01:22:57  11   there?

01:22:57  12   Q    Okay.  There are two-bar codes.

01:22:59  13   A    Yeah.  Why are there two bar codes?

01:23:01  14   Q    Are there two bar codes on page 1 of Exhibit 5?

01:23:09  15   A    Let's see -- this is four.

01:23:12  16   Q    The deed of trust -- I'm sorry.

01:23:14  17        Exhibit 4, are there two bar codes on the page 1 of

01:23:18  18   Exhibit 4?

01:23:18  19   A    Okay.  We're back to 4.

01:23:20  20        Okay.  There is two bar codes on page 2.

01:23:28  21   Q    Right?

01:23:30  22   A    Two bar codes on page 3.

01:23:34  23   Q    Okay.

01:23:37  24   A    And two bar codes on page 4.

01:23:40  25   Q    And how about page 5?

01:23:43  1    A   Okay.  And it's hard to see in this light, but, uh, kind

01:23:58  2    of looks like one.  But, I don't have good illumination here,

01:24:03  3    so.

01:24:03  4    Q   Okay.  Did you come to any determinations as to how

01:24:07  5    these bar codes were placed on what you believe to be a copy

01:24:11  6    of an original document?

01:24:12  7    A   They're stickers.

01:24:14  8    Q   Okay.  And so the person, it would be fair to say,

01:24:17  9    that was involved in copying or forging the signature, would

01:24:23  10   have also had to have redone the bar codes on the document,

01:24:27  11   right?

01:24:28  12   A   Well, bar code machines are ubiquitous.

01:24:33  13   Q   Right.  But whether they're ubiquitous or not, under

01:24:36  14   your hypothesis, sir, the person doing the changing of the

01:24:40  15   signature would have had -- also to have changed out the bar

01:24:43  16   codes, correct?

01:24:43  17   A   Uh, if they're remanufacturing a document, they would

01:24:52  18   have to put bar codes on the document.

01:24:54  19   Q   Right.

01:24:54  20   A   Okay.

01:24:55  21   Q   Yeah.  You agree with that?

01:24:56  22   A   Yeah.

01:24:57  23   Q   Good.

01:24:57  24   A   At some point.

01:24:59  25   Q   Now let's go down the front page where it says, "when

01:25:03   1   recorded mail to," and it says "Wells Fargo Home Equity..."

01:25:07   2   et cetera, et cetera.  What type of type medium is that -- or

01:25:11   3   printing process is that.  Excuse me.

01:25:13   4   A   Well, it, it -- I would have to look at it more closely.

01:25:19   5   It kind of looks like typewriting.

01:25:21   6   Q   Okay.

01:25:22   7   A   Okay?  But, it could also be done by a printer, you know,

01:25:27   8   just any printer.  Right?  Because any printer can print

01:25:31   9   typewritten stuff.  Right?

01:25:33   10   Q   But it wasn't significant enough for you, in June

01:25:37   11   of 2018, for you to determine whether that was a printer or

01:25:40   12   whether that was a typewriter, correct?

01:25:42   13   A   Uh, I looked at it, uh -- but the -- there are many

01:25:50   14   explanations for this type of thing.  So let's say it was

01:25:55   15   an inkjet or laser jet or something like that, it wouldn't

01:26:00   16   be material to my opinion.  So, it's not as important as other

01:26:05   17   anomalies, if there are any anomalies there.

01:26:08   18   Q   So the answer to my question is you didn't really study

01:26:12   19   this as part of your analysis as to whether or not this

01:26:15   20   document was an original or a copy, correct?

01:26:17   21   A   No.  I have a blownup copy.  I have a really big

01:26:20   22   photograph of this thing.

01:26:21   23   Q   Did ya?

01:26:22   24   A   Yeah.  And I also have microscopic pictures of this area,

01:26:27   25   which are not in the report.  I've got, like, 500 pictures,

142

01:26:31  1  and not every one of them went into my report because it would

01:26:35  2  be overwhelming, you know, but -- so, yeah, the key thing, the

01:26:40  3  most probative evidence are the inkjet satellites.  That's

01:26:44  4  probative.

01:26:44  5  Q   Well, we're not talking about those.  We're talking about

01:26:47  6  the typewritten information on the top of page 1 of exhibit 4.

01:26:52  7  A   Yeah, and that might have some -- in some -- when

01:26:55  8  considered in the totality of the evidence, it might have

01:26:58  9  some significance.  But in this particular case, it didn't.

01:27:01  10  Q   Okay.  So you would agree with me that whatever machine

01:27:04  11  or process was used to put that information, those words on

01:27:07  12  this page, it was different than the inkjet printer that you

01:27:11  13  claim was used to create the signature.

01:27:13  14       Fair enough?

01:27:14  15  A   I'm not drawing that conclusion.

01:27:15  16  Q   Well, do you disagree?

01:27:17  17  A   I'm saying -- I'm not drawing that conclusion.

01:27:20  18  Q   That wasn't my question.

01:27:21  19       Do you disagree?

01:27:22  20  A   I didn't examine it to obtain such a conclusion.

01:27:24  21  Q   You didn't think that was germane to your overall

01:27:27  22  assignment to determine whether this, this was a fake or

01:27:30  23  not?

01:27:30  24  A   The satellite ink droplets are probative standards.  The

01:27:35  25  ATSM standards, SWG doc standards say you can stop when you

01:27:42   1   have sufficient information for your opinion.

01:27:43   2   Q   So you stopped?

01:27:44   3   A   You don't have to keep going.

01:27:45   4   Q   You stopped, right?  You just didn't go there?

01:27:48   5   A   It didn't contribute any weight to the opinion.

01:27:52   6   Q   All right.  And because you really didn't analyze it?

01:27:55   7   A   But, no.

01:27:56   8               MR. PANKOPF:  Objection --

01:27:57   9               THE WITNESS:  You're drawing conclusions.  I did

01:28:00   10   analyze it and I found it to be not material.

01:28:02   11               THE COURT:  Okay.  I've already said this many

01:28:05   12   times, if there's an objection, please, stop.  Don't testify.

01:28:09   13               THE WITNESS:  Okay.

01:28:10   14               THE COURT:  More importantly, before you

01:28:11   15   answer any question, maybe pause a moment, sir, to allow for

01:28:15   16   an objection to be made and for a ruling to be made before

01:28:18   17   we actually have testimony of people talking over each other.

01:28:21   18               THE WITNESS:  Sorry.

01:28:22   19               THE COURT:  I think the question is fair, which

01:28:24   20   was -- Miss Reporter, can you read back.

01:28:46   21         (Record read.)

01:28:47   22               THE COURT:  And that's --

01:28:47   23               THE WITNESS:  And I'm disagreeing with you.  I

01:28:50   24   did analyze it and found it to be immaterial.

          25           ///

01:28:52  1   BY MR. WILLIS:

01:28:53  2   Q   Well, and I don't want to beat this horse any further,

01:28:55  3   but if you did analyze it, you didn't determine what type of

01:28:59  4   process made this print, correct, whether it was an inkjet,

01:29:02  5   laser, typewriter, some other form of printer?

01:29:05  6   A   That's not true.

01:29:07  7   Q   Okay.  What was it?  What is it?  Is it typed?

01:29:13  8   A   I said this wasn't material to my opinion.  And when,

01:29:17  9   when a signature is made with an inkjet printer, that's

01:29:21  10  material.

01:29:22  11  Q   Yeah, I --

01:29:22  12  A   And I don't have to look for -- you know, determine

01:29:25  13  whether or not the document -- it doesn't mean I didn't

01:29:27  14  analyze it.  I looked at it and I said this isn't material.

01:29:31  15  Q   But you didn't really analyze it in the holistic sense

01:29:36  16  of what had to happen, if someone was out to create a forged

01:29:43  17  document, to ensure that this information would be contained

01:29:48  18  on the forged document and look real, right?

01:29:51  19          You didn't do any analysis like that?

01:29:53  20  A   That's not required in the standard to do that kind

01:29:55  21  of analysis.

01:29:57  22  Q   Right.  If you're looking to the compare whether a

01:29:59  23  document was created by the same inkjet printer, yes, I

01:30:03  24  agree with it you.  But, if you're looking at a document to

01:30:06  25  determine whether it's a forgery, wouldn't you agree that

145

01:30:09  1    that's critical?

01:30:11  2    A    It could be, but it's not in this case.

01:30:14  3    Q    Do you understand you are being proffered as an expert

01:30:19  4    witness to conclude, to opine, that the three documents in

01:30:24  5    front of you, Exhibits 3, 4 and 5 are forgeries?

01:30:27  6          Do you understand that?

01:30:28  7    A    Yes.

01:30:28  8    Q    Okay.  And you are here to opine that they're forgeries?

01:30:32  9    A    I'm here to opine that they're copies.  It's up to the

01:30:36  10   Court to determine if they're forgeries.  Not me.

01:30:38  11   Q    Okay.  Potential forgeries.  But, they're not real,

01:30:42  12   correct?

01:30:42  13   A    They're copies.

01:30:44  14   Q    All right.  Look at the ink on the top left, the APN.

01:30:50  15         Do you see that?

01:30:50  16   A    Uh-huh.

01:30:51  17   Q    The recording information on the top left of the first

01:30:54  18   page, do you know what ink that is?

01:30:57  19   A    It's blue ink.

01:30:58  20   Q    And do you know what type of printing process put that

01:31:02  21   blue ink there?

01:31:06  22   A    I didn't analyze this particular thing because it wasn't

01:31:10  23   material to the conclusion of the document to make -- to

01:31:14  24   render such an opinion.  I could do that.

01:31:17  25   Q    Well -- okay.

01:31:18  1    A    But, it wasn't necessary.

01:31:19  2    Q    We may be back to the same point, but if you are here

01:31:23  3    testifying that this document is a copy or a forgery or a

01:31:28  4    fake, wouldn't you agree that having some explanation as to

01:31:31  5    how that information was placed on the -- what you claim is

01:31:36  6    the copy -- couldn't you agree that that information would be

01:31:39  7    material?

01:31:39  8    A    I told you, I thought that it wasn't material.

01:31:43  9    Q    Okay.  Not material.

01:31:46  10          All right.  Would you mind handing Exhibits 3, 4

01:31:57  11   and 5 back to Her Honor.  That's the rider, the deed of trust,

01:32:02  12   and the HELOC.

01:32:07  13   A    Okay.  This is 4.  Three.  And what part was the other

01:32:07  14   one, 5?

01:32:07  15   Q    Three, 4, 5?

01:32:25  16   A    Okay.  I got 5-A -- Oh, okay.  Where is 5 hiding?

01:32:28  17          Oh, here it is.  Okay.

01:32:30  18          THE COURT:  Thank you, sir.

01:32:32  19   BY MR. WILLIS:

01:32:33  20   Q    Now, doctor, how long do you plan to stay in Reno?

01:32:40  21   A    I was planning on leaving tonight.

01:32:42  22   Q    Okay.

01:32:43  23   A    On an airplane.  Right?

01:32:45  24   Q    What time is your flight?

01:32:47  25   A    I believe around 6:30.  I haven't double checked yet.

01:32:50    1    Q    Okay.

01:32:51    2         Now if I understand what you told us just now, it

01:32:54    3    would take you about three hours for you to determine whether

01:32:59    4    or not Exhibits 3, 4 and 5 were the documents that you

01:33:02    5    examined in my office.

01:33:04    6    A    I could give some sort of opinion on it.  Yeah.

01:33:07    7    Q    Yeah.  Could you determine, definitively, whether they

01:33:11    8    were the documents you reviewed in our office?

01:33:14    9    A    I think it would be unfair for ask me to, uh, collect

01:33:20   10    the data and do a thorough analysis in three hours because

01:33:24   11    rather I collect the data in three hours and I take it back

01:33:28   12    and analyze it.  It may take a week.

01:33:30   13    Q    But you're doing that for the purpose of determining

01:33:33   14    whether or not an inkjet printer was used to create signature.

01:33:37   15    I'm just asking you to confirm these are the same three

01:33:40   16    documents.  That's a different animal.

01:33:42   17    A    That's a different task I've never been asked to do

01:33:45   18    before.

01:33:45   19    Q    All right.

01:33:46   20    A    Right?  So, I'm saying the analysis portion of it taking

01:33:49   21    more time than the data collection.

01:33:50   22    Q    Well, how much time would you need?

01:33:53   23    A    I'm not absolutely certain.  I, usually, am not under

01:33:56   24    that kind of time pressure.  I take this stuff back and I come

01:34:00   25    back a week or two, whatever it takes.

01:34:02   1    Q    Week or two?

01:34:02   2    A    Yeah.  Sometimes it's real quick.  Sometimes it takes

01:34:06   3    longer.  It depends on the documents.

01:34:10   4    Q    So, doctor, let me ask you this.  During the time that

01:34:14   5    you were performing services for Mr. Slovak, and examining

01:34:20   6    and analyzing the Exhibits 3, 4 and 5 that you had before you,

01:34:27   7    did you ever consider an alternative hypotheses to what was

01:34:32   8    your conclusion that these were copies waiting to be

01:34:36   9    forgeries?

01:34:38   10   A    I actually don't understand that question.

01:34:42   11   Q    Well, I think we've established that you're here

01:34:44   12   testifying that the signature is not the original signature;

01:34:48   13   that the document is a copy, correct?

01:34:51   14   A    It's a copy.  Yeah.

01:34:52   15   Q    And, if that document were used in some way, it would

01:34:56   16   become a forgery?

01:35:00   17   A    Well, that's not up to me to decide.  Again, that's a

01:35:03   18   legal conclusion.  I just don't do those.

01:35:05   19   Q    Well, you realize that you, either directly or

01:35:08   20   indirectly, are accusing me of perpetrating a fraud on

01:35:12   21   the Court.

01:35:12   22        Do you realize that?

01:35:14   23   A    I'm not accusing anyone of anything.  I'm just simply

01:35:18   24   reporting on what I'm finding in the document, and that's the

01:35:22   25   scope of my investigation.  I don't have a legal opinion at

01:35:27   1    all.

01:35:27   2    Q    So, when you were doing this project --

01:35:29   3    A    Uh-huh.

01:35:29   4    Q    -- did you have any alternate hypotheses that would

01:35:35   5    mean a reason, other than an inkjet printer, that the document

01:35:40   6    was -- do you have any -- did you have any alternative

01:35:44   7    hypotheses related to the quality or validity of the signature

01:35:49   8    on the document?

01:35:51   9    A    Let me explain how I do this.  I go through each picture

01:35:57  10    and I make observations of each picture.

01:35:59  11    Q    Uh-huh?

01:36:00  12    A    I try to select the pictures from the large set of

01:36:02  13    photographs that I have that contain information.

01:36:07  14    Q    Okay.

01:36:07  15    A    Then I analyze that.

01:36:08  16    Q    Okay.

01:36:09  17    A    And I try not to form any final opinion about anything

01:36:12  18    until I have a whole bunch of examples that I think represent

01:36:16  19    the document.  And then I don't make -- I don't start out with

01:36:21  20    a hypotheses.  I start with observations and I record my

01:36:27  21    observations like you see in the thing, where I'm making

01:36:30  22    notes.  Oh, that's a satellite.  This is feathering from

01:36:33  23    the ink.

01:36:34  24    Q    Uh-huh.

01:36:34  25    A    This is a toner particle or this sort of thing.

01:36:38  1        So, so those are the obs -- that's the

01:36:41  2   observational stage.  Then, after that, I collect all of

01:36:45  3   these observations together and then I try to determine

01:36:50  4   whether or not they conflict with each other.  They lead

01:36:52  5   to conflicting conclusions.  If they do, then I've got a

01:36:56  6   problem.  It's going to take me -- I'm going to have to sort

01:36:59  7   it out.

01:37:00  8        So then I consider an alternate hypotheses at this

01:37:03  9   stage.  Okay?  And then in this particular case, all the

01:37:07  10  indications were pointing in the same direction.

01:37:09  11       So I don't have a lot of, lot of inconsistencies in

01:37:13  12  the indicators that conflict with the probative evidence, so

01:37:17  13  it's pretty, a pretty tight situation.  But, it's not always

01:37:21  14  that way.  Sometimes I have nothing probative and I just have

01:37:25  15  a lot of indicators.

01:37:26  16  Q   Well, you would agree, would you not, that your

01:37:28  17  indicators all arose from the analysis of the initials

01:37:32  18  and the signatures, correct?

01:37:33  19  A   The indicators come from the features that are -- for

01:37:37  20  example, if I'm dealing with an inkjet document, much of

01:37:41  21  those features are identified, largely, in an ATSM or SWG doc,

01:37:49  22  liquid inkjet standard.

01:37:52  23  Q   Did you ever, sir, take your hypothesis -- which was,

01:37:59  24  the signature was placed by somebody after the fact with an

01:38:03  25  inkjet -- and see whether or not there was any extraneous

01:38:07  1  evidence that would support a different hypothesis, such as

01:38:11  2  the bar codes, such as the typewriting, such as the other

01:38:18  3  bar code on the condominium rider, such as the ballpoint ink

01:38:24  4  on the front page?

01:38:26  5         Did you ever consider that those, those anomalies,

01:38:34  6  if you will, were inconsistent with your hypothesis that

01:38:37  7  somebody deliberately set out to make a copy using an inkjet

01:38:41  8  printer.

01:38:42  9         Did you ever think about that?

01:38:43  10  A   I, uh, I, I consider alternative hypotheses, for example,

01:38:49  11  with respect to the bar code.

01:38:51  12  Q   Oh.

01:38:51  13  A   Okay?  And the question is why are there two bar codes,

01:38:55  14  one on top of the other, on four pages, right -- or three,

01:38:59  15  three or four pages of the thing?  Why?  Why is that?

01:39:04  16         And was there an error made in the original bar

01:39:07  17  code that they then had to correct by putting a new bar code

01:39:10  18  over it?  And then to find --

01:39:11  19  Q   Let me stop you, doctor.  I think we're plowing new

01:39:14  20  ground.

01:39:14  21  A   So I'm answering your question that you asked me if I

01:39:17  22  considered alternative hypothesis.  That's the type of

01:39:21  23  hypothesis test I consider in the alternative.

01:39:24  24  Q   Did you, when you were exercising your scientific

01:39:27  25  methods, ever consider, as an alternative hypothesis, that the

01:39:29  1    documents were legitimate, and the signatures that appeared on

01:39:33  2    them were those of Mr. Slovak?

01:39:35  3    A    Yes.   Initially.   I always start out with -- you know, I

01:39:39  4    don't know what this is going to turn out.   I don't know where

01:39:42  5    these documents are going to take me.

01:39:45  6    Q    But, you had stopped your investigation after doing

01:39:47  7    nothing more than analyzing the signatures and the initials,

01:39:51  8    and not coming up with explanations for the remainder of the

01:39:56  9    printing processes reflected in these documents, correct?

01:40:00  10   A    That's not correct.

01:40:02  11         Just because it's not in the report, doesn't mean

01:40:04  12   I didn't do the work.   The work that's reflected in the

01:40:08  13   report is what I consider to be the, like the most important

01:40:13  14   features.   That doesn't mean I didn't look at the rest of the

01:40:15  15   document.   Trust me.   I looked at everything and I picked

01:40:20  16   those things which I considered to be material and important.

01:40:23  17   Because if I presented everything, the report would be

01:40:28  18   200 pages long.   And that -- you know, this is not a good

01:40:32  19   situation, you know.   It's -- and it's also unnecessary.

01:40:37  20   According to the standards, you're allowed to stop when you

01:40:41  21   have sufficient evidence.   Okay?   I mean, it's very clear.

01:40:44  22   Q    Doctor, have you ever had an engagement in which you

01:40:49  23   determined the signatures on loan instruments were authentic?

01:40:52  24   A    Yes.

01:40:53  25   Q    How many?

01:40:54   1    A    Um, I had a savings and loan in --

01:40:57   2    Q    The question was how many?

01:40:59   3    A    Well, you -- I have to pull them out of my memory.  Okay?

01:41:03   4    Q    Pull away.

01:41:05   5    A    Yeah.  In a bank in Santa Fe recently, uh -- and

01:41:11   6    sometimes there's simply not enough evidence to -- for me

01:41:15   7    to render an opinion.  And in a case like that, I tell the

01:41:18   8    client, I say, look, there's not evidence here in these

01:41:23   9    documents for me to render an opinion.

01:41:27   10            And sometimes I've had -- when I've done that,

01:41:30   11   sometimes they make me do one anyway, and I say it's not going

01:41:33   12   to change what I'm telling you.  Right?  Then they get mad.

01:41:37   13            So, that's the way it works.

01:41:47   14            MR. WILLIS:  Your Honor, I have nothing further

01:41:48   15   of this witness.

01:41:49   16            THE COURT:  Okay.  Thank you, sir.

01:41:57   17            MR. WILLIS:  One housekeeping matter.

01:41:58   18            THE COURT:  Yes.

01:41:58   19            MR. WILLIS:  I referenced two decisions from

01:42:02   20   a court, one in New York, one in Colorado.  I have copies

01:42:06   21   of those orders, as well as an additional order from the

01:42:12   22   MacDonald case disqualifying Dr. Kelley.  We have set these

01:42:17   23   up with a declaration by Ms. Dove because she obtained them

01:42:22   24   from Pacer and other public sources.

01:42:25   25            In light of your admonition that we shouldn't be

01:42:28  1    filing much more in here, rather than filing it, would Your

01:42:31  2    Honor accept it as an exhibit and take judicial notice of

01:42:34  3    the opinions?

01:42:35  4                THE COURT:  Have you provided a copy to the

01:42:37  5    plaintiff's counsel?

01:42:38  6                MR. WILLIS:  I will do so right now.

01:42:44  7                THE COURT:  If they're court records then,

01:42:46  8    under Rule 201, judicial notice should be more than sufficient

01:42:51  9    under the circumstances.  But, I do think that we should allow

01:42:55  10   the opportunity for the plaintiff's counsel to review those

01:42:58  11   documents and to see if there's any objection, at the very

01:43:00  12   minimum.  And I'll give them the opportunity to review that.

01:43:04  13   I think it's little bit much to ask them to do it right now

01:43:08  14   and make a determination whether they have an objection.  So,

01:43:11  15   I this maybe what we'll do is give them time to look over

01:43:14  16   those at the break, and then we'll make a decision of that.

01:43:16  17   But if they're court records, I have no problem taking

01:43:19  18   judicial notice of them, but I won't make a decision until I

01:43:22  19   hear objections from plaintiff's counsel on that.

01:43:24  20                Mr. Pankopf, do you have any redirect, sir?

01:43:28  21                MR. PANKOPF:  Uh, just one, I believe, Your

01:43:32  22   Honor -- or one issue.  One or two questions.

01:43:36  23                       **REDIRECT EXAMINATION**

01:43:37  24   BY MR. PANKOPF:

01:43:44  25    Q   Dr. Kelley, I'm going to refer you back to Exhibit 9,

01:43:49   1   page 2, of the SWG doc standards.

01:44:06   2   A   Uh, okay.  9-002, Exhibit 9-002.

01:44:11   3   Q   And the paragraph 4.1 referring to "the procedures

01:44:15   4   outlined here are grounded in the generally accepted body

01:44:18   5   of knowledge and experience in the field of forensic document

01:44:22   6   examination."

01:44:22   7   A   Yes.

01:44:23   8   Q   Right.  In addition to the following sentence regarding

01:44:28   9   "the ability to make a determination as to whether a copy

01:44:32   10  that was printed by an inkjet printer, and another copy that

01:44:40   11  was printed by an inkjet printer -- strike that.  I got lost.

01:44:46   12         THE COURT:  No problem, sir.  Take your time.

01:44:50   13  BY MR. PANKOPF:

01:44:53   14  Q   Basically my question is it was these standards and

01:44:56   15  methodologies that allow you to make a determination as to

01:45:00   16  whether a particular copy was printed by an inkjet, an inkjet

01:45:08   17  printer, correct?

01:45:08   18  A   Absolutely correct.  And it has to be that way because

01:45:13   19  you can't prove that a document came from -- two documents

01:45:19   20  came from the same inkjet printer without knowing it's an

01:45:23   21  inkjet printer that printed it.

01:45:25   22  Q   Right.  And some of these features that they identify

01:45:28   23  within these standards, they are indicators that these -- the

01:45:35   24  copies was produced by an inkjet printer, correct?

01:45:39   25  A   That's right.  And so if there were different kinds of

01:45:42  1    inkjet printers, you would expect those features to exhibit

01:45:45  2    themselves in different ways, manifest themselves in different

01:45:50  3    ways, and I --

01:45:53  4              MR. PANKOPF:  So, Your Honor, that's the final

01:45:56  5    question.  And, uh, I don't know if, at this time, if -- you

01:46:00  6    know, I would like to move Dr. Kelley's testimony into the

01:46:05  7    record and have him be qualified as an expert witness.  I

01:46:08  8    didn't know if you want to do that now, or if you were going

01:46:11  9    to take another review.

01:46:12  10             THE COURT:  I'm going to take that under review,

01:46:14  11   sir.  Thank you.

01:46:15  12             However, I do have a few questions that I would like

01:46:18  13   to clarify too, if I may.

01:46:20  14             Sir, just so I'm clear, you testified about the

01:46:23  15   specialty organizations to which you are a member, and I

01:46:25  16   believe you stated that you were a member of the IEEE, is that

01:46:29  17   correct.

01:46:30  18             THE WITNESS:  I triple E.

01:46:32  19             THE COURT:  But there are no specialty

01:46:33  20   organizations which you're a member of that relate to forensic

01:46:38  21   document examination, is that correct?

01:46:40  22             THE WITNESS:  Uh, yeah.  The I triple E does a

01:46:44  23   lot of document research.

01:46:46  24             THE COURT:  But, is it an organization that's

01:46:48  25   specific to forensic document examination?

01:46:50  1              THE WITNESS:  They have specific research

01:46:53  2    there to automate the process of determining whether or not a

01:46:57  3    document is authentic or not by computer.

01:47:00  4              THE COURT:  Okay.

01:47:01  5              THE WITNESS:  It's a computer --

01:47:02  6              THE COURT:  Let me ask this one more time.

01:47:04  7              THE WITNESS:  Okay.

01:47:05  8              THE COURT:  I really need you to answer my

01:47:06  9    question --

01:47:07  10              THE WITNESS:  Okay.

01:47:07  11              THE COURT:  -- which is, is the I triple E an

01:47:10  12    organization that's specific to the specialty of forensic

01:47:14  13    document examinations, or is it an engineering group?

01:47:18  14              THE WITNESS:  It covers a wide latitude of

01:47:22  15    electronic and electrical engineering things.  And one of the

01:47:27  16    subgroups would be this forensic document stuff.

01:47:32  17              THE COURT:  Okay.

01:47:33  18         Sir, you indicated there was, there was a series of

01:47:36  19    questions about things that you have written, but there were

01:47:39  20    no questions about whether or not you've ever taught anything

01:47:42  21    with respect to forensic document examination.

01:47:45  22         Have you ever taught any classes, or spoke or

01:47:48  23    provided any lectures on this topic?

01:47:50  24              THE WITNESS:  Uh, I've sometimes do it -- do

01:47:54  25    provide, uh, demonstrations of it to, uh -- I've done it to

01:47:59  1   groups of lawyers and people like that.

01:48:01  2                    THE COURT:  Okay.

01:48:01  3                    THE WITNESS:  But not, like, at a university.

01:48:06  4                    THE COURT:  And as I understood the questions

01:48:08  5   that Mr. Willis had for you this afternoon, you were asked

01:48:11  6   specifically about anytime where you found a document to be

01:48:15  7   authentic, and I only heard you articulate one time.

01:48:19  8            Is that correct?

01:48:20  9                    THE WITNESS:  No.  There's more than one time.

01:48:21  10                    THE COURT:  Okay.

01:48:22  11                    THE WITNESS:  So the -- and there's a whole

01:48:25  12   group of them where there's no opinion because there's not

01:48:28  13   sufficient evidence.

01:48:29  14                    THE COURT:  Okay.

01:48:29  15                    THE WITNESS:  So that, that case was, uh, a

01:48:34  16   savings and loan in Florida.  The note was perfect.  I mean,

01:48:38  17   I couldn't find anything wrong with it.

01:48:40  18                    THE COURT:  Okay.

01:48:40  19                    THE WITNESS:  Yeah.  It was absolutely perfect.

01:48:43  20            And then recently, in Santa Fe, I had a case where

01:48:46  21   the loan was made, and it was a JP Morgan loan made in 2011.

01:48:53  22   And this is after -- you know, this light compared to what I

01:48:59  23   usually see, and I could not come up with any, you know,

01:49:03  24   definitive findings on that based on the information I had

01:49:06  25   available in the document.  So, I announced to the person that

01:49:10  1    I, uh, that I couldn't give them an opinion that it was

01:49:16  2    inauthentic.

01:49:17  3              THE COURT:  With respect to the documents that

01:49:19  4    you were provided in Exhibits 3, 4 and 5 from the defense, the

01:49:23  5    documents that you have looked at before that they indicated

01:49:26  6    were asking questions about were these the documents that

01:49:28  7    you reviewed, do you recall those documents that you were

01:49:32  8    testifying about?

01:49:33  9              THE WITNESS:  Well, uh, are you -- uh, are

01:49:36  10   you talking about the ones I examined or the ones that --

01:49:39  11             THE COURT:  I'm asking about the ones you were

01:49:41  12   asked questions about today.

01:49:42  13             THE WITNESS:  Oh.  Okay.

01:49:43  14             THE COURT:  Do you have any reason to believe

01:49:45  15   that these are not the same?  Do they look the same as the

01:49:48  16   documents you reviewed when you were at their office?

01:49:51  17             THE WITNESS:  They're similar; however, there's

01:49:53  18   some differences in the -- I don't think they presented the

01:49:58  19   copies, but, uh --

01:49:59  20             THE COURT:  Okay.  That answers my question,

01:50:02  21   sir.  That's fine.

01:50:02  22             THE WITNESS:  Okay.

01:50:03  23             THE COURT:  Is there any further questions at

01:50:05  24   this point?

01:50:05  25             MR. PANKOPF:  Yeah, Your Honor.

| | | |
|---|---|---|
| 01:50:06 | 1 | THE COURT:  Mr. Pankopf. |
| 01:50:07 | 2 | MR. PANKOPF:  I forgot one other issue.  It |
| 01:50:10 | 3 | shouldn't take long. |
| 01:50:11 | 4 | **REDIRECT EXAMINATION (resumed)** |
| 01:50:11 | 5 | BY MR. PANKOPF: |
| 01:50:12 | 6 | Q   Can I refer you to Exhibit 15. |
| 01:50:15 | 7 | A   15?  Okay. |
| 01:50:24 | 8 | Oh.  Okay. |
| 01:50:26 | 9 | Q   Can you review the pages -- |
| 01:50:30 | 10 | A   Oh.  Oh. |
| 01:50:31 | 11 | Q   -- within Exhibit 15? |
| 01:50:33 | 12 | A   Okay.  Yeah, there's a Sharpie pen. |
| 01:50:38 | 13 | Q   Well, look at them all. |
| 01:50:40 | 14 | A   Oh, okay. |
| 01:50:41 | 15 | Q   There's more than one page in Exhibit 15. |
| 01:50:43 | 16 | A   There's a Sharpie pen; a uni-ball pen; a Pentel pen; a |
| 01:50:49 | 17 | uni-ball vision pen, a different version of it; uni-ball gel |
| 01:50:56 | 18 | pen.  There's a Paper Mate Flair, of course, point felt -- |
| 01:51:02 | 19 | it's like a felt tip pen.  And there's a Paper Mate Flair, |
| 01:51:07 | 20 | plain, medium pen.  And, there's Paper Mate Profile, which is |
| 01:51:11 | 21 | actually a ballpoint pen. |
| 01:51:15 | 22 | Okay.  So -- and so that's what, what's there in |
| 01:51:20 | 23 | that. |
| 01:51:20 | 24 | Q   Okay. |
| 01:51:24 | 25 | Mr. Willis asked you about other research that |

01:51:26  1    you've done in the field of document, forensic document

01:51:31  2    examination.

01:51:32  3    A    Uh-huh.

01:51:33  4    Q    Is this some of the research that you've done?

01:51:35  5    A    Yeah.  This is part of the E book.  And what these are

01:51:38  6    are actual pens.  So these -- there's no question that these

01:51:41  7    are pens.  There's no inkjet here and there's no laser or

01:51:46  8    anything else.  It's just a pen that you can use.  You can buy

01:51:51  9    it and use it.  And the question is what do they look like on

01:51:55  10   paper.

01:51:57  11   Q    Right.  And within this exhibit, and the individual

01:52:01  12   pages, you've made observations about each one of these

01:52:05  13   different types of pens, correct?

01:52:07  14   A    Uh-huh.  Yes.

01:52:09  15   Q    Is there anything that would, you know, help the Court

01:52:14  16   understand the difference between the signature created by

01:52:18  17   an inkjet printer and that of these different types of ink

01:52:22  18   pens?

01:52:23  19   A    Yeah.  Yeah.  And, uh -- so I just make notes.  I make

01:52:27  20   observations.  And that little bounding box up there is a

01:52:32  21   50X optical magnification.

01:52:35  22           Using that microscope, that very microscope there --

01:52:38  23   Q    Now, just so the record is clear, Dr. Kelley, when you're

01:52:42  24   referring to one of these pages, let us know specifically

01:52:45  25   which page it is.

01:52:46  1   A   This is the very first page.  Its subtitle is Exhibit 17.

01:52:51  2   Q   Okay.

01:52:52  3   A   Sharpie thin pen ink analysis.

01:52:57  4   Q   Okay.  Go on.

01:52:57  5                   MR. WILLIS:  Your Honor, I object.  This is

01:52:59  6   outside the scope of cross.

01:53:00  7                   MR. PANKOPF:  It's right in the scope of cross

01:53:02  8   because he asked about other research that he had done and

01:53:05  9   where is it and --

01:53:05  10                  THE COURT:  Well, and that might be true, sir,

01:53:07  11  but we have, really, no foundation of what -- who created

01:53:11  12  these.  Anything like that.

01:53:13  13       But, I -- I'm going to allow it because I know where

01:53:16  14  you're going.  And to be totally frank with you, I don't know

01:53:18  15  that we need to go much further with this.  I think I, I get

01:53:23  16  what the argument is here.

01:53:26  17                  MR. PANKOPF:  Okay.

01:53:27  18                  THE COURT:  But I do think you need to lay some

01:53:29  19  foundation as to how these were even created, if we're going

01:53:34  20  to even hear anything about them.

01:53:35  21                  MR. PANKOPF:  Yes, Your Honor.

01:53:35  22  BY MR. PANKOPF:

01:53:36  23   Q   Dr. Kelley, how were these pages in Exhibit 15 created?

01:53:39  24   A   I went and I, uh -- down to Office Depot.  I got a

01:53:45  25  Sharpie pen.  I wrote the name of the pen onto a piece of

01:53:49  1   paper.  I took the paper back to -- made microscope photos of

01:53:57  2   what, of what that pen did on the paper.  And this is what it

01:54:02  3   did.

01:54:03  4          And you can even see the blew line because we're

01:54:07  5   using, like, a shorthand notebook.  So, that's the blew line

01:54:11  6   underneath there.  The line I was writing on.  So, that's an

01:54:15  7   excerpt from the, you know, the description of the pen.  So,

01:54:22  8   it's a direct photo, made directly from the pen, writing on

01:54:28  9   the paper.

01:54:28  10  Q    Okay.  And I was going to try to move this along, wrap

01:54:32  11  it up.

01:54:32  12  A    Yeah.

01:54:32  13  Q    In these examples that you created, did you find any

01:54:39  14  magenta anomalies within any of these ink pens that you, uh,

01:54:47  15  created?

01:54:50  16  A    I'll just take a look at them.

01:54:55  17          (Witness reviews documents.)

01:54:57  18          No.  Looks like the ink is homogenous.

01:55:02  19  Q    Did you discover any cyan satellites surrounding any of

01:55:09  20  the writings that you made?

01:55:12  21  A    There were none of the pens that I tested.  And I did far

01:55:16  22  more than the exhibits here.  None of them produced satellite

01:55:20  23  ink droplets and I distinguish -- I need to clarify something.

01:55:25  24          When there is a satellite ink droplet, I expect the

01:55:30  25  color of that satellite to match the color of the ink pictured

01:55:35  1    here.  So, you might see in this first exhibit here that

01:55:37  2    there's some black dots there, I verified that those are

01:55:40  3    black defects in the paper, so it is not ink.  So, there's

01:55:45  4    no satellites in this picture at all.  And there are none in

01:55:49  5    any of the pen pictures, including the ones that aren't blue.

01:55:54  6    Q    Did you find any evidence of overspray?

01:55:58  7    A    No.

01:56:03  8                 MR. PANKOPF:  Your Honor, I would like to move

01:56:05  9    these into evidence.

01:56:08  10               THE COURT:  Mr. Willis.

01:56:11  11               MR. WILLIS:  Object on the basis of relevance.

01:56:13  12   Lack of foundation.

01:56:17  13               THE COURT:  I believe he's laid a sufficient

01:56:19  14   foundation that Dr. Kelley is the one that created these.  I'm

01:56:23  15   going to go ahead and admit these into evidence.

01:56:26  16               And is there anything further, Mr. Pankopf?

01:56:28  17               (Whereupon, Exhibit 15 -- a document, was received

01:56:29  18   in evidence.)

01:56:29  19               MR. PANKOPF:  No, Your Honor.  Thank you.

01:56:30  20               THE COURT:  In light of that examination,

01:56:33  21   Mr. Willis, do you have any short recross?

01:56:35  22               MR. WILLIS:  Very brief, Your Honor, and it

01:56:38  23   arises from one of the questions you put to the witness.

01:56:41  24   \\\

01:56:41  25                       **RECROSS EXAMINATION**

165

01:56:42   1    BY MR. WILLIS:

01:56:42   2     Q    Did I hear your correctly, doctor, that you say that

01:56:46   3    you looked at Exhibits 3, 4 and 5 here today, and you found

01:56:50   4    differences between those exhibits and what you looked at at

01:56:53   5    my office?

01:56:57   6     A    You know, which -- there's three documents there.

01:57:02   7                   THE COURT:  You know what, sir, let me hand him

01:57:06   8    the documents so that way he can see what you're talking

01:57:07   9    about.

01:57:07   10                  THE WITNESS:  I don't want to over-generalize.

01:57:10   11                  MR. WILLIS:  Okay.

01:57:11   12                  THE COURT:  That may have been my mistake as

01:57:12   13   well?

01:57:12   14   BY MR. WILLIS:

01:57:13   15    Q    Well, if I misheard you, you're more than welcome to

01:57:15   16   clear up my confusion, but --

01:57:16   17    A    I'm not sure what you heard, that's the problem, so I'm

01:57:18   18   confused.

01:57:19   19          Okay.  So I got the condominium rider here, the deed

01:57:22   20   of trust, and the home equity documents that you produced, so.

01:57:30   21    Q    Yes.  But my question was in response to questions from

01:57:32   22   Her Honor, did you say that you saw some differences in those

01:57:35   23   exhibits, and the documents you looked at in my office on

01:57:38   24   June 8th?

01:57:40   25    A    Actually, what I meant to say is I saw some differences

166

01:57:44  1   between -- I'm not sure what you heard, but, for example,

01:57:49  2   some of these doc -- your copies, didn't reproduce the staple

01:57:55  3   holes.  I mean, your own copies, the ones you made at your

01:57:58  4   office.

01:57:58  5   Q   Okay.

01:57:58  6   A   So I wondering about that.

01:58:00  7   Q   Okay.  Your comment was limited to comparing --

01:58:03  8   A   Yeah.  Very specific.

01:58:04  9   Q   -- documents 3, 4, 5 with 3-A, 4-A, 5-A.  That's fine.

01:58:10  10          Is that a correct statement, that's --

01:58:11  11  A   Yeah.  Can you look at it and you'll see, for example --

01:58:13  12  Q   You've answered my question, doctor.

01:58:16  13          Thank you.

01:58:16  14  A   Okay.

01:58:17  15          MR. WILLIS:  Thank you, Your Honor.

01:58:18  16          THE COURT:  Thank you.

01:58:19  17      Sir, if I may have those documents back.

01:58:24  18          THE WITNESS:  These ones?  Okay.  Yeah.

01:58:25  19          THE COURT:  Thank you.

01:58:27  20      Before we go on, Mr. Pankopf, I know that you were

01:58:30  21  present at the time these documents were reviewed in June

01:58:33  22  of 2018, did you take a look at these documents at all when

01:58:36  23  you were there, sir?

01:58:37  24          MR. PANKOPF:  Yeah.  I observed them.  I didn't

01:58:39  25  handle them.

01:58:40   1                    THE COURT:  You did not handle them at all?

01:58:42   2                    MR. PANKOPF:  To the best of my recollection is,

01:58:44   3   yeah, I did not handle them.

01:58:45   4                    THE COURT:  Okay.  Okay.

01:58:45   5            And just out of curiosity, can you tell me who else

01:58:49   6   was present at the time that these were actually reviewed?  I

01:58:51   7   know that I read this before, but I can't recall as I'm

01:58:55   8   sitting here.

01:58:55   9                    MR. WILLIS:  Uh, V.R. Bowman from our office in

01:58:57  10   Las Vegas.

01:58:58  11                    THE COURT:  Okay.

01:58:59  12                    MR. WILLIS:  He is an associate attorney.

01:59:01  13                    THE COURT:  Okay.  So it was Mr. Bowman,

01:59:09  14   Mr. Pankopf, and Dr. Kelley.

01:59:11  15            Was there anybody else present?

01:59:13  16                    MR. PANKOPF:  The video recorder and the

01:59:15  17   court reporter.

01:59:16  18                    THE COURT:  Okay.  Oh.  That's correct.  Okay.

01:59:18  19                    MR. PANKOPF:  So I think it was a total of five

01:59:21  20   of us.

01:59:22  21                    THE COURT:  Okay.

01:59:33  22            At this point, is there any other witnesses for the

01:59:37  23   plaintiff?

01:59:38  24                    MR. JOHANNESSEN:  Yes, Your Honor.

01:59:39  25                    THE COURT:  Okay.

01:59:41  1            MR. JOHANNESSEN:  Plaintiff calls

01:59:43  2    Ms. Jodi Hawkins.

01:59:47  3            THE COURT:  Ms. Hawkins if you could -- sir,

01:59:49  4    you're now excused.

01:59:50  5        At this point, may we release Dr. Kelley?  We're not

01:59:53  6    going to recall him for any purpose at this point?

01:59:56  7            MR. WILLIS:  Your Honor, the only reluctance in

01:59:59  8    saying yes to that is that we might, collectively, wish to

02:00:04  9    consider whether or not to have Dr. Kelley take Exhibits 3, 4

02:00:09  10   and 5, and confirm that they were the documents he examined

02:00:13  11   in our office.

02:00:14  12           THE COURT:  Okay.  And I understand that, sir.

02:00:16  13       So, we will not be completing releasing you, sir.

02:00:19  14   You may step down from the witness stand.

02:00:21  15       Ma'am, if you could come up and just stand where

02:00:24  16   you're at and you'll be sworn.

02:00:24  17

02:00:24                       **JODI HAWKINS,**
02:00:24  18        called as a witness on behalf of the Government,
02:00:24                  was sworn and testified as follows:
02:00:40  19

02:00:40  20           THE CLERK:  Please be seated.

02:00:42  21       Please state your full name for the record, spelling

02:00:46  22   your last name.

02:00:47  23           THE WITNESS:  Jodi, J-o-d-i, Hawkins,

02:00:51  24   H-a-w-k-i-n-s.

02:00:54  25           THE CLERK:  Thank you.  Please be seated.

02:00:57  1          Ma'am, just make sure the microphone is close to

02:01:00  2   you.  Speak directly into it.

02:01:01  3              THE WITNESS:  Yes, ma'am.

02:01:02  4              THE COURT:  Thank you.

02:01:03  5          Please go ahead.

02:01:05  6              MR. JOHANNESSEN:  Your Honor, may I have some

02:01:06  7   leeway in examining this witness?  I don't want to call her a

02:01:09  8   hostile witness, but under Rule 611(c), uh, so I'm able to ask

02:01:14  9   some leading questions.  She is associated to an adverse

02:01:17  10  party.

02:01:17  11             THE COURT:  Well, let's just get started and see

02:01:19  12  where we go.  And then we'll decide how we're going to handle

02:01:22  13  that.

02:01:23  14             MR. JOHANNESSEN:  Okay.  Thank you, Your Honor.

02:01:24  15                    **DIRECT EXAMINATION**

02:01:25  16  BY MR. JOHANNESSEN:

02:01:25  17  Q   Good afternoon, Ms. Hawkins.

02:01:27  18  A   Good afternoon.

02:01:28  19  Q   Where do you work?

02:01:32  20  A   I work for Wells Fargo Bank.

02:01:33  21  Q   Okay.  Can you be more specific?

02:01:35  22  A   Where do I, physically, work?

02:01:38  23  Q   No.  For example -- the reason I'm asking is we've got

02:01:41  24  Wells Fargo & Company, which is the parent umbrella company.

02:01:45  25  And then we've got Wells Fargo Home Mortgage.  We've got a

02:01:47  1   number of different Well Fargos, so that's why I'm asking,

02:01:51  2   specifically, which company do you work for.

02:01:52  3    A   I work for Wells Fargo Bank in the Home Equity

02:01:56  4   Department.

02:01:56  5    Q   Okay.  Do you work for -- have you ever worked for

02:02:01  6   Wells Fargo Home Equity Group?

02:02:02  7    A   That is the group that I worked for is the Home Equity

02:02:05  8   Group.

02:02:05  9    Q   Okay.  What is the difference between the Home Equity

02:02:09  10  Group and the Wells Fargo N.A.?

02:02:10  11   A   That's a group within Wells Fargo Bank.  The Home Equity

02:02:15  12  Group, the whole mortgage department, I mean there's different

02:02:18  13  departments within Wells Fargo Bank, N.A.

02:02:21  14   Q   Okay.  And who writes your check?  I'm not asking how

02:02:27  15  much you get paid.  Who writes your check?

02:02:29  16   A   I get an auto-draft that's deposited into my checking

02:02:33  17  account every day.  I'm not handed a physical check.

02:02:37  18   Q   Do you know who makes that deposit?

02:02:39  19   A   Wells Fargo does.

02:02:40  20   Q   Wells Fargo?

02:02:40  21   A   N.A.

02:02:42  22   Q   Okay.  Have you ever been identified as a witness in any

02:02:45  23  case before?

02:02:47  24   A   I've been a witness in many cases.

02:02:50  25   Q   In Nevada?

02:02:52  1    A   Um, yes.  I believe so.

02:02:54  2    Q   How many?

02:02:55  3    A   I don't know.  A handful.

02:02:57  4    Q   What's a handful?  Six?  12?

02:03:00  5    A   I've been to Las Vegas, maybe, two or three times.  And

02:03:03  6    I've been here twice.  Maybe three times.

02:03:07  7    Q   Okay.  Have you ever testified in a case in Palm Beach,

02:03:12  8    Florida?

02:03:12  9    A   Uh, I've testified in many cases in Palm Beach.

02:03:16  10   Q   So the answer is yes?

02:03:17  11   A   Yes.

02:03:18  12   Q   Okay.  Have you ever been part of a witness list that was

02:03:20  13   provided by Wells Fargo, as a witness to testify in another

02:03:25  14   case anywhere?

02:03:26  15   A   Yes.

02:03:27  16   Q   In the Palm --

02:03:29  17              THE COURT:  I don't mean to be rude, sir, but I

02:03:31  18   need to find out what this is related to because the purpose

02:03:34  19   of this hearing is to determine whether or not the documents

02:03:37  20   at issue are, in fact, authentic or not, effectively.  I

02:03:42  21   mean -- actually, what's really at issue here is whether or

02:03:45  22   not Wells Fargo, Snell & Wilmer, and three attorneys are

02:03:49  23   subject to sanctions for having presented materially false

02:03:52  24   information to the Court.

02:03:53  25              In that determination, is this question of whether

02:03:56  1   or not the documents that were presented are, in fact,

02:03:59  2   forgeries, as opposed to authentic documents.

02:04:03  3        So, I'm not sure what the purpose of the line of

02:04:05  4   questioning is that you have right now, so I'm going to ask

02:04:08  5   you to get to the point, or at least give me some idea of

02:04:12  6   where we're going so that I know that this is really relevant

02:04:15  7   to what we're doing here today, sir.

02:04:18  8        MR. JOHANNESSEN:  Well, for point of

02:04:19  9   clarification, if I might ask the Court.  In the November 6th

02:04:21  10  hearing, you mentioned that the reason or the purpose for this

02:04:24  11  hearing is -- Your Honor, I'm paraphrasing -- the reason for

02:04:28  12  this hearing is to determine whether the expert opinion

02:04:33  13  proffered by plaintiff is admissible.  We're really not going

02:04:38  14  to the weight of the evidence.

02:04:40  15       Is that correct.

02:04:40  16       THE COURT:  Well, I think that's part of the

02:04:41  17  question in the Motion For Sanctions because if there is not

02:04:44  18  an expert opinion that can be admissible that shows that these

02:04:48  19  documents are not authentic --

02:04:50  20       MR. JOHANNESSEN:  Uh-huh.

02:04:50  21       THE COURT:  -- then we're left with the question

02:04:52  22  of are the documents true and authentic, which I think we're

02:04:55  23  all going into that direction anyway, even though that's not

02:05:00  24  entirely what's at issue because the Motion For Sanctions is

02:05:03  25  really part and parcel of that.

02:05:05   1          MR. JOHANNESSEN:  Yes.

02:05:05   2          THE COURT:  But, again, I don't see how that's

02:05:08   3   really different than what I just said.  So, maybe I'm

02:05:11   4   confused about --

02:05:13   5          MR. JOHANNESSEN:  No.  I'm not saying that at

02:05:15   6   all, Your Honor.

02:05:15   7          THE COURT:  Okay.

02:05:16   8          MR. JOHANNESSEN:  It's just there's a witness

02:05:17   9   who has been, until a couple weeks ago, didn't exist on

02:05:23  10   record.  And now we have somebody who has come up to testify

02:05:27  11   and, apparently, she has been offered by Wells Fargo Bank,

02:05:31  12   N.A., the defendant, as a custodian, of sorts, of the

02:05:36  13   documents; for example, the deed of trust, the note.  I'm

02:05:40  14   trying to find out exactly which company she works for, which

02:05:43  15   division, because if she doesn't work for a division that is

02:05:46  16   the custodian of these -- charged with being the custodian of

02:05:50  17   the originals, then she's not qualified to testify.

02:05:52  18          I'm just finding out exactly where -- if you can

02:05:53  19   grant me some leeway, Your Honor.  She just popped up a couple

02:05:57  20   weeks ago.

02:05:57  21          THE COURT:  Okay.  But, now, we're talking about

02:05:59  22   a witness list in a case in Palm Beach, Florida.

02:06:02  23          MR. JOHANNESSEN:  Yes.

02:06:02  24          THE COURT:  So I'm not sure how that relates to

02:06:05  25   that.

02:06:05   1          MR. JOHANNESSEN:  Because, Your Honor, I am

02:06:06   2   unclear as to how Wells Fargo's organizational chart actually

02:06:10   3   operates.  And the Palm Beach, Florida -- all is -- it's

02:06:14   4   marked as Exhibit 16, but Ms. Hawkins is named as one of 62

02:06:18   5   witnesses in that case, and her, uh -- the company it says she

02:06:23   6   works for is Wells Fargo Home Equity Group.  We have other

02:06:27   7   companies which are -- have equity in them.  I'm not as clear

02:06:31   8   as perhaps the Court is what -- particularly, Wells Fargo's

02:06:36   9   witness works.

02:06:37  10          Is she's a custodian --

02:06:38  11          THE COURT:  Well, I'm not sure how that would

02:06:39  12   relate, at all, to the question of whether or not she could be

02:06:42  13   the custodian of records to the documents we have at issue in

02:06:45  14   this case, so --

02:06:47  15          MR. JOHANNESSEN:  Let me -- I'll proceed with

02:06:49  16   that in mind, Your Honor.

02:06:49  17          THE COURT:  Okay.

02:06:51  18          And let me ask the defense.  Were you intending to

02:06:53  19   call her as a custodian --

02:06:54  20          MR. WILLIS:  No.

02:06:54  21          THE COURT:  Of record of these documents.

02:06:55  22          MR. WILLIS:  No.  We have not listed her as a

02:06:57  23   custodian of records.  We were not intending to call her at

02:07:00  24   all.  She is our client representative.

02:07:03  25          THE COURT:  Okay.  So if they're not calling

02:07:06  1   her as the custodian of records of these documents, then what

02:07:10  2   purpose does this serve at this point?

02:07:13  3            MR. JOHANNESSEN:  Well, Your Honor, on

02:07:14  4   November 6th, they identified they would provide somebody

02:07:18  5   who could testify as to custodian, custodianship over the

02:07:22  6   records.  And I'm assuming in response to that, they proffered

02:07:26  7   Ms. Hawkins.

02:07:28  8            So I'm not --

02:07:29  9            THE COURT:  They just stated they were not

02:07:31  10  intending to call her for that purpose.  So, maybe I should

02:07:33  11  have found out from you before we called this witness what the

02:07:36  12  purpose was of this testimony.  But if she's not here to

02:07:39  13  testify on behalf of the defense as a custodian of records,

02:07:42  14  then whether or not she can or cannot be a custodian of

02:07:46  15  records is irrelevant.

02:07:47  16           Unless I'm missing something.

02:07:49  17           MR. JOHANNESSEN:  I don't think you're missing

02:07:50  18  anything, Your Honor.

02:07:51  19           THE COURT:  Okay.

02:07:51  20           MR. JOHANNESSEN:  I, honestly, really don't

02:07:53  21  think you're missing anything.  It was just unclear -- and

02:07:56  22  pardon me for the request for clarification back in the early

02:08:00  23  part of the month, but it was unclear as to what this person

02:08:02  24  is doing because we're talking all morning about what may be

02:08:05  25  the original document, what may not be, copies, and copies of

176

02:08:09   1   copies.

02:08:09   2                    THE COURT:  Well, as I understand it --

02:08:11   3                    MR. JOHANNESSEN:  Yes, Your Honor.

02:08:12   4                    THE COURT:  Wells Fargo's position has always

02:08:13   5   been, and continues to be, that these are the original

02:08:15   6   documents.  The only testified that has come in to say that

02:08:20   7   they're not is the expert testimony and documents that were

02:08:23   8   provided by Dr. Kelley and by Mr. Michaels, if I remember

02:08:29   9   correctly.  But without that witness, evidence and testimony,

02:08:34   10  we're left with these are the original documents because

02:08:37   11  that's the representations that are made by officers of this

02:08:41   12  court --

02:08:42   13                    MR. JOHANNESSEN:  Uh-huh.

02:08:42   14                    THE COURT:  -- that I would expect to be telling

02:08:44   15  the truth.  So if that is not the case, and the question

02:08:48   16  becomes whether or not this evidence is going to be admissible

02:08:52   17  and considered, then we're left with the question of there is

02:08:56   18  no other evidence to say that this isn't authentic and that

02:09:00   19  these aren't originals.

02:09:02   20       Now, to be totally frank with everybody -- and maybe

02:09:05   21  I should have been clear about this -- we really aren't here

02:09:08   22  to figure out -- I mean, I don't see this as an issue of we're

02:09:12   23  going to have testimony back and forth about the authenticity,

02:09:14   24  necessarily, of the documents, because it's always been

02:09:17   25  Wells Fargo's position that they are authentic and they

02:09:19  1   are the originals.  The only evidence that contradicts that

02:09:23  2   is what the plaintiff has put forward in its Motion For

02:09:27  3   Sanctions.  The motion has not been made for the Court to

02:09:31  4   make a finding about these being original documents.

02:09:34  5               MR. JOHANNESSEN:  I see.

02:09:34  6               THE COURT:  And so maybe I'm not clear.

02:09:36  7           Mr. Willis, do you have anything to add?

02:09:40  8               MR. WILLIS:  Uh, no, Your Honor.

02:09:43  9               THE COURT:  Am I paraphrasing this -- that

02:09:46  10  correctly?

02:09:46  11              And maybe I'm getting confused.

02:09:48  12              MR. WILLIS:  I believe you are.

02:09:49  13          Our position is that in the event that Dr. Kelley

02:09:54  14  is not qualified to offer expert testimony, then there is no

02:09:58  15  evidence to support the allegation that these documents are

02:10:01  16  not what they are, which is the original loan documents.

02:10:06  17              What follows from that would, necessarily, be a

02:10:08  18  denial of the Motion For Sanctions.  And then I think any

02:10:11  19  proceedings after that we would have to determine, because

02:10:14  20  the remand from the Ninth Circuit was not to -- a remand to

02:10:19  21  have a full merits blown case related to the settlement

02:10:23  22  agreement.

02:10:24  23              So I think you and I are on the same page, Your

02:10:27  24  Honor.

02:10:27  25              THE COURT:  Okay.  And --

02:10:27  1          MR. JOHANNESSEN:  And I may be a bit skewed from

02:10:30  2  the same page.  Pardon me, Your Honor.

02:10:31  3          It's -- the Ninth Circuit determined that Mr. Slovak

02:10:34  4  did not get the benefit of his bargain, and part of his

02:10:38  5  bargain was to obtain the original documents.  And so, so

02:10:41  6  I'm -- again, I don't mean to parse this, but this is -- I'm

02:10:45  7  just being frank and candid with you my understanding of what

02:10:49  8  happened so far, today, in the case, as far as what we're here

02:10:53  9  for today on the request for sanctions.  And what I've heard

02:10:58  10  is there are varying degrees of what is -- for example, you

02:11:04  11  have an original copy from the County Recorder, Washoe County

02:11:09  12  Recorders Office, which purports to be the original deed of

02:11:12  13  trust.

02:11:12  14          THE COURT:  Which is a self-authenticating

02:11:14  15  document under Rule 903, I believe.

02:11:17  16          MR. JOHANNESSEN:  Correct.

02:11:18  17          So, that self-authenticates based on what the County

02:11:21  18  Recorder provided to whomever, correct?  That's -- but it,

02:11:27  19  does not authenticate is that what was taken to the County

02:11:30  20  Recorder's Office was a copy.

02:11:33  21          So, a copy could be taken to the County Recorder's

02:11:35  22  Office -- for example --

02:11:36  23          THE COURT:  Okay.  So that's completely outside

02:11:39  24  of what my understanding is of what we're doing here today.

02:11:42  25          MR. JOHANNESSEN:  Okay.

| | | |
|---|---|---|
| 02:11:42 | 1 | THE COURT:  So let me be clear again. |
| 02:11:45 | 2 | MR. JOHANNESSEN:  Yes, ma'am. |
| 02:11:45 | 3 | THE COURT:  The plaintiff has filed a Motion |
| 02:11:48 | 4 | For Sanctions that alleges Wells Fargo lied to the Court when |
| 02:11:51 | 5 | it said it had original documents.  And the only evidence to |
| 02:11:55 | 6 | support that that information is false is the expert testimony |
| 02:11:59 | 7 | and witness that has been offered, at this point, by the |
| 02:12:03 | 8 | plaintiff. |
| 02:12:03 | 9 | MR. JOHANNESSEN:  Uh-huh. |
| 02:12:04 | 10 | THE COURT:  If that testimony and information |
| 02:12:07 | 11 | is not admissible, then we are left back with the idea that |
| 02:12:10 | 12 | the only evidence in this case is that this is the original -- |
| 02:12:15 | 13 | these are the originals, as it's been represented by |
| 02:12:19 | 14 | Wells Fargo.  That might mean that we have to have a |
| 02:12:21 | 15 | bifurcated hearing -- |
| 02:12:22 | 16 | MR. JOHANNESSEN:  Yes. |
| 02:12:23 | 17 | THE COURT:  -- to then come back and decide that |
| 02:12:25 | 18 | question.  But, I see no evidence to support the idea that |
| 02:12:29 | 19 | Wells Fargo, its attorneys, would be sanctioned if, in fact, |
| 02:12:34 | 20 | Mr. Kelley -- or Dr. Kelley and Mr. Michael's evidence is not |
| 02:12:37 | 21 | admissible. |
| 02:12:38 | 22 | MR. JOHANNESSEN:  Understood. |
| 02:12:39 | 23 | THE COURT:  But am I -- again, I'll go back to |
| 02:12:42 | 24 | the defense.  Am I missing something in that whole thing? |
| 02:12:45 | 25 | And a part of this has to with the with fact that I |

—180—

02:12:48   1   wasn't the judge when all this stuff happened.

02:12:50   2             MR. JOHANNESSEN:  I know.

02:12:50   3             THE COURT:  So I'm here in sort of situation

02:12:53   4   similar to you, sir, where we're reading the documents, but

02:12:56   5   we weren't there for the hearings and everything that

02:12:59   6   transpired.  All we can do is read the transcripts.

02:13:02   7             But am I missing something, sir?

02:13:03   8             MR. WILLIS:  I do not believe so, Your Honor.

02:13:05   9             MR. JOHANNESSEN:  Then, Your Honor, that leads

02:13:06   10  to my inquiry as to whether or not we would be having a

02:13:09   11  bifurcated hearing.  So, I'm not sure how that's going to

02:13:13   12  work out.  I'm taking the Court's lead, as I should be,

02:13:16   13  Your Honor.

02:13:16   14            THE COURT:  Well, I guess the question would

02:13:18   15  become then, what evidence would there be that these aren't

02:13:21   16  originals if, in fact, the testimony is not accepted?

02:13:24   17            MR. JOHANNESSEN:  Well, Your Honor --

02:13:24   18            THE COURT:  How would the plaintiff ever be able

02:13:27   19  to prove, at that point, that they are not the originals?

02:13:32   20            MR. JOHANNESSEN:  I, I don't want to be

02:13:36   21  rhetorical and I don't mean to be, Your Honor, so --

02:13:38   22            THE COURT:  And I'm not trying to sound

02:13:40   23  flippant --

02:13:41   24            MR. JOHANNESSEN:  No, no, you're not.  It's a

02:13:43   25  different inquiry because on November 6th when we had a

02:13:46  1   telephonic hearing, there was a question as to -- and you were

02:13:48  2   very clear about the scope of the hearing, that it is based on

02:13:51  3   this expert that plaintiff is proffering; that there will be a

02:13:55  4   determination as to whether or not his opinion is admissible.

02:13:58  5   But, it does not go to the authenticity of the documents.  So

02:14:01  6   my concern is that there would be somehow a default because

02:14:05  7   let's say an expert -- whether it's admitted or not, and the

02:14:09  8   Court looks at the admissibility first, and then looks at the

02:14:13  9   weight, and the default is because there is no evidence at

02:14:17  10  this point in these proceedings -- and there is a collateral

02:14:21  11  matter of sanctions.  If I'm being unclear --

02:14:24  12              THE COURT:  Well, let me ask you this, sir.

02:14:25  13              MR. JOHANNESSEN:  Yes, ma'am.

02:14:26  14              THE COURT:  If this court rejects your client's

02:14:30  15  experts that these are, in fact, forgeries, is your client

02:14:33  16  going to continue to contest the authenticity of these

02:14:37  17  documents?

02:14:40  18              MR. JOHANNESSEN:  With a clarification.  I know

02:14:42  19  -- and you expect and you deserve a yes or no answer, but I

02:14:46  20  can't do that yes or no.  I believe the testimony is that

02:14:50  21  there -- I understand the questioning, the line of questioning

02:14:51  22  by counsel that forgery, forgery, forgery, which is different

02:14:54  23  from whether they're a copy or not.  But, yes, if there is

02:14:58  24  a -- if the question is not about the sanction, about the

02:15:00  25  admissibility, yes, those documents will be examined to

02:15:05  1   determine whether or not they are authentic for the main

02:15:08  2   case in chief -- not for the purposes of a sanction motion, a

02:15:14  3   Rule 11 sanction motion.

02:15:17  4            THE COURT:  Just a moment.

02:15:27  5        As I understand it, the parties, on remand,

02:15:33  6   indicated, from Wells Fargo's perspective, that they had the

02:15:37  7   original documents and they were prepared to provide them to

02:15:40  8   the plaintiff in exchange for the $280,000 that he agreed to

02:15:43  9   in the settlement.  The response to that was, no.  I'm not

02:15:48  10  sure these are originals, so I want to have them examined

02:15:53  11  first, to which the Court said, okay.

02:15:56  12       At that point, they were examined and Mr. -- or

02:16:00  13  Dr. Kelley determined, in his opinion, that these were copies,

02:16:04  14  that they were not the originals.  And as I recall reading

02:16:08  15  through these filings, that is exactly what was said, is that

02:16:12  16  these are, effectively, forgeries.

02:16:14  17       Just a second, Mr. Pankopf.

02:16:17  18       We are now here because a Motion For Sanctions was

02:16:20  19  filed --

02:16:21  20            MR. JOHANNESSEN:  I understand.

02:16:22  21            THE COURT:  -- because of that allegation, with

02:16:24  22  the idea that Wells Fargo and its attorneys personally lied

02:16:29  23  to this court -- which I take, like I said already, very

02:16:34  24  seriously.

02:16:35  25            MR. JOHANNESSEN:  Of course.

02:16:35  1          THE COURT:  So if this Court finds that

02:16:37  2   Dr. Kelley's opinion is not admissible, and that it rejects

02:16:42  3   his opinions, then we're left back with the same place where

02:16:46  4   we were before.

02:16:48  5          MR. JOHANNESSEN:  Uh-huh.

02:16:48  6          THE COURT:  I'm not sure I understand, at that

02:16:51  7   point, why there would need to be any further examination

02:16:56  8   because that's exactly what you already got.

02:17:01  9          Right?  Did plaintiffs not hire an expert to do an

02:17:04  10  examination of these documents?

02:17:06  11         MR. JOHANNESSEN:  Correct.

02:17:06  12         THE COURT:  Okay.  So let's go on -- forward

02:17:13  13  this way --

02:17:14  14         MR. JOHANNESSEN:  Okay.

02:17:15  15         THE COURT:  -- this hearing is specific to that.

02:17:18  16  But at end of the day, if that evidence is gone, there is no

02:17:23  17  other evidence that these are not originals and that these

02:17:26  18  documents are not authentic.  There are affidavits that do

02:17:30  19  show the chain of custody leading up to those documents being

02:17:34  20  proffered and provided for Dr. Kelley, Mr. Pankopf to review.

02:17:38  21         MR. JOHANNESSEN:  Uh-huh.

02:17:39  22         THE COURT:  So, there really isn't a lot of

02:17:42  23  question about where they were.

02:17:44  24         I have never heard, and it is the first time I'm

02:17:47  25  hearing that now the allegation is not simply that after they

02:17:51  1   were recorded they were copied; but, rather, before they were

02:17:55  2   recorded, somebody went in and made copies and, therefore,

02:17:59  3   these aren't the originals that were filed.

02:18:02  4                    MR. JOHANNESSEN:  We're -- may I say something,

02:18:05  5   Your Honor?

02:18:06  6                    THE COURT:  Tread lightly, sir.

02:18:08  7                    MR. JOHANNESSEN:  I will.  Absolutely, Your

02:18:08  8   Honor.

02:18:11  9        Again, I don't -- we have a document that is

02:18:15  10  presented as an original.  Let's say the deed of trust.

02:18:19  11                   THE COURT:  Uh-huh.

02:18:20  12                   MR. JOHANNESSEN:  That deed of trust was,

02:18:22  13  purportedly, recorded.

02:18:25  14       Now, if we get a document back from the County

02:18:28  15  Recorders Office, it has bar codes on it, has some writing

02:18:31  16  about APN, uh, typewriter -- pardon me -- typewriter,

02:18:36  17  whatever.

02:18:36  18       Okay.  What we have -- what we can say, I guess

02:18:40  19  at the end of the day, at the end of the day for purposes of

02:18:43  20  this particular matter, is that these documents came from the

02:18:47  21  county recorder -- was recorded with the County Recorder.

02:18:51  22  But, that doesn't mean -- my understanding is Mr. Slovak is

02:18:55  23  sitting in a title company signing documents.  Those documents

02:18:58  24  are given to the title company, delivered to -- or a escrow

02:19:02  25  company -- delivered to a runner, whatever, they go to record

02:19:06  1    in Washoe County Recorder's Office; or, which is more likely,

02:19:09  2    because of what my familiarity is with the way banks work, is

02:19:13  3    they go back to the office.  They get all the documents.  They

02:19:17  4    scan it.  They copy it.  Put it in a digital form.  And then,

02:19:20  5    put the originals in a collateral file.

02:19:23  6         Then what they do is there's a five-day lag.  We got

02:19:27  7    April 19, 2002, when Mr. Slovak was sitting in the title

02:19:30  8    company signing these documents.  April 24, five days later,

02:19:34  9    somebody from Wells Fargo -- and I'm going to use that Wells

02:19:37 10    Fargo N.A. -- somebody from Wells Fargo takes -- prints out

02:19:41 11    that digital copy that they scanned, grabs it, gives it to

02:19:44 12    recorder, said go down and record this.

02:19:46 13         Now, is the document an original that was recorded?

02:19:50 14         No.  It's a copy.

02:19:51 15         But is the copy that comes back, is -- does the

02:19:54 16    document that comes back, for example, in court here, is

02:19:56 17    that the original?  It is what was recorded, but it doesn't

02:20:01 18    necessarily follow that it was the -- that it wasn't a copy

02:20:05 19    that was recorded.

02:20:07 20         And I'm -- if I'm not making any -- to me, it

02:20:10 21    makes sense to me that that's what banks do.  I'm not saying

02:20:14 22    somebody is forging something.  That's not what I'm saying.

02:20:17 23    What I'm saying is somebody could have taken a copy to get it

02:20:21 24    recorded as opposed to the original.  And the only original

02:20:24 25    that I have seen -- again, Your Honor, I'm like you.  I'm kind

02:20:27  1    of new to this case.  But, the only original that I have been

02:20:28  2    looking for is what did Mr. Slovak sign in the title company?

02:20:33  3    Where is that document?

02:20:34  4              Are you asking -- has that been produced yet?

02:20:37  5              I don't think it has.  I haven't seen it.

02:20:40  6              THE COURT:  And the only evidence to support

02:20:42  7    that is what's been proffered by your expert.

02:20:49  8              MR. JOHANNESSEN:  It's my understanding the

02:20:51  9    expert is opining as to whether or not that was a copy and,

02:20:55  10   therefore, he didn't -- he was not able to examine the

02:20:59  11   original.  And what was supposed to be produced was the

02:21:03  12   original, but it wasn't produced for him to review and to

02:21:07  13   examine.

02:21:09  14             I'm not, Your Honor --

02:21:11  15             THE COURT:  And Wells Fargo's position has been,

02:21:13  16   from the beginning of this, on remand --

02:21:15  17             MR. JOHANNESSEN:  Yes.

02:21:15  18             THE COURT:  -- that these are the originals.

02:21:17  19             MR. JOHANNESSEN:  I agree with that.  I agree

02:21:18  20   that that has been their position.

02:21:21  21             THE COURT:  And so without any evidence to the

02:21:23  22   contrary, where would that leave us?

02:21:29  23             MR. JOHANNESSEN:  Oh, I don't think just because

02:21:30  24   there's a negative you can prove the positive in this sa --

02:21:32  25   respectfully, Your Honor, for example, Ms. Dove submitted a

02:21:36  1    declaration -- I think it was Exhibit J to their response

02:21:39  2    to the Motion For Sanctions -- where she identified -- and

02:21:44  3    I've -- until this morning, I haven't met Miss Dove.  But in

02:21:50  4    her declaration, she says the original note -- she came into

02:21:55  5    possession of the original note.  But when she identifies the

02:21:59  6    deed of trust, it's not identified as original.

02:22:01  7            I mean, why not?  I mean that's something I wanted

02:22:04  8    to ask the custodian of records, or whatever -- if she's

02:22:08  9    involved in this transportation of these documents, because

02:22:11  10   I don't want to call Ms. Dove as a witness.  Because it's

02:22:14  11   unclear to me.  I've never done that before.  That's why I'm

02:22:18  12   having trouble with this.

02:22:19  13           THE COURT:  Well, it's curious because you filed

02:22:21  14   a Motion For Sanctions against her.

02:22:25  15           MR. JOHANNESSEN:  Um -- oh, the Rule 11?

02:22:28  16           THE COURT:  To file a Motion For Sanctions

02:22:30  17   against an attorney, and then show some hesitation to actually

02:22:33  18   call them as a witness?  I guess I'm having a hard time

02:22:37  19   understanding why that would be so bad.

02:22:39  20           MR. JOHANNESSEN:  It's, it's, uh -- it's just

02:22:45  21   something I've never done.  I've been practicing over

02:22:49  22   30 years.  And I know it's highly disruptive --

02:22:52  23           THE COURT:  Well, I've been practicing a long

02:22:54  24   time and I can tell you that I have very rarely seen motions

02:22:56  25   for sanctions filed.

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

02:22:58  1          MR. JOHANNESSEN:  And also, Your Honor, it's my

02:22:59  2   understanding, again, we are -- we both -- I assume we both

02:23:02  3   share the same duration of time involved in this case, but if

02:23:11  4   -- the Motion For Sanctions, as I read it, is a motion for

02:23:15  5   sanctions based on, basically, three grounds:  One, Rule 11;

02:23:19  6          One via inherent authority of the Court to do that

02:23:22  7   and to control its own proceedings before it; and

02:23:26  8          A U.S. code section which talks about whether or not

02:23:30  9   something has been produced or not.

02:23:34  10          And I'm not sure -- the latter two don't have

02:23:38  11   anything to do with the Rule 11, I don't think.  A Rule 11

02:23:41  12   is a specific provision in the Federal Rules of Civil

02:23:45  13   Procedure which talks about the -- well, you know what it

02:23:47  14   talks about.

02:23:48  15          I'm just trying to get a handle on exactly what

02:23:51  16   this hear -- what the scope of this hearing is because we're

02:23:54  17   talking about a lot of things which appear to be leaning

02:23:57  18   toward some type of finding or conclusion that what was

02:24:02  19   produced on June 8th was or was not the original.  But, that's

02:24:10  20   not what the witness has been testifying.  He's making an

02:24:13  21   opinion based on signatures and initials on documents.  And

02:24:17  22   those can't --

02:24:17  23          THE COURT:  That was the opinion provided by

02:24:19  24   your witness.

02:24:19  25          MR. JOHANNESSEN:  Yes.

02:24:20   1          THE COURT: In his report.

02:24:21   2          MR. JOHANNESSEN:  Yes.

02:24:22   3          THE COURT:  For the context which your motion

02:24:25   4    states that, at best, these are copies, at worst these are

02:24:30   5    fabricated forgeries.  That's on page 10, lines 1 and 2 of

02:24:34   6    document 218.

02:24:35   7          MR. JOHANNESSEN:  I understand that.

02:24:36   8          THE COURT:  So the scope of this hearing is

02:24:38   9    based on your motion.  That's the reality.  We're here because

02:24:42   10   of your motion, not because of the defense's motion, but

02:24:45   11   because of your motion.  And I should -- when, when I say

02:24:47   12   "your motion," I mean the plaintiff.

02:24:49   13         MR. JOHANNESSEN:  So, Your Honor --

02:24:50   14         THE COURT:  The question is --

02:24:50   15         MR. JOHANNESSEN:  Yes.

02:24:51   16         THE COURT:  -- whether or not there's any

02:24:52   17   evidence to support that motion.  And that motion is based

02:24:55   18   upon the allegation that this expert has provided information

02:25:00   19   to show that these are not original documents.

02:25:02   20          We can argue back and forth whether they're

02:25:05   21   forgeries or documents -- or forgeries or whether they're

02:25:08   22   copies.  But at the end of the day, the question is are these

02:25:12   23   the original documents?  Because that's what Wells Fargo has

02:25:14   24   represented, that's what the Court was under the impression

02:25:18   25   they were, and that's what Mr. Pankopf in his motion said they

02:25:21  1   did not provide.

02:25:22  2          Right?

02:25:23  3                  MR. JOHANNESSEN:  I believe so.

02:25:24  4                  THE COURT:  Is that correct, Mr. Willis?

02:25:25  5                  MR. WILLIS:  Yes, Your Honor.

02:25:27  6                  THE COURT:  Okay.

02:25:27  7          So at the end of the day, what the scope will

02:25:30  8   be is whether or not that evidence supports the conclusions,

02:25:37  9   and whether or not that's going to be admitted.  And if it's

02:25:40  10  not admitted, the Motion For Sanctions is going to be denied,

02:25:44  11  but then we're left with where we all started; which is,

02:25:47  12  Wells Fargo has acknowledged, or stated that these are the

02:25:50  13  originals.  And I guess, at that point, we'll decide how

02:25:54  14  we'll proceed.  Because I'll be totally frank with everybody,

02:25:57  15  I think at some point, even if you had a settlement, maybe we

02:26:01  16  don't have a settlement anymore.  Because if all you're going

02:26:03  17  to do is litigate and litigate and litigate, I guess we can

02:26:07  18  decide how we proceed from that point because, at this point,

02:26:11  19  it seems to me that there's been enough litigation already,

02:26:14  20  that we could have tried this case three times over.  I

02:26:18  21  mean, that's just my opinion, again looking at this from

02:26:21  22  an outsider's point of view.

02:26:24  23                  MR. JOHANNESSEN:  Yes, Your Honor.

02:26:25  24                  THE COURT:  So going back to this witness, which

02:26:27  25  is where we're at, if the question is whether or not this

02:26:30  1    witness, your witness, and his testimony and opinions are

02:26:34  2    admissible and, thus, support the Motion For Sanctions, I'm

02:26:38  3    not sure what this witness is here to add, other than if

02:26:42  4    she were going to testify as a custodian of records as to

02:26:45  5    the chain of custody of the documents that Wells Fargo claims

02:26:48  6    are originals.

02:26:49  7           And Wells Fargo is saying we're not calling that

02:26:51  8    witness because -- I presume Wells Fargo has taken the

02:26:55  9    position that that's really not what's at issue, which is,

02:26:57  10   essentially, what I thought my understanding was and your

02:27:01  11   understanding was as well.  And again, maybe this is all my

02:27:04  12   fault.  And I apologize to everybody in the room --

02:27:06  13           MR. JOHANNESSEN:  I'm not --

02:27:07  14           THE COURT:  I'm new at this.  I'm just trying

02:27:09  15   to get to the truth.  That's really all I want, is to try to

02:27:12  16   rule on this motion as best as I can.  And the last thing I

02:27:16  17   want to do is to give short shift to a Motion For Sanctions

02:27:20  18   because, to the plaintiff's credit, if they truly believe

02:27:23  19   that, it's very serious to the plaintiff.  But, I can see,

02:27:27  20   sitting on the other side of the Courtroom, how very serious

02:27:30  21   it would be if I were the attorney sitting over there, having

02:27:32  22   been accused of what they've been accused of.

02:27:35  23           MR. JOHANNESSEN:  And I agree with you.

02:27:36  24       Your Honor, and --

02:27:37  25           THE COURT:  Okay.  So, with that, do we need to

02:27:39  1   continue with this witness?

02:27:48  2            MR. JOHANNESSEN:  Maybe a few questions, Your

02:27:50  3   Honor.

02:27:50  4            THE COURT:  Okay.

02:27:51  5            **DIRECT EXAMINATION (resumed)**

02:27:51  6   BY MR. JOHANNESSEN:

02:27:52  7    Q   Hi, Ms. Hawkins.  I apologize for that, but I appreciate

02:27:57  8   the Court's candor and clarification.

02:28:03  9            Were you ever in possession of a deed of trust

02:28:07  10  that Wells Fargo believes is an original document -- not

02:28:13  11  just something was recorded with the Washoe County Recorder's

02:28:17  12  Office, but something that's an original document?  In other

02:28:20  13  words, Mr. Slovak's original writing.

02:28:25  14   A   I don't know if I understand your question.

02:28:26  15   Q   Let me --

02:28:27  16   A   Have I ever been in possession of any deed of trust?

02:28:29  17   Q   No.  The deed of trust we're talking about in this case.

02:28:32  18   A   No.  I've never been -- it's never been in my possession.

02:28:35  19  The original deed of trust has never been in my --

02:28:38  20   Q   Okay.  Do you know, uh, where deeds of trust are -- if

02:28:42  21  they are original -- are stored?

02:28:44  22   A   Yes.

02:28:44  23   Q   And where is that?

02:28:45  24   A   Billings, Montana.

02:28:47  25   Q   Okay.  Weren't they -- didn't they used to be in Texas,

02:28:50   1   when it was Wachovia, before Bank of America -- or Wells Fargo

02:28:56   2   N.A.?  Weren't they in San Antonio?

02:28:59   3   A   We do have original documents in San Antonio, but this

02:29:03   4   particular loan, which is a home equity line of credit, are

02:29:06   5   housed in Billings, Montana.

02:29:08   6   Q   And have you ever seen the original?

02:29:10   7   A   Yes.

02:29:10   8   Q   And when did you first see the original?

02:29:12   9   A   Um, this morning.

02:29:14   10   Q   Do you know how the attorneys for Wells Fargo Bank, N.A.,

02:29:21   11   the defendant in this case, came into possession of the

02:29:24   12   original?

02:29:24   13   A   Wells Fargo sent the originals to the attorneys.

02:29:27   14   Q   When you say "Wells Fargo," who is that?

02:29:30   15   A   The bank.

02:29:32   16        I mean, I don't know what you're talking about.

02:29:34   17   Wells Fargo, that owns this loan that we're talking about

02:29:39   18   today, pulled the originals off the shelf in Billings,

02:29:43   19   Montana, and mailed them to our attorney's office when they

02:29:46   20   requested them.

02:29:47   21   Q   How long ago was that, do you know?

02:29:47   22   A   Um --

02:29:52   23   Q   Like within the last month?

02:29:54   24   A   No.  The note was sent, I believe sometime in 2014.  The

02:29:58   25   deed of trust was sent May of this year, I believe.

| | | |
|---|---|---|
| 02:30:05 | 1 | Q   And the deed of trust and the note were sent in 2014 from |
| 02:30:10 | 2 | Wells Fargo N.A., Wells Fargo Bank, N.A., to whom? |
| 02:30:15 | 3 | A   No.  In 2014, the note -- the line of credit agreement -- |
| 02:30:19 | 4 | excuse me -- |
| 02:30:19 | 5 | Q   Okay. |
| 02:30:19 | 6 | A   -- was sent to our attorney's office. |
| 02:30:23 | 7 | Q   The attorneys who are representing here today? |
| 02:30:26 | 8 | A   Yes. |
| 02:30:26 | 9 | Q   Okay.  And then the deed of trust? |
| 02:30:27 | 10 | A   Was sent to them, I believe in May of 2018. |
| 02:30:31 | 11 | Q   And where is that deed of trust now? |
| 02:30:35 | 12 | A   Um, I, I don't know.  It's been around this courtroom |
| 02:30:40 | 13 | today.  I believe she has them, but I'm not sure. |
| 02:30:43 | 14 | Q   Okay.  Can you, can you give me, uh -- so you're not the |
| 02:30:53 | 15 | custodian of the original deed of trust? |
| 02:30:55 | 16 | A   No. |
| 02:30:56 | 17 | Q   Okay.  And Wells Fargo Bank, N.A., your contention is |
| 02:31:02 | 18 | that it is the custodian of that deed of trust, the original |
| 02:31:06 | 19 | deed of trust? |
| 02:31:07 | 20 | A   I'm not here to testify to anybody being the custodian. |
| 02:31:10 | 21 | I was just here, brought here to testify that Wells Fargo Bank |
| 02:31:14 | 22 | was in possession from the time that they received them at the |
| 02:31:17 | 23 | origination, to the time that we sent them to our attorney's |
| 02:31:21 | 24 | office.  That's all I'm here to testify to. |
| 02:31:23 | 25 | Q   So is it a fair statement to say that what was produced |

02:31:27  1    for examination on June 8th, which is a month after the May

02:31:30  2    date you provided, as far as when the deed of trust was sent

02:31:33  3    to your attorneys, that what was presented for examination on

02:31:36  4    June 8th of this year, you don't know whether that was the

02:31:39  5    original or not?

02:31:40  6     A    I wasn't present, so I don't know what was reviewed.

02:31:43  7     Q    Has -- is -- are Wells Fargo's attorneys still in

02:31:49  8    possession of the original?

02:31:50  9     A    Again --

02:31:51  10    Q    Deed of trust.

02:31:52  11    A    Again, I think the judge has the original documents right

02:31:55  12   this second, so I can't say that my attorneys are in physical

02:31:59  13   possession of them right this second.  I don't know where

02:32:02  14   they're at in this courtroom.

02:32:03  15    Q    But is it -- it's -- it seems to be a disconnect.  And

02:32:08  16   enlighten me.  I would appreciate that.  Because as the Court

02:32:11  17   has mentioned, it's, uh -- we're new to this.

02:32:16  18          Before June 8, 2018, when the examination took

02:32:22  19   place, you don't have any personal knowledge as to where that

02:32:25  20   -- the originals were, correct, either the deed of trust or

02:32:29  21   the promissory note, or the note?

02:32:31  22    A    Part of the system of record that I reviewed prior to

02:32:33  23   coming here today, Wells Fargo Bank was in possession of the

02:32:38  24   original documents.  They were at some point -- I don't

02:32:42  25   remember the exact month and year -- they were sent to our

02:32:46  1    attorney's office.  I mean, besides that -- I mean, I don't

02:32:52  2    know what else to say.  I mean, we've had them.  We sent them

02:32:55  3    to our attorney's office, and they were brought here today for

02:32:58  4    the hearing.

02:32:59  5    Q    Is it common practice for deeds of trust, the original

02:33:03  6    documents, to be kept at an attorney's office for, what, nine

02:33:09  7    months now?

02:33:12  8    A    Um, well, we're in, what, November?  And I believe they

02:33:15  9    were sent in May.  I don't know if that's nine --

02:33:18  10   Q    Six -- what's that -- okay.  You're correcting me then.

02:33:20  11   Six months.  Let's say six months.

02:33:21  12   A    Six months, I guess.

02:33:22  13        I mean, we're in the process of litigation.  If

02:33:25  14   they request them, they had to be present for somebody's

02:33:28  15   inspection.  So, yes, I mean, as long as they need them -- I

02:33:32  16   mean, they had to be here in court today.  We're not going

02:33:35  17   to have them -- mail them back and forth, you know, 15 times.

02:33:39  18   That's not how it works.

02:33:40  19   Q    So is it fair to say that since May of this year, 2018,

02:33:43  20   and since -- what was the date you had in 2014 for the note?

02:33:46  21   A    I don't remember the exact month.

02:33:49  22   Q    But is it fair to say that when those documents left

02:33:53  23   Wells Fargo N.A. in Billings, Montana?

02:33:55  24   A    Yes.

02:33:56  25   Q    And were sent to the attorneys in -- was it Las Vegas?

02:33:59   1   A   Uh, I don't remember the exact address.  I just know they

02:34:02   2   were sent.

02:34:03   3   Q   Is it fair to say that your, Wells Fargo's attorneys have

02:34:05   4   been in possession of that, what was purported to be the

02:34:09   5   original note, since 2014, and the original deed of trust,

02:34:13   6   purported original deed of trust, since May of this year?

02:34:16   7   A   Yes.

02:34:16   8   Q   So you don't know whether what was produced for

02:34:20   9   examination is the original or not?

02:34:22   10   A   I wasn't there, so I don't know what was looked at.

02:34:24   11   Q   And likewise, you don't know if what was presented today

02:34:28   12   in court was the original or not?

02:34:30   13   A   Um, it is my understanding that it should be.  I mean, it

02:34:33   14   was what the -- Wells Fargo Bank pulled off the shelves and

02:34:36   15   sent to our attorney's office, and our attorney's office has

02:34:40   16   been in possession.  I mean, that's all I can say.

02:34:43   17   Q   Who follows that, that line, that chain of custody, for

02:34:46   18   example, since 2014, Billings, Montana -- let's go back to

02:34:49   19   2002 when these were signed.  How does that chain of custody

02:34:52   20   work with Wells Fargo, N.A.?

02:34:55   21   A   I don't know what you mean.  I don't know what you're

02:34:57   22   asking.

02:34:57   23   Q   Well, Mr. Slovak went into a title company in April

02:35:02   24   of 2002, signed some -- a deed of trust, signed a note.  From

02:35:07   25   there -- that was in April 2002 -- to where we are today, if

02:35:11  1  you needed to, you could determine what the chain of custody

02:35:14  2  was between when the document was signed, the original, with

02:35:17  3  the original writing, and today?

02:35:20  4  A   Wells Fargo tracks where the original documents are.

02:35:26  5  So from the time we received them, after they are signed,

02:35:30  6  wherever they're signed -- it varies on states -- after we

02:35:33  7  receive them, they're logged into our system.  And every time

02:35:37  8  you pull them, whether you just want to look at them or you

02:35:39  9  have to send them somewhere, that's tracked in our system of

02:35:43  10  record.

02:35:43  11          So, we have been in possession of the original

02:35:45  12  documents from the time we received them, after closing,

02:35:48  13  until we sent them to our attorney's office.  They've never

02:35:53  14  moved out of Wells Fargo's possession besides sending them

02:35:57  15  to our attorney's office.

02:35:58  16  Q   But you don't have personal knowledge of that?

02:36:00  17  A   Well, I reviewed our system of record.  My knowledge

02:36:03  18  is based on my review of the bank's records.

02:36:06  19  Q   What is a system of records?  Can you describe what that

02:36:10  20  is?

02:36:10  21  A   That's the records that Wells Fargo Bank has in order to

02:36:15  22  track the original documents.

02:36:16  23  Q   So Wells Fargo has records where April 2002, document

02:36:23  24  signed.  November 28, 2018, what purports to be the original

02:36:28  25  here in court, Wells Fargo Bank, N.A. keeps records of the

02:36:33  1   travel from April of 2002 to November 2018.  You have some

02:36:40  2   type of -- Wells Fargo Bank, N.A. has some type of log that

02:36:44  3   keeps track of this, is that correct?

02:36:46  4   A   We have a log of when we receive them, send them to the

02:36:50  5   attorney's office, and when we receive them back from the

02:36:54  6   attorney's office.  That's the log that we have.

02:36:58  7           While the attorney's office has it, no, we have no

02:37:00  8   log of that.  We have when we receive them after origination,

02:37:05  9   if we pull them off the shelves and have to send them to our

02:37:08  10  attorney's office, that's logged in there.  When we receive

02:37:11  11  them back from our attorney's office, that's also logged in

02:37:14  12  there.

02:37:14  13          When it's at the attorney's office, no, we have no

02:37:17  14  log of that.  We -- I mean, it's in their possession.  It's

02:37:20  15  not in our possession.

02:37:21  16  Q   Did they only go to one attorney's office?

02:37:24  17  A   Per the records that I reviewed, they were sent to only

02:37:28  18  the law offices that are here today.  There was no other

02:37:31  19  attorney.

02:37:32  20  Q   And the law office, to your knowledge, the law offices

02:37:34  21  that are here today are just one firm?

02:37:37  22  A   What their firm consists of, I mean, I don't know.  I

02:37:42  23  mean, there's multiple attorneys, so I don't know where your

02:37:45  24  going with that.  I mean, I don't know if they have multiple

02:37:47  25  branches.  I don't know how that works.

02:37:49  1   Q    Well, there was another -- there was a mediation that

02:37:52  2   occurred in the past and it went to another attorney's office

02:37:55  3   as well.  That's why I'm asking if you know about that.

02:37:57  4   A    Did what go to the attorney's office?

02:38:00  5   Q    The promissory note and deed of trust.

02:38:02  6   A    Well, I have no recollection of that.  I don't know

02:38:06  7   that.

02:38:06  8   Q    If -- okay.  Let me make this -- it seems like -- and

02:38:11  9   again, the Court is 100 percent right.  We have officers

02:38:16 10   of the Court who are representing that original note, the

02:38:19 11   original deed of trust were produced June 8th.  We have that.

02:38:25 12        Is it possible -- I mean, do you, do you know

02:38:30 13   whether Wells Fargo provides their attorneys with documents

02:38:35 14   which may not be the originals, but they are represented as

02:38:38 15   being the originals, so you have an attorney who comes into

02:38:42 16   court and says here are the originals?

02:38:44 17   A    Um, to my knowledge, the bank has never sent any

02:38:48 18   documents that we purport to be originals that aren't

02:38:52 19   originals.  I've been doing that for quite some time and I've

02:38:57 20   never heard of that.

02:38:57 21   Q    And you know for certain that that's happened in this

02:38:59 22   case?

02:38:59 23   A    That that's happened in this case?  I don't believe that

02:39:03 24   has happened in this case.

02:39:05 25   Q    Okay.

02:39:10  1          Ms. Dove, in her declaration, identifies the note as

02:39:13  2   the original note.  In her declaration, she also -- this is

02:39:18  3   Exhibit J to the response to the Motion For Sanctions --

02:39:21  4          THE COURT:  And I'm not sure how this witness

02:39:23  5   could testify to what's in someone else's declaration.

02:39:27  6          MR. JOHANNESSEN:  Well, let me --

02:39:28  7   BY MR. JOHANNESSEN:

02:39:28  8   Q   It's your understanding that the original note went to

02:39:31  9   Ms. Dove, correct?

02:39:33  10  A   The original note was sent to the attorney's office.

02:39:36  11  To whose attention that was, and who within the law office

02:39:40  12  actually grabbed it from the FedEx person or UPS, or whoever

02:39:44  13  it was, I have no idea.  I wasn't there.

02:39:46  14  Q   Okay.  And if I were to ask Wells Fargo Bank, N.A. in

02:39:51  15  Billings, Montana, to provide me with a log of how the

02:39:54  16  original documents travelled from April 2002 to November 2018,

02:39:59  17  Wells Fargo, of course, they're keeping track of all this, so

02:40:02  18  they would be able to provide all that, correct?

02:40:04  19  A   I mean, we have those records.  Whether our attorney

02:40:07  20  advises us to produce those or the court requires us to

02:40:12  21  produce those, that's out of my hands.  I told you that we

02:40:16  22  have a record that tracks where the original docs are, whether

02:40:20  23  that's in our possession or we sent them to outside counsel.

02:40:23  24  Whether we will produce those, I mean, I can't testify to

02:40:25  25  that.

02:40:25   1    Q   I understand that.  I guess my -- I'm sorry if I wasn't

02:40:28   2    clear.

02:40:30   3              From what I understand from your testimony, there

02:40:32   4    is a log, or something, that Wells Fargo Bank, N.A., out of

02:40:39   5    Billings, Montana, tracks where the document originated and

02:40:43   6    how it traveled through the system, to where we got here

02:40:46   7    today.  In other words, they would know, at any point in time,

02:40:49   8    where that original document is, correct?

02:40:51   9    A   The system doesn't track where the document originated.

02:40:56   10   The system tracks when we receive them after they were signed

02:40:59   11   by the borrower.  I mean, at that time, that is when a folder

02:41:04   12   is created.  They're stuck in that folder.  A bar code is

02:41:09   13   attached to the outside of that folder, which is what is used

02:41:12   14   to scan to tell where the original documents are.  So, that's

02:41:16   15   when that is created.  That's when the tracking starts when we

02:41:19   16   receive them after the closing.

02:41:20   17   Q   Is that called a collateral file?

02:41:22   18   A   Yes, that's what we call it.

02:41:24   19   Q   Okay.  And where is the collateral file stored today?  If

02:41:29   20   a collateral file were not stored in the safe at, for example,

02:41:34   21   Wells Fargo's attorney's office, where would that collateral

02:41:37   22   file be stored?

02:41:38   23   A   It's in Billings, Montana.

02:41:40   24   Q   Okay.  And Billings, Montana, has the records of how

02:41:45   25   that -- whatever was in the collateral file -- we're assuming

02:41:48   1    the original note, the original deed of trust -- how that

02:41:50   2    traveled from April 2002 until today?

02:41:54   3         In other words, you can actually go on -- in that

02:41:57   4    log you're talking about and say here, on April 19th, 2002,

02:42:01   5    say, Mr. Slovak had the original.  He was signing it.  It's

02:42:05   6    given to the title company.  It goes to, uh, the escrow

02:42:09   7    company, or it goes to Wells Fargo to make a copy of it,

02:42:13   8    and either a copy or the original is taken to the County

02:42:16   9    Recorder's Office, correct?  And then --

02:42:18   10        MR. WILLIS:  Objection.  Asked and answered.

02:42:21   11        THE COURT:  Not only is it asked and answered,

02:42:23   12   but I think it's quite lengthy and compound potentially

02:42:28   13   because I was losing track.

02:42:29   14        So, can you answer your question -- ask that

02:42:30   15   question in a different way, sir?

02:42:32   16        MR. JOHANNESSEN:  Yeah.  Let me break it down,

02:42:34   17   Your Honor.  Thank you.  I apologize for that.

02:42:36   18   BY MR. JOHANNESSEN:

02:42:36   19    Q   Mr. Slovak signs a deed of trust in a title company in

02:42:42   20   April of 2002.  That's kind of where everything kind of

02:42:45   21   starts.  Right?  We're going to the close for their -- buying

02:42:47   22   something or refinancing something or taking out a loan or

02:42:50   23   whatever.  Is that correct?  That's pretty much where the

02:42:53   24   original is at that point, correct?

02:42:54   25    A   Um, I don't know where the closing took place on this

—204—

02:42:56  1    loan.

02:42:56  2    Q    Let's assume it took place in Incline Village.

02:43:00  3    A    I mean, I can't assume anything, so -- I mean, I don't

02:43:03  4    know where it happened so.

02:43:04  5    Q    How would you find out where it happened?

02:43:06  6    A    I would have to review the system of record.

02:43:09  7    Q    And that would be that log you're talking about?

02:43:12  8    A    No.

02:43:12  9    Q    What's the system of record?

02:43:13  10   A    It would be -- I'm assuming it would be in the

02:43:17  11   origination documents that are scanned into the system.

02:43:20  12   Other than that, I don't know.  I couldn't tell you where

02:43:22  13   it was.

02:43:23  14              MR. JOHANNESSEN:  Your Honor, may I make an oral

02:43:25  15   request to bifurcate this issue for a later determination?

02:43:28  16              I understand your charge and what you're looking at

02:43:31  17   right now, Your Honor, on the Motion For Sanctions.  I'm not

02:43:35  18   suggesting that that be delayed.  What I am suggesting is

02:43:38  19   that we don't arrive at a default position via the Motion

02:43:42  20   For Sanctions, that the original was actually produced on

02:43:45  21   June 8th because we don't know that.  We know the attorneys

02:43:49  22   with told that.  And again, I don't -- I'm not --

02:43:51  23              THE COURT:  See, here's the problem --

02:43:52  24              MR. JOHANNESSEN:  Yes.

02:43:55  25              THE COURT:  -- that was not the position of your

02:43:55  1   co-counsel.

02:43:58  2               MR. JOHANNESSEN:  Pardon?

02:43:58  3               THE COURT:  That was not the position of your

02:44:01  4   co-counsel.  The position of you co-counsel in the Motion of

02:44:03  5   Sanctions is that the representation that they made was

02:44:05  6   materially false.  Their representation is that this was the

02:44:07  7   original.  There was never an argument, nor was there ever

02:44:13  8   anything put forward to say that somehow these documents that

02:44:16  9   were at the title company were not the original documents that

02:44:19  10  then made their way to the recorder's office, and then to the

02:44:22  11  custodian of records for Wells Fargo.

02:44:25  12              What the position has been is that these attorneys,

02:44:29  13  their law firm, and Wells Fargo, somewhere along the way, knew

02:44:33  14  that these were false documents and then represented that they

02:44:37  15  were originals.  But this idea that somehow, now, the

02:44:42  16  attorneys didn't know, is not exactly what the position has

02:44:46  17  been.

02:44:46  18              So I, I understand what you're saying in terms of

02:44:50  19  bifurcating the question of the original nature of the

02:44:53  20  documents, which I will hear from the defense as to how we

02:44:56  21  should proceed, but I have to tell you, if you can't already

02:45:04  22  tell, I'm a little frustrated with where we're at because I

02:45:09  23  feel like we've gone off on a turn that we did not intend to

02:45:13  24  go on.

02:45:13  25              Mr. Pankopf, I think you had intended to say

02:45:16   1   something earlier, sir.  Is there something that you need to

02:45:19   2   add to this because you were the attorney involved from the

02:45:21   3   beginning?

02:45:22   4                   MR. PANKOPF:  I just wanted to clarify the

02:45:24   5   Court's recollection of what happened on May 10th.  It wasn't

02:45:26   6   a situation where the hearing had started and we were asking

02:45:29   7   for the ability to have the note and the deed of trust

02:45:32   8   examined and the -- Judge Cooke, Magistrate Judge Cooke

02:45:36   9   said, no, that's not going to happen.  I'm not going to allow

02:45:39   10  that to happen.

02:45:40   11                  THE COURT:  Okay.

02:45:40   12                  MR. PANKOPF:  And then, you know, Ms. Dove

02:45:43   13  brought to the Court's attention that we were trying to

02:45:45   14  get a written settlement agreement finalized and that they

02:45:50   15  wanted to make sure that once this settlement was finalized,

02:45:54   16  Mr. Slovak, the plaintiff, didn't go off and file a new

02:45:57   17  lawsuit, so she wanted a clause in there that we're waiving

02:46:01   18  any claims as to the authenticity of the document.  And then

02:46:04   19  it was at that point that Judge Cooke said, well, if you want

02:46:07   20  that in the settlement agreement, then they get to examine

02:46:10   21  the document.

02:46:11   22                  THE COURT:  Okay.

02:46:11   23                  MR. PANKOPF:  Okay?  So I just wanted to clarify

02:46:13   24  that.  I wasn't --

02:46:13   25                  THE COURT:  And I appreciate that, sir.  That

02:46:15    1    is -- after you said that, that is my recollection of the

02:46:19    2    transcript as well -- or at least along those lines.

02:46:22    3                MR. JOHANNESSEN:  May I stream a --

02:46:24    4                THE COURT:  Just hold on a second.

02:46:26    5                MR. JOHANNESSEN:  All right.  I'm sorry.

02:46:26    6                THE COURT:  Let me just gather my thoughts for a

02:46:28    7    moment.

02:46:28    8                MR. JOHANNESSEN:  Sure.

02:46:34    9                THE COURT:  Let me turn to Mr. Willis because

02:46:36    10   you've made your position, but let me hear from Mr. Willis on

02:46:39    11   this issue, at least shortly, because I think I'm going to

02:46:43    12   need to take a break in a minute.

02:46:44    13               So, please.

02:46:46    14               MR. WILLIS:  Well, I'm not sure I understand the

02:46:48    15   issue.  The issue is we bifurcate this issue somehow?

02:46:51    16               THE COURT:  I think what the argument is, or

02:46:53    17   at least the position is that the plaintiff, as I understand

02:46:56    18   it -- and this is me paraphrasing -- is that the question

02:46:59    19   of whether or not these are, in fact, the originals is not

02:47:02    20   something that the Court makes a finding on as it relates

02:47:05    21   to this motion; but, rather, simply makes a finding as it

02:47:09    22   relates to the admissibility and the opinions provided by

02:47:15    23   plaintiff's expert.  In other words, the Court can rule on the

02:47:18    24   Motion For Sanctions, but not go the next step to then say,

02:47:22    25   and, yes, these are originals and, therefore, they should be

02:47:26  1   -- the settlement should be consummated.  In other words,

02:47:29  2   that second question of the original nature of the documents

02:47:32  3   then becomes a separate question to which there may need to

02:47:36  4   be additional evidence provided.

02:47:38  5              I think that's how I understand it.  And if I'm

02:47:41  6   wrong, better tell me now so that Mr. Willis can speak, you

02:47:44  7   know, intelligently to what's being said here.

02:47:46  8              MR. JOHANNESSEN:  May I respond to you with a

02:47:47  9   hypothetical, Your Honor?

02:47:48  10             THE COURT:  No.  I need to know what is the

02:47:50  11  position.

02:47:50  12             MR. JOHANNESSEN:  Okay.  Yes.  That's correct.

02:47:51  13  Because I, I believe, from what I have seen and what -- the

02:47:56  14  short period of time, it appears, giving the benefit of doubt

02:48:00  15  to counsel, that it is completely plausible that Wells Fargo

02:48:04  16  said here are the originals and counsel, like a lot of us do,

02:48:07  17  say, okay, we'll take those.  So, when representing to the

02:48:11  18  Court that they're originals, they're taking their client's

02:48:14  19  word for it.  And so we have a bifurcation where we're

02:48:17  20  actually examining those documents as to whether they actually

02:48:21  21  are authentic.

02:48:22  22             THE COURT:  Mr. Willis.

02:48:23  23             MR. WILLIS:  Well, this raises -- if we give

02:48:28  24  the benefit of the doubt, why are we the object of a motion

02:48:31  25  for sanctions?  That's my first reaction.

02:48:33  1          But getting over that hump, you know, they brought

02:48:36  2    this issue up to the Court for an evidentiary hearing in the

02:48:39  3    context of the Motion For Sanctions --

02:48:41  4              THE COURT:  Actually, in fairness to them, I'm

02:48:43  5    the one that asked for the evidentiary hearing, sir.  They

02:48:47  6    did not ask for an evidentiary hearing.  I did.  To make sure

02:48:50  7    we had a clean record.

02:48:51  8              MR. WILLIS:  Okay.

02:48:52  9              THE COURT:  And so for that clarification --

02:48:53  10             MR. WILLIS:  My point is this is the way they

02:48:56  11   tee'd -- the issue came into this court --

02:48:59  12             THE COURT:  Right.

02:48:59  13             MR. WILLIS:  -- was we think -- or that we have

02:49:00  14   proof that these are false.  We have proof that you knew they

02:49:03  15   were false.  You're perpetrating a fraud on the court.

02:49:07  16        What's your proof?

02:49:08  17        Well, it's this guy, Dr. Kelley.

02:49:10  18        Okay.  Any other proof?

02:49:12  19        No.

02:49:13  20        Dr. Kelley testifies.  He either is or he isn't

02:49:15  21   qualified as an expert.  If he's not qualified as an

02:49:18  22   expert, then they don't have any proof that our evidence,

02:49:21  23   representations by the bank, by members of our law firm that

02:49:25  24   these are the original documents is in any way false.  So I

02:49:30  25   think, Your Honor, that if you decide that his testimony

02:49:34   1   isn't competent, or he's not qualified to give the testimony,

02:49:37   2   resolving the Motion For Sanctions, uh, what I would like to

02:49:42   3   look at is does this create a law of the case issue within the

02:49:45   4   confines of this litigation?

02:49:47   5         Now, maybe it does.  Maybe it doesn't.  But what

02:49:50   6   I'm worried about is is that every time we attempt to enforce

02:49:54   7   the settlement or, God forbid, go forward with litigation,

02:49:59   8   we'll get this, but you can't prove they're the original

02:50:02   9   documents.  We get that all the time.  And it's just -- it's

02:50:06  10   just -- well, it's the reason that Mr. Slovak has been living

02:50:09  11   in his house for the last six years for free in this case,

02:50:12  12   so.

02:50:13  13         I'm venting a little, Your Honor.  I'm sorry.  I

02:50:16  14   hope I've answered your question.  But, I guess the bottom

02:50:20  15   line is I would really like to look at the law of the case

02:50:23  16   implications before I say whether or not this issue ought to

02:50:27  17   be bifurcated or preserved.

02:50:30  18         THE COURT:  Well, let me ask you this.  Are you

02:50:31  19   withdrawing the Motion For Sanctions or are you proceeding

02:50:34  20   on a Motion For Sanctions against these attorneys now that

02:50:38  21   you're making this argument?

02:50:39  22         MR. JOHANNESSEN:  Well, of course we're going to

02:50:40  23   proceed with it, Your Honor.

02:50:41  24         THE COURT:  Okay.

02:50:41  25         MR. JOHANNESSEN:  The reason why I'm saying that

02:50:43  1   is because it was my understanding that this was limited to

02:50:44  2   the admissibility of this expert witness' opinion.  That's

02:50:47  3   what you informed us on.  You were very clear with us and I

02:50:50  4   appreciate the clarification, which is why the motion was

02:50:53  5   filed.

02:50:53  6              THE COURT:  Then I think that Mr. Willis' point

02:50:55  7   is similar to where my understanding was; is that that then

02:50:59  8   leaves us with no other evidence that these are not originals,

02:51:02  9   except the word of officers of this court to say that these

02:51:06  10  are the originals that we were provided by Wells Fargo, and

02:51:09  11  that should be sufficient to consummate this settlement

02:51:12  12  agreement.  And that's it.

02:51:16  13             It's sort of a chicken and the egg issues, I guess,

02:51:20  14  in some respects.  Because if the documents are -- if there's

02:51:24  15  no evidence that the documents are not originals, if this

02:51:29  16  witness' testimony is not provided -- is not admissible, and

02:51:33  17  it's not accepted by the Court, then there's no evidence to

02:51:36  18  claim that they're not originals.

02:51:37  19             And now the argument is, well, even if that is

02:51:40  20  the case, there may still be some evidence that they aren't

02:51:44  21  originals.  And that is not what my understanding was.

02:51:48  22             Now, on the same token, I'll give you the benefit

02:51:51  23  of the doubt that I don't know that it was made entirely

02:51:56  24  clear, and especially in the previous proceedings, and then

02:51:59  25  leading into my taking over this case, that that necessarily

02:52:03  1   means a finding would be made as to the original nature of the

02:52:06  2   documents.  However, if we're left with no other evidence

02:52:09  3   except the word of attorneys that are officers of the court,

02:52:13  4   that is the only information that we have.

02:52:15  5              MR. JOHANNESSEN:  I understand.

02:52:16  6              THE COURT:  And so in my mind, if there -- the

02:52:19  7   whole thing starts with, okay, let's finalize this deal.

02:52:24  8   I have the documents you said you wanted.  And then it

02:52:28  9   becomes, well, wait, no, we don't think these are the

02:52:30  10  documents that we said we wanted.  But if at the end of

02:52:34  11  the day the Court rejects that position, then we're back to

02:52:38  12  where we were -- I think it was in April 2018 when you

02:52:41  13  first tried to consummate the settlement.

02:52:44  14             Is that correct, Ms. Dove?

02:52:45  15             MS. DOVE:  Yes.  That's correct.

02:52:46  16             THE COURT:  And is that correct, Mr. Pankopf?

02:52:48  17  Was it April of 2018 when everything was -- --

02:52:50  18             MR. PANKOPF:  I think that -- I'm sorry to

02:52:51  19  interrupt.

02:52:52  20             I thought that the April hearing was continued to

02:52:55  21  May 10th, wasn't it?

02:52:56  22             MS. DOVE:  Yeah, it might have, it might have

02:52:57  23  occurred in May, but it started early this year.

02:53:00  24             THE COURT:  But nonetheless, the position at

02:53:02  25  that point was we have the original documents.  We're ready to

02:53:04  1   go.

02:53:04  2          And so there is no evidence to the contrary.   And

02:53:06  3   I will tell you I am disinclined to have more evidence and

02:53:11  4   more testimony and more hearings on this question because

02:53:14  5   without expert testimony, I see no reason why I should

02:53:21  6   question the statements made by officers of this court.

02:53:27  7   And, I see no reason not to accept the fact that they have

02:53:31  8   affidavits provided by custodians of record that state we

02:53:34  9   received these documents and then we provided them to our

02:53:38  10  attorneys.

02:53:38  11         Now, I know the Rules of Evidence pretty good.

02:53:42  12         MR. JOHANNESSEN:  I have no doubt.

02:53:44  13         THE COURT:  So, I don't see how we get past that

02:53:48  14  issue.  But, for right now, I'm not sure we even need to even

02:53:53  15  get there.

02:53:53  16         Let's take a break.  Let us all take a moment.  But,

02:53:59  17  let me ask you this before we do that.  Is there any reason --

02:54:02  18  do you have cross-examination, Mr. Willis, of this witness?

02:54:04  19         MR. WILLIS:  No, Your Honor.

02:54:05  20         THE COURT:  Do you have further questions for

02:54:07  21  this witness, sir?

02:54:08  22         MR. JOHANNESSEN:  It depends on whether we're

02:54:10  23  going to bifurcate or not, Your Honor.  I don't want to

02:54:12  24  leave anything because I've -- and I don't want to stall your

02:54:15  25  break.  I know -- I mean, I need a break.  I'm not trying to

| | | |
|---|---|---|
| 02:54:20 | 1 | do that.  I just -- what I do want to do is make sure that |
| 02:54:22 | 2 | we're not foreclosing the possibility that when the expert |
| 02:54:26 | 3 | arrived on June 8th, 2018, his determination as to the |
| 02:54:30 | 4 | signatures and the initials were they were copies, but |
| 02:54:35 | 5 | that doesn't -- that that does not necessarily mean there is |
| 02:54:37 | 6 | or is not an original. |
| 02:54:38 | 7 | THE COURT:  Okay.  Let me leave you with this -- |
| 02:54:40 | 8 | MR. JOHANNESSEN:  And I -- |
| 02:54:41 | 9 | THE COURT:  Let me leave you with this thought. |
| 02:54:43 | 10 | MR. JOHANNESSEN:  Yes. |
| 02:54:43 | 11 | THE COURT:  At that point, what would be the |
| 02:54:45 | 12 | good faith basis of your client to continue to refuse to |
| 02:54:50 | 13 | consummate this settlement? |
| 02:54:54 | 14 | Because if there is no evidence to the contrary that |
| 02:54:56 | 15 | these are originals -- and these attorneys are saying they |
| 02:54:59 | 16 | are, and Wells Fargo says under their custodian of records |
| 02:55:03 | 17 | these are -- what would be the good faith basis, at that |
| 02:55:06 | 18 | point, for your client to take the position that, no, these |
| 02:55:10 | 19 | are, in fact, forgeries now? |
| 02:55:12 | 20 | MR. JOHANNESSEN:  I would -- I like to use the |
| 02:55:14 | 21 | word "copies," but, um -- which are different, because you |
| 02:55:16 | 22 | determine whether they're a forgery or not.  It's -- they're |
| 02:55:19 | 23 | either copies or originals -- |
| 02:55:20 | 24 | THE COURT:  You're not going to -- we're going |
| 02:55:20 | 25 | to stop with that cutting of words. |

02:55:23  1          MR. JOHANNESSEN:  Okay.  I will.  I will.

02:55:25  2          There is nothing that the, uh -- the client had a

02:55:28  3  good faith belief that these documents are not original.  It

02:55:33  4  doesn't mean the original does not exist.  It just means that

02:55:37  5  it was not produced on June 8th.  If we take the time to --

02:55:40  6          THE COURT:  What would be the good faith basis

02:55:43  7  for your client to continue to claim that these documents that

02:55:44  8  have been provided are not the originals at that point, if we

02:55:49  9  determine, the Court determines, that his expert is not going

02:55:52  10 to provide the testimony, or that his evidence is not going

02:55:56  11 to be admissible and is not going to be accepted by the Court,

02:55:59  12 what would be the good faith basis, at that point, for your

02:56:02  13 client to continue with the position that these are not

02:56:04  14 originals?

02:56:04  15         And I'm going to take a break and let you and

02:56:07  16 Mr. Pankopf discuss that.  You don't have to answer that

02:56:09  17 right away.  But, I want you both to really consider that.

02:56:13  18         MR. JOHANNESSEN:  Absolutely.  Sure.

02:56:14  19         THE COURT:  Because that's a road that I don't

02:56:16  20 know that you want to go down.

02:56:18  21         MR. JOHANNESSEN:  I'm not going down either

02:56:20  22 road, Your Honor.

02:56:20  23         THE COURT:  Okay.

02:56:21  24         So at this point, we're going to be in recess and

02:56:23  25 we'll be back at ten after 3:00.

                                                                    —216—

02:56:25  1              MR. JOHANNESSEN:  Thank you.

02:56:26  2          (Recess taken.)

03:13:22  3              THE CLERK:  In the matter of Robert A. Slovak

03:13:24  4   versus Golf Course Villas Homeowners Association, court is

03:13:27  5   again in session.

03:13:28  6              THE COURT:  Thank you.  Please be seated.

03:13:29  7          Before we get started, I wanted to ask if there's

03:13:32  8   been an opportunity by plaintiff's counsel to review the

03:13:35  9   documents that Mr. Willis had provided with respect to the

03:13:39  10  court documents involving Dr. Kelley.

03:13:42  11             MR. PANKOPF:  Yes.  Your Honor, I would just

03:13:45  12  like to point out that the first Exhibit A is an unsigned

03:13:49  13  order.

03:13:51  14             THE COURT:   Okay.

03:13:51  15             MR. PANKOPF:  And, uh, so, you know, I object to

03:13:53  16  that being brought into evidence.  It's not an order.

03:13:57  17             THE COURT:  Is it a federal case?

03:14:01  18             MR. PANKOPF:  I think this is Colorado, a

03:14:04  19  Colorado State district court case, in the County of

03:14:07  20  Jefferson.  So, it's a state court action.

03:14:26  21         The Exhibit C is simply a motion in limine to

03:14:31  22  preclude evidence that was filed.  I don't, uh, see what

03:14:35  23  the relevance of that is.  It's just more paper or more

03:14:43  24  electronic blips.  So, I would object to A and C.

03:14:48  25         And then the other two orders that were filed in

03:14:52  1    the case is five years ago.

03:14:55  2                    THE COURT:  Okay.

03:14:56  3                    MR. PANKOPF:  That would be fine.

03:14:57  4                    THE COURT:  I appreciate that, sir.

03:14:58  5          Um, what we'll go ahead and do is I'll go ahead and

03:15:00  6    -- we'll go ahead and have those filed.  And then I'll review

03:15:03  7    what they are and make a determination on those.

03:15:06  8          Let me start with this -- and Mr. Johannessen, you

03:15:10  9    may want to just take a seat, sir, for the moment.

03:15:21  10                    COURT REPORTER:  Your Honor, can I just clarify?

03:15:21  11   Are you marking that as an exhibit for the record so that --

03:15:22  12                    THE COURT:  You know, that probably makes the

03:15:22  13   most sense to mark it as a defense exhibit.  I think we're on

03:15:27  14   number 8 --

03:15:28  15                    MR. WILLIS:  Defense 8.  Defense 7?

03:15:36  16                    THE CLERK:  Eight.

03:15:44  17                    THE COURT:  So we'll mark that as an exhibit and

03:15:47  18   I will hold off on ruling on the admissibility of that

03:15:50  19   exhibit.

03:15:51  20          (Whereupon Exhibit 8 -- a document, was marked for

03:15:53  21   identification only.)

03:15:53  22                    THE COURT:  Let me start with this.  This has

03:15:55  23   been, in my opinion, a fairly contentious piece of litigation

03:15:59  24   that's gone on for an extensive period of time.  It was filed

03:16:02  25   in 2013 and here we are in 2018, almost 2019.  One of the

03:16:07  1   things that I noticed as I reviewed everything on the record,

03:16:10  2   was that it appears no matter what the decision is by a given

03:16:14  3   judge in this case, there's either an appeal, or there's an

03:16:17  4   argument against why that was wrong, et cetera.  And what I

03:16:20  5   would -- the purpose of this hearing, from my perspective,

03:16:25  6   was to create a very thorough record in the event that that

03:16:28  7   happened at the conclusion of this hearing as well.

03:16:30  8          But with that in mind, it seems to me that in order

03:16:33  9   to ensure that we really do have the most thorough record,

03:16:36  10  that we do get to that second question.  And we actually do

03:16:39  11  have some evidence as to the authenticity and the originality

03:16:42  12  of these documents, if for no other reason to create a record

03:16:46  13  and to protect everybody involved.  I think it will resolve,

03:16:51  14  hopefully, all of the issues as it relates to whether or not

03:16:54  15  these documents are original, at least in terms of the Court

03:16:56  16  making that additional finding.  But, quite frankly, I think

03:17:01  17  it behooves everybody in this room to have a record made for

03:17:05  18  that purpose, in the event that this case does go up on appeal

03:17:09  19  again, or if there is any additional litigation over whether

03:17:12  20  or not the settlement should be consummated, effectively, at

03:17:15  21  that point.

03:17:16  22         To be honest with you, I'm hesitant to do that

03:17:19  23  because I know how much money in attorney's fees and

03:17:22  24  everything has gone into this but, at the same token, I would

03:17:25  25  rather do that now and have it done, rather than to do this

03:17:28  1  piecemeal over the next several months.

03:17:30  2          So this is what my thought is and this is the

03:17:32  3  proposal that I would make:  At this point, what we've heard

03:17:35  4  today is the testimony from Dr. Kelley.  I've reviewed all

03:17:38  5  the evidence and things that have been provided both with the

03:17:42  6  motions, the response, the opposition.  We have the exhibits,

03:17:44  7  much of which, from what I can tell, are either exhibits that

03:17:47  8  were already attached to motions.  For the most part, they

03:17:50  9  seem to be duplicative of what the Court has already received

03:17:53  10  in some form or another.  I haven't looked through all the

03:17:56  11  plaintiff's exhibits, but that's from what I can gather the

03:17:59  12  case.

03:17:59  13          I believe that the defense exhibits, for the most

03:18:01  14  part, appear to be either copies or what they purport to be

03:18:05  15  the original documents in this case.  I don't see any real

03:18:09  16  reason not to consider what's been provided.  And we can

03:18:13  17  discuss the admissibility of all those things at a later time,

03:18:16  18  but that's, basically, what's before the Court.  But, this is

03:18:19  19  what my thought is:  I think we should have a second hearing.

03:18:23  20  And at that hearing, I would ask if Wells Fargo intends to

03:18:27  21  have an expert witness that's going to opine as to whether or

03:18:30  22  not these documents are original; that that person be prepared

03:18:33  23  to testify to that but also, if necessary, provide a report to

03:18:37  24  the plaintiff so that they can be prepared to cross-examine.

03:18:42  25          I think that in light of the fact that I think

03:18:45  1    today I was going to originally allow that person to testify

03:18:48  2    strictly in a rebuttal capacity, but I think in this

03:18:51  3    particular instance, because I think it makes sense to get

03:18:55  4    to that second issue, that we should have that person prepared

03:18:58  5    to testify to just not Dr. Kelley and his report, but also if

03:19:01  6    that person is going to go on to do the next step, which I

03:19:04  7    would suggest that they do so that we can get to that question

03:19:07  8    of originality as well.  If there's any witnesses as to chain

03:19:12  9    of custody, I think those witnesses should be prepared to

03:19:15  10   testify.  And I would include in that anybody that could

03:19:18  11   testify as to whether or not the documents that have been

03:19:21  12   submitted as 3, 4 and 5 are the documents that were, in fact,

03:19:24  13   provided to Dr. Kelley at the time that he reviewed them back

03:19:28  14   in June of 2018.

03:19:29  15        At the conclusion of that hearing I will rule on

03:19:37  16   the Motion For Sanctions and I will rule and make a finding

03:19:41  17   as to whether or not these documents are original.  And at

03:19:45  18   that point, I will expect that the parties finish up the

03:19:50  19   settlement, unless I hear from the parties as to what the

03:19:53  20   next step should be.

03:19:55  21        My suggestion would be that you find a title

03:19:58  22   company, or some other type of escrow company that could

03:20:01  23   hold the money, and that could hold the original documents,

03:20:04  24   so that you can do that at the end of that hearing as quickly

03:20:08  25   as possible, without anybody having to argue over, well, I'm

03:20:11  1   not giving you the money until I get the documents and vice

03:20:15  2   versa.  But, that's just me.  So, I just want to throw that

03:20:17  3   out there at least for the parties to consider at this point.

03:20:20  4        I guess then my question, we'll start with this,

03:20:25  5   Mr. Willis, how long do you think it will take you, and how

03:20:29  6   many witnesses do you anticipate?

03:20:31  7        And I know that you're going to have to be sort of

03:20:33  8   making a decision on the fly, and I won't hold you to this,

03:20:36  9   but can you give me some idea of how long you think you would

03:20:39  10  need for purposes of that additional part of a hearing.

03:20:41  11       MR. WILLIS:  May I take a moment and consult

03:20:44  12  with Ms. Kelly?

03:20:46  13       THE COURT:  Absolutely, sir.  Please do that.

03:21:26  14       (Defense counsel confer.)

03:21:26  15       MR. WILLIS:  Your Honor, we can have a report

03:21:28  16  ready before Christmas.

03:21:30  17       THE COURT:  Okay.

03:21:31  18       MR. WILLIS:  And then given my trial schedule,

03:21:34  19  I have a discovery schedule on a couple other cases, I would

03:21:37  20  suggest that the hearing occur in January.

03:21:39  21       THE COURT:  Okay.  One thing that I would say is

03:21:42  22  that since we have your witness here, if you would like to

03:21:45  23  have her proceed, at least on the rebuttal aspects, we can at

03:21:49  24  least get some of her testimony in.  And I don't know if you'd

03:21:52  25  want to proceed with that or if you'd rather just have her

03:21:54  1   come back and testify to the rebuttal aspects of her opinions,

03:21:58  2   as well as her opinion as to the authenticity and the

03:22:01  3   originality of the documents -- and I don't even think that's

03:22:04  4   a word, but I'm using it because I don't know how to refer to

03:22:08  5   the documents.  So, I apologize if that sounds bizarre.

03:22:10  6          MR. WILLIS:  You're not intending to rule on the

03:22:12  7   fundamental or the found -- the preliminary question of his

03:22:16  8   qualifications until the second hearing?

03:22:18  9          THE COURT:  Correct.

03:22:19  10          MR. WILLIS:  And then I would ask that we just

03:22:21  11   put it all together in the second hearing.

03:22:23  12          THE COURT:  And what I should say is that I see

03:22:25  13   these as two things that are sort of intertwined.  So to the

03:22:28  14   extent that if we accept Dr. Kelley's position, or if his

03:22:33  15   evidence is admitted, then we have the Motion For Sanctions

03:22:36  16   to deal with, but that, in effect, would deal with, to some

03:22:38  17   extent, I think that question and vice versa.  So I would wait

03:22:42  18   to, I think, rule on everything all at the same time, but I

03:22:46  19   want to make sure that your expert is given the opportunity

03:22:49  20   because I believe you had indicated that she was going to be a

03:22:51  21   rebuttal witness.  So, I don't want to make any finding with

03:22:56  22   respect to Dr. Kelley until I've heard from your witness on

03:22:58  23   those positions.  So, if that helps clarify that.

03:23:00  24          MR. WILLIS:  Well, if we presented our witness

03:23:02  25   today on, solely on the issue of qualifications, would the

223

| | | |
|---|---|---|
| 03:23:05 | 1 | Court be inclined to make a ruling on that issue before the |
| 03:23:08 | 2 | next hearing? |
| 03:23:11 | 3 | THE COURT:  To be quite frank with you, I |
| 03:23:13 | 4 | had anticipated I would be able to do that today, but I |
| 03:23:16 | 5 | would like to review the transcript and be able to use the |
| 03:23:20 | 6 | transcript to be able to do that; so, I'm not sure that I |
| 03:23:22 | 7 | could rule by the end of today without having a chance to go |
| 03:23:26 | 8 | back and review everything on the transcript. |
| 03:23:29 | 9 | And I don't know if that changes what you want to |
| 03:23:32 | 10 | do or how you want to proceed.  But I -- you know, in light |
| 03:23:34 | 11 | of what I'm doing here today, I'm going to defer, to some |
| 03:23:37 | 12 | extent, to the attorneys because I think I'm putting you all |
| 03:23:40 | 13 | in sort of a position that nobody anticipated today. |
| 03:23:43 | 14 | If you want a moment to think about that, let me |
| 03:23:45 | 15 | know. |
| 03:23:45 | 16 | MR. WILLIS:  Okay.  One moment. |
| 03:23:46 | 17 | THE COURT:  Okay. |
| 03:24:10 | 18 | (Defense counsel confer.) |
| 03:24:10 | 19 | MR. WILLIS:  Your Honor, if it's within our |
| 03:24:12 | 20 | discretion, we would prefer to put Ms. Kelly off until the |
| 03:24:16 | 21 | next hearing. |
| 03:24:17 | 22 | THE COURT:  That's fine. |
| 03:24:18 | 23 | MR. WILLIS:  Take care of the whole thing. |
| 03:24:19 | 24 | We do have some concern on the chain of custody, |
| 03:24:22 | 25 | for lack of a better term.  Um, we received the note in 2014. |

03:24:32  1    We then transmitted it, for a short period of time, to

03:24:35  2    McCarthy Whole House for the mandatory mediation.  But then

03:24:39  3    it was returned to us by McCarthy, then we retained it until

03:24:44  4    2018, at which time we also received the deed of trust.  And

03:24:51  5    then in addition to having Mr. -- or Dr. Kelley review that on

03:24:55  6    June 8th, we also delivered those documents to Ms. Kelly for

03:25:01  7    review a week or two ago.  And so she -- which, you know,

03:25:05  8    we'll establish that part of the chain through her testimony

03:25:09  9    as an expert.  And then that came back to us.  And they are

03:25:12  10   now resting with the Court.

03:25:15  11          Our concern is do we need to bring, in your

03:25:19  12   estimation, the paralegal who pulled it out of the safe,

03:25:23  13   the associate that sat through the document review by

03:25:28  14   Dr. Kelley, the McCarthy Whole House lawyers?

03:25:31  15          I would not think so since we filed declarations.

03:25:35  16   They haven't been contested, to the best of my knowledge, as

03:25:38  17   to where it went.

03:25:41  18          MR. PANKOPF:  We filed an objection.

03:25:42  19          THE COURT:  They did file objections to those

03:25:44  20   declarations, which I overruled, because I do believe that

03:25:47  21   they were based on personal knowledge.  And to the extent

03:25:49  22   that we have authenticity issues, those were perfectly within

03:25:52  23   the scope of what a business record's custodian would state.

03:25:58  24          Um, I guess the question will be -- and again, I'm

03:26:03  25   going to ask this question again.  Are you continuing to

03:26:06  1    proceed with the Motion For Sanctions?  Or, are you going

03:26:10  2    with the position that these are not authentic because they

03:26:15  3    were not the same documents that were filed initially?  In

03:26:22  4    other words, that somewhere before they were actually sent to

03:26:25  5    Wells Fargo, something happened.  They were copied or they

03:26:29  6    were forged or whatever.

03:26:31  7            Because I think I'm a little confused myself, and I

03:26:34  8    think it goes back to what Mr. Willis is really questioning

03:26:37  9    because if there isn't really a question as to these documents

03:26:40  10   being the same ones that Wells Fargo provided, and that Mr. --

03:26:44  11   or Dr. Kelley reviewed, and that their expert reviewed, but

03:26:47  12   really the question is whether or not the documents, before

03:26:50  13   they were sent to Wells Fargo were authentic, then I think it

03:26:54  14   does create a different question.

03:26:55  15           So let me ask you that, Mr. Johannessen, and we'll

03:26:58  16   go from there.

03:26:59  17                   MR. JOHANNESSEN:  May I approach?

03:27:00  18                   THE COURT:  Please.

03:27:00  19                   MR. JOHANNESSEN:  I'm more comfortable at the

03:27:02  20   podium.

03:27:02  21                   THE COURT:  No.  I appreciate that, sir.

03:27:04  22   Thank you.

03:27:04  23                   MR. JOHANNESSEN:  You can probably hear me

03:27:05  24   better.

03:27:06  25           The answer to the first question is yes, to proceed

03:27:10  1    with the motion.  But, I also want to make myself clear, which

03:27:15  2    I don't always do --

03:27:16  3              THE COURT:  Okay.

03:27:17  4              MR. JOHANNESSEN:  -- but I try.  That I think

03:27:20  5    it's very important -- I focus on process --

03:27:25  6              THE COURT:  Uh-huh.

03:27:26  7              MR. JOHANNESSEN:  -- and how things work.  And

03:27:28  8    hopefully, the process will end up in a just and fair result.

03:27:33  9    And where I stand now, as an attorney, you asked me about good

03:27:36  10   faith and I understand the gravity of the allegation, and I

03:27:40  11   also understand the gravity of the question.  We arrived here

03:27:45  12   at a hearing and it was my understanding, based on the record,

03:27:50  13   that it was as to the admissibility of plaintiff's expert's

03:28:00  14   opinion, and it did not go to the authenticity of anything

03:28:03  15   other than the fact that the expert is saying it's a copy.

03:28:07  16             And I must tell you, Your Honor -- and this is in

03:28:10  17   good faith, as an officer of the court, and I truly believe

03:28:13  18   this because I know enough people that are in science and the

03:28:16  19   advancements of technology over the last, 20, 25 years, things

03:28:20  20   are changing.  And it's because of that that we have people

03:28:22  21   getting out of jail because we have DNA analysis.  The same

03:28:25  22   thing here.  Things change.  And so the reason why -- and it's

03:28:30  23   another issue on good faith.  I understand why the Court

03:28:40  24   denied plaintiff's request to take the deposition of a

03:28:42  25   custodian, or whatever that might be, or who she is, or he.

03:28:47   1   I understand that.  But I don't -- and this is with all due

03:28:52   2   respect, Your Honor -- I do not understand why we were not

03:28:54   3   able to take the deposition of an expert that was --

03:28:57   4                   THE COURT:  Okay.

03:28:57   5                   MR. JOHANNESSEN:  Oh.  Okay.

03:28:59   6                   THE COURT:  Maybe I wasn't clear.

03:29:00   7                   MR. JOHANNESSEN:  Okay.

03:29:00   8                   THE COURT:  But, let me be clear again.

03:29:02   9                   MR. JOHANNESSEN:  Yes.

03:29:03  10                   THE COURT:  When I make a ruling, we're not

03:29:05  11   going to re-argue it.  Okay?  We're not going to have

03:29:07  12   re-argument over it.  We're not going to revisit it.  That

03:29:10  13   decision has already been made.  We're not going to go down

03:29:13  14   that road again.

03:29:14  15                   MR. JOHANNESSEN:  Okay.

03:29:14  16                   THE COURT:  The question I have for you is

03:29:16  17   whether or not you're proceeding with a Motion For Sanctions.

03:29:18  18   Your answer is yes.

03:29:20  19           So Mr. Willis, yes, if I were you, I would have

03:29:23  20   someone here that can testify to the chain of custody of these

03:29:26  21   documents from the beginning to the end.  Mr. Johannessen

03:29:30  22   is telling me that he has a good faith basis to challenge the

03:29:33  23   authenticity and whether or not these documents are original.

03:29:36  24   I will accept that position.  We don't need to go into any

03:29:39  25   other argument over that.

03:29:40  1          This was never intended to be something where we

03:29:43  2   were going to have depositions of anybody.  The defense had

03:29:45  3   never asked to have a deposition of your expert.  So, having a

03:29:49  4   deposition of a chain of custody witness made no sense to me.

03:29:53  5   But, we're not going to go down that road again.

03:29:56  6          So based on what I'm hearing, we will reschedule

03:29:58  7   this hearing for -- how long do we need in January?  That's

03:30:03  8   the question that we have now -- unless there's something else

03:30:07  9   for you to argue, sir, that we haven't already revisited in

03:30:10  10  terms of what you need to put on the record.

03:30:12  11         Mr. Johannessen, is there anything else you need to

03:30:14  12  put on the record that we haven't already argued that you

03:30:17  13  would like to place on the record today?

03:30:18  14             MR. JOHANNESSEN:  Yes, Your Honor.

03:30:20  15         If -- I agree with the -- I don't if we call it a

03:30:25  16  bifurcation or it's actually a continuance -- I believe it

03:30:29  17  is plaintiff's prerogative, in a case like this, to be able

03:30:36  18  to, if not -- to be able to depose the other side's expert,

03:30:40  19  whether or not they deposed plaintiff's expert.  I think

03:30:43  20  that's a fair request.  There's a lot at stake here.  There's

03:30:47  21  a lot of time that's been put on it, and it precedes both you

03:30:50  22  and I even coming onto the stage on this thing.  But, I

03:30:53  23  believe that if we're going to continue it until January --

03:30:55  24  which is fine, as long as it works with the Court and

03:30:58  25  with Mr. Willis and his witnesses -- to able to take that

03:31:02  1    deposition.  If they want to take plaintiff's expert's

03:31:06  2    deposition, fine.

03:31:07  3              THE COURT:  Okay.  That's denied.

03:31:09  4         So what else would you like to put on the record?

03:31:11  5              MR. JOHANNESSEN:  Um.  I appreciate your

03:31:14  6    patience.

03:31:15  7              THE COURT:  I'm trying.  I'm really trying.

03:31:17  8              MR. JOHANNESSEN:  So am I, Your Honor.  I know.

03:31:19  9    I know.  But, I'm just --

03:31:20  10             THE COURT:  I think that, unfortunately, coming

03:31:22  11   into this after the fact, makes it a little bit difficult

03:31:26  12   for all of us.  And I appreciate your professionalism and

03:31:29  13   everything you're saying here today, sir.  And I'm not trying

03:31:31  14   to be flippant or anything like that.  I appreciate that.

03:31:34  15             MR. JOHANNESSEN:  You're in a tougher position

03:31:36  16   than I am.  I understand.

03:31:37  17             THE COURT:  What I will say is this, because

03:31:38  18   I wasn't clear before the first hearing, I would like the

03:31:42  19   parties to exchange, at least two weeks before the hearing,

03:31:45  20   a witness list and exhibits so that everybody can be prepared.

03:31:52  21   Because I do appreciate Mr. Johannessen's position of a

03:31:55  22   deposition is usually intended to be able to explore those

03:31:58  23   issues in preparation for having somebody testify at a

03:32:01  24   hearing, and so since I'm denying that, because I don't

03:32:05  25   believe in this case it's necessary, and for other reasons, I

03:32:09  1   think that it's only fair that we do that and, that way, we

03:32:12  2   don't all come in here trying to figure out whose exhibit are

03:32:16  3   what with these things flipping around.

03:32:19  4        So, two weeks ahead of the hearing I would ask that

03:32:22  5   if there are any additional exhibits from the plaintiff's

03:32:23  6   position, that those be provided.  And any witnesses that you

03:32:26  7   want to place on the record that you intend to call at that

03:32:29  8   point, that you provide those names, and a list of those

03:32:31  9   witnesses to the defense.  And I would ask the defense to do

03:32:33  10  the same.

03:32:36  11       I think in light of everything that's happened, and

03:32:38  12  to make as good a record as we can, to make sure you can get

03:32:42  13  through all the witness testimony you need, in light of no

03:32:44  14  depositions, that we set this for two days.  I hope that we

03:32:48  15  don't need two days, but I don't want to have a situation

03:32:51  16  like today, where we run into the end of the day and we know

03:32:54  17  we're not going to get it done.

03:32:56  18       I understand what your understanding of the hearing

03:33:01  19  was, and maybe I wasn't clear enough, but that's why I want to

03:33:04  20  have this hearing and have that second half of the hearing, I

03:33:09  21  guess for lack of a better term, all done at one time, and

03:33:12  22  then a ruling done all at one time.

03:33:16  23       I guess at this point, is there anything else from

03:33:18  24  the plaintiff's counsel that you need to put on the record

03:33:21  25  before I -- are there any other witnesses -- or any other

03:33:22   1    questions of this witness at this time, I guess before we, we

03:33:27   2    go to the next step?  She's been sitting here the whole time.

03:33:30   3                    MR. JOHANNESSEN:  I believe the witness has been

03:33:31   4    patient enough.

03:33:32   5                    THE COURT:  Okay.  Thank very much.

03:33:34   6             You can step down.  I apologize.  I should have

03:33:36   7    asked that question first before I --

03:33:36   8                    MR. JOHANNESSEN:  But there is one more thing

03:33:38   9    that I --

03:33:39  10                    THE COURT:  Okay.

03:33:39  11                    MR. JOHANNESSEN:  This isn't a Steve Jobs one

03:33:42  12    more thing, so --

03:33:42  13                    THE COURT:  All right.

03:33:43  14                    MR. JOHANNESSEN:  I would only ask, Your Honor,

03:33:45  15    that, again, there's a -- Wells Fargo produces witness lists

03:33:50  16    with 62 people, one of them who happened to be here today.

03:33:54  17    If we're going to produce witness lists, it's very difficult,

03:33:58  18    as an attorney, when you get a list with 62 names, to prepare.

03:34:03  19    And, at the top of it they say one of them will be called.

03:34:06  20    So, it's difficult.  So if we could -- with the Court's

03:34:09  21    permission, I would like to have Wells Fargo at least produce

03:34:12  22    a short list.

03:34:13  23                    THE COURT:  Well, I think that either list

03:34:15  24    that's provided should be the witnesses that are going to be

03:34:18  25    called, not every witness that you could call, I guess.  And

03:34:22  1   that goes for both sides.

03:34:23  2             MR. JOHANNESSEN:  I appreciate that, Your Honor.

03:34:25  3             THE COURT:  Um, so -- and we're not listening to

03:34:27  4   62 witnesses, just so everybody is clear on that right now.  I

03:34:31  5   don't think there's any way we would get through that in two

03:34:34  6   days anyway.

03:34:35  7             MR. WILLIS:  Your Honor, we might have two.

03:34:37  8             THE COURT:  Okay.  I appreciate that.

03:34:39  9             MR. WILLIS:  Other than the chain of custody.

03:34:41  10        Is Your Honor interested in discussing logistics and

03:34:44  11   scheduling?

03:34:45  12            THE COURT:  Yes.  And that is what I was going

03:34:47  13   to get to, but I wanted to make sure we didn't have any other

03:34:51  14   witness -- or any questions of that witness.

03:34:52  15        And if I'm not clear, again, it's exhibits that

03:34:54  16   you're intending to use and witnesses you're intending to

03:34:57  17   call.  Not everybody and everything that could potentially be

03:34:59  18   a part of this case, I guess, for lack of better term.

03:35:02  19        Anything else?

03:35:03  20            MR. JOHANNESSEN:  Did I say one last thing the

03:35:06  21   last time?

03:35:06  22            THE COURT:  You did.  You did.  But, I'll give

03:35:08  23   you --

03:35:09  24            MR. JOHANNESSEN:  One last thing -- and it's

03:35:11  25   more of a process.

03:35:12  1            I apologize.  I've never done this in 30 years --

03:35:15  2                 THE COURT:  Okay.

03:35:15  3                 MR. JOHANNESSEN:  -- I'm not talking about being

03:35:17  4      in court.  I'm talking about while you were talking, I turned

03:35:19  5      my back and I don't do that.  And I apologize for that.  I

03:35:23  6      really do sincerely.  I turned my back to the Court.

03:35:26  7                 THE COURT:  Oh.  No apologies sir --

03:35:26  8                 MR. JOHANNESSEN:  It's disrespectful.  That's

03:35:28  9      just what I'm -- that's -- I need to clear my head on that

03:35:30  10     one.

03:35:30  11                THE COURT:  Oh.  No apology necessary.  But,

03:35:32  12     thank you very much for saying that, sir.

03:35:33  13                MR. JOHANNESSEN:  Thank you.

03:35:33  14                THE COURT:  I appreciate that.

03:35:34  15           Mr. Willis, is there anything from the defense

03:35:36  16     before we get to logistical points that you want to make on

03:35:39  17     the record at this point, or anything you need to clarify

03:35:42  18     with me to where we're all on the same page before we go to

03:35:45  19     the next part of this case?

03:35:47  20                MR. WILLIS:  I don't believe so, Your Honor.

03:35:48  21                THE COURT:  Okay.  Thank you very much, sir.

03:35:52  22           I do want to thank everybody today.  I know that

03:35:54  23     this, like I said, has been very contentious and this is a

03:35:57  24     very serious motion that I think is, you know, difficult for

03:35:59  25     everybody in the room.  And I appreciate your professionalism

03:36:02  1   and the preparation that anybody went into with today's

03:36:05  2   hearing.  Again, to the extent that I wasn't clear, that I

03:36:07  3   haven't been clear, I apologize to everyone.  You know, this

03:36:10  4   is, I think my second month on the bench, so I'm still getting

03:36:14  5   used to what I'm doing up here.  So I apologize if I wasn't

03:36:17  6   clear but, hopefully, we can move to the next part of this

03:36:20  7   case and it will be more clear when we get here for the next

03:36:23  8   hearing.

03:36:24  9          Mr. Willis, we indicated January.  Do you have some

03:36:26  10  dates in January that you're available?

03:36:29  11          MR. WILLIS:  I do.  And -- but before that, I,

03:36:31  12  perhaps, answered your last question too quickly.

03:36:33  13          THE COURT:  I apologize.  Go ahead.

03:36:35  14          MR. WILLIS:  There is one thing.  And it's a

03:36:36  15  delicate subject, but Your Honor has touched upon it several

03:36:40  16  times; and that is, this is a very serious motion.

03:36:42  17          THE COURT:  Uh-huh.

03:36:43  18          MR. WILLIS:  This is quite unusual.  And

03:36:47  19  while we are all, I think, behaving professionally -- and I

03:36:51  20  compliment my colleagues on the other side -- at the root

03:36:54  21  of this is a very, um, emotional and painful series of

03:37:01  22  allegations.

03:37:02  23          THE COURT:  Uh-huh.

03:37:03  24          MR. WILLIS:  My point of raising this is to

03:37:05  25  say that the river flows both ways.  And if the results of

03:37:09   1   this Motion For Sanctions are not in their favor -- and I

03:37:13   2   highly suspect they won't be -- we may be back with you

03:37:17   3   visiting the consequences of that decision.

03:37:22   4            THE COURT:  And I should put on the record

03:37:24   5   that if I do deny the motion, I will be entertaining a

03:37:27   6   motion for attorneys fees from the prevailing party in terms

03:37:35   7   of whether its plaintiff or defense.  So, you might want to

03:37:38   8   have everybody make sure that you have your statements and

03:37:41   9   everything put together.

03:37:42   10           I will also state for the record that as it relates

03:37:46   11  to Rule 11, certainly there are some concerns that I have

03:37:49   12  with the filing of the Rule 11 aspect of this particular

03:37:53   13  motion.  And I do have a series of questions to ask about

03:37:57   14  that.  Um, I think it may make sense for me to ask some of

03:38:04   15  those questions today as opposed to put things off, at least

03:38:08   16  that way I can have that in my notes before we adjourn.

03:38:17   17           And you having brought that up, Mr. Willis, reminded

03:38:20   18  me of that.  And so let me do that.  Let me move to that

03:38:27   19  before we do logistics.

03:38:29   20           Mr. Pankopf, I just want to make sure I understand

03:38:31   21  your motion and I want to understand the basis of the Rule 11

03:38:35   22  aspects of the motion.  And there's a few things in respect

03:38:38   23  to that that I think I need some very serious clarification

03:38:41   24  on.  The first being the basis of the motion.

03:38:44   25           The Rule 11 aspect, as I understand it -- and I'm

03:38:47  1   just trying to understand it, sir -- is that the filing of

03:38:50  2   the reply brief, at I believe docket number 123, that's the

03:38:57  3   document that is claimed to have contained the materially

03:39:02  4   false information.

03:39:03  5         Is that the basis, and that's the only basis, to

03:39:06  6   which the Rule 11 aspect of the motion was filed?

03:39:09  7         MR. PANKOPF:  That, and then the, uh, the

03:39:13  8   e-mails that went back and forth in terms of trying to get

03:39:20  9   a declaration from the defendants that that was, in fact, the

03:39:27  10   original note and deed of trust that they presented at the

03:39:33  11   June 8th hearing.

03:39:34  12         THE COURT:  So I'm clear, you have two aspects

03:39:38  13   of your Rule 11 -- the Rule 11 component of the motion.  And

03:39:43  14   the first being a reply brief that was filed in 2015 related

03:39:48  15   to statements made that Wells Fargo was ready to provide the

03:39:52  16   original documents, or the documents at that time and proceed

03:39:55  17   with the settlement; and, e-mails that went back and forth

03:40:02  18   between yourself and opposing counsel over a declaration?

03:40:05  19         MR. PANKOPF:  Right.

03:40:06  20         THE COURT:  So what would be the basis of that

03:40:08  21   second part for Rule 11?

03:40:10  22         MR. PANKOPF:  Well, that, that would -- just

03:40:12  23   substantiated the, uh, the knowledge that the documents

03:40:18  24   were -- the representation that was made in the prior

03:40:22  25   document that they were not original notes and deeds of trust.

03:40:29   1                    THE COURT:   So Rule 11 is specific to

03:40:31   2    representations made to the court.

03:40:32   3                    MR. PANKOPF:   Right.

03:40:33   4                    THE COURT:   Documents that are signed and filed

03:40:35   5    with the court?

03:40:36   6                    MR. PANKOPF:   Right.

03:40:37   7                    THE COURT:   So, I'm going to ask again.   What

03:40:40   8    would the basis of a Rule 11 motion be for e-mails that go

03:40:44   9    between counsel?

03:40:45  10             And I'm truly not trying to be --

03:40:48  11                    MR. PANKOPF:   Well, I guess, I'm --

03:40:49  12                    THE COURT:   I'm trying to understand how that

03:40:51  13    could form the basis of the Rule 11 motion itself.   And I

03:40:54  14    don't recall that in your motion.   So, if you can clarify that

03:40:57  15    for me, sir.

03:40:58  16                    MR. PANKOPF:   Well, I guess in terms of -- I --

03:41:02  17    what I would say, Your Honor, is that the e-mails do not

03:41:07  18    form the basis of the Rule 11 motion.   The formation of the

03:41:11  19    Rule 11 motion is the statement in there regarding the, uh,

03:41:14  20    the authenticity of the note and the deed of trust that was

03:41:17  21    in that other document.   But it was the, it was the e-mails

03:41:22  22    that precipitated or, uh, came to the conclusion that they

03:41:28  23    were unwilling to sign a declaration or affidavit that the

03:41:31  24    documents that were presented, like I say, were, in fact, the

03:41:34  25    originals that, you know, led to the conclusion that this

03:41:38  1   statement to the court and Slovak's counsel at the time was

03:41:44  2   not truthful and meant to mislead.

03:41:51  3              THE COURT:  One of the questions that I have

03:41:53  4   is that one of the attorneys that you have personally named

03:41:56  5   as someone that Rule 11 sanctions should be imposed against

03:42:01  6   is Ms. Dove.  And if you look at document 123, her name does

03:42:05  7   not appear on that document, nor does her signature appear on

03:42:08  8   that document.

03:42:09  9              MR. PANKOPF:  I --

03:42:09  10             THE COURT:  So how is it that she would be --

03:42:11  11             MR. PANKOPF:  I don't --

03:42:11  12             THE COURT:  -- someone that should be sanctioned

03:42:14  13   under Rule 11, when she was not counsel, at least that I could

03:42:17  14   tell, of record at that time?

03:42:19  15             MR. PANKOPF:  I mean, I, I would have to review

03:42:21  16   my motion again at this time, but I mean in terms of that

03:42:24  17   document, I would agree with you that she's not counsel.

03:42:28  18   And I thought I put on the motion that counsel that signed

03:42:33  19   those pleadings --

03:42:33  20             THE COURT:  Mr. Gordon and Ms. O'Mara --

03:42:36  21             MR. PANKOPF:  -- at that time.

03:42:36  22        Right.  Those two people --

03:42:37  23             THE COURT:  -- Ms. Dove was not named in the

03:42:39  24   caption.

03:42:39  25             MR. PANKOPF:  That's right.  Yes.  And to my

03:42:41  1    recollection, I don't -- I didn't look at the motion -- or

03:42:44  2    I haven't looked at the motion, but it would not have

03:42:47  3    been the basis for the Rule 11 against Ms. Dove -- right.

03:42:54  4    Ms. Dove.  So, I agree with that.  And I would have to go

03:43:00  5    over that again.

03:43:00  6        But, again, my recollection was it was the other two

03:43:03  7    counsel that were responsible for filing that pleading.

03:43:20  8        THE COURT:  Counsel is listed in this motion,

03:43:22  9    particularly with respect to the Rule 11 aspect, as

03:43:26  10   counsel.  And counsel is defined as Ms. Dove, Ms. O'Mara,

03:43:30  11   and Mr. Gordon.  So if, in fact, that document did not include

03:43:35  12   Ms. Dove's name, and she was not the one that signed or

03:43:38  13   otherwise was named on that document, do you continue to

03:43:43  14   pursue Rule 11 sanctions against Ms. Dove based on the filing

03:43:47  15   of that document?

03:43:47  16       MR. PANKOPF:  No, I do not.

03:43:48  17       THE COURT:  Okay.  So to the extent that that

03:43:50  18   motion is made as a Rule 11 motion against Ms. Dove for the

03:43:54  19   filing of that document, it will be denied based upon the

03:43:57  20   withdrawal of that aspect of the motion by Mr. Pankopf.

03:44:00  21       The second question I have relates more generally

03:44:06  22   to the motions for Rule 11 sanctions; and that is, the

03:44:10  23   document that was served, which was included at Exhibit F, I

03:44:14  24   believe, of the defendant's response is very different than

03:44:18  25   the motion that was filed.  And the case law, as I understand

03:44:23  1   it, requires that the motions be identical, even if you're

03:44:26  2   making alternative arguments.

03:44:28  3        So, what authority do you cite to that supports

03:44:31  4   the notion that you complied with the safe harbor obligations

03:44:36  5   under Rule 11 by serving a different motion on Wells Fargo and

03:44:40  6   its counsel to that that was filed?

03:44:43  7        MR. PANKOPF:  I think the Rule 11 motion is

03:44:45  8   quite, uh, specific and you need only file the basis for the

03:44:50  9   Rule 11 motion.  You do not have to file the alternative

03:44:56  10  reasons for the motions for sanctions, and that's what was

03:45:01  11  provided and --

03:45:02  12       THE COURT:  Do you have a case that you rely on

03:45:05  13  for that position, sir?

03:45:06  14       MR. PANKOPF:  Not as I stand here right now.  I

03:45:08  15  mean, I could brief it after that.

03:45:10  16       THE COURT:  Let me make it clear to everybody

03:45:12  17  in the room, no more briefing unless there's really a reason

03:45:15  18  for it.  But I will say this, I don't want briefing before the

03:45:19  19  hearing, and I don't want any follow-up briefing after today.

03:45:23  20  If there's any need for briefing I will ask for it as it

03:45:26  21  relates specifically to the Motion For Sanctions and the

03:45:29  22  mo -- I guess I'll -- the question of the originality and

03:45:34  23  authenticity of the documents.  If we need additional briefing

03:45:37  24  after the next part of this hearing, then I will ask for

03:45:40  25  it.  But other than that, there should be no other filings,

03:45:43  1   specifically as to these things.

03:45:46  2          Sir, that is not my understanding of the case law,

03:45:49  3   and that's not my understanding of the law as it relates to

03:45:52  4   Rule 11.  So what I will ask you to do -- and I will not

03:45:56  5   rule on this right now -- but is to go back and do some

03:45:59  6   research as it relates to Rule 11.  And if there are cases

03:46:03  7   that support your position, at the next hearing, I would ask

03:46:06  8   for you to provide those.  But if they are not available and

03:46:10  9   the case law does not support your position, I will be asking

03:46:13  10  you again at that time whether you are going to continue to

03:46:16  11  proceed with the Rule 11 sanction motion against not only

03:46:20  12  Wells Fargo, but Snell & Wilmer and, at this point, I believe

03:46:23  13  we're down to Ms. O'Mara and Mr. Gordon.  Because if you did

03:46:27  14  not comply with the safe harbor obligations, I do not believe

03:46:31  15  that that motion would be appropriate.  But, I'll give you the

03:46:33  16  opportunity to look for that case law and find that support

03:46:36  17  for your position.

03:46:37  18         I think that that is the extent of the questions

03:46:41  19  that I really had that were specific to the Rule 11 motion

03:46:44  20  itself and that aspect of it.  I guess, at this point, can

03:46:49  21  we move to the question of scheduling and try to find dates

03:46:55  22  that will work for everybody, including the witnesses.  I do

03:46:58  23  not believe that any other -- Dr. Kelley needs to be here for

03:47:01  24  the next, but I do believe, Mr. Willis, there was a question

03:47:04  25  about whether or not you wanted him to review the documents,

| | | |
|---|---|---|
| 03:47:06 | 1 | and I could ask that we deal with that as well when we deal |
| 03:47:09 | 2 | with the scheduling question. |
| 03:47:12 | 3 | MR. WILLIS:  Very well.  In looking at my |
| 03:47:14 | 4 | calendar, uh, the week of January 7th, 7, 8, 9, 10 or 11 -- |
| 03:47:20 | 5 | preferably 8, 9, 10 or 11, but I need to check with my expert. |
| 03:47:27 | 6 | Okay.  When are you -- |
| 03:47:28 | 7 | MR. PANKOPF:  I'm not going to be available then |
| 03:47:30 | 8 | either.  I'm going to be on vacation with my family. |
| 03:47:33 | 9 | THE COURT:  Okay.  Okay. |
| 03:48:06 | 10 | MR. WILLIS:  January 30, 31, February 1, |
| 03:48:08 | 11 | February 4 are all good, as are February 6, 7 and 8. |
| 03:48:24 | 12 | MR. JOHANNESSEN:  Your Honor, February 7th, is |
| 03:48:25 | 13 | that one of the alternatives? |
| 03:48:27 | 14 | MR. PANKOPF:  7 and 8. |
| 03:48:30 | 15 | MR. WILLIS:  Or 6 and 7 -- or 7 and 8.  Excuse |
| 03:48:34 | 16 | me. |
| 03:48:34 | 17 | MR. JOHANNESSEN:  What about 6 and 8? |
| 03:48:36 | 18 | MR. WILLIS:  I don't think I can be -- |
| 03:48:38 | 19 | MR. JOHANNESSEN:  I'm sorry, Your Honor. |
| 03:48:42 | 20 | THE COURT:  I appreciate the levity, sir. |
| 03:48:49 | 21 | MR. JOHANNESSEN:  Either three, two of the |
| 03:48:51 | 22 | three. |
| 03:49:06 | 23 | THE COURT:  And that works for you, Mr. Pankopf? |
| 03:49:08 | 24 | MR. PANKOPF:  Yes, Your Honor. |
| 03:49:08 | 25 | THE COURT:  Okay.  Thank you, sir. |

243

03:49:10   1                     THE CLERK:  The 7th and 8th; February 7th at

03:49:14   2     9:00 a.m. and February 8th at 9:00 a.m.

03:49:30   3                     MR. WILLIS:  Your Honor, with regard to the

03:49:32   4     chain of custody witnesses --

03:49:34   5                     THE COURT:  Okay.

03:49:34   6                     MR. WILLIS:  -- are generally paralegals and

03:49:36   7     lawyers in my law firm mainly based in Las Vegas, can they

03:49:40   8     appear by Skype, or some other form of video conferencing?

03:49:47   9                     THE COURT:  Is there an objection to that from

03:49:49  10     the plaintiff's counsel?

03:49:51  11                     MR. JOHANNESSEN:  Not at all.

03:49:52  12                     THE COURT:  I have no problem with that.

03:49:54  13            Um, I will have to say, though, I'm not sure I

03:49:56  14     can rule on that from the bench.  I need to find out if

03:49:59  15     our court technology will support that in this particular

03:50:02  16     courtroom.

03:50:04  17                     THE CLERK:  I don't think we can do Skype.

03:50:05  18                     THE COURT:  We can't do Skype.

03:50:08  19                     THE CLERK:  But, we might have something else

03:50:09  20     that we can do.

03:50:09  21                     THE COURT:  We may be able to accommodate some

03:50:12  22     other type of video conferencing or --

03:50:16  23                     MR. WILLIS:  We can probably even do FaceTime.

03:50:18  24     I mean, it's -- if we have permission to do it, we'll figure

03:50:21  25     out a way to get it done.

03:50:22  1          THE COURT:  I think the question will be more a

03:50:24  2   matter of the courtroom technology and whether or not we'll be

03:50:27  3   able to -- unfortunately, these particular courtrooms are not

03:50:30  4   sufficiently -- they're antiquated.  Let me just put it that

03:50:35  5   way.  We don't have the same technology that they have in the

03:50:37  6   district court courtrooms, so we're a bit limited.

03:50:39  7          I don't necessarily have a problem with an

03:50:42  8   alternative way of testifying, but let me speak with

03:50:45  9   my court staff.  And then if I need to, we may have a

03:50:48  10  teleconference over the phone where we can discuss how

03:50:51  11  we work that out and make that happen so, that way, we can

03:50:54  12  accommodate that.  But, we'll do what we can to do that.  I

03:50:57  13  appreciate the expense that that is and the time that it

03:51:00  14  takes away from people.

03:51:03  15         Is there -- now with respect to the documents, were

03:51:06  16  you still going to request, or were you seeking to request

03:51:09  17  that Dr. Kelley review these documents to determine if he

03:51:12  18  can opine whether or not these are, in fact, the documents

03:51:15  19  that he reviewed, or will you deal with that through the chain

03:51:18  20  of custody witnesses?

03:51:20  21         MR. WILLIS:  Well, uh, I would like that.  I

03:51:24  22  would like Dr. Kelley to take those documents back and look

03:51:27  23  at them.  And if he says they aren't, I would like him to be

03:51:31  24  back at the hearing.  And if he says they are, doesn't that

03:51:35  25  eliminate the chain of custody issue?

03:51:41  1           THE COURT:  Plaintiff's counsel.

03:51:42  2           MR. JOHANNESSEN:  Your Honor, um, I think

03:51:46  3    it's -- may I make a suggestion?

03:51:48  4           THE COURT:  Please.  That's why I'm asking.

03:51:50  5           MR. JOHANNESSEN:  We have a -- if we have a

03:51:51  6    hearing on the 6 and 7th?

03:51:54  7           THE COURT:  Uh-huh.  7th and 8th.

03:51:54  8           MR. JOHANNESSEN:  7th and 8th.

03:51:57  9           MR. PANKOPF:  7th and 8th.  Sorry.  I would

03:52:00 10    appreciate an order from the Court to tell the attorneys to

03:52:03 11    get together on the Rule 11 aspect before then and see if

03:52:06 12    there's a way to informally resolve that because in my --

03:52:09 13           THE COURT:  Now, we're not talking about that

03:52:11 14    issue right now, sir.

03:52:12 15           MR. PANKOPF:  Oh, we're not.

03:52:13 16           THE COURT:  And we can get to that.

03:52:14 17           The question is whether or not there would be a

03:52:17 18    way for Dr. Kelley to review these documents, or -- and if

03:52:21 19    he says these are -- or that he can state that these are the

03:52:23 20    documents he reviewed, then does that -- and I think I -- I

03:52:28 21    think the point is well taken, Mr. Willis, that that then

03:52:31 22    eliminates the question of the chain of custody issue in terms

03:52:34 23    of whether or not these were the documents he reviewed and

03:52:37 24    that got to court, et cetera, versus if he says they're not,

03:52:42 25    having him available again to testify at the next aspect of

03:52:46  1    the hearing.

03:52:48  2             Uh, I am a little bit concerned about releasing

03:52:51  3    these documents to Dr. Kelley or anybody else, just because I

03:52:55  4    don't want there to be any claim later, especially at the

03:52:58  5    end of this, when these are supposed to be turned over to

03:53:00  6    Mr. Slovak, if, in fact, they are the originals.

03:53:04  7             So is there a way to -- Dr. Kelley is in Marin area

03:53:08  8    or --

03:53:10  9             DR. KELLEY:  Yeah.  San Francisco -- but

03:53:12  10   San Jose.

03:53:12  11            THE COURT:  San Jose?

03:53:14  12            THE WITNESS:  Yeah.  Southern peninsula.  Right.

03:53:16  13            MR. WILLIS:  Well, there's nothing, I would

03:53:17  14   suppose, that would prevent him from flying to Reno and

03:53:21  15   reviewing the documents in the courthouse, if there was a

03:53:24  16   conference room.  We could send over someone -- or if you'd

03:53:28  17   release it to us to take across the street, we could do it in

03:53:30  18   our office.

03:53:30  19            THE COURT:  That was going to be my intention

03:53:32  20   was actually to release them back to you --

03:53:34  21            MR. WILLIS:  Okay.

03:53:34  22            THE COURT:  -- to have them held by you to

03:53:37  23   ensure that they are maintained.  I feel a bit uncomfortable

03:53:41  24   with the Court doing that.

03:53:42  25            MR. WILLIS:  Okay.

03:53:43    1               THE COURT: So between the two sides, can you

03:53:46    2   work out something where Dr. Kelley can review these documents

03:53:49    3   again to make that determination?

03:53:52    4               MR. JOHANNESSEN: Yes.

03:53:54    5               THE COURT: Okay.

03:53:54    6               MR. JOHANNESSEN: I'm just not -- well, that --

03:54:00    7   I love the practice of law. I just really don't like the

03:54:04    8   business of it.

03:54:04    9               It's the cost involved. And it's -- I'll be blunt.

03:54:12   10   My client, plaintiff, is not a two trillion dollar company,

03:54:17   11   so this does cost something. So if there's a way we can do

03:54:21   12   some type of a -- I don't know. That's just stream of

03:54:24   13   consciousness, Your Honor.

03:54:25   14               THE COURT: Well, let me say this on the record.

03:54:26   15   It's your motion, sir.

03:54:28   16               MR. JOHANNESSEN: Yes. I understand that. I

03:54:29   17   understand that.

03:54:29   18               THE COURT: And so I'm not inclined to shift any

03:54:31   19   burden or cost onto the defendant when it's your burden.

03:54:35   20               MR. JOHANNESSEN: Okay.

03:54:35   21               THE COURT: And in this instance, I think the

03:54:37   22   questions were fair. The line of questioning was fair as it

03:54:40   23   related to these documents. And Dr. Kelley was not able to

03:54:44   24   testify as to whether these were the same documents that he

03:54:47   25   reviewed or not. I don't think it's unfair or unreasonable

03:54:50  1   to request that he make that determination since he testified

03:54:53  2   that he likely could.  I understand the cost considerations,

03:54:57  3   but I think that's a fair request by the defense given the --

03:55:02  4   given what's at stake at this point.

03:55:05  5           MR. WILLIS:  He could do it here.  He could do

03:55:07  6   it in Vegas again.  We could make sure that the documents were

03:55:10  7   there.

03:55:11  8           THE COURT:  And I guess that's the question.

03:55:13  9   What would be the least expensive and most economical?

03:55:18  10  I would assume he can drive here from San Francisco as

03:55:22  11  opposed to flying to Las Vegas, which would be less expensive,

03:55:24  12  potentially, I guess, depending on the price of gas.

03:55:27  13          MR. JOHANNESSEN:  There's a direct Southwest

03:55:35  14  flight from Nashville to Las Vegas.

03:55:35  15          THE COURT:  Not to Reno.

03:55:35  16          MR. JOHANNESSEN:   Not to Reno.

03:55:43  17          THE COURT:  Why don't we do this.  I would ask

03:55:47  18  that the two of you try to resolve this.

03:55:50  19          MR. JOHANNESSEN:  Sure.

03:55:51  20          THE COURT:  And if you're not able to resolve

03:55:52  21  it by Friday, someone call my chambers and we'll get on the

03:55:56  22  phone and we'll resolve it that way.

03:55:59  23          Dr. Kelley indicated that he would need a couple of

03:56:02  24  hours, I think three hours, in total, to do a full

03:56:06  25  examination, at least from what I understood --

03:56:08  1          DR. KELLEY:  Yes.

03:56:08  2          THE COURT:  -- I don't know that it would take

03:56:10  3   that long for him to do what he's being asked to do here,

03:56:13  4   which is simply to be able to verify that these are or are

03:56:17  5   not what he believes to be the documents he reviewed in June.

03:56:22  6          I think the next question is a fair question from

03:56:24  7   Mr. Willis then back to the plaintiff.  If Dr. Kelley does

03:56:27  8   state that these are the documents, or he believes them to

03:56:29  9   be the same documents that he reviewed, would you still take

03:56:33  10  the position that these are not authentic in terms of the

03:56:37  11  documents that were examined by Dr. Kelley at that point?

03:56:41  12  That's eliminating the need, or requiring the need for chain

03:56:44  13  of custody witnesses from that point forward.

03:56:52  14         MR. JOHANNESSEN:  Always think before you

03:56:54  15  speak.

03:56:54  16         Um, I believe, Your Honor, there is a way the

03:56:58  17  documents are authentic.  I don't think there's a dispute

03:57:04  18  as to authenticity here.  I think there's a dispute as to

03:57:06  19  originality -- which are two different things.  A copy can

03:57:09  20  be authentic, right?

03:57:11  21         THE COURT:  As far as I understand under the

03:57:12  22  best evidence rule.

03:57:12  23         MR. JOHANNESSEN:  But, it doesn't mean that that

03:57:15  24  copy is original.   So, I'm not sure --

03:57:19  25         THE COURT:  And I think that that's not my

03:57:20  1   understanding of what the position has been in the past.  And

03:57:24  2   so for what that's worth, uh, if we're not claiming that these

03:57:30  3   are not authentic, but rather that they're just copies, then

03:57:34  4   are you still objecting to the admission of these, as these

03:57:37  5   being the documents that Dr. Kelley reviewed?

03:57:40  6                  MR. JOHANNESSEN:  I don't think I'm in a

03:57:42  7   position to even answer that, Your Honor.

03:57:44  8                  THE COURT:  Okay.

03:57:45  9                  MR. JOHANNESSEN:  From what, from what I

03:57:46  10  understand, what was examined on June 8th are copies, that --

03:57:50  11  a copy that has been recorded, which is different.

03:57:53  12                  MR. PANKOPF:  I think what the Court is saying

03:57:55  13  is that these are the documents he examined on June 6th -- or

03:58:01  14  June 8th --

03:58:01  15                  MR. JOHANNESSEN:  One of those dates.  I was --

03:58:02  16                  THE COURT:  Correct.

03:58:02  17                  MR. PANKOPF:  And so if he determines, yeah,

03:58:05  18  these are them, then we don't -- then they don't need to prove

03:58:08  19  that these were the documents that they brought.  This is what

03:58:11  20  he examined.  They're not scanned, but they're the original,

03:58:15  21  the actual originals, but they're just these documents that he

03:58:18  22  examined, correct?

03:58:19  23                  THE COURT:  That's my understanding of what

03:58:22  24  Mr. Willis' position was.

03:58:23  25                  MR. PANKOPF:  So -- and anyhow, what my -- with

03:58:25  1   that understanding, you know, I would agree with the Court

03:58:29  2   that they wouldn't need to have a chain of custody as to those

03:58:32  3   being the documents he examined.  But, I still think we're

03:58:36  4   still talking about the issue of the chain of custody from

03:58:39  5   2002 to the present, correct?

03:58:42  6           THE COURT:  Right.  But, I still think that

03:58:45  7   eliminates several witnesses potentially, or at least one

03:58:47  8   witness, potentially, with respect to chain of custody, which

03:58:50  9   may resolve the question of whether or not we need to have a

03:58:52  10  teleconference or video conference testimony.

03:58:55  11          MR. PANKOPF:  Right.

03:58:55  12          THE COURT:  And it was plaintiff that objected

03:58:56  13  to these particular documents as being the documents, or

03:58:59  14  potentially being the documents, as I understood the

03:59:02  15  objection --

03:59:02  16          MR. PANKOPF:  Right.

03:59:02  17          THE COURT:  -- by Mr. Pankopf, so I think

03:59:04  18  that's why we're in this position in the first place.  So --

03:59:07  19  and I don't mean to say that you did anything incorrect by

03:59:10  20  objecting, but that's why we have this issue now.

03:59:14  21          So, as I understand it, the plaintiff would agree

03:59:19  22  that if Dr. Kelley reviews these and comes to the conclusion

03:59:23  23  this these appear to be the same documents he reviewed, no,

03:59:26  24  you would not need to bring a chain of custody witness from

03:59:29  25  that point forward.  If, in fact, he says that they are not,

03:59:33   1   then I agree with the defense then I would like Dr. Kelley to

03:59:36   2   be here to testify to that, and to the reasons behind that, at

03:59:40   3   the next hearing.

03:59:42   4           The question then becomes when can we have

03:59:45   5   Dr. Kelley review these documents such that he can make

03:59:48   6   that determination?  I would like that to be done as soon as

03:59:52   7   possible so that everybody can appropriately prepare for the

03:59:54   8   next hearing.  Um, I think we should schedule that now.  We

04:00:00   9   may as well take the time to do that so we don't have any

04:00:04   10  argument over it later.  Initially, I think I was thinking

04:00:06   11  you guys could just talk and work that out amongst yourself.

04:00:10   12  But since Dr. Kelley is here, I assume he has his calendar and

04:00:14   13  you can work out a date that he could be here.  We'll do it

04:00:17   14  here in Reno.  I will give them back to the attorneys for

04:00:21   15  Snell & Wilmer, and they shall be here, and we'll work out who

04:00:24   16  all needs to be in the room when that all happens.

04:00:27   17          I think the same process that you used in the first

04:00:29   18  instance may be the same thing that you do this time around,

04:00:32   19  is when he looked at them the first time.  So, can we figure

04:00:36   20  out a date now, between now and, say, the end of the year when

04:00:39   21  Dr. Kelley could do that?

04:00:41   22          MR. PANKOPF:  What do you got available?

04:00:43   23          DR. KELLEY:  Uh, yeah, well, I got one

04:00:44   24  commitment in Chicago in early December.  So, yeah, sometime

04:00:48   25  in December, maybe --

| | | |
|---|---|---|
| 04:00:49 | 1 | MR. PANKOPF:  Take a look at your calendar and |
| 04:00:51 | 2 | get us some dates. |
| 04:00:53 | 3 | THE WITNESS:  Second half of December. |
| 04:00:53 | 4 | MR. PANKOPF:  Second half of December? |
| 04:00:55 | 5 | THE WITNESS:  Except for Christmas. |
| 04:00:56 | 6 | MR. PANKOPF:  Christmas and New Year's. |
| 04:00:58 | 7 | THE WITNESS:  Okay. |
| 04:00:58 | 8 | THE COURT:  Do we have a specific date that we |
| 04:01:00 | 9 | could narrow that down to? |
| 04:01:08 | 10 | MR. WILLIS:  Did we pick a date?  I'm sorry. |
| 04:01:11 | 11 | MR. PANKOPF:  No.  He was -- he said I'm |
| 04:01:12 | 12 | allowing you to pick a date. |
| 04:01:12 | 13 | THE WITNESS:  I'm allowing you to pick a date. |
| 04:01:15 | 14 | MR. PANKOPF:  He said he had the second half of |
| 04:01:17 | 15 | December, except for Christmas and New Year's, or New Year's |
| 04:01:17 | 16 | Eve. |
| 04:01:17 | 17 | MR. WILLIS:  Okay. |
| 04:01:18 | 18 | THE COURT:  So this is a date that you all can |
| 04:01:21 | 19 | pick, as long as it's in the second half of December and it's |
| 04:01:24 | 20 | not on Christmas day? |
| 04:01:25 | 21 | THE WITNESS:  Yeah.  Probably would be a good |
| 04:01:28 | 22 | idea -- |
| 04:01:29 | 23 | THE COURT:  I'll be working, but that's just me. |
| 04:01:29 | 24 | MR. WILLIS:  How about the 18th? |
| 04:01:31 | 25 | THE WITNESS:  Okay.  Yeah, that's enough ahead |

04:01:33    1    of time.

04:01:33    2                    MR. PANKOPF:  I'm available on the 18th.

04:01:36    3                    THE COURT:  Okay.

04:01:36    4                    THE WITNESS:  I'm a little worried about the

04:01:39    5    flights back and forth and them crowding up.

04:01:40    6                    THE COURT:  I think what makes the most sense

04:01:42    7    is that we just schedule that here at the courthouse.  I'll be

04:01:45    8    available if there's any issues that come up.  And that way --

04:01:47    9    and the attorneys, I'm assuming someone from the defense and

04:01:48   10    someone from the plaintiff will be here, so if anything needs

04:01:51   11    to be resolved at that point, if there's any problem, we can

04:01:54   12    deal with that.

04:01:55   13            And maybe what we can do -- and Dr. Kelley, out of

04:01:59   14    curiosity, at the end of that would, would you be able to

04:02:02   15    state that day if these are the documents that you believed

04:02:05   16    you reviewed; or, would you need time after that hearing or

04:02:08   17    after that time frame?

04:02:09   18                    THE WITNESS:  I think probably I should take at

04:02:12   19    least three days because sometimes the, you know, I don't

04:02:16   20    recognize things immediately because --

04:02:17   21                    THE COURT:  Okay.

04:02:17   22                    THE WITNESS:  -- I'm looking at very fine

04:02:19   23    detail.

04:02:20   24                    THE COURT:  Okay.

04:02:20   25                    THE WITNESS:  So, I don't like to push it too

| | | |
|---|---|---|
| 04:02:23 | 1 | much.  I might make the wrong -- a wrong judgment. |
| 04:02:26 | 2 | THE COURT:  Okay. |
| 04:02:27 | 3 | Then I would ask that within seven days of |
| 04:02:29 | 4 | that review, that there be a filing that simply states |
| 04:02:36 | 5 | Dr. Kelley -- |
| 04:02:37 | 6 | THE WITNESS:  Yes or no. |
| 04:02:38 | 7 | THE COURT:  -- Dr. Kelley says yes or Dr. Kelley |
| 04:02:41 | 8 | says no.  And then, that way, we will know how we need to |
| 04:02:44 | 9 | proceed at the hearing in February. |
| 04:02:44 | 10 | MR. WILLIS:  And if he says no, can he have -- |
| 04:02:47 | 11 | be required to list his reasons? |
| 04:02:48 | 12 | THE WITNESS:  Absolutely. |
| 04:02:49 | 13 | THE COURT:  I think that's fair, at least a |
| 04:02:52 | 14 | short summary report that identifies the reasoning behind |
| 04:02:53 | 15 | that, similar to the one that he already did.  It doesn't have |
| 04:02:56 | 16 | to be extensive, but at least I think that's fair if he's |
| 04:02:59 | 17 | going to come back to testify that these aren't the documents |
| 04:03:01 | 18 | that he reviewed, at that point we can -- because that's a |
| 04:03:06 | 19 | whole other issue then, I think, that we're going to have to |
| 04:03:09 | 20 | deal with at that point. |
| 04:03:10 | 21 | MR. PANKOPF:  Did we decide a time on the 18th? |
| 04:03:13 | 22 | THE COURT:  Um, can we -- what would be the best |
| 04:03:15 | 23 | room?  Should we use my conference room where -- |
| 04:03:18 | 24 | THE CLERK:  Uh-huh. |
| 04:03:18 | 25 | THE COURT:  Okay. |

04:03:19  1          THE WITNESS:  Yeah, it could be done in one of

04:03:21  2   the conference rooms outside one of the courtrooms --

04:03:25  3          THE COURT:  Okay.

04:03:25  4          THE WITNESS:  -- or whatever.

04:03:25  5          THE COURT:  I have a conference room back in my

04:03:27  6   chambers.  We can just do it there.

04:03:29  7          THE WITNESS:  That's good.

04:03:29  8          THE CLERK:  Nine o'clock?

04:03:29  9          THE COURT:  Let's do nine o'clock in the morning

04:03:33  10  on the 18th.

04:03:34  11         THE WITNESS:  That's fine.

04:03:39  12         THE COURT:  Is there any specific equipment or

04:03:42  13  anything that we need to provide or make sure is available?

04:03:45  14         THE WITNESS:  I'll bring everything that's

04:03:47  15  needed.

04:03:48  16         THE COURT:  Okay.

04:03:50  17      Okay.  So we've schedule that.  We've scheduled the

04:03:52  18  hearing.  Is there anything else that we need to address right

04:03:56  19  now before we recess at this point?

04:03:58  20         MR. JOHANNESSEN:  I believe one thing, Your

04:03:58  21  Honor.

04:04:00  22      Throughout the course of the day, we've been

04:04:02  23  getting, kind of, drips and drabs of defendant's expert

04:04:07  24  analyses -- I mean, we haven't gotten that far yet, but is

04:04:09  25  there an expect -- pardon me -- is there an expectation that

04:04:12   1   plaintiff receives some type of report from them?

04:04:15   2                   MR. PANKOPF:  Yeah.

04:04:16   3                   MR. WILLIS:  Yes.

04:04:16   4                   MR. JOHANNESSEN:  Okay.  And --

04:04:16   5                   THE COURT:  Yes.  I would ask that that be

04:04:18   6   provided as soon as possible.  And I think --

04:04:20   7                   MR. WILLIS:  I think we've said sometime before

04:04:21   8   Christmas.

04:04:22   9                   THE COURT:  Okay.

04:04:23   10         So, we'll have that provided.  Let's get an actual

04:04:28   11   date just so we're all on the same page.

04:04:31   12                   MR. WILLIS:  The 21st?  It's the Friday.

04:04:32   13                   THE COURT:  Yeah.  Let's do it on the 21st.

04:04:37   14                   MR. WILLIS:  Ma'am, is that good?

04:04:39   15                   UNIDENTIFIED SPEAKER:  Yes.  That's perfect.

04:04:40   16                   THE COURT:  And then the issue of meeting and

04:04:42   17   conferring on the Rule 11.  I believe that was another issue

04:04:45   18   that you had, sir.  Is that --

04:04:46   19                   MR. JOHANNESSEN:  Well, the reason I bring

04:04:47   20   that up, Your Honor, it's -- I think it's probably stating

04:04:49   21   the obvious, that a lot of cases, uh, once you get into

04:04:52   22   the attorney stuff, uh, you know this back and forth with

04:04:56   23   attorneys -- I'm not laying fault at anybody's feet right now

04:05:00   24   -- but, it seems to get in the way of the resolution, the

04:05:02   25   resolution everybody wants, which is between the clients.

04:05:06  1   So I thought, well, why don't we meet on the Rule 11.  We're

04:05:09  2   not going to take Wells Fargo out of the picture by no means,

04:05:12  3   but at least take the -- what could possibly be an emotional

04:05:17  4   component out of the case and put it at the feet of the

04:05:20  5   clients.

04:05:21  6               THE COURT:  Well, I believe that the Motion For

04:05:23  7   Sanctions seeks sanctions against the attorneys at Snell &

04:05:30  8   Wilmer not simply on the basis of Rule 11, but also on the

04:05:35  9   basis of 18 U.S.C. Section 1927, as well as the inherent

04:05:38  10  authority of the Court.

04:05:39  11       So I guess the question becomes is -- does the

04:05:42  12  plaintiff, are you going to withdraw as it relates to Snell

04:05:48  13  & Wilmer and the attorneys as to all three basis, and only

04:05:50  14  proceed on sanctions as to Wells Fargo?

04:05:53  15              MR. JOHANNESSEN:  No, not -- I'm not able to

04:05:55  16  make that commitment right now.  I hope you understand.  I --

04:05:57  17              THE COURT:  I do.  I do.  I'm just trying to

04:06:00  18  understand.  I just want you to be clear that the motion for

04:06:02  19  sanctions is broader than Rule 11.  It, actually, is on three

04:06:06  20  separate basis.  In fact, I do not believe that sanctions can

04:06:11  21  be impose against a client -- and I'll need to go back and

04:06:15  22  review this -- as to all three basis, I think it's specific to

04:06:18  23  certain entities that can be sanctioned under certain rules

04:06:22  24  and statutes.

04:06:23  25              MR. JOHANNESSEN:  I agree.

04:06:24   1          THE COURT:  Is there a time and date that you

04:06:28   2   would like to meet and confer with the plaintiff and the

04:06:31   3   defense counsel to discuss the scope of the motion going

04:06:36   4   forward?  Because I think that's what I had originally heard

04:06:40   5   was that you wanted to discuss whether or not there should be

04:06:42   6   a meet and confer.

04:06:44   7          MR. JOHANNESSEN:  I don't see how communication

04:06:45   8   cannot help, so.

04:06:49   9          THE COURT:  Mr. Willis.

04:06:50  10          MR. WILLIS:  We're always willing to talk,

04:06:52  11   Your Honor.

04:06:53  12          THE COURT:  Okay.

04:06:53  13          MR. PANKOPF:  We're lawyers.

04:06:56  14          THE COURT:  That's what we do, right?

04:06:57  15          MR. WILLIS:  We might even listen too.

04:06:59  16          THE COURT:  Now don't get crazy, sir.

04:07:03  17          I will leave that to the parties.  You know, like

04:07:06  18   you said, this -- and I think Mr. Willis pointed it out.  I

04:07:11  19   know I've pointed it out.  It becomes much more emotional when

04:07:14  20   people are being individually attacked, in effect.  So, I'll

04:07:17  21   leave it to the parties to work out a meet and confer.  And

04:07:20  22   if there is some agreement as to limiting the scope of the

04:07:25  23   sanction motion as to who it's going to be sought against, we

04:07:29  24   can address that on the record first thing in February.  We

04:07:32  25   can put that on the record and we can go forward on that

04:07:36   1   basis.  I think that would make the most sense, that will

04:07:39   2   give you plenty of time to discuss it, maybe work that out

04:07:42   3   amongst yourselves.

04:07:44   4         I would say this though.  If there is an inclination

04:07:46   5   to withdraw this motion as it relates to individual attorneys

04:07:49   6   and to Snell & Wilmer, I would seriously encourage everybody

04:07:53   7   to do that, regardless of what the Court may or may not do.  I

04:07:57   8   think it is a very, very serious allegation to make against

04:08:01   9   attorneys.  And I can say, from what I've read, I do not

04:08:05   10  see any evidence to support the idea that those individual

04:08:09   11  attorneys, or Snell & Wilmer, even if these documents are not

04:08:13   12  what they are purported to be, that they knew that, or had any

04:08:17   13  reason to question that.  And I think that is where the crux

04:08:21   14  of the problem comes in when you file a motion for sanctions

04:08:24   15  against attorneys and law firms, because unless you have some

04:08:27   16  very clear evidence that they did something on purpose, and

04:08:30   17  they knew what they were doing was wrong, you're going down a

04:08:34   18  very, very slippery slope.

04:08:38   19        And I will say, preliminarily, I do not see any

04:08:41   20  evidence in this motion, and I have not heard any evidence

04:08:44   21  here today, that would support the notion that Ms. O'Mara or

04:08:48   22  Mr. Gordon, or Snell & Wilmer as a firm, knew that they were

04:08:52   23  providing something that was false, or that they intended to

04:08:56   24  make material misrepresentations to this court when it filed

04:09:00   25  -- or when they filed the document 123, or even in the

04:09:06   1   subsequent representations that were made to the Court.

04:09:08   2           That's my preliminary statement as to that.  I'm

04:09:12   3   not going to rule on the overarching question of whether or

04:09:16   4   not the document really was what it was purported to be or

04:09:19   5   not.  That's a question as to the client and what they may

04:09:21   6   have known or didn't know.  But as it relates to the attorneys

04:09:25   7   and the law firm, I have not seen any evidence that supports

04:09:28   8   that at this point.

04:09:30   9           Now, we're having a continuation of the hearing, so

04:09:32  10   I'm not going to make any ruling on that.  But as we sit here

04:09:36  11   today, I don't see that necessarily.  So I would encourage

04:09:41  12   you, if you're inclined to do that, to do that sooner rather

04:09:44  13   than later.

04:09:44  14           Is there anything else, sir, or Mr. Pankopf?

04:09:47  15           MR. PANKOPF:  No, Your Honor.

04:09:47  16           THE COURT:  Thank you very much both of you.

04:09:49  17           Mr. Willis or Ms. Dove, is there anything else from

04:09:51  18   you?

04:09:53  19           MS. DOVE:  Not from me, Your Honor.

04:09:53  20           MR. WILLIS:  I don't believe so.  Thank you.

04:09:55  21           THE COURT:  Okay.  Thank you again for your

04:09:57  22   professionalism and for your preparation.  I look forward to

04:09:59  23   seeing everybody again in February.  As I already indicated, I

04:10:04  24   do not see why anything would need to be filed or any issues

04:10:07  25   would have to come up between the parties.  But, if there is

04:10:10   1    any issue that you feel that you need to bring to the Court's

04:10:12   2    attention, that you cannot work out amongst yourselves, to be

04:10:16   3    clear on the record, file a document.  If one gets filed, that

04:10:20   4    is a joint document, that lists in one or two paragraphs each

04:10:24   5    parties' position, and file it with me.  And if I can't decide

04:10:28   6    it on the documents that are provided -- or that document,

04:10:31   7    then I will just have a quick teleconference, like I had last

04:10:34   8    time, so we can resolve it as quickly as possible so we don't

04:10:37   9    have outstanding issues.  I don't want to have the hearing

04:10:41   10   pushed back or delayed or anything because of any kind of

04:10:44   11   conflicts between the parties.  I don't see why any should

04:10:47   12   occur.  But for whatever it's worth, if there is any need for

04:10:51   13   that, that's what we will do.

04:10:53   14           I would also order that the plaintiff actually order

04:10:55   15   the transcript in this particular case to make sure that the

04:10:59   16   transcript gets transcribed for everyone for purposes of this

04:11:02   17   particular hearing.

04:11:03   18           I also indicated that I will be giving back the

04:11:06   19   documents that are marked at 3, 4 and 5A, back to defense

04:11:10   20   counsel, Mr. Willis --

04:11:12   21               MR. WILLIS:  May I approach?

04:11:14   22               THE COURT:  -- to retain.

04:11:16   23           Yes.  Please, sir.

04:11:17   24           Um, and these are the documents that the Court will

04:11:18   25   order that be brought to the court on December 18th, so that

04:11:21  1    there's no question that those are the documents that are

04:11:24  2    being returned, and that then show back up here on the 18th.

04:11:27  3    That's an order of the Court.

04:11:29  4              Unless there's anything further -- anything further

04:11:31  5    from the plaintiff at this point?

04:11:32  6              MR. JOHANNESSEN:  Thank you for your patience,

04:11:34  7    Your Honor.

04:11:34  8              THE COURT:  Thank you very much.

04:11:35  9              Anything from the defense?

04:11:36  10             MR. WILLIS:  No, Your Honor.  Thank you.

04:11:37  11             THE COURT:  Thank you very much.

04:11:39  12             And we will be in recess.  We will see you in

04:11:43  13   February.

04:11:44  14             MR. PANKOPF:  Thank you.

          15             (Court Adjourned.)

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                                    -o0o-

2

3                    I certify that the foregoing is a correct
                     transcript from the record of proceedings
4                    in the above-entitled matter.

5          \s\ Kathryn M. French              December 29, 2018

6          _____   _____

           KATHRYN M. FRENCH, RPR, CCR                  DATE
04:11:45   7         Official Reporter
04:11:45
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2

3      **PLAINTIFF'S WITNESSES:**                          **PAGE:**

4      **1)    DR. JAMES KELLEY**

5              Direct Examination By Mr. Pankopf          15
               Cross-examination By Mr. Willis            80
6              Redirect Examination by Mr. Pankopf       154
               Recross-Examination By Mr. Willis         165
7
       **2)    JODI HAWKINS**
8
               Direct Examination By Mr. Johannessen       I
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

266

1                    **I N D E X   O F   E X H I B I T S**

2

3    **EXHIBIT NUMBER:**                      **MARKED**    **RECEIVED**

4    Exhibit 8  --  Document                              33

5    Exhibit 9  --  Document                              34

6    Exhibit 6  --  Document                              37

7    Exhibit 5  --  Document                              51

8    Exhibit 1  --  Document                              82

9    Exhibit 7  --  Document                              85

10   Exhibit 15  --  Document                            164

11   Exhibit 8  --  Document                             217

12

13

14

15

16

17

18

19

20

21

22

23

24

25