1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ROBERT A. SLOVAK,

               Plaintiff,

   v.

GOLF COURSE VILLAS HOMEOWNERS
AOSSICATION, *et al.*,

          Defendants.

3:13-cv-00569-RCJ-CBC


<u>**ORDER**</u>

      Plaintiff Robert A. Slovak ("Slovak") filed this lawsuit in 2013 seeking quiet title and declaratory relief related to a condominium properly located in Incline Village, Nevada. After several years of litigation, a settlement was reached between the parties. To date, the terms of that settlement agreement have yet to be consummated.

      Currently before the court is Slovak's motion for sanctions (ECF No. 218), which arises from the attempts of the parties to follow through with the terms of the settlement agreement. Slovak seeks sanctions against Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), the law firm of Snell & Wilmer, LLP ("Snell"), and individual Snell attorneys Richard C. Gordon and Catherine M. O'Mara (collectively referred to as "the individual attorneys") based on his claim that Wells Fargo failed to provide "original copies" of the note and deed of trust as required by the parties' previous settlement agreement.[1] (ECF No. 218). According to Slovak, the documents Wells Fargo and its counsel tendered as "originals" were, "at best copies or at worst fabricated forgeries". (*Id.*, p. 10). Wells Fargo

---

[1]    In the original motion, Slovak also sought sanctions against Snell attorney, Kelly Dove. Slovak voluntarily withdrew that portion of his motion at the evidentiary hearing on November 28, 2018. (ECF No. 244, p. 4). Based on that withdrawal, the court entered an order denying Slovak's motion to the extent it sought sanctions against Ms. Dove with prejudice. (*Id.*)

opposed (ECF No. 222) and Slovak replied (ECF No. 227). Due to the seriousness of Slovak's allegations, the court ordered an evidentiary hearing, which was held on November 28, 2018.

For the reasons stated below, Slovak's motion for sanctions (ECF No. 218) is denied.

I.      FACTUAL BACKGROUND

A.      Underlying Facts and Procedural History Regarding Settlement Agreement

This case has a long and tortured history that began in 2002 when Wells Fargo agreed to provide Slovak a home equity loan on property in Incline Village, Nevada. To complete this transaction, Slovak signed and executed a note and "Deed of Trust" for the benefit of Wells Fargo, which was recorded in April 2002. Slovak, however, failed to keep up the payments and ultimately defaulted on the loan.

After his default, Slovak sued Wells Fargo and various other defendants in state court alleging claims for quiet title and declaratory relief. Wells Fargo removed the case to federal court. (ECF No. 1). After extensive litigation occurred, the parties participated in a settlement conference with the Honorable Valerie P. Cooke on June 3, 2014. (ECF No. 83). At the conclusion of the settlement conference, the parties reached an agreement and the court placed the material terms on the record. (*Id.*) The terms required Slovak to pay Wells Fargo $280,000, and in exchange, Wells Fargo would reconvey the property to Slovak.

Shortly thereafter, trouble arose when the parties could not agree on the language and terms to be included in the written settlement agreement. (*See* ECF Nos. 91, 102). The primary dispute centered upon Slovak's claim that the terms of the settlement agreement required Wells Fargo to return the "original" note and deed of trust to him prior to him providing Wells Fargo with payment. (ECF No. 102). Wells Fargo disagreed asserting that references to returning the note and deed of trust meant only that Wells Fargo would reconvey title to Slovak. Ultimately, Wells Fargo filed a motion to enforce the terms of the settlement agreement. (ECF No. 107). The district court granted

1  Wells Fargo's motion, adopting the report and recommendation entered by the Judge

2  Cooke, who found, in part, that the terms of the settlement did not require Wells Fargo to

3  deliver the original documents. (ECF No. 128).

4  Slovak appealed the decision the Ninth Circuit Court of Appeals, who reversed

5  and remanded for further proceedings. (ECF No. 140).

6      B.   Facts and Procedural History Following Remand

7  Following remand, Slovak filed a motion to enforce the settlement agreement

8  contending that the Ninth Circuit's decision required Wells Fargo required to provide the

9  "original" documents to him. (ECF No. 156). Although Wells Fargo continued to contest

10  that it was required to deliver the "original" documents, Wells Fargo claimed it located

11  the original documents and agreed to provide them to Slovak in order for the original

12  settlement terms to be enforced. (ECF No. 165). The court held a hearing on Slovak's

13  motion on February 23, 2018. (ECF No. 215, Ex. 6). In light of Wells Fargo's willingness

14  to tender the original documents, the court ordered to parties to meet and consummate

15  the full settlement agreement. (*Id.*, pp. 14-16). The court directed Wells Fargo to provide

16  Slovak the original note and deed of trust as well as a deed of full reconveyance. (*Id.*,

17  pp. 15-16). Slovak, on the other hand, was ordered to arrange a wire transfer of

18  $280,000 that would occur immediately upon receipt of the documents. (*Id.*) Finally, the

19  parties were directed to then sign and file a written release of liability and stipulated

20  dismissal with the court at the conclusion of the meeting. (*Id.*)

21  All did not go as planned. On May 10, 2018, the court held a status conference to

22  determine whether the settlement had been completed. (ECF No. 180, Hr'g Minutes;

23  ECF No. 213, Hr'g Transcript). The parties advised the court Slovak had concerns with

24  the authenticity of the "original" documents and wanted the documents forensically

25  examined to determine whether they were truly "originals." (ECF No. 213, pp. 3-5). The

26  court granted Slovak thirty days to conduct the requested forensic analysis. (*Id.*, p. 29).

27  The parties were ordered to either file a stipulation and order to dismiss the case on or

28

before June 20, 2018 or to appear for a hearing that would be set on that same day, if the settlement was not completed. (*Id.*, pp. 31-33; *see also* ECF No. 193).

On June 20, 2018, the parties re-convened for another hearing. At the hearing, Slovak claimed that the forensic examination conducted on the documents "irrefutably" established that the documents were "forgeries" and claimed Wells Fargo had perpetrated a fraud on the court. (ECF No. 202, Hr'g Minutes; ECF No. 214, p. 3, Hr'g Transcript). Slovak's claims were based upon two expert reports he received prior to the hearing but did not provide to either the court or opposing counsel. (ECF No. 214, pp. 5-6). Based on seriousness of Slovak's accusation, but without any evidence to review, the court concluded it could not rule on the still outstanding motion to enforce settlement until it had an opportunity to consider the allegations made by Slovak. (*Id.*, p. 15-16). At this point, Slovak withdrew his motion to enforce without prejudice and indicated he wanted to proceed by filing a motion for sanctions. (*Id.*, p. 17). The court then ordered him to file any motion for sanctions on or before Friday, July 6, 2018. The court noted it would consider an extension of time to file a sanctions motion if that was necessary to comply with the safe harbor provisions contained in Rule 11. (*Id.*, pp. 14, 17.)

C.    <u>Motion for Sanctions</u>

Slovak did not his motion for sanctions on or before Friday, July 6, 2018. Rather, he filed a motion for an extension of time requesting a 7-day extension to July 13, 2018 stating he was "almost finished with the motion and [he would] be able to file it as requested." (ECF No. 207, p. 1.) He indicated he had two legal issues to finish researching and a few exhibits to identify prior to the filing. (*Id.*) The court granted Slovak's request. (ECF No. 208).

When July 13, 2018 arrived, Slovak again failed to file the motion for sanctions. Rather, on the day the motion was due, Slovak once again filed a request for an extension. (ECF No. 209). This time he claimed he had *now* "concluded a motion pursuant to Rule 11 [was] appropriate" and he needed more time to comply with the safe harbor provisions required under the rule. (ECF No. 209, p. 1). This time, Slovak

requested an extension of 35 days, which included 21-days to comply with the safe harbor provision and an additional 14-days to file the motion, resulting in a new deadline of August 16, 2018. (*Id.*, p. 2). The court granted Slovak's request over Wells Fargo's objection. (ECF No. 210; 211).

On July 19, 2018, Slovak sent a letter to Wells Fargo's counsel that enclosed a document entitled, "Motion for Rule 11 Sanctions." (ECF No. 223, Ex. F). The enclosed motion was only 5 pages long and argued for sanctions under a single legal theory – Rule 11. (*Id.*, pp. 3-7) Slovak asserted that he was providing the enclosed motion pursuant to the safe harbor provision of Rule 11. (*Id.*, p. 2). He further stated that if Wells Fargo did not "voluntarily produce the original note and original deed of trust within 21 days of service of the letter and draft motion," he would file the document seeking sanctions against Wells Fargo. (*Id.*). Wells Fargo responded on August 10, 2018 asserting that Slovak's motion was unfounded and detailed the various deficiencies in his accusations. (ECF No. 223, Ex. G).

Ultimately, on August 17, 2018, Slovak filed a motion for sanctions against Wells Fargo, Snell and the individual attorneys. (ECF No. 218). However, the motion that was filed was not the same motion that was previously served upon Wells Fargo and its counsel. (*Compare* ECF No. 218, *with* ECF No. 223, Ex. F, pp. 3-7). Rather, the motion filed was approximately 11-pages in length and sought sanctions under three separate legal theories – Rule 11, 28 U.S.C. § 1927, and the court's inherent powers. (ECF No. 218).

The overarching contention of Slovak's motion for sanctions is his argument that Wells Fargo and its counsel failed to provide "original copies" of the note and deed of trust as required by the parties' previous settlement agreement. (ECF No. 218). According to Slovak, the documents Wells Fargo and its counsel tendered as "originals" were, "at best copies or at worst fabricated forgeries." (*Id.*, p. 10). Slovak's argument is premised entirely upon the alleged expert reports and opinions provided by Dr. James E. Kelley and Gary Michaels, who Slovak proffered as experts in the field of forensic

document examination. Slovak offered the C.V.s of Dr. Kelley and Mr. Michaels, as well as their respective expert reports, as evidence to support his contentions. (*See* ECF No. 218, Exs. 8-11).

According to Dr. Kelley's report, the documents tendered were not originals but were copies made by an ink jet printer. (ECF No. 218, Ex. 10). Mr. Michaels's did not personally examine the documents. (ECF No. 218, Ex. 11). Rather, according to this report, he simply reviewed Dr. Kelley's report and conclusions. Based on that review, he agreed that the documents were not the originals but were copies made by an ink jet printer. However, Mr. Michaels also went one step further concluding the documents were "forgeries." (*Id.*)

Wells Fargo opposed the motion for sanctions on August 31, 2018. (ECF No. 222). Wells Fargo argued that the court should deny the sanctions for a variety of reasons. Specifically, Wells Fargo challenged Slovak's expert witnesses arguing that their expert opinions and reports should be rejected by the court because neither witnesses' testimony or opinions satisfy the requirements of Federal Rule of Evidence 702 or the *Daubert* analysis. (*Id.*, pp. 7-10). According to Wells Fargo, without these expert opinions and reports, there was no evidence in the record to support any finding that the documents tendered were not the originals. Slovak filed his reply on September 11, 2018. (ECF No. 225).

D.    Evidentiary Hearing

Due to the seriousness of Slovak's allegations, the court ordered an evidentiary hearing to determine whether the expert opinions and reports offered by Slovak satisfy Rule 702 and *Daubert*. This hearing was held on November 28, 2018. (ECF No. 244, Hr'g Minutes; ECF No. 249, Hr'g Transcript). At that hearing, the court heard testimony

of Dr. Kelley regarding his qualifications and his expert opinions regarding the documents.[2] (*Id.*)

Both parties submitted various exhibits to support their respective positions. Plaintiff's Exhibits 5-9 and 15 were admitted and Defendant Exhibits 1 and 2 were admitted. The court's analysis and determination in this order relies only upon the admitted exhibits at the hearing, along with Plaintiff's Exhibits 9 and 11, attached to his motion for sanctions, ECF No. 218, which consist of the C.V. for Mr. Gary Michaels and Mr. Michaels's expert report.[3]

## II.    ANALYSIS

### A.    Legal Standards

Slovak has moved for sanctions under three legal theories: (1) Federal Rule of Civil Procedure 11; (2) 18 U.S.C. § 1927; and, (3) the Court's Inherent authority. A different legal standard applies to each theory, which are as follows.

#### 1.    Rule 11

Federal Rule of Civil Procedure 11 provides that when an attorney (or unrepresented party) signs a pleading, motion or other paper, and presents it to the court, the attorney or parties certifies that it "is not being presented for any improper purpose;" "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous legal argument for extending, modifying, or reversing existing

---

[2]    Slovak also called Jodie Hawkins, the Wells Fargo client representative, to allegedly testify with respect to her role as the Wells Fargo custodian of records for the tendered documents. This testimony was elicited for the separate, but related issue, of the authenticity and originality of the documents. The court granted Slovak's oral request to bifurcate that determination from the underlying issue of sanctions. This testimony is unrelated to the question of whether Dr. Kelly or Mr. Michaels's expert opinions are admissible and will not be addressed herein.

[3]    At the November 28, 2018 hearing, Wells Fargo was prepared to present a rebuttal expert on forensic document examinations. However, Wells Fargo choose to reserve calling that witness until the court held a subsequent hearing on the bifurcated issue requested by Slovak. Having reviewed the filings on the motion for sanctions, the admitted exhibits at the hearing, and the testimony presented that the hearing, the court finds rebuttal expert testimony is not necessary on this issue. Rather, this order is based strictly on the filings related to the motions for sanctions, the *admitted* exhibits at the hearing, and Dr. Kelley's testimony.

law or for establishing new law;" "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;" and, "denials of factual contentions are warranted on the evidence or … reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(a), (b)(1)-(4).

If the court concludes Rule 11(b) has been violated, after notice and an opportunity to respond have been afforded, appropriate sanctions may be imposed on the attorney, law firm or party that violated the rule. Fed. R. Civ. P. 11(c)(1).

A motion for sanctions under Rule 11 must be made separately and describe the conduct that violates the rule. Fed. R. Civ. P. 11(c)(1). It must be served under Rule 5, and the offending attorney or party has 21 days to withdraw or correct the challenged paper, claim, defense, contention or denial. Fed. R. Civ. P. 11(c)(2). If the matter is not withdrawn or corrected within 21 days, the party may then file the motion for sanctions. Fed. R. Civ. P. 11(c)(2). "If warranted, the court may award to the prevailing party the reasonable expenses, including attorney fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2). The sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). It may include: "nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

"Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose." *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).  There must be "strict compliance" with the safe-harbor provision before a motion for sanctions can be filed. (*Id.*) (citing *Holgate v. Baldwin*, 425 F.3d 671, 678 (9th Cir. 2005)).

1    The Ninth Circuit has held that where Rule 11 sanctions are not dispositive of a

2    claim or defense of a party, a magistrate judge has authority to enter an order (as

3    opposed to a recommendation) issuing sanctions. *See Maisonville v. F2 America, Inc.*,

4    902 F.2d 746, 747 (9th Cir. 1990).

5              2.    *28 U.S.C. § 1927*

6    Sanctions may also be imposed pursuant to 28 U.S.C. § 1927, which states:

7         Any attorney or other person admitted to conduct cases in any court of the
      United States or any Territory thereof who so multiplies the proceedings in
8         any case unreasonably and vexatiously may be required by the court to
      satisfy personally the excess costs, expenses, and attorneys' fees
9         reasonably incurred because of such conduct.

10   28 U.S.C. § 1927. Unlike Rule 11 sanctions, section 1927 sanctions can only be

11   imposed against an attorney or other person permitted to conduct cases in federal court.

12   These sanctions may not be imposed against a party to the litigation nor may they be

13   imposed against a law firm. *See Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290

14   (9th Cir. 2015).

15   Section 1927's language — "unreasonably and vexatiously" — "implies a bad faith

16   or intentional misconduct requirement not explicit in the statute." *Barnd v. City of*

17   *Tacoma*, 664 F.2d 1339, 1343 (9th Cir. 1982). Therefore, "[s]anctions pursuant to

18   section 1927 must be supported by a finding of subjective bad faith." *Blixseth v.*

19   *Yellowstone Mountain Club, LLC*, 796 F.3d 1004, 1007 (9th Cir. 2015) (internal quotation

20   marks omitted). Among other circumstances, "bad faith is present when at attorney

21   knowingly or recklessly raises a frivolous argument." *Id.* (internal quotation marks and

22   alteration omitted). An argument is frivolous if its resolution "is obvious" or the argument

23   is "wholly without merit." *Nat'l Mass Media Telecomm. Sys., Inc. v. Stanley*, 152 F.3d

24   1178, 1181 (9th Cir. 1998) (internal quotation marks omitted).

25   Sanctions under section 1927 are appropriate upon a finding that an attorney

26   "recklessly or intentionally misled the court." *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir.

27   2010). Thus, section 1927 sanctions require bad faith or something akin to bad faith, i.e.,

28

1    recklessness plus something more such as frivolousness or an improper purpose. *See*

2    *Moore v. Keegan Mgmt. Co.*, 78 F.3d 431, 436 (9th Cir. 1996); *Pac. Harbor Capital, Inc.*

3    *v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000); *B.K.B. v. Maui Police*

4    *Dep't*, 276 F.3d 989, 993-94 (9th Cir. 2001). A court retains "substantial leeway" when

5    determining whether to impose sanctions pursuant to section 1927. *Haynes v. City &*

6    *Cty. of San Francisco*, 688 F.3d 984, 987 (9th Cir. 2012).

7                   *3.      Court's Inherent Authority*

8          Finally, a federal district court also has inherent authority to sanction conduct

9    abusive of the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46

10   (1991). This power, however, is to be exercised with restraint and discretion. *Id.* at 44.

11   "Before imposing sanctions under its inherent sanctioning authority, a court must make

12   an explicit finding of bad faith or willful misconduct." *In re Dyer*, 322 F.3d 1178, 1196 (9th

13   Cir. 2003); *see also Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001). Recklessness,

14   when combined with an additional factor such as frivolousness, harassment, or an

15   improper purpose, may support sanctions. *See In re Girardi,* 611 F.3d 1027, 1061 (9th

16   Cir. 2010); *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001); *Fink*, 239 F.3d at

17   994. Mere negligence or recklessness alone will not suffice. *In re Lehtinen*, 564 F.3d

18   1052, 1058 (9th Cir. 2009). "[S]anctions are available if the court specifically finds bad

19   faith or conduct tantamount to bad faith." *Fink*, 239 F.3d at 994.

20         Inherent power sanctions may be imposed against attorneys, clients, and *pro se*

21   litigants. *Aleyska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975).

22   The court's "inherent power 'extends to a full range of litigation abuses.'" *Fink*, 239 F.3d

23   at 992 (quoting *Chambers*, 501 U.S. at 46-47).

24         The court has discretion to rely on its inherent powers rather than a federal rule or

25   statute. *Fink*, 239 F.3d at 994 (citing *Chambers*, 501 U.S. at 50). Under its inherent

26   power, sanctions may include: fines (*see Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469,

27   1472-73 (D.C. Cir. 1995)), awards of attorney's fees and expenses (*see Roadway*

28   *Express Inc. v. Piper*, 447 U.S. 752, 765 (1980)), and contempt citations (*id.* at 764).

1    Again, it is clear that "one permissible sanction" under the court's inherent power is "an

2    assessment of attorney's fees" "instructing a party that has acted in bad faith to

3    reimburse the legal fees and costs incurred by the other side." *Goodyear Tire & Rubber*

4    *Co. v. Haeger*, 137 S.Ct. 1178, 1186 (2017) (citation omitted).

5        B.    Analysis

6        Slovak's motion for sanctions turns solely on whether the documents tendered by

7    Wells Fargo are, as he claims, "at best copies or at worst forgeries." The evidence

8    Slovak presents to support his claims that the documents are "copies" or "forgeries" are:

9    (1) Dr. Kelley's affidavit report, (Hr'g Ex. 5); (2) Dr. Kelley's declaration, (Hr'g Ex. 7; (3)

10   Dr. Kelley's testimony (Hr'g Tran., pp. 15-165); and, (4) Mr. Michaels's expert report

11   (ECF No. 218, Ex. 11). Slovak offers Dr. Kelley and Mr. Michaels as "experts" in the field

12   of forensic document analysis.

13       Therefore, prior to considering the proffered expert opinions from either witness,

14   the court must first determine whether these experts and their opinions satisfy the

15   requirements set for in Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow*

16   *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

17       Federal Rule of Evidence 702 governs the admission of expert testimony and

18   evidence. It provides:

19       If scientific, technical, or other specialized knowledge will assist the trier of
20       fact to understand the evidence or to determine a fact in issue, a witness
         qualified as an expert by knowledge, skill, experience, training, or
21       education, may testify thereto in the form of an opinion or otherwise if (1)
         the testimony is based upon sufficient facts or data, (2) the testimony is
22       the product of reliable principles and methods, and (3) the witness has
         applied the principles and methods reliably to the facts of the case.
23

24   Fed. R. Evid. 702.

25       "Faced with a proffer of expert scientific testimony, the court must determine at

26   the outset … whether the expert is proposing to testify to (1) scientific knowledge that (2)

27   will assist the trier of fact to understand or determine a fact in issue. This usually entails

28   a preliminary assessment of whether the reasoning or methodology underlying the

1  testimony is scientifically valid and of whether that reasoning or methodology properly

2  can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

3  U.S. 579, 589 (1993).  The court has discretion under Rule 702 as a "gatekeeper to

4  decide what evidence is relevant, reliable, and helpful the trier of fact." *Desrosiers v.*

5  *Flight Int'l of Fla. Inc.*, 156 F.3d 952, 961 (9th Cir. 1998).

6          In exercising its gatekeeping function, the court must first determine whether the

7  expert is qualified. To make this determination, the court considers whether the

8  individual has sufficient "knowledge, skill, experience, training or education" in the

9  subject matter of their alleged expertise. Fed. R. Evid. 702. This qualification standard is

10  meant to be broad and to seek a minimal foundation justifying the expert's role as an

11  expert. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir.

12  2004) (internal quotations and citations omitted).

13          If the expert is deemed qualified, the court must then consider the reliability of the

14  expert's opinions and conclusions. *Daubert*, 509 U.S. at 593-94. The Supreme Court

15  articulated several factors in *Daubert* that courts should consider in exercising this

16  function. These factors incude: (1) whether the theory, technique, and background

17  knowledge the expert applies is generally accepted in the relevant scientific community;

18  (2) whether the research supporting the expert's conclusion has been subjected to peer

19  review and publication; (3) whether the expert's theory can be and has been tested; (4)

20  whether standards exist to control the operations of the expert's methods; and (5)

21  whether the known or potential rate of error is acceptable. *Daubert* , 509 U.S. at 593-94.

22  The inquiry, however, is a flexible one, with the focus solely on the principles and

23  methodology used, not on the conclusions they generate. *Id.* at 594; *see also Claar v.*

24  *Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (the district court is "both

25  authorized and obligated to scrutinize carefully the reasoning and methodology"

26  underlying the expert's testimony.)

27          Furthermore, it is "very significant" whether the expert is testifying "about matters

28  growing naturally and directly out of research they have conducted independent of

litigation, or whether they have developed their opinions expressly for the purpose of testifying." *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 777 (D. Ariz. 2017) (citing *Daubert v. Merrell Down Pharm.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). If the opinion is produced for litigation, the proffering party must provide "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles,'" such as peer review. *Id.* In assessing reliability, a court may peek beyond an expert's methodology to his or her conclusion where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

### 1.   Dr. Kelley

Slovak proffered the expert opinions of Dr. Kelley contained in an affidavit report, a declaration, and Dr. Kelley's testimony. In his report, declaration and his testimony, Dr. Kelley opines that the note and deed of trust are "copies." However, the court finds Dr. Kelley is not a qualified expert in the area of forensic document examination and his opinions are not supported by scientifically reliable or accepted methods or principles. Therefore, Dr. Kelley is excluded as an expert and his expert opinions are excluded from consideration by this court.

### a.   Qualifications

First, Dr. Kelley is not qualified to provide expert testimony regarding forensic document analysis as he lacks the requisite "knowledge, skill, experience, training, or education" in this field. Fed. R. Evid. 702. A review of Dr. Kelley's qualifications and experience, as provided by his testimony, C.V., and declaration, reveals he has no special education, training, skill or experience related to any type of forensic document analysis. (*See* Pl. Hr'g Ex. 6; Pl. Hr'g Ex. 7; ECF No. 249, Hr'g Transcript).

Dr. Kelley has received no formal education specific to forensic science or forensic document examination. For example, he received his Bachelor of Arts degree from San Jose State University in mathematics, with a minor in chemistry and philosophy. (Pl. Hr'g Ex. 6, p. 6:004; ECF No. 249, p. 19). Thereafter, he received a

master's degree in electrical engineering and a Ph.D in electrical and computer engineering both  from the University of California, Santa Barbara. (Pl. Hr'g Ex. 6, p. 6:004; ECF No. 249, p. 16). None of Dr. Kelley's educational background includes any classes, degrees, designations, or other educational background in forensic science or document examination.

In addition, a review of Dr. Kelley's "prior experience" reveals that he has little to no relevant experience related to forensic document examination. Dr. Kelley testified that his prior work experience includes his work on nuclear reactor corporate design for General Electric, work on the "Rayheon Missile Systems division" for the B-1 Bomber, and anti-ballistic missiles. (ECF No. 249, p. 17). He also served an a mathematician for Stanford Research Institute and ran his "own company for 10 years, building,  . . . in-circuit emulators for highly specialized computers." (*Id.*) During his testimony, he summarized his work history from the time he was an undergraduate student to the present as including various positions as a mathematician, engineer, work on various weapons systems, various positions related to computer programs and software, and the like. (*Id.,* pp. 20-23). However, he did not testify regarding any specific *work experience* as a forensic document examiner.

Dr. Kelley's "C.V." and his declaration list various items that are entitled, "relevant experience." However, a review of these items reveals none of them truly relate to any "experience" in forensic document analysis. Rather, the relevant experience listed pertains almost exclusively to Dr. Kelley's work involving engineering weapons systems, computer systems or the like. (Pl. Hr'g Ex. 6, p. 6:002-6:003, 6:009). For example, Dr. Kelley's C.V. states that his relevant experience includes designing "airborne radar and electronic countermeasures" at various companies; developing and testing signal processing that "permits the early detection of enemy aircraft and ground based threats by fighter jets"; developing software used to identify and shoot down shoulder-launched missiles; developing and applying cryptographic methods and software for password

protection on computers; and holding patents in "ultra high-speed" databases and networking architecture. (*Id.*)

By contrast, the only items listed on his C.V. related to forensic document examinations are his use of "computer graphics tools for the detection of anomalies in documents and signatures that indicate that they are computer generated altered documents;" (*Id.* at p. 6:002); his familiarity with "state and federal procedures" and his "proffered testimony" and depositions "in connection with various document examinations." (*Id.* at p. 6:003); and his use of image-processing methods to test the authenticity of documents . . . [this method he claims] is discussed in the Forensic Documents Standards of the American Society of Testing Materials." (*Id.*)  None of these items provide any specific relevant work experience in the area of forensic document examination.

None of Dr. Kelley's "specialties" are related to forensic document examinations either. On his C.V., Dr. Kelley lists his "specialties" as "Chemistry through Organic and Physical Chemistry" and "Reactor Core Design Physics." (Pl. Hr'g Ex. 6, p. 6:004). However, during his testimony, he stated that his "specializations" include "Part of the PAT program . . . [which is] single processing and it has to do with image processing and speech processing." He stated that "in connection with that, [he] did create a radio for Litton Industries for F-16 fire aircraft." (ECF No. 249, p. 18). When specifically asked whether any of his specialties "involve[d] forensic document examination," his testimony was evasive. He stated only that "procedures of forensic document examination involve the use of scan, you know, photo scanners, microscopes, you know, and inspection, according to the SWB doc and AST standards, and the procedures are specified in there." (*Id.*)

Dr. Kelley has also not received any specialized training in the area of forensic document examination. When first asked about his "specialized training," Dr. Kelley testified that his only specialized training involved training as a "licensed private pilot with a tail guarder certification and … scuba." (*Id.*, p. 19). He then identified taking courses on

nuclear reactor physics at Lowell Technical Institute and information theory at Stanford. (*Id.*, p. 20). His C.V. also includes references to "training" in the use of Adobe Photoshop and Illustrator. (Pl. Hr'g Ex. 6, p. 6:004).

When asked whether he had any specialized training or formal training in *forensic document examination*, however, Dr. Kelley stated he did not. (ECF No. 249, pp. 29, 35, 84). Rather, he claimed there was no need for him to receive any specialized training in forensic document examinations because these examinations involved things he already knew such as "microscopes, scanners, the use of illumination, the equipment." (*Id.*, p. 29) Finally, he testified that his training and experience related to forensic document examinations came from reviewing one document in 2012 and then moving forward to conduct additional examinations. (*Id.*, pp. 25, 35).

In contrast to his testimony, Dr. Kelley's C.V. appears to claim that he does have training in this area. However, a review of that "training" reveals Dr. Kelley has merely taken training classes in such things as "digital phased radar and electronic countermeasures," "nuclear reactor physics," "image processing," "introduction to printing," Adobe Photoshop, image processing, and the like. (Pl. Hr'g *Ex. 6, p.* 6:004). None this training relates, or appears to be in any way related to, forensics, forensic techniques, or forensic document analysis or examinations.

Dr. Kelley is also not a member of any professional organization or group specifically related to forensic document examination. According to both his testimony and his C.V., he is a member of the following professional organizations: (1) the Association of Computing Machinery; (2) the Institute of Electrical and Electronic Engineers (IEEE); (3) Signal Processing (SIG IEEE); and, (4) Computational Intelligence (SIG IEEE). (Pl. Hr'g Ex. 6, p. 6:005).

When specifically asked by the court whether he was a member of any professional organization that was specifically related to forensic document examination, Dr. Kelley's responses, again, appeared to be evasive. For example, he testified that the IEEE was a was an such organization because "they have specific research there to

auto the process of determining whether or not a document is authentic or by computer." (ECF No. 249, pp. 156-157). He then stated that the IEEE "covers a wide latitude of electronic and electrical engineering tings. And one of the subgroups would be this *forensic document stuff.*" (*Id.*) (emphasis added). However, he did not identify what specific "subgroup" was related to this "forensic document stuff" nor did he claim he was a member of that specific subgroup.

Dr. Kelley has not published any article, book or other document related to forensic document examinations. (*Id.*, p. 93). In addition, Dr. Kelley has never taught any courses, seminars, or classes related to forensic document examination. (Id., pp. 157-158). He has also never provided any lectures on this subject – save and except the "demonstrations" he testified he had done for "groups of lawyers and people like that." (*Id.*)

In sum, after considering Dr. Kelley's testimony and the evidence presented at the evidentiary hearing, the court finds there is no evidence in the record that Dr. Kelley received any specific education or training in the area of forensic document analysis or examination. The court rejects Dr. Kelley's testimony and claims that his knowledge in using microscopes, scanners, imaging technology, or computer programs provides him the requisite skill or knowledge to be an expert in the area of forensics, forensic sciences, or forensic document analysis or examinations.

In addition, the court finds that Dr. Kelley lacks the required prior relevant work experience or professional experience to qualify as an expert in this area. Although Dr. Kelley may very well be an "expert" in such things as "electrical and computer engineering," this does not make him an expert in the forensic examination of documents. Therefore, Dr. Kelley simply does not possess the requisite "scientific knowledge" required to qualify as an expert in the field of forensic document examinations. On this basis alone, the proffered expert opinions and reports prepared by Dr. Kelley are not admissible and will not be considered by the court for any purpose.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.      Reliability of Methods Used by Dr. Kelley

In addition, Dr. Kelley's methods are not reliable as required under *Daubert* and Rule 702. Therefore, even if Dr. Kelley was a qualified expert, his expert opinions and reports are still inadmissible on this additional basis.

At the hearing, Dr. Kelley described the methods he used to reach his opinions that the documents at issue were copies as follows. First, he testified that he physically inspected the documents for a period of time. (ECF No. 249, p. 40). He then scanned the documents and took several photographs of the documents using his microscope. (*Id.*, pp. 41, 46). After taking these scans and photographs, Dr. Kelley took the photographs back to home and allegedly applied the following "standards" for forensic document examination: (1) the American Society of Testing Materials, Int'l ("ATSM"), Standard Guide for Examination of Documents Produced with Liquid Ink Jet Technology (Pl. Hr'g Ex. 8); and, (2) Scientific Working Group for Forensic Document Examination ("SWGDOC"), Standard for Examination of Documents Produced with Ink Jet Technology. (ECF No. 249, pp. 49, 92). He testified that these two standards are essentially identical and that he is looking for certain "characteristics" described in these standards. (*Id.*, pp. 27-28). He also testified that he "measured" the size of the documents to determine if there were anomalies. (*Id.*, pp. 117-122). Based on his review of the documents, his measurements, and his alleged application of these standards, such as an examination of spray patterns or the like, Dr. Kelley concluded the documents tendered by Wells Fargo were not "original documents." Rather, the documents were copies generated by an "ink jet printer." (*Id.*, pp. 61-62; 65; 68).

However, when ATSM and SWGDOC standards are reviewed, it is clear Dr. Kelley did not properly apply them nor did he apply them in the means that they are intended. These standards only apply to documents *originally produced* with an ink jet printer. (Pl. Hr'g Exs. 8, 9). In other words, the standards and methods of the ATSM and SWGDOC alleged used by Dr. Kelley pertain to how to examine a document that is *known* to be created by an ink jet printer prior to any examination taking place. (*Id.*)

These standards specifically state that the procedures outlined in them can be used for a forensic document examiner to "reliably reach an opinion concerning whether two or more documents *produced* with the ink jet printer technology are from the *same device*, whether *the particular device created* the document, or the determination of the *make or model of the device*." (Pl. Hr'g Ex. 8, p. 8:002, ¶ 4; Pl. Hr'g Ex. 9, p. 9:002, ¶ 4) (emphasis added).

This is not how Dr. Kelley's used these standards. Rather, his methodology attempts to use these standards in reverse. Specifically, his methodology involves taking a photograph or scan of an original document and then attempting to prove the document – which is purported to be an original – was actually created by an ink jet printer. His methodology has nothing to do with attempting to determine which ink jet device was used to create a document or if two documents were produced by the same device, which he acknowledged during cross-examination. (ECF No. 249, pp. 81-82).

There is no evidence in the record that establishes Dr. Kelley's methodology or his use of the standards in this way are reliable to determine that a document is a "copy" or a "forgery." To the contrary, according to Dr. Kelley, these methods have never been subjected to peer review or to any error-rate testing. (*Id.*, pp. 94-96). Dr. Kelley testified "there's no way of doing an error rate" on his methods. (*Id.*) Rather, he merely stated that "there is university documents, like at Purdue forensic labs . . . and they have, you know, identified ink jet things." (*Id.*, p. 96).

This is further underscored by the fact that Dr. Kelley has not been qualified as an expert in several cases other cases.  Although Dr. Kelley's C.V. and declaration list a variety of cases that Dr. Kelley claims he was retained in and served as an "expert," the court was unable to verify these claims and his testimony conflicts with the information provided on these documents. For example, on his C.V., Dr. Kelley listed numerous cases in which he claims he served as an expert witness for forensic document examination. (Pl. Hr'g Ex. 6, pp. 6:005-6:009). Yet, in his declaration, he indicated he only *testified* in two cases that proceeded to trial. (Pl. Hr'g Ex. 7, p. 7:001.)  The cases

1
2
3
4
5

listed in his declaration are: *Pembroke v. US Bank, et. al.*, District Court, County of Jefferson, Colorado, Case No. 214-CV-30592 and *Bank of New York v. Didrick*, 20th Judicial District, Collier County, FL, Case No. 12-380-CA. (*Id.*) However, Dr. Kelley was actually excluded as an expert witness in the *Bank of New York Mellon v. Didrick case* in Florida.[4]

6
7
8
9
10
11

In addition, Dr. Kelley's testimony related to his prior work as an expert appeared to conflict with the information provided in his C.V. and his declaration and lacked credibility. For example, when asked about his prior experience as an expert witness, Dr. Kelley stated he testified "20 or 30 times." (ECF No. 249, p. 37). However, when asked to exclude times in which he was merely deposed, Dr. Kelley then stated he had only testified approximately "10 times." (*Id.*, p. 39).

12
13
14
15
16
17
18
19

As it turns out, it appears Dr. Kelley has been excluded as an expert in forensic document examination by other federal courts. *See Malin v. JP Morgan Chase Bank, N.A., et. al.*, Case No. 3:11-cv-00554-TAV-HBG, Order Excluding Dr. Kelley's Expert Opinions, Docket No. 84 (E.D. Tenn., May 7, 2013); *McDonald v. Onewest Bank, FSB, et. al.*, 2:10-cv-01952-RSL, ECF No. 298 (W.D. Wash. Aug. 23, 2013).[5] In fact, after an extensive search, the court was unable to locate any federal case wherein Dr. Kelley has been qualified as an expert in forensic document examination or where his methods have been deemed reliable.

20
21
22

In addition, Dr. Kelley has also been excluded from appearing as an expert forensic document examiner in state courts. *See e.g.*, *JP Morgan Chase Bank v.*

23
24
25
26
27
28

---

[4]     The court takes judicial notice of the court filings in *Bank of New York Mellon, et. al. v. Didrick*, 20th Judicial District Court, FL, Case No. 11-2012-CA-003870 pursuant to Fed. R. Evid. 201.The electronic docket for this court is located at: https://cms.collierclerk.com/cmsweb#!/casedetails, last visited 12/27/2018. A review of the docket reveals that Plaintiff filed a motion in limine to exclude Dr. Kelley as an expert in the case. *See*, Docket No. 87. This motion was granted by the court on June 16, 2014. *See*, Docket Number 101.

[5]     The court takes judicial notice of the Dockets and filings in these federal cases. Fed. R. Evid. 201.

*Stevens*, Case No. 104835, 2017 Ohio App. LEXIS 3303, **13-14 (8th App. Dist. Ohio, August 10, 2017) (upholding magistrate's rejection of Dr. Kelley as an "expert" under Ohio state Rule 702, which mirrors the federal rule); *Bank of New York Mellon, et. al. v. Didrick*, 20th Judicial District Court, FL, Case No. 11-2012-CA-003870 (excluding Dr. Kelley as expert witness). Ultimately, on cross-examination he acknowledged that he had been excluded as an expert in several cases. (ECF No. 249, p. 90).

Therefore, the court finds that Dr. Kelley's methods are also unreliable. Pursuant to Rule 702 and *Daubert*, Dr. Kelley's proffered testimony and evidence is not admissible and will not be considered by the court for any purpose in this case.

### 2.   Mr. Michaels

Next, Slovak submitted a C.V. and "forensic examination report" prepared by Gary Michaels. (ECF No. 218, Exs. 9, 11). Mr. Michaels's report also concludes the documents are not only copies, but that they are "forgeries." (ECF No. 218, Ex. 11, p. 10, ¶ 22). However, this conclusion is not based on any personal analysis or tests conducted by Mr. Michaels. Although Mr. Michaels report states he, "examined the questioned documents," Mr. Michaels was not in Las Vegas to physically examine the tendered documents. (ECF No. 249, p. 166-167). Rather, Mr. Michaels reviewed the "photographs" of the documents taken by Dr. Kelley and the conclusions reached by Dr. Kelley. (ECF No. 218, Ex. 11, 8, ¶ 11).  From that "review," Mr. Michaels "opined" that Dr. Kelley's conclusions were correct and he "agreed" the documents are "copies" and opined that they are "forgeries." (*Id.*, 10, ¶¶ 16-17, 22).

In this instance, even assuming *arguendo* that Mr. Michaels is a qualified expert in the area of forensic document analysis and examinations, his report is not admissible and will not be considered by the court. In this instance, Mr. Michaels did not personally examine or even see the original documents. Rather, he simply reviewed the photographed copies of the documents and the opinions reached by Dr. Kelley and opined that those conclusions are accurate. Mr. Michaels opinions are not "expert" opinions – but opinions that Dr. Kelley's opinions are correct. His report is nothing more

1    than an attempt to bolster the credibility of Dr. Kelley and the legitimize "opinions"

2    reached by him. This type of "expert" testimony is not proper and is impermissible. *See*

3    *e.g., United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995) (holding an expert is

4    not permitted to testify specifically to bolster the credibility of another witness); *United*

5    *States v. Shay*, 57 F.3d 126, 131 (1st Cir. 1995) (expert testimony that is presented for

6    the sole purpose to bolster the testimony of another witness is properly excluded); *Tunis*

7    *Bros. Co. v. Ford Motor Co.*, 124 F.R.D. 95, 98 (E.D. Pa. 1989) (expert testimony offered

8    to simply vouch for another expert is inappropriate). Therefore, the court finds that the

9    proffered evidence of Mr. Michaels is also inadmissible and will not be considered by the

10   court.

11       As such, Slovak has provided no admissible evidence to support his claims that

12   the documents are "copies" and/or "forgeries" and no evidence to support the motion for

13   sanctions against Wells Fargo, Snell or the individual attorneys. Therefore, the court

14   denies Slovak's motion for sanctions in its entirety.

15   **IV.    CONCLUSION**

16       **IT IS THEREFORE ORDERED** that Plaintiff's motion for sanctions (ECF No. 218)

17   is **DENIED**.

18   **DATED**: January 15, 2019.

19

20   _____
     **UNITED STATES MAGISTRATE JUDGE**

21

22

23

24

25

26

27

28

22