**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| ROBERT A. SLOVAK, | Case No. 3:13-CV-00569-MMD-CLB |
| Plaintiff, | **REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE[1]** |
| v. | |
| GOLF COURSE VILLAS HOMEOWNERS' ASSOCIATION, *et al.*, | |
| Defendants. | |

Currently pending before the Court is Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") motion to enforce settlement agreement against Plaintiff Robert A. Slovak ("Slovak"). The Court held the first of two evidentiary hearings related to the settlement agreement and originality of the Note and Deed of Trust (collectively, the "Loan Documents") on November 28, 2018. (ECF No. 244, Hr'g Minutes; ECF No. 249, Hr'g Transcript.) At the November hearing, Slovak requested the Court bifurcate the ultimate issue of whether there was evidence that the Loan Documents were, in fact, originals, (ECF Nos. 244 at 4; 249 at 204), and thus, on October 27, 2021, the second portion of the evidentiary hearing was held. (ECF No. 392, Hr'g Minutes; ECF No. 400, Hr'g Transcript.) For the reasons set forth herein, the Court recommends Wells Fargo's motion to enforce settlement agreement be granted.

**I.    PROCEDURAL HISTORY[2]**

In 2002, Wells Fargo provided Slovak a home equity loan on condominium property in Incline Village, Nevada. Slovak filed this lawsuit in 2013 seeking quiet title and

---

[1]    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

[2]    Due to the extensive nature of this litigation, the Court provides a detailed procedural history which is necessary to fully explain the events leading up to the final evidentiary hearing held on October 27, 2021.

declaratory relief related to the property. (ECF No. 1.) A settlement was reached between Wells Fargo and Slovak in June 2014. (ECF No. 83.) Pursuant to the terms of the agreement, Slovak agreed to pay Wells Fargo $280,000. (ECF No. 124.) In return, Wells Fargo agreed to provide Slovak with the Deed of Trust, the Promissory Note (hereinafter "the Loan Documents"), and to reconvey the property to him. (*Id.*) To date, more than seven years later, the terms of that settlement agreement have not been consummated.

The primary contention between the parties remains the issue of whether the Loan Documents tendered by Wells Fargo, are, in fact, the original Promissory Note and Deed of Trust required to be delivered pursuant to the terms of the parties' agreement.

At a hearing on June 20, 2018, Slovak's attorney, Pankopf, claimed a forensic examination conducted on the Loan Documents "irrefutably" established the documents tendered by Wells Fargo were "forgeries" and Wells Fargo had perpetrated a fraud on the Court. (ECF No. 202, Hr'g Minutes; ECF No. 214 at 3, Hr'g Transcript.) Pankopf's claims were based upon two expert reports he received prior to the hearing but did not provide to the Court or opposing counsel. (ECF No. 214 at 5-6.) Based on the seriousness of the accusation, but without any evidence to review, the Court concluded it could not rule on the outstanding motion to enforce settlement until it had an opportunity to consider the allegations made by Slovak. (*Id.* at 15-16.) Slovak then withdrew his motion to enforce, without prejudice, indicating he wanted to proceed by filing a motion for sanctions. (*Id.* at 17.)

Slovak filed his motion for sanctions on August 17, 2018. (ECF No. 218.) The overarching contention of Slovak's motion for sanctions was his argument that Wells Fargo and its counsel failed to provide "original copies" of the Loan Documents as required by the parties' previous settlement agreement. (*Id.*) According to Slovak, the documents Wells Fargo and its counsel tendered as "originals" were, "at best copies or at worst fabricated forgeries." (*Id.* at 10.) Slovak's argument was premised upon the alleged expert reports and opinions provided by Dr. James E. Kelley ("Dr. Kelley") and Gary Michaels ("Michaels"), who Slovak proffered as experts in the field of forensic

document examination. Slovak offered the C.V.'s of Dr. Kelley and Michaels, as well as their respective expert reports, as evidence to support his contentions. (*Id.* at Exs. 8-11.)

According to Dr. Kelley's report, the documents tendered were not originals but were copies made by an ink jet printer. (*Id.* at Ex. 10.) Michaels did not personally examine the documents. (*Id.* at Ex. 11.) Rather, according to his report, he simply reviewed Dr. Kelley's report and conclusions. Based on that review, he agreed that the documents were not the originals but were copies made by an ink jet printer. Michaels also went one step further concluding the documents were "forgeries." (*Id.*) Wells Fargo opposed the motion for sanctions, and Slovak replied. (ECF Nos. 222, 225.)

On November 28, 2018, the evidentiary hearing to determine whether the expert opinions and reports offered by Slovak satisfied Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceutical Inc.*, 509 U.S. 579 (1993) ("*Daubert*") (ECF No. 244, Hr'g Minutes; ECF No. 249, Hr'g Transcript.) The Court heard testimony from Dr. Kelley regarding his qualifications and his expert opinions. (*Id.*) Both parties submitted various exhibits supporting their respective positions, some of which were admitted.

During the November hearing, Slovak requested the Court bifurcate the ultimate issue of whether there was evidence that the documents were, in fact, originals. (ECF Nos. 244 at 4, 249 at 204.) Slovak argued that even if the Court denied the motion for sanctions or rejected his experts, there was still no evidence in the record that the documents were originals, and the Court should hold an additional hearing to make a factual finding on this issue. (ECF No. 249 at 204.) Slovak asserted there may still be a basis to contest that the documents were originals—even without his expert testimony. (*Id.* at 227.) The Court agreed to the requested bifurcation and set a second hearing for February 7-8, 2019. (ECF Nos. 244 at 5, 249 at 243.)

Prior to the second hearing, the Court entered its order denying Slovak's motion for sanctions on January 15, 2019. (ECF No. 250.) In sum, the Court determined that Slovak's expert witness, Dr. Kelley, was not qualified to provide expert testimony regarding forensic document analysis, as he lacked the requisite "knowledge, skill,

experience, training, or education" in this field. (*Id.* at 13.) And even if Dr. Kelley could qualify as an expert, his expert reports and his opinions were not supported by scientifically reliable or accepted methods or principles and were not admissible. (*Id.* at 18.) The Court also excluded Michaels as an expert and likewise rejected his report. The Court determined that his opinions were not "expert" opinions, but rather opinions that Dr. Kelley's opinions were correct. (*Id.* at 21.) The Court held this was little more than an attempt to bolster Dr. Kelley's credibility by legitimizing the "opinions" reached by him, which is not a proper basis for expert testimony. (*Id.* at 21-22.) Accordingly, the Court held there was no evidence to support Slovak's motion that Wells Fargo produced fake or forged documents and denied the motion for sanctions.

The Court did not make any factual findings related to whether there was sufficient evidence presented by Wells Fargo to establish that the documents it presented in the Spring of 2018 were authentic and original. That issue was still to be addressed at the second stage of the evidentiary hearing. Prior to the second stage of the hearing, the Court issued an order vacating the February hearing and ordering Slovak to deposit $280,000, to be held in an interest-bearing account, with the Clerk of Court on or before Monday, March 25, 2019, pursuant to LR 67-1 and 67-2. (ECF No. 251.) The Court stated that based on its January 15, 2019, ruling (ECF No. 250), no evidence existed in the record supporting any contention the documents tendered by Wells Fargo were *not* the originals. (ECF No. 251 at 2.) Rather, this assertion appeared to be based upon Slovak's attorneys' suggestion that the documents may still be copies and no evidence existed to show the documents were not originals. (*Id.*) Whether Slovak's assertion had merit or not, the Court determined Wells Fargo had tendered the documents it contended were the originals and established that it stood ready, willing, and able to finalize the terms of the settlement agreement upon an order of the Court to do so. (*Id.*) However, the same could not be said for Slovak. (*Id.*) Due to the fact that over five years had elapsed since the time the parties originally entered into the settlement agreement, it was unclear whether Slovak was ready, willing, and able to immediately pay Wells Fargo $280,000 upon an

order of the Court. (*Id.*) Therefore, prior to conducting any additional hearings or utilizing any additional resources of the Court or the parties, the Court ordered Slovak to deposit the required funds in the Court's trust account. (*Id.* at 3.)

Slovak failed to comply with this order and extensive litigation ensued that delayed the re-setting of the second stage of the hearing for several years. Ultimately, on January 8, 2021, the Court held a video show cause hearing related to Slovak's continued refusal to comply with the Court's deposit orders. (ECF No. 301, Hr'g Minutes; ECF No. 364, Hr'g Transcript.)[3] At the show cause hearing, counsel for both parties orally requested to enforce the settlement. (*Id.* at 41:12-22.) The Court construed the oral requests as a motion and cross-motion to enforce the terms of the settlement agreement. (*Id.*) Prior to the hearing, Slovak provided proof that he had deposited the $280,000 in an account at One Nevada Credit Union and the Court determined that Slovak's funds would remain in the account and would not be moved, pending the second portion of the evidentiary hearing. (ECF No. 301, Hr'g Minutes; ECF No. 364, Hr'g Transcript; ECF No. 308.)

The Court also determined it would proceed with the second portion of the evidentiary hearing. (ECF No. 301.) The Court advised the parties that no briefing would be required prior to the evidentiary hearing, exhibits would be allowed at the hearing, and the Court may or may not order post-briefing after the hearing. (*Id.*)

On March 2, 2021, the Court set the 2-day evidentiary hearing for May 17-18, 2021. (ECF No. 312.) On April 7, 2021, the parties filed a joint stipulation to continue the evidentiary hearing based on conflicts with counsel and witnesses, which was granted the same day. (ECF Nos. 316, 317.) The hearing was re-set for August 19-20, 2021. (ECF No. 317.)

On April 13, 2021, Wells Fargo filed a motion to permit certain custodial witnesses and Wells Fargo's corporate representative to testify by written or remote means for the August evidentiary hearing. (ECF No. 318.) Wells Fargo requested: (1) that custodial

---

[3]     The issues related to the Order to Show Cause will be addressed in a separate order.

witnesses be permitted to establish the chain of custody of the original Loan Documents through declarations, as opposed to in-person appearances; and (2) alternatively, Wells Fargo requested that three of the custodial witnesses be permitted to testify remotely in the interest of public health during the COVID-19 pandemic, and in compliance with Chief Judge Du's Extension Order, and with respect to Wells Fargo's corporate representative, that they be permitted to participate remotely to allow them the benefit of Wells Fargo's company policy against travel during the COVID-19 pandemic. (*Id.*) Slovak opposed the motion, stating he could not examine the Loan Documents remotely nor could he adequately examine any witness remotely about either of the Loan Documents, which would need to be available for inspection and examination by each custodial witness testifying. (ECF No. 322.) However, Slovak stated he was amenable to continuing the presently scheduled evidentiary hearing to accommodate Wells Fargo's COVID-19 concerns and permit its witnesses to appear personally for testimony. (*Id.*)

Ultimately, the Court denied the motion, finding that the evidentiary hearing was set as an in-person hearing—by order of the Court—and the current state of the COVID-19 pandemic did not require remote testimony at that time. (ECF No. 327.) Wells Fargo objected to the Court's order denying Wells Fargo's motion for leave to appear by remote means. (ECF No. 328.) The District Court overruled Wells Fargo's objection, finding that this Court did not commit clear error. (ECF No. 330.)

Slovak then filed a "motion for clarification and leave to conduct limited pre-evidentiary hearing discovery." (ECF No. 331.) In the motion, Slovak alleged that he sought "clarification" of the Court's previous orders, which explicitly denied his repeated requests to engage in pre-evidentiary hearing discovery, i.e., to take the depositions of witnesses that may be called to testify at the evidentiary hearing. (*Id.*) Wells Fargo opposed the motion, pointing out the many times Slovak previously made the identical request in relation to the bifurcated hearing and the many times the Court expressly denied those requests. (ECF No. 333.) The Court denied Slovak's motion, finding that contrary to Slovak's arguments, the purpose and scope of the evidentiary hearing set for

August 2021 remained the same as when the hearing was originally set in February 2019, which was for the presentation of evidence related to the authenticity and originality of the documents offered by Wells Fargo in 2018 to finalize the parties' settlement agreement. (ECF No. 335.) Further, in 2018, this Court expressly ruled—on more than one occasion—that pre-hearing discovery or depositions were not necessary on the straightforward issues related to authenticity and originality of the Loan Documents. (*Id.*)

On August 5 and 6, 2021, Wells Fargo and Slovak filed their respective witness lists in preparation for the evidentiary hearing. (ECF Nos. 336, 337.) On August 12, 2021, Wells Fargo filed a motion to exclude Slovak's disclosed witnesses. (ECF No. 338.) Wells Fargo argued that Slovak was "improperly trying to use this hearing as a re-do of his failed 2018 effort to affirmatively prove his signature was inauthentic. . ." (*Id.*) Wells Fargo argued that one alleged expert, Dr. Kelly, had already been excluded, three witnesses were experts with no reports, and the others were supposed custodial witnesses Wells Fargo did not designate and who were not subpoenaed. (*Id.*)

The next day, on August 13, 2021, Slovak filed an emergency motion to continue the evidentiary hearing based on "health and safety concerns" of Slovak, his attorney, Scott Johannessen, and his expert witness, Douglas Cobb. (ECF No. 341.) Wells Fargo opposed the emergency motion stating the "purported emergency is solely of [Slovak] and his counsel's own creation." (ECF No. 345.) Wells Fargo claimed the motion should be denied because Slovak created the "emergency" through unwarranted delay, as the purported health issues were known well in advance of when the motion was filed. (*Id.*) Wells Fargo stated that because Slovak offered no admissible evidence to show the documents are not originals and the notarized documents are themselves self-authenticating, Slovak need not personally attend the hearing. (*Id.* at 13.) Further, Wells Fargo argued that neither Slovak nor Johannessen "are forensic document experts and have no evidence to personally offer as to the originality of the documents." (*Id.* at 14.) Finally, Wells Fargo did not object to the Court's allowing remote appearances for those concerned about traveling. (*Id.*) Importantly, Slovak never requested that he, his counsel,

or proposed witnesses be allowed to appear remotely—and instead, Slovak opposed allowing witnesses to appear remotely. (*See* ECF No. 322.)

The Court found that: (1) due to technical issues with the Court's Case Management Electronic Filing System ("CM/ECF"), which apparently caused documents to not be properly served upon counsel at the time of filing, and (2) because it would be impossible for the Court to properly consider and thoroughly review Wells Fargo's motion to exclude witnesses in time to provide both parties and their witnesses sufficient notice to make (or cancel) necessary travel arrangements given the lateness of the filings and scheduled timing for the upcoming evidentiary hearing, the Court had to continue the currently scheduled evidentiary hearing and therefore granted Slovak's emergency motion to continue hearing. (ECF No. 350.)

Following the Court's order granting the emergency motion to continue the evidentiary hearing, Slovak filed a motion to exclude Wells Fargo's disclosed witness Jodie Hawkins. (ECF No. 353.) Slovak argued: (1) he was "denied his right to finish his day in court midstream," including completion of his examination of Hawkins; (2) Hawkins is unqualified to be a "chain of custody" witness; and (3) Slovak requested the opportunity to finish his witness examination of Hawkins. (*Id.*) In response, Wells Fargo argued the motion should be denied because: (1) excluding Hawkins from testifying as a representative and custodian of records is squarely at odds with the express purpose of the hearing, which is for Wells Fargo to present evidence of the Loan Documents' authenticity through its expert testimony and custodial witnesses; (2) Slovak is too late in scrutinizing how Hawkins was designated at the November 2018 hearing so the time for any such objection has long passed and is therefore waived; (3) Slovak's argument that Hawkins is unqualified goes only to weight and not admissibility; and (4) Slovak was not denied the right to fully examine Hawkins at the November 2018 hearing. (ECF No. 363.)

On September 1, 2021, the Court held a video status conference where the Court made clear it would not accept any further filings related to the evidentiary hearing, except for finalizing briefing on pending motions, and set clear parameters on the litigation going

1   forward. (ECF No. 362.) Specifically, the Court ordered: (1) that the hearing be held on

2   October 27-28, 2021; (2) that at least one attorney would be required to be present; (3)

3   that no further continuances would be granted; and, (4) no further motions related to

4   issues surrounding the hearing would be accepted. (*Id.*)

5       On September 14, 2021, Slovak filed an objection for district judge review of this

6   Court's September 1, 2021 minute order. (ECF No. 365.) In his objection, Slovak

7   discussed, in part, the "no filings" directive of the minute order, arguing it "not only chills

8   legal advocacy, but it also suppresses it." (*Id.* at 2-3.) The District Court overruled the

9   objection "because a court has inherent authority to manage proceedings before it and

10  Slovak [had] not demonstrated that [this Court] made a clear error in [the] Order." (ECF

11  No. 372.) Upon receiving the District Court's ruling, Slovak filed a notice of appeal with

12  the Ninth Circuit regarding the "no filing" directive in the September 1, 2021 minute order.

13  (ECF No. 375.)[4]

14      On September 22, 2021, the Court granted Wells Fargo's motion to exclude

15  Slovak's disclosed witnesses, finding that Dr. James Kelley, Doug Cobb, Tom Vastrick,

16  Alan Wallace, Robert Ferguson, Catherine O'Mara, Shae Smith, and Kevin Michael

17  Webber would not be permitted to testify. (ECF No. 368.) The Court further denied

18  _____

19  [4]      Notably, in approximately the two months leading up to the September 1 status
    conference, Slovak filed the following documents: (1) motion for clarification and leave to
20  conduct limited pre-evidentiary hearing discovery; (2) motion to shorten time; (3)
    emergency motion to continue the evidentiary hearing; (4) motion to seal and declaration
21  thereto; (5) motion to extend time; (6) motion to exclude Wells Fargo's disclosed witness;
    (7) status report (containing argument and requests for relief); (8) motion for order to
22  lodge original loan documents with Court Clerk pending evidentiary hearing; and (9)
    motion to strike. (ECF Nos. 331, 332, 340, 341, 346, 348, 353, 357, 358, 359,
23  respectively.)

24      Further, despite Slovak's claim to have been enjoined from filing by the supposed
    "no filing" ruling, since September 1, 2021, through the date of the evidentiary hearing on
25  October 27, 2021, Slovak filed: (1) objection to the September 1, 2021 minute order; (2)
    motion for release of funds from court-blocked account to consummate settlement and
26  errata; (3) notice of appeal; (4) notice regarding Plaintiff's availability and intent to file
    reply following pendency of appeal; (5) notice of filing and motion to seal; and (6) objection
27  to October 22, 2021 order. (ECF Nos. 365, 370, 371, 375, 380, 386, 387, 388,
    respectively.)
28

Slovak's motion to exclude Wells Fargo's disclosed witness. (*Id.*) The Court again reiterated that the express purpose of the evidentiary hearing was for Wells Fargo to present evidence of the Loan Documents' authenticity and originality through its custodial witnesses and expert witness. (*Id.*)

On September 28, 2021, Slovak filed a motion for release of funds from the court-ordered blocked account to consummate settlement. (ECF No. 370.) Wells Fargo filed a motion for leave to file its opposition to Slovak's motion for release of funds, (ECF No. 373), in addition to its opposition to the motion. (ECF No. 374.) That same day, Slovak filed a notice of appeal and Ninth Circuit Rule 3-2 representation statement. (ECF No. 375.) The Court granted Wells Fargo's motion for leave to file its opposition and additionally granted leave to Slovak to file a reply in support of his motion on or before October 19, 2021. (ECF No. 377.) In lieu of filing a reply, Slovak filed a document titled: "Notice Regarding Plaintiff's Availability and Intent to File Reply Following Pendency of Appeal." (ECF No. 380.) The Court construed the "notice" as Slovak's reply brief. However, as new issues were raised in the document, the Court ordered Wells Fargo leave to file a response to this document. (ECF No. 381.) Wells Fargo filed that response on October 22, 2021. (ECF No. 382.)

On October 22, 2021, the Court granted, in part, Slovak's motion and allowed him to withdraw his motion to enforce the settlement. (ECF No. 385 at 3.)[5] The Court found that the notice of appeal filed by Slovak did not divest this Court of jurisdiction, as ECF No. 372 was an interlocutory order related to procedural matters in this case and was therefore not a final, appealable order. (*Id.*) Therefore, irrespective of the notice of appeal, the Court stated it would proceed with this case in all respects, including, but not limited to, proceeding with the evidentiary hearing set for October 27- 28, 2021. (*Id.*) The Court denied Slovak's motion in all other respects. Specifically, the Court denied Slovak's request to vacate the evidentiary hearing because Wells Fargo's motion to enforce the

---

[5]    Consequently, Wells Fargo's motion is the only motion outstanding with respect to enforcement of the settlement agreement.

settlement agreement was still pending and needed to be decided. (*Id.*) The Court also denied the motion to the extent it sought release of the settlement funds, as the motion did not affirmatively explain how or when Slovak would "consummate" the settlement. (*Id.*) However, the Court stated that if the parties filed a joint stipulation or agreement indicating that Slovak would accept the documents tendered by Wells Fargo as sufficient to finalize the 2014 settlement agreement prior to the hearing, the Court would convert the scheduled evidentiary hearing to a hearing to finalize the terms of the settlement agreement. (*Id.*)

## II.   EVIDENTIARY HEARING

Ultimately, the second portion of the bifurcated evidentiary hearing took place on October 27, 2021. (ECF No. 392, Hr'g Minutes; ECF No. 400, Hr'g Transcript.) The only issue presented was whether the documents provided by Wells Fargo are the authentic original Loan Documents. Attorneys Kelly Dove and Vance Robert "V.R." Bohman appeared on behalf Wells Fargo. Tory Pankopf appeared on behalf of Slovak. At the hearing, the Court heard testimony from several witnesses related to the chain of custody of the Loan Documents. In addition, Jan Seaman Kelly testified as an expert witness on behalf of Wells Fargo regarding her qualifications and expert opinions with respect to the authenticity and originality of the Loan Documents. (*Id.*)

## III.   FACTUAL FINDINGS

1.     In 2002, Slovak signed a Promissory Note and Deed of Trust with respect to a home equity line of credit he received from Wells Fargo on the subject property in this case.

2.     With respect to the chain of custody of the contested documents, Jodie Hawkins ("Hawkins"), a loan verification consultant for Wells Fargo, testified as the custodian of records for Wells Fargo.

3.     Hawkins testified to the process that takes place after original loan documents are signed and recorded and how Wells Fargo maintains and tracks these original documents after they are received following a loan transaction. (ECF No. 400 at

61:6-14; 61:25-62:5.)

4.      Hawkins testified that Wells Fargo utilizes several internal systems to maintain and track original documents. These internal systems are called ECAR, ICMP, and CRIS. Hawkins explained that ECAR houses loan information, such as balance, interest rates, and notes on the file, such as calls from the borrower and when letters were sent out. (*Id.* at 62:19-24.) ECAR also documents when a loan file is pulled from the vault and where it was sent and when it was received back. (*Id.*) ICMP is the imaging system where original documents are imaged once they are received, it also includes letters that are sent out to the borrower. (*Id.* at 62:35-63:3; 63:14.) CRIS is the system which houses the payment history for loans. (*Id.* at 63:4-5.)

5.      Prior to her testimony, Hawkins reviewed Wells Fargo's internal systems ECAR, ICMP, and CRIS. (*Id.* at 62-63.)

6.      After original loan documents are signed and/or recorded, Hawkins explained that these documents are sent to a secured vault location in Billings, Montana. Upon receipt the documents are imaged, a file is created, and the file and documents placed in a secure vault. (*Id.* at 67:5-14.) A bar code is placed on the outside of the file so it can be scanned, and then the file is put on a shelf in the vault to be housed until the documents need to be pulled again. (*Id.*)

7.      Hawkins testified that the usual circumstances in which original documents are permitted to be removed from the vault are: (1) once a loan is paid in full; (2) during a foreclosure process and certain states, including Nevada, require original documents be used; and (3) during certain litigation, when courts require Wells Fargo to pull the original documents to be brought to court. (*Id.* at 68:14-69:8.) Occasionally, there are one-off circumstances, which require management approval that is documented in the system of record. (*Id.*)

8.      When an original document is removed from the vault, it is documented in Wells Fargo's system of record, ECAR, which also documents where it was sent and when it was received back. (*Id.* at 69:9-14.)

9.     Hawkins testified that the records she reviewed in relation to this case were maintained in the ordinary course of business and the notes or records in Wells Fargo's documents systems that related to these documents were created by a person with knowledge of what they recorded. (*Id.* at 63:16-23.) Further, she testified that the notes were created by a person with a duty to create the records in the ordinary course of business, which would have been created at or near the time of the events they recorded. (*Id.* at 63:24-64:5.)

10.    Specifically, with respect to the documents in this case, Hawkins testified Wells Fargo received the original Note on April 29, 2002, at which time a copy of the original Note was scanned into the imaging system, ICMP. (*Id.* at 64:25-65:10.)

11.    The original Deed of Trust was received by Wells Fargo on August 17, 2002 and imaged into ICMP through the same process. (*Id.* at 65:11-15.)

12.    Hawkins testified that it is common for Wells Fargo to receive a deed of trust later than a note because once a deed of trust is signed, it must be sent to the county to be recorded and there is a delay between the time when they are sent for recording and when they are received back by Wells Fargo. (*Id.* at 65:16-22.)

13.    Hawkins testified that from April 29, 2002, when Wells Fargo first received the original Loan Documents, until April 17, 2013, the Loan Documents had not been removed from the Wells Fargo vault. (*Id.* at 71:4-17.)

14.    Hawkins testified that the original Loan Documents were first pulled from the Wells Fargo vault on April 17, 2013. (*Id.* at 70:25-71:3; 72:25-73:3.)

15.    The Loan Documents were sent to Snell & Wilmer's office in Las Vegas, Nevada. (*Id.* at 71:18-20; 73:6-8.)

16.    Hawkins testified that the Loan Documents were received back by Wells Fargo on May 9, 2013, at which time they were placed back in the original loan file in Wells Fargo's vault. (*Id.* at 71:20-72:8; 73:13-16.)

17.    Hawkins testified that the Note was removed from the Wells Fargo vault on July 31, 2014 and sent to Snell & Wilmer's Las Vegas office. (*Id.* at 72:10-16.) Wells Fargo

has not received the original Note back, after sending it to Snell & Wilmer on July 31, 2014. (*Id.*)

18. On July 28, 2016, the Deed of Trust was removed from Wells Fargo's vault in connection with a state court mandatory mediation, where it was sent to an employee internally. (*Id.* at 74:14-16.)

19. The Deed of Trust was returned to Wells Fargo's vault on May 8, 2017. (*Id.* at 75:14-15.)

20. Next, Hawkins testified that the Deed of Trust was sent from Wells Fargo to Snell & Wilmer on May 7, 2018. (*Id.* at 75:19-76:1.)

21. Wells Fargo has not received the original Deed of Trust back after sending it to Snell & Wilmer on May 7, 2018. (*Id.* at 76:2-5.)

22. Kelly Dove ("Dove"), counsel for Wells Fargo and partner at Snell & Wilmer, testified she first received the Loan Documents from Wells Fargo through Federal Express in April of 2013. (*Id.* at 30:3-4, 30:17-19.)

23. The Loan Documents were returned to Wells Fargo via Federal Express around May 7, 2013. (*Id.* at 31:2-3.)

24. Dove testified that following the settlement conference that took place in this case in June 2014, the Note was sent to Snell & Wilmer from Wells Fargo in early August 2014. (*Id.* at 31:5-11.)

25. The Note was next delivered to the Law Offices of McCarthy & Holthus ("McCarthy Holthus") from Snell & Wilmer, for the purposes of participating in a foreclosure mediation on August 2, 2016. (*Id.* at 31:13-16.)

26. Dove testified that Snell & Wilmer next had the Note in its possession on May 8, 2018, when it was picked up from McCarthy Holthus. (*Id.* at 31:19-22.)

27. Dove testified that Snell & Wilmer received the Deed of Trust from Wells Fargo on May 9, 2018. (*Id.* at 32:4-5.)

28. The Loan Documents were in Dove's personal possession from May 9, 2018, until May 10, 2018, for a hearing with Magistrate Judge Cooke, and Dove then

returned them to her office in Las Vegas. (*Id.* at 32:4-17.)

29.    The Loan Documents were next retrieved on June 8, 2018, when Dr. James Kelley examined the documents. (*Id.* at 32:20-22.)

30.    The Loan Documents were then retrieved again on November 15, 2018, for examination by Jan Seaman Kelly in advance of the November 28, 2018, evidentiary hearing. (*Id.* at 33:2-13.)

31.    When the evidentiary hearing concluded, the documents were returned to the safe in the Snell & Wilmer Reno Office. (*Id.* at 33:15-17.)

32.    The Loan Documents were removed from the safe for one day on December 18, 2018, for Dr. Kelley to conduct an examination in the courthouse. (*Id.* at 33:19-34:6.)

33.    Finally, Dove testified that the documents remained in the safe at the Snell & Wilmer Reno office from December 18, 2018, until October 26, 2021, when she personally retrieved them in preparation for the second portion of the evidentiary hearing held on October 27, 2021. (*Id.* at 34:9-13.)

34.    V.R. Bohman ("Bohman"), partner at Snell & Wilmer, testified he was in possession of the Loan Documents on June 8, 2018, for purposes of supervising the expert review of the documents by Dr. James Kelley. (*Id.* at 42:2-7; 45: 7-9; 43:18-21.)

35.    Next to testify was Lyndsey Luxford, Bohman's legal administrative assistant at Snell & Wilmer. (*Id.* at 47:5-7; 47:19-20.) She stated that while she does not specifically recall handling the Loan Documents, her regular pattern and practice in handling original documents would be to take them from Bohman, and then take them directly to the office administrator/manager, who would lock them in a safe. (*Id.* at 48-50.)

36.    Kristin Shuler-Hintz ("Shuler-Hintz"), managing partner at McCarthy Holthus, testified that she had personal possession of the Note from approximately August 2, 2016, through May 2018, for purposes of the foreclosure mediation. (*Id.* at 53:5-23; 55:2-5.)

37.    Jan Seaman Kelly testified that she had custody of the Loan Documents

from November 15, 2018, through November 27, 2018, when she returned them to Dove. (*Id.* at 117:6-9; 118:5-10.)

38.    Ms. Kelly was also called as an expert witness on behalf of Wells Fargo. First, Ms. Kelly testified about her background, training and experience as a forensic document examiner and expert in rubber stamps. (ECF No. 400 at 92-98.)

39.    Ms. Kelly testified that she is a forensic document examiner with 33 years of experience and has been in private practice since 2017. (*Id.* at 92:11-17.)

40.    Prior to starting her private practice, she worked with the Las Vegas Metropolitan Police Department for 17 years as a document examiner. (*Id.* at 92:16-20.)

41.    Ms. Kelly's training in forensic document examination consisted of completing a two-year formal training program with the U.S. Postal Service in San Bruno, California in 1987 to 1989. (*Id.* at 92:23-93:1.) Additionally, she attended a two-week Secret Service school and two-week FBI school. (*Id.* at 93:3-4.)

42.    She also participates in regular training and workshops with organizations such as the American Academy of Forensic Science and the Southwest Association of Forensic Document Examiners. (*Id.* at 93:4-17.)

43.    Ms. Kelly takes an annual ASCLAD test for questioned document examiners. (*Id.* at 93:25-94:5.)

44.    Ms. Kelly also provides training to other forensic document examiners in the areas of handwriting and examination of rubber stamps. (*Id.* at 94:8-25.)

45.    She possesses a certification as a forensic document examiner from the American Board of Forensic Document Examiners. (*Id.* at 95:6-13.)

46.    Ms. Kelly is a fellow with the American Board of Forensic Document Examiners, QD section, a past member of the American Society of Questioned Document Examiners, and an invited member of the Organization of Scientific Area Committees and American Standards Board. (*Id.* at 95-97.)

47.    Ms. Kelly has published books related to forensic document examination, specifically *The Examination of Rubber Stamps* and *Scientific Examination of Documents*.

16

(*Id.* at 97:24-98:4.)

48.     Ms. Kelly testified that she has conducted and published research on rubber stamp examination, the examination of numbers, and the examination of business writing. (*Id.* at 98:7-10.)

49.     Finally, Ms. Kelly testified that she has testified in state and federal court as an expert witness and has never been excluded as an expert. (*Id.* at 98:11-16).

50.     After detailing her extensive qualifications and experience, Ms. Kelly testified with respect to her expert opinions related the Loan Documents at issue in this case. First, she described how she conducted her analysis and the standards that she applied in reaching her conclusions. Ms. Kelly testified that she conducted her examination using a stereomicroscope and a Video-Spectral Comparator 6000, which is an instrument that has a complete range of infrared and ultraviolet filters to examine inks, paper, and machine-generated text. (*Id.* at 101:10:16.)

51.     Ms. Kelly testified that these instruments and the methodology used for the examination are consistent with the standards in the field of forensic document examination. (*Id.* at 101:17-22.)

52.     Ms. Kelly testified that she was tasked with determining whether the signatures on the Deed of Trust, Note, and Condominium Rider were original signatures and that the documents were not copies, but were indeed, originals. (*Id.* at 99:7-16.)

53.     She testified that she conducted an examination using a stereomicroscope and determined the signatures were wet-inked signatures and not a photocopy of a signature, so they were originals. (*Id.* at 100:2-9.)

54.     While Ms. Kelly testified that based on her stereomicroscope examination, that Slovak's signatures were originals, Ms. Kelly further stated that she decided to conduct a holistic examination of all the documents and while examining the documents she made several observations. (*Id.* at 100:6-12.)

55.     She noted that there were various printing processes on the documents such as: handwritten entries in blue and black ink, indications of gel ink pen and ballpoint

17

pen, color laser printing of the text itself on the documents, a notary stamp that used water-based ink, typewriting at the top of a page that was originally typed text, embossment on the backs of pages, and indentations on the fronts of pages—all of which are indications of original documents. (*Id.* at 100-115.)

56.     Based on her analysis and review of the documents, Ms. Kelly testified that in her expert opinion, the variety and number of types of ink and writing and methods of printing on these documents, as well as an examination of the paper itself, conclusively showed that all facets of the documents are original. (*Id.* at 115-116.)

57.     In sum, after conducting her review of the Loan Documents marked as Exhibits 3, 4, and 5, in her expert opinion, the Loan Documents tendered by Wells Fargo are the original documents signed by Slovak in 2002. (*Id.*)

Importantly—and despite being given every opportunity to do so—Slovak's counsel neither objected to any of the testimony presented nor did he cross-examine any witnesses based on his representation that his client "instructed [him] not to participate in the evidentiary hearing without him being present. . . ." (*Id.* at 25:9-10.) The Court cautioned that if Slovak's counsel proceeded and did not participate, he did so at his "own risk and at Mr. Slovak's own risk." (*Id.* at 25:16-19.)

## III.     CONCLUSIONS OF LAW

The Court must first consider Slovak's oral motion for the Court to make a factual finding regarding whether the documents tendered by Wells Fargo and its counsel are, in fact, the authentic, original Loan Documents. There is no evidence in the record to refute the fact that the tendered documents are not the authentic, originals. Despite this, Slovak argues that even if his expert's opinions and testimony are rejected—which they were— the Court must still make a factual finding that the tendered documents are the authentic originals.

### A.     Credibility of Witnesses

As a preliminary matter, the Ninth Circuit's Model Jury Instructions provide eight factors to take into account when evaluating the credibility of a witness's testimony: (1)

the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's testimony in light of all the evidence; and, (8) any other factors that bear on believability. 9th Cir. Model Jury Instruction No. 1.14, *available at* https://www.ce9.uscourts.gov/jury-instructions/node/55. Applying these factors to the Court's personal observations of Wells Fargo's witnesses, the Court finds Kelly Dove, Vance Robert "V.R." Bohman, Lyndsey Luxford, Kristin Shuler-Hintz, Jodie Hawkins, and Jan Seaman Kelly, and the testimony they provided to the Court, to be credible.

### B.    Admission of Exhibits 3, 4, and 5 into Evidence

At the conclusion of the bifurcated evidentiary hearing, the Court took under submission a motion made by Wells Fargo to admit Exhibits 3, 4, and 5—which are the Deed of Trust, Promissory Note, and Condominium Rider—into evidence. (ECF No. 400 at 119-120.) Federal Rule of Evidence 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

A witness does not have to be the custodian of documents offered into evidence to establish Rule 803(6)'s foundational requirements. *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (citing *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1991). "The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." *Ray*, 930 F.2d at 1370.

The Court finds that Hawkins is familiar with the contents and preparation of

Exhibits 3, 4, and 5, and thus, she is an appropriate witness to lay the foundation for admission of the Loan Documents under the business records exception to the hearsay rule. Slovak's counsel did not object to any of the testimony provided by Hawkins. Accordingly, Exhibits 3, 4, and 5—the Deed of Trust, Note, and Condominium Rider—are admitted into evidence under the business records exception to the hearsay rule.

Pursuant to Federal Rule of Evidence 901, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. To satisfy the authentication requirement, Wells Fargo put on a series of witnesses to first establish the usual practice of Wells Fargo in handling original loan documents, as well as witnesses with personal knowledge as to the chain of custody of the documents at issue. *See* Fed. R. Evid. 901(b)(1) (testimony of a witness with knowledge who provides testimony that an item is what it is claimed to be, satisfies the authentication requirement). Slovak's counsel did not object to any of the testimony provided.

The testimony of the witnesses regarding the chain of custody of the Loan Documents was as follows: Wells Fargo received the original Note on April 29, 2002. (ECF No. 400 at 64:25-65:10.) Wells Fargo received the original Deed of Trust on August 17, 2002. (*Id.* at 65:11-15.) When Wells Fargo first received the original Loan Documents, until April 17, 2013, the Loan Documents had not been removed from the Wells Fargo vault. (*Id.* at 71:4-17.)

The original Loan Documents were first pulled from the Wells Fargo vault on April 17, 2013, when they were sent through Federal Express to Snell & Wilmer's office in Las Vegas, Nevada. (*Id.* at 70:25-71:3; 72:25-73:3; 71:18-20; 73:6-8; 30:3-4, 30:17-19.) The Loan Documents were returned to Wells Fargo via Federal Express around May 7, 2013. (*Id.* at 31:2-3.) The Loan Documents were received back by Wells Fargo on May 9, 2013, at which time they were placed back in the original loan file in the Wells Fargo vault. (*Id.* at 71:20-72:8; 73:13-16.)

Following the settlement conference that took place in this case in June 2014, the

Note was removed from the Wells Fargo vault on July 31, 2014 and sent to Snell & Wilmer's Las Vegas office. (*Id.* at 31:5-11; 72:10-16.) Wells Fargo has not received the original Note back, after sending it to Snell & Wilmer on July 31, 2014. (*Id.*)

The Note was next delivered to the McCarthy Holthus from Snell & Wilmer, for the purposes of participating in a foreclosure mediation on August 2, 2016. (*Id.* at 31:13-16.) Shuler-Hintz had personal possession of the Note from approximately August 2, 2016, through May 2018, for purposes of the foreclosure mediation. (*Id.* at 53:5-23; 55:2-5.) Snell & Wilmer next had the Note in its possession on May 8, 2018, when it was picked up from McCarthy Holthus. (*Id.* at 31:19-22.)

On July 28, 2016, the Deed of Trust was removed from Wells Fargo's vault in connection with a state court mandatory mediation, where it was sent to an employee internally. (*Id.* at 74:14-16.) The Deed of Trust was returned to the Wells Fargo vault on May 8, 2017. (*Id.* at 75:14-15.)

The Deed of Trust was sent from Wells Fargo to Snell & Wilmer on May 7, 2018. (*Id.* at 75:19-76:1.) Wells Fargo has not received the original Deed of Trust back after sending it to Snell & Wilmer on May 7, 2018. (*Id.* at 76:2-5.) Snell & Wilmer received the Deed of Trust from Wells Fargo on May 9, 2018. (*Id.* at 32:4-5.)

The Loan Documents, collectively, were in Dove's personal possession from May 9, 2018, until May 10, 2018, for a court hearing, and Dove then returned them to the Snell & Wilmer office in Las Vegas. (*Id.* at 32:4-17.)

The Loan Documents were next retrieved on June 8, 2018, when Dr. Kelley examined the documents. (*Id.* at 32:20-22.) Bohman was in possession of the Loan Documents on June 8, 2018, for purposes of supervising the expert review of the documents, after which they were returned to Snell & Wilmer's safe. (*Id.* at 42:2-7; 45: 7-9; 43:18-21; 47:5-7; 47:19-20; 48-50.)

The Loan Documents were retrieved again on November 15, 2018, for examination by Ms. Kelly in advance of the November 28, 2018 evidentiary hearing. (*Id.* at 33:2-13.) Ms. Kelly had custody of the Loan Documents from November 15, 2018 through

November 27, 2018, when they were returned to the safe in Snell & Wilmer's Reno office. (*Id.* at 117:6-9; 118:5-10; 33:15-17.)

The Loan Documents were removed from the safe for one day on December 18, 2018, for Dr. Kelley to conduct an examination in the courthouse. (*Id.* at 33:19-34:6.) The Loan Documents remained in the safe at the Snell & Wilmer Reno Office from December 18, 2018, until October 26, 2021, when Dove personally retrieved them in preparation for the second portion of the evidentiary hearing held on October 27, 2021. (*Id.* at 34:9-13.)

Based on the testimony provided at the evidentiary hearing, the Court finds the witnesses have personal knowledge of the chain of custody of the Loan Documents and further finds that based upon the witnesses' personal knowledge, Exhibits 3, 4, and 5, are the same documents signed by Slovak in 2002.

Additionally, the Court personally reviewed the documents and found that the exhibit stickers that were placed on the exhibits in November 2018 were consistent with what the stickers were at that time. (*Id.* at 35:10-14.) Further, upon the Court's personal observation and examination of the documents, there is no indicia that Exhibits 3, 4, and 5 are not authentic originals based upon the stickers, notary stamps, pen markings, and staple holes on the documents.

Further, the documents are self-authenticating based upon the declarations submitted by Kelly Dove, Kristin Shuler-Hintz, and Shae Smith. (*See* ECF Nos. 223-10, 223-11, 223-12.) Also, under Nevada law, documents accompanied by a certificate of acknowledgment of a notary public or officer authorized by law to take acknowledgments are presumed to be authentic. NRS 52.165; *see also Einhorn v. BAC Home Loans Servicing*, 128 Nev. 689, 697, 290 P.3d 249, 254 (2012) (holding that a document that includes an acknowledgment before a notary public "carries a presumption of authenticity," which makes it self-authenticating.). Thus, the Loan Documents are presumed to be authentic, as they are notarized documents.

For all these reasons, Wells Fargo has adequately established that Exhibits 3, 4, and 5 are the same documents signed by Slovak in 2002, based upon the chain of

custody of these documents from the time of their signing to the final evidentiary hearing held on October 27, 2021.

### C.    Expert Testimony – Jan Seaman Kelly

Prior to considering the proffered expert opinion of Ms. Kelly, the Court must first determine whether this expert and her opinions satisfy the requirements set forth in Rule 702 and *Daubert* and its progeny.

Federal Rule of Evidence 702 governs the admission of expert testimony and evidence. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

"Faced with a proffer of expert scientific testimony, the court must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This usually entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 589. Under Rule 702, the Court has discretion as a "gatekeeper to decide what evidence is relevant, reliable, and helpful to the trier of fact." *Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 961 (9th Cir. 1998).

In exercising its gatekeeping function, the Court must first determine whether the expert is qualified. To make this determination, the Court considers whether the individual has sufficient "knowledge, skill, experience, training or education" in the subject matter of their alleged expertise. Fed. R. Evid. 702. This qualification standard is meant to be broad and to seek a minimal foundation justifying the expert's role as an expert. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (internal quotations and citations omitted).

If the expert is deemed qualified, the Court must then consider the reliability of the expert's opinions and conclusions. *Daubert*, 509 U.S. at 593-94. The Supreme Court articulated several factors in *Daubert* that courts should consider in exercising this function. These factors include: (1) whether the theory, technique, and background knowledge the expert applies is generally accepted in the relevant scientific community; (2) whether the research supporting the expert's conclusion has been subjected to peer review and publication; (3) whether the expert's theory can be and has been tested; (4) whether standards exist to control the operations of the expert's methods; and (5) whether the known or potential rate of error is acceptable. *Daubert*, 509 U.S. at 593-94. The inquiry, however, is a flexible one, with the focus solely on the principles and methodology used, not on the conclusions they generate. *Id.* at 594; *see also Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (the district court is "both authorized and obligated to scrutinize carefully the reasoning and methodology" underlying the expert's testimony.).

Furthermore, it is "very significant" whether the expert is testifying "about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for the purpose of testifying." *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 777 (D. Ariz. 2017) (*citing Daubert v. Merrell Down Pharm.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). If the opinion is produced for litigation, the proffering party must provide "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles,'" such as peer review. *Id.* In assessing reliability, a court may peek beyond an expert's methodology to their conclusion where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### 1.    Ms. Kelly's Qualifications

Ms. Kelly has the requisite knowledge, skill, experience, training, and education to be deemed an expert in the field of forensic document examination and analysis pursuant to Rule 702 and *Daubert*.

First, Ms. Kelly has been employed as a forensic document examiner for more than 33 years. (ECF No. 400 at 92:11-18; *see also* ECF No. 245, Att. 3 at 1.) She currently owns her own company, Forensic Dynamics, LLC, in which Ms. Kelly continues to work as a consultant and expert witness in the area of forensic document examination and footwear impression examinations, and prior to that she was employed by the Las Vegas Metropolitan Police Department. (ECF No. 400 at 92:11-18.)

Ms. Kelly's initial training as a forensic document examiner consisted of two years of training by the United States Postal Crime Laboratory in San Bruno, California, between 1987 and 1989. (*Id.* at 92:21-93:1) She has attended courses in forensic document examinations provided by the United States Secret Service and the FBI. (*Id.* at 93:3-8.) Ms. Kelly has passed various annual proficiency exams in forensic document examination and participated in extensive ongoing educational classes related to forensic document examinations. (*Id.* at 93:3-94:5.)

Ms. Kelly has been certified by the American Board of Forensic Document Examiners since 1993. (*Id.* at 95:1-13.) She is also affiliated with several professional organizations related to forensic document examination and rubber stamps. (*Id.* at 95:14-97:1.) Her affiliation with these organizations includes several leadership positions. (*Id.*) In addition, Ms. Kelly has founded training organizations on forensic document examination, provided several training seminars for forensic document professionals and on the topics of rubber stamps, and has published on the topics of document forensic examinations and rubber stamp examinations. (*Id.* at 94:13-25; 97:22-98:12.) In addition, Ms. Kelly testified that she has received several awards related to her work as a forensic document examiner. (*Id.* at 97:11-21.) Finally, Ms. Kelly testified that she has testified in state and federal court as an expert witness and has never been excluded as an expert. (*Id.* at 98:11-16).

Based on the above, the Court finds Ms. Kelly is qualified as an expert in forensic document examinations and rubber stamps. Further, at the evidentiary hearing, the Court found that pursuant to Rule 702 and the *Daubert* standards, Ms. Kelly was qualified as

an expert in forensic document examinations and rubber stamp examinations. (ECF No. 400 at 98:22-25.)

### 2. Reliability

During her testimony, Ms. Kelly described how she conducted her analysis and the standards that she applied in reaching her conclusions. Ms. Kelly testified that she conducted her examination using a stereomicroscope and a Video-Spectral Comparator 6000, which is an instrument that has a complete range of infrared and ultraviolet filters to examine inks, paper, and machine-generated text. (ECF No. 400 at 101:10:16.) Ms. Kelly testified that these instruments and the methodology used for the examination are consistent with the standards in the field of forensic document examination. (*Id.* at 101:17-22.)

While examining the documents, Ms. Kelly noted that there were printing processes on the documents such as handwritten entries in blue and black ink, gel ink pen, ballpoint pen, color laser printing of the text itself of the documents, a notary stamp which was water-based stamp ink, typewriting at the top of the page that was originally typed text, emboss on back of page and indentations on front of page, all of which are indications of original documents. (*Id.* at 100-115.)

Based on her analysis and review of the documents, Ms. Kelly testified that in her expert opinion, the variety and number of types of ink and writing and methods of printing on these documents, as well as an examination of the paper itself, conclusively showed that all facets of the documents are original. (*Id.* at 115-116.) In sum, after conducting her review of the Loan Documents marked as Exhibits 3, 4, and 5, in her expert opinion, the Loan Documents tendered by Wells Fargo are the original documents signed by Slovak in 2002. (*Id.*)

A review of Ms. Kelly's use and application of these standards, in addition to her testimony at the evidentiary hearing, are reliable and appropriate in reaching her expert opinions under these circumstances. Therefore, Ms. Kelly's expert opinions and report are admissible under Rule 702 and *Daubert* and the Court finds Ms. Kelly's expert

opinions to be accurate. The Court finds that the opinions of Ms. Kelly also establish that these documents are the originals signed by Slovak in April of 2002. Therefore, the only admissible evidence in the record establishes that the documents tendered by Wells Fargo—Exhibits 3, 4, and 5—are, in fact, the authentic original Deed of Trust, Note, and Condominium Rider.

### D.   Wells Fargo's Motion to Enforce Settlement Agreement

Settlement agreements are governed by the law of the forum state. *United Commercial Ins. Serv. Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Under Nevada law, a settlement agreement is a contract, and general contract principles govern the interpretation and enforcement of such agreements. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). A contract is valid and enforceable under Nevada law if there has been "an offer and acceptance, meeting of the minds and consideration." *Id.*

For all the reasons discussed above, and after thoroughly reviewing the evidence presented in this case, and the testimony provided at the November 28, 2018, and October 27, 2021, evidentiary hearings, the Court finds that the documents tendered by Wells Fargo, and that have been admitted in this case as Defense Exhibits 3, 4, and 5, are the **authentic original** Promissory Note, Deed of Trust, and Condominium Rider signed by Slovak in 2002. This finding is supported by evidence related to the chain of custody of the documents, as well as the expert testimony of Wells Fargo's expert, Jan Seaman Kelly.

Because the Court finds that the Loan Documents proffered by Wells Fargo are the authentic original documents, the Court finds that the parties are able to consummate the settlement agreement as contemplated in June 2014 and indicated by the Ninth Circuit. Accordingly, the Court recommends that Wells Fargo's motion to enforcement settlement agreement be **GRANTED**.

### IV.   CONCLUSION

For good cause appearing and for the reasons stated above, the Court recommends that Wells Fargo's motion to enforce settlement agreement be **GRANTED.**

The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V.    RECOMMENDATION

Based on the Court's finding that the Loan Documents are the authentic originals, **IT IS HEREBY RECOMMENDED** that Wells Fargo's motion to enforce settlement be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that if the District Court accepts and adopts this Report and Recommendation, within thirty days of such order, a subsequent order be issued with instructions on how the parties will consummate the settlement agreement.

**DATED**: ___December 3, 2021___ .

_____
**UNITED STATES MAGISTRATE JUDGE**